**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | | |
|---|---|---|
| JAMES EDWARD ("Dusty") BROGDON, Jr., | * | |
| as Executor of the Estate of Debra Sue Mills, | * | |
| deceased, and JAMES EDWARD BROGDON, Jr., | * | |
| and RONALD BRIAN ("Rusty") BROGDON, | * | |
| Individually and as surviving children of | * | CIVIL ACTION FILE |
| Debra Sue Mills, | * | |
| | * | NO. |
| and | * | |
| | * | |
| JAMES EDWARD BROGDON, Jr., | * | |
| as Executor of the Estate of Herman Edwin Mills, | * | |
| deceased, and JASON EDWIN MILLS, | * | |
| Individually and as surviving child | * | |
| of Herman Edwin Mills, | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| | * | |
| v. | * | |
| | * | |
| FORD MOTOR COMPANY, | * | JURY TRIAL DEMANDED |
| | * | |
| | * | |
| Defendant. | * | |

**COMPLAINT FOR PERSONAL INJURIES and for
<u>WRONGFUL DEATHS and PUNITIVE DAMAGES</u>**

Plaintiff James Edward "Dusty" Brogdon, Jr. as Executor of the Estates of Mrs. Debra

Sue Mills and Mr. Herman Edwin Mills; James Edward Brogdon, Jr. and Ronald Brian "Rusty"

Brogdon, individually and as surviving children of Mrs. Debra Sue Mills; and Jason Edwin

Mills, individually and as surviving child of Mr. Herman Edwin Mills, file this their Complaint

for personal injuries to their parents and for the wrongful deaths of their parents and show this

Honorable Court the following:

## I.      INTRODUCTION

1.

Mrs. Debra Mills and her husband Mr. Herman Mills were both injured by the defective roof on their 2015 Ford F250 "Super Duty" truck.  The roof crushed down on top of them after the truck rolled over one half time and ended up on its roof.

2.

Debra and Herman Mills had been married for 30 years and were inseparable.

3.

Debra Mills suffered pain and the likely knowledge that death was imminent before dying at the scene of the wreck as a result of the injuries caused by roof crush.  Herman Mills lingered for nine painful days at a hospital before dying as a result of the injuries caused by roof crush.

4.

Mr. and Mrs. Mills left behind their three sons, three daughters-in-law, eight grandchildren aged 7 to 27, nine siblings, and a host of dear friends.

5.

The wreck occurred in Decatur County, Georgia.  This lawsuit is filed here, in Columbus, Georgia, because both Debra Mills and Herman Mills designated that their son Dusty Mills should serve as the Executor of their Estates in the event both of them died, and Dusty Mills lives in Cataula just outside of Columbus. M.D. Ga. L.R. 3.4.

6.

Ford sold over 5.2 million "Super Duty" trucks with virtually identical roofs, from model year 1999 through model year 2016. The "Super Duty" trucks included "F250s," "F350s," "F450s," and "F550s."

7.

Ford has known for over 20 years that the roofs of those "Super Duty" trucks were dangerously weak, defective, and deadly, and were killing and maiming innocent American citizens.

8.

The defective and dangerously weak roofs on Ford's 1999 model year through 2016 model year "Super Duty" trucks have killed, paralyzed, or severely injured hundreds, if not thousands, of American citizens.

9.

Ford has refused to state how many American citizens have been killed or maimed as a result of roof crush after a rollover wreck involving the subject "Super Duty" trucks.

10.

It is estimated that Ford has been sued over 200 times as a result of roof crush in its "Super Duty" trucks after a rollover wreck.  Ford settled all of those lawsuits, except for three cases Ford picked to take to trial.

11.

It is quite possible that no automotive defect in history other than the "sidesaddle" gas tanks in the "C/K" trucks manufactured by General Motors has resulted in more lawsuits and more victims than the roof crush defect in Ford's "Super Duty" trucks.

3

12.

On Friday August 19, 2022 a jury in Gwinnett County, Georgia imposed $1.7 billion in punitive damages against Ford because of the roof crush defect in the "Super Duty" trucks. The case was *Hill v. Ford Motor Company*, Case. No. 16-C-04179-S2 (State Ct. of Gwinnett County, Georgia).  The victims were Voncile and Melvin Hill, farmers from Macon County Georgia, who were occupants of a 2002 model year Ford F250 "Super Duty" truck that rolled over in Sumter County, Georgia on April 3, 2014.

13.

***Three days later***, on Monday, August 22, 2022, Mr. and Mrs. Mills were severely injured when their 2015 model year Ford F250 "Super Duty" truck rolled over in Decatur County, Georgia.

14.

During the litigation of the *Hill* case and during the trial of that case Ford had, through its official corporate representative, insisted there was nothing at all wrong with the subject roof and that the roof was "*absolutely safe*."

15.

Ford's public response to the *Hill v. Ford* verdict imposing punitive damages against Ford was to claim that the subject roof is "*reasonably safe*." Despite over 200 lawsuits and many Americans killed or severely injured, Ford claimed "the safety record is strong."

16.

After the *Hill v. Ford* verdict, Ford also claimed that the subject roof was "the strongest in its class."  However, it is undisputed—from Ford's own document—that the subject roof was the weakest roof in Ford's entire fleet of cars and trucks. Plaintiffs' Exhibit 164 in *Hill v. Ford*:

4



17.

After the verdict in *Hill v. Ford*, Ford Motor Company did not accept any responsibility, refused to admit the subject roofs were defective, did not warn anyone of the danger, and did not recall the defective trucks.

18.

These are photographs of Mr. and Mrs. Hills' 2002 model year  Ford F250 "Super Duty" truck after the roof crush that killed Mr. and Mrs. Hill on April 3, 2014:





19.

These are photographs of Mr. and Mrs. Mills' 2015 model year Ford F250 "Super Duty" truck after the roof crush that killed Mr. and Mrs. Mills on August 22, 2022:





20.

The photographs of those "Super Duty" trucks shown above do not show the full extent of the intrusion of the roof into the occupant compartment; the intrusion was greater than the photographs indicate.  It is the nature of metal that the dynamic crush exceeds the static crush— the metal roof rebounds from the full extent of the crush that occurs in the rollover wreck.

21.

The damage to the roof and the intrusion of the roof into the occupant compartment of the truck is very similar in both wrecks. In both wrecks the roofs of the trucks were crushed and collapsed down into the passenger compartment.

22.

There are literally dozens of wrecks known to Ford where there was similar roof crush in the Ford "Super Duty" trucks and resultant deaths or injuries to occupants.

23.

In the *Hill v. Ford* trial, the Court admitted into evidence 79 other incidents, as substantially similar wrecks with roof crush (other similar incidents, known as "OSIs") where people were killed or injured.

24.

In every one of those OSIs the roof was crushed and intruded into the passenger compartment.

25.

Ford has refused to state how many substantially similar wrecks are known to Ford.

26.

Not later than the year 2000 Ford was on actual notice from other similar wrecks involving roof crush in the "Super Duty" trucks with injuries and/or deaths that the dangerously weak roofs in its "Super Duty" trucks were killing and maiming Americans in rollover wrecks.

27.

Ford absolutely knew that the roofs on the "Super Duty" trucks were dangerously weak and defective.

28.

The jury in the *Hill* trial found there was "clear and convincing evidence" that Ford's conduct amounted to "willful misconduct," *or* "wantonness," *or* "that entire want of care that would raise the presumption of conscious indifference to the consequences."

29.

The *Hill v. Ford* case was first tried in 2018, but Ford was so certain a substantial punitive damages verdict would result it deliberately caused a mistrial.  That misconduct earned Ford issue preclusion sanctions.  Despite those sanctions, at the second trial in 2022 Ford was allowed to present any evidence it wanted to present claiming that the roof was not defective or claiming that roof crush supposedly doesn't cause injuries, in an attempt to persuade the jury that punitive damages should not be imposed.

30.

Given an opportunity during the 2022 trial of *Hill v. Ford* to present evidence that the subject roof was not defective and dangerously weak, *Ford elected not to call to the witness stand* a single Ford engineer who was involved in the design of the subject roof or of the five-

times-stronger roof for the "Super Duty" trucks designed in 2006 (but not used in a "Super Duty" truck until the 2017 model year).

31.

Ford's own documents prove that Ford knew that roof crush is deadly, and that Ford knew the importance of building roofs that would hold up in a rollover wreck, and that Ford knew how to build safe roofs.

32.

*Ninety years ago,* in 1933, Ford created a video of a Model A Ford automobile being rolled down a hill where it rolled over seven times, after which the roof was totally intact:[1]



---

[1] The full video is available to download and view in the following Dropbox link:
https://www.dropbox.com/sh/zti7bmd6ht9fk9l/AAD2XBzyvCrrimS9NQnunQB9a?dl=0.

33.

*Sixty two years ago*, in 1961, Ford created a video of a crash test involving a 1961 Mercury Comet manufactured by Ford, in which the car rolled over two times with two roof impacts:[2]



34.

In that 1961 Comet rollover crash test, there was no collapse of the roof.  In that crash test the dummies occupying the front seat were restrained only by seat belts—without shoulder belts.  The seat belts held them in their seats—without any so-called "diving" into the roof. Ford's narrator for the video of the 1961 Comet rollover crash test stated: "Both drivers hold their seated positions and neither driver is thrown forcibly against the interior of the car." "Landing on the roof for the second time without any collapse of the structure or injury to the

_____

[2] The full video is available to view and download in the following Dropbox link: https://www.dropbox.com/sh/zti7bmd6ht9fk9l/AAD2XbzyvCrrimS9NQnunQB9a?dl=0

passengers." "Even after 2 complete rolls full protection of the passengers is provided by the roof structure."

35.

In 2006, fearing that the federal government might finally replace the minimum standard for roof strength that then dated from 1971 and apply that increased minimum standard to heavy duty trucks such as the Ford "Super Duty," Ford assembled a team of roof engineers to design an all-new roof for the "Super Duty" trucks.

36.

Ford called the roof redesign project the "Enhanced Roof Strength Program for Super Duty Trucks" ("ERSP").

37.

The reason the ERSP Team was tasked with designing an all-new far stronger roof for the "Super Duty" trucks was captured in a memorandum written by a member of that team, which noted that it was important to design such a stronger roof because of lawsuits filed against Ford as a result of roof crush during rollover wrecks in the "Super Duty" trucks.

38.

In about sixteen months the "ERSP" Team of Ford roof engineers completed the design of an all-new roof that was five times as strong as the existing roof on Ford's "Super Duty" trucks—*and was cheaper to build.*  The new roof that Team designed was five times stronger than the roof in the "Super Duty" trucks owned by Mr. and Mrs. Hill and by Mr. and Mrs. Mills.

39.

Ford knew what a great design the ERSP Team's roof was—Ford gave that Team the "Henry Ford Technical Excellence Award" for their work.

40.

Ford did not use that five-times-stronger roof on the "Super Duty" trucks for eleven years—until the 2017 model year.

41.

Instead of using that five-times-stronger roof in its "Super Duty" trucks, Ford lobbied the federal government agency NHTSA[3] not to apply a stronger minimum federal roof strength standard to the heavy trucks for several years.

42.

Ford did, however, put the stronger ERSP roof in its best-selling F150 pickup trucks, starting in 2009, upgraded further in 2011, and finally the full five-times-stronger ERSP roof was put in the 2015 model year F150.

43.

Ford did *not* put the five-times-stronger roof in Mr. and Mrs. Mills' 2015 F250 "Super Duty" truck.

44.

Obviously in a rollover wreck the heavier "Super Duty" truck needs a stronger roof more than does the lighter F150 light duty truck.

45.

Ford has never offered any explanation or excuse for its failure to install the five-times-stronger roof in the "Super Duty" trucks for which it was designed.

46.

Ford did not warn anyone that the "Super Duty" truck roof was dangerously weak.

---

[3] National Highway Traffic Safety Administration.

47.

Ford did not warn anyone that a five-times-stronger roof was available for the "Super Duty" trucks and was both economically and technologically feasible.

48.

In 2009, an automotive components supplier of airbags and seat belts named Autoliv did a full-scale rollover crash test for Ford, paid for by Ford, testing a "Super Duty" truck.  A Ford engineer who was a member of the ERSP Team has admitted under oath that in the test the roof collapsed.   That was three years after the ERSP Team had designed the five-times-stronger roof for the "Super Duty" trucks.  That was 13 years before Mr. and Mrs. Mills were injured by roof crush.

49.

That Autoliv crash test in 2009 was more evidence known to Ford that the "Super Duty" roof was deadly dangerous.

50.

Yet Ford executives still refused to put the five-times-stronger roof in the "Super Duty" trucks.

51.

Ford built and sold the 2015 F250 in which Mr. and Mrs. Mills were riding on August 22, 2022 with the weak roof instead of the five-times-stronger ERSP roof.

52.

The strength of a roof is typically measured by what is called the "strength to weight" ratio, or "SWR."

53.

Ford has in the past claimed that when the 1999-2016 "Super Duty" trucks were being built and sold, Ford's own internal minimum standard for SWR was 1.8.

54.

According to calculations made by Ford's own engineer, Hikmat Mahmood, Ph.D., a member of the ERSP Team, the SWR of the 1999-2016 "Super Duty" truck roof was 1.1.

55.

According to Ford's own Chief Global Safety Engineer Steven Kozak the SWR of the 1999-2016 "Super Duty" truck roof was 1.2.

56.

From 1998 until 2010 Ford Motor Company owned Volvo, which was then a division of Ford Motor Company.

57.

The ERSP Team used the Volvo XC90 roof as the "benchmark" for its strategy to design the five-times-stronger roof for the "Super Duty" truck.

58.

When the ERSP Team was designing the all-new five-times-stronger roof for the "Super Duty" truck, the internal standard for roof strength of Ford's Volvo division was 3.5 SWR.

59.

Despite its own 1.8 SWR standard and the 3.5 SWR standard of its Volvo division, and despite the ERSP Team having designed a five-times-stronger roof for the "Super Duty" trucks with a SWR of 5.85, Ford kept right on building and selling to American citizens those "Super Duty" trucks with a SWR of only 1.1 or 1.2.

15

60.

By contrast, for the 2015 model F150, Ford used the ERSP Team roof, with a roof strength of 5.85 SWR.

61.

After 2015, lawsuits continued to be filed against Ford alleging deaths and injuries caused by roof crush in rollover wrecks of Ford "Super Duty" trucks with the weak roof.

62.

By contrast, Ford has admitted that it does not know of a single lawsuit filed against Ford alleging death or injury caused by roof crush in rollover wrecks of the 2015 model year or later F150 with a roof strength of 5.85 SWR.

63.

The F250 "Super Duty" truck Ford sold to Mr. and Mrs. Mills was a 2015 model year truck, with a roof strength of no more than 1.2 SWR.

64.

The original roof for the new version of the "Super Duty" trucks that were planned for sale as the 1999 model year trucks was designed in the 1994-1995 time frame.

65.

After that roof had been designed, an edict came from Ford executives for "cost containment."

66.

In compliance with that edict, Ford removed components from and reduced the size of metal components in the already-designed roof for the "Super Duty" trucks.

16

67.

The removal of metal from the roof made the roof weaker.

68.

After "cost containment" resulted in a weaker roof, Ford itself never conducted any physical testing of the strength of the roof.

69.

Ford engineers have admitted the roof on the "Super Duty" trucks could have been five times stronger.

70.

Ford's own designated corporate representative has admitted under oath in *Hill v. Ford* that the "cost containment" measure for the roof saved Ford $100 per truck. Ford sold 5.2 million of the 1999-2016 "Super Duty" trucks, generating an additional $520 million in profit.

71.

Ford has no defense to the claim that the roofs on 5.2 million "Super Duty" trucks it sold from 1999 through 2016 are defective.

72.

The Insurance Institute for Highway Safety (IIHS) is an independent group formed and funded by liability insurance companies with the intent of reducing deaths and injuries in wrecks.

73.

Since 2009, IIHS has required that a roof have a roof strength of at least 4.0 SWR to qualify for a "good" safety rating.

74.

All automakers have scrambled to increase the roof strength in their vehicles to obtain the "good" safety rating for roof strength, with one exception: Ford made no such attempt until it did so for the 2017 model year "Super Duty" trucks.

75.

Ford has never explained why it dawdled in increasing roof strength on its heavy trucks—which obviously need stronger roofs more than lighter vehicles.

76.

Ford has never explained why it continued to build and sell its "Super Duty" trucks with a roof strength of only 1.1 SWR (or 1.2, depending on which Ford engineer's calculations one uses)—the weakest in Ford's fleet of cars and trucks—contrary to the IIHS standard, contrary to Ford's own supposed internal standard, contrary to the standard of Ford's own Volvo division, and despite installing the five-times-stronger roof in its best-selling F150 trucks.

77.

That vehicles will be involved in rollover wrecks was and is foreseeable to Ford.

78.

That a roof crushing into the occupant space of a vehicle during a rollover wreck can cause injuries and can kill was and is foreseeable to Ford.

79.

The roof crush that occurred in the August 22, 2022 wreck that caused fatal injuries to Mrs. Debra Mills and Mr. Herman Mills was foreseeable to Ford.

80.

The roof crush that occurred in the August 22, 2022 wreck that caused fatal injuries to Mrs. Debra Mills and Mr. Herman Mills *was actually foreseen by Ford*—because Ford was on notice it had happened so many times before, and Ford had been sued for that happening so many times before.

81.

The roof crush that occurred in the August 22, 2022 wreck that caused fatal injuries to Mrs. Debra Mills and Mr. Herman Mills was avoidable: Ford had known how to prevent that roof crush *for decades.* Not only that—Ford's own ERSP Team had taught Ford specifically how to avoid that dangerous roof crush nine years before Ford built the 2015 F250 Ford sold to Mr. and Mrs. Mills, and sixteen years before Mr. and Mrs. Mills were fatally injured.

82.

Ford knew, and knows, that it is imperative to design an occupant protection system within a vehicle that will provide survival space within the vehicle in the event of a rollover wreck.

83.

Ford's dangerously weak and defective roof killed Mrs. Debra Mills.

84.

Ford's dangerously weak and defective roof killed Mr. Herman Mills.

85.

Ford's response to allegations that the roofs on its 1999-2016 "Super Duty" trucks are defective and dangerously weak is to claim that everyone else is wrong—Congress, NHTSA, IIHS, and even Ford's own engineers.

86.

It is an absolute certainty that more American citizens, unaware of the danger posed by the subject roof because Ford continues to protest it is "absolutely safe" and refuses to warn of the danger, will be killed, paralyzed, and otherwise severely injured in rollover wrecks of the 1999-2016 Ford "Super Duty" trucks where the roof crushes down on them.

87.

Undisputed evidence admitted in the *Hill v. Ford* trial established that Ford's revenues for the past four years averaged $145 billion; its net worth was at least $57 billion; and as a matter of policy Ford retained cash or cash equivalents each year of some $20 billion.

88.

It seems self-evident that a punitive damages award of $1.7 Billion was insufficient to cause Ford to accept responsibility and to cause Ford to warn American citizens of the danger of riding in a 1999-2016 "Super Duty" truck.

89.

Something drastic and dramatic has to be done to make Ford stop the line of victims that continues every year—as is proved by the fatal injuries inflicted upon Mr. and Mrs. Mills just three days after the *Hill* verdict.

**II.    FORD's "DIVING" ARGUMENT**

90.

Rather than attempt to defend weak roofs like those in the subject "Super Duty" trucks, Ford has for many years attempted to argue, through its lawyers and paid professional testifiers, that "roof strength doesn't matter" because in a rollover wreck occupants supposedly 'dive' into

Case 4:23-cv-00088-CDL   Document 1   Filed 05/23/23   Page 21 of 34

the roof in the nanosecond before the roof crushes down on top of them, and it is that "diving"

that causes injury, not the roof crush.

91.

That argument was based on some so-called "studies" done by persons who are recidivist

testifiers for automakers in roof crush cases, most notably Kenneth Orlowski.

92.

At the *Hill v. Ford* trial in 2022, Ford had every opportunity to present that "diving"

argument, but elected not to present as witnesses any of the authors of those so-called "studies,"

despite the fact Orlowski was listed by Ford as one of its expert witnesses for the *Hill v. Ford*

trial.

93.

In *Hill v. Ford* the court ruled that those so-called "studies" about "diving" could be

presented in evidence, *if* Ford showed that actual roof engineers at Ford ever relied on them.

94.

At the *Hill v. Ford* trial, Ford elected not to call to the witness stand a single Ford

engineer who was involved in the design of the subject roof or the five-times-stronger ERSP roof

to testify that actual Ford roof engineers ever relied on such so-called "studies" in designing

roofs for Ford vehicles, or, for that matter, had ever even heard of that "diving" argument.

95.

In *Hill v. Ford,* plaintiffs took the testimony of six actual Ford roof engineers, by

videotaped deposition.  Ford's lawyers were present.  Not one of those six Ford engineers

testified that he had ever even heard of that "diving" argument, much less relied on that

argument or the "studies" upon which it was supposedly based.

96.

Ford's "diving" argument has been rejected by the U.S. Congress, and by NHTSA, and

has been mocked by the liability insurers' automotive safety organization, IIHS.

97.

That 'diving' argument is, of course, contrary to law as well as common sense. As Judge

William P. Adams wrote in 2013 regarding that Ford argument:

> Defendant Ford's position in this case, described by Defendant Ford as counterintuitive,
> is that a stronger car roof does not necessarily reduce the risk of injury in a rollover
> accident. Given that Federal Motor Vehicle Safety Standard number 216, "Roof crush
> resistance", has as its purpose "to reduce death and injuries due to the crushing of the
> roof into the occupant compartment in rollover crashes", 49 CFR 571.216 (S2) *Defendant*
> *Ford's position could be described as something other than counter-intuitive.*

8/20/13 Order Granting Plaintiffs' *Daubert* Motion Challenging Ford Expert Testimony

Regarding Crown Victoria "CRIS" Testing, p. 2, *Hatfield v. Ford Motor Co.*, Case No. 77639

(State Ct. Bibb County) (emphasis added).

98.

Ford's "diving" argument was made up by testifiers and lawyers to attempt to defend roof

crush cases and to try to convince NHTSA not to increase the federal minimum standard for roof

strength.

99.

Of course, if Ford ever actually believed that 'diving' argument, it obviously had a duty

to prevent such injurious 'diving.' Ford never attempted to do so.

**III.     PARTIES, JURISDICTION, AND VENUE**.

100**.**

Plaintiff James Edward Brogdon, Jr. the duly-appointed Executor of the Estates of both

Mrs. Debra Mills and of Mr. Herman Mills and a surviving child of Mrs. Debra Mills, is a

resident of Cataula, Harris County, Georgia.  Plaintiff Ronald Brian Brogdon, a surviving child of Mrs. Debra Mills, is a resident of Climax, Decatur County, Georgia.  Plaintiff Jason Edwin Mills, surviving child of Mr. Herman Mills, is a resident of Wewahitchka, Gulf County, Florida.

101.

Defendant Ford Motor Company ("Ford") is a foreign corporation organized and existing under the laws of Delaware with its principal place of business located at One American Road, Dearborn, Michigan 48126. Ford is engaged in the business of designing, manufacturing, marketing, distributing, and selling vehicles in the State of Georgia, throughout the United States, and elsewhere.

102.

Ford markets its vehicles extensively in the State of Georgia and urges Georgia citizens to buy its vehicles through television, radio, print media, and direct mail. Ford dealerships sell and repair vehicles under Ford warranties in the State of Georgia. Ford distributes replacement parts to dealers and independent automotive shops in the State of Georgia.

103.

The truck that killed Mrs. Debra Mills and Mr. Herman Mills was sold to them, as a new truck, by Ford through its dealer in Georgia.

104.

Ford is subject to the jurisdiction of this Court because it transacts business in this state and maintains a registered agent in this state. Ford's registered agent in Georgia is: The Corporation Company, 106 Colony Park Drive, Suite 800-B, Cumming, Georgia 30040, where it may be served with legal process.

105.

This Court has original jurisdiction under the provisions of 28 U.S.C. §1332, as complete diversity exists between the parties and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

106.

Venue is proper in this District because the wreck that caused the injuries that resulted in the deaths of Mrs. Debra Mills and Mr. Herman Mills occurred in this District.

107.

Venue is proper in this Division under M.D. Ga. L.R.3.4 because Plaintiff James Edward "Dusty" Brogdon, Jr., the duly-appointed Executor of both Estates and a surviving child of Mrs. Debra Mills, resides in this Division, 18 miles from the United States Courthouse in Columbus, Georgia.

108.

All material witnesses have agreed to come to the trial of this case in Columbus, Georgia and are otherwise available for depositions and as needed during this litigation.

## IV.    LIABILITY OF FORD MOTOR COMPANY

### COUNT ONE

### (Negligence and Strict Liability)

109.

Plaintiffs re-allege and reincorporate Paragraphs 1 through 108 as if fully set forth herein verbatim.

110.

The subject truck was designed, manufactured, marketed, and distributed by Ford.

111.

Ford had a duty to exercise reasonable care to design, engineer, test, manufacture, inspect, and sell safe vehicles so as not to subject consumers or motorists to an unreasonable risk of harm.  Ford breached its duty to exercise reasonable care with respect to the subject truck.

112.

The subject truck, when distributed and sold by Ford, had a defectively designed occupant protection system, which caused the roof crush in the subject wreck.

113.

The defective design of the occupant protection system and of the roof proximately caused the injuries to and deaths of Mrs. Debra Mills and Mr. Herman Mills.

114.

Despite Ford's knowledge that the occupant protection system must be designed so as to maintain survival space in the event of a foreseeable rollover, Ford made the decision to build the subject truck with a dangerously weak roof structure in order to cut costs and increase Ford's profits.

115.

Ford failed to design an occupant protection system that would maintain the survival space for the occupants in the event of a foreseeable rollover, despite the fact that it was both technologically feasible and economically practicable to design such an occupant protection system.

116.

There is no doubt that prior to the manufacture of the 2015 Ford F250 in which Mr. and Mrs. Mills were riding on August 22, 2022, it was technologically feasible for Ford to design and

manufacture a roof that would not crush down in a rollover to the extent that the roof on Mr. and Mrs. Mills' Ford F250 did.

117.

There is no doubt that designing a stronger, safer roof for the 2015 Ford F250 was economically practicable—the five-times-stronger ERSP Team roof was cheaper to manufacture than the weak roof Ford elected to put in that truck.

118.

Ford elected not to implement technologically feasible, economically practicable, and fundamentally safer alternative designs for the occupant protection system on the subject truck.

119.

Ford has never explained why it failed to use, until the 2017 model year, the five-times-stronger ERSP roof in the "Super Duty" trucks after that stronger roof had been designed by the ERSP Team *specifically for* the "Super Duty" trucks.

120.

Ford instead elected to use in the 2015 F250 truck an occupant protection system that it already knew would result in roof crush in foreseeable rollover wrecks, causing injuries and deaths.

121.

At the time Ford designed, manufactured, distributed, and sold the subject vehicle, Ford knew from, among other things, its own studies, testing, and other incidents involving the same or similar vehicles and roof designs, that the subject vehicle and its roof would fail in foreseeable conditions with catastrophic consequences to the occupants of the vehicle.

122.

Ford's negligence and wanton and reckless misconduct proximately caused the injuries to, and deaths of, Mrs. Debra Mills and Mr. Herman Mills.

123.

Ford is strictly liable in tort for the injuries to, and deaths of, Mrs. Debra Mills and Mr. Herman Mills.

124.

Ford is liable for the design defects in the subject vehicle under O.C.G.A. § 51-1-11 because the risks inherent in the design of the subject vehicle outweighed any utility of the chosen design, thereby rendering the vehicle not reasonably suited to the use for which it was intended.

**COUNT TWO**

**(Ford's Failure to Warn)**

125.

Plaintiffs re-allege and reincorporate Paragraphs 1 through 124 as if fully set forth herein verbatim.

126.

As a manufacturer of vehicles distributed and sold to the public, Ford had and has a duty to warn the public about dangers it knows exists in its vehicles.

127.

Ford failed to warn of the dangers of the subject truck, either prior to, during, or after the sale of that truck to Mr. and Mrs. Mills.

128.

By failing to warn of the danger, Ford breached its duty and obligations to the consuming public, including Mrs. Debra Mills and Mr. Herman Mills.

129.

Ford's election not to warn of the known defective and unreasonably dangerous conditions in the subject truck proximately caused the injuries to, and deaths of, Mrs. Debra Mills and Mr. Herman Mills.

130.

Plaintiffs are entitled to recover damages from Ford as a result of its failure to warn pursuant to O.C.G.A. § 51-1-11 and other applicable law.

## COUNT THREE

### (Punitive Damages Against Ford)

131.

Plaintiffs re-allege and reincorporate Paragraphs 1 through 130 as if fully set forth herein verbatim.

132.

*Before* it built and sold the 1999-2016 "Super Duty" trucks, Ford knew that the occupant protection system design for the subject truck was defective and unreasonably susceptible to roof crush in foreseeable rollover accidents.

133.

*After* it designed, built, and sold "Super Duty" trucks with the subject roof, Ford was repeatedly put on notice that citizens claimed the occupant protection system of the 1999-2016 "Super Duty" trucks was defective and unreasonably susceptible to roof crush in foreseeable

rollover accidents.

134.

At the time it manufactured all those 5.2 million "Super Duty" trucks with the subject roof and at all times since then, Ford has had actual knowledge from, among other things, its notice of real world incidents involving those trucks and the laws of physics, that when the occupant protection system was and is defective and unreasonably dangerous, occupants are highly vulnerable to being killed or injured in foreseeable rollover wrecks.

135.

Despite its knowledge of the danger, Ford consciously designed, built, and sold the 1999-2016 "Super Duty" trucks with a defective occupant protection system.

136.

By the time it built and sold to Mrs. Debra Mills and Mr. Herman Mills the subject 2015 Ford F250 truck, Ford absolutely knew that the roof on that truck was defective and dangerously weak.

137.

By the time it built and sold to Mrs. Debra Mills and Mr. Herman Mills the subject 2015 Ford F250 truck, Ford had gained actual knowledge that the roof on that truck was defective and dangerously weak from lawsuits, from its own settlement of lawsuits, and from its own engineers.

138.

Ford's misconduct was a wanton and reckless disregard for the lives and wellbeing of untold numbers of victims, including Mrs. Debra Mills and Mr. Herman Mills and other citizens.

139.

Ford has been guilty of wanton and reckless misconduct, and such an entire want of care as to raise the presumption of conscious indifference to the consequences.

140.

Ford's misconduct is so aggravating it authorizes, warrants, and demands the imposition of substantial punitive damages against Ford pursuant to O.C.G.A. § 51-12-5.1.

## COUNT FOUR

### (Attorneys' Fees and Expenses of Litigation)

141.

Plaintiffs re-allege and reincorporate Paragraphs 1 through 140 as if fully set forth herein verbatim.

142.

Ford has acted in bad faith, has been stubbornly litigious, and has caused the Plaintiffs unnecessary trouble and expense, such that Plaintiffs are entitled to recover from Ford all of Plaintiffs' costs of litigation, including attorneys' fees and expenses, pursuant to O.C.G.A. § 13-6-11.

143.

The entire history of Ford's attempts to 'defend' the subject roof proves that Ford will once again assert frivolous claims and arguments, whereupon post-verdict Plaintiffs will make a motion for general damages, including but not limited to attorneys' fees and expenses of litigation, pursuant to O.C.G.A. § 9-11-68(e).  *Showan v, Pressdee*, 922 F. 3d 1211 (11th Cir. 2019).

## V.   DAMAGES SOUGHT

### 144.

Plaintiffs re-allege and reincorporate Paragraphs 1 through 143 as if fully set forth herein verbatim.

### 145.

The damages claimed by Plaintiffs were proximately caused by the tortious acts and omissions of Ford, for which Ford is liable.

### 146.

Plaintiffs James Edward Brogdon, Jr., Ronald Brian Brogdon, and Jason Edwin Mills, as surviving children of Mrs. Debra Mills and Mr. Herman Mills, claim the following damages:

(a)   compensatory damages for the wrongful death of Mrs. Debra Mills, the measure of which under Georgia law is the full value of the life of Mrs. Debra Mills to herself as though she had survived and lived and not been killed;

(b)   compensatory damages for the wrongful death of Mr. Herman Mills, the measure of which under Georgia law is the full value of the life of Mr. Herman Mills to himself as though he had survived and lived and not been killed;

(c)   attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11 and O.C.G.A. § 9-11-68(e).

### 147.

Plaintiff James Edward Brogdon, Jr. as Executor of the Estate of Mrs. Debra Mills, claims the following damages suffered by Mrs. Debra Mills:

(a)   shock, fright, and terror Mrs. Debra Mills experienced prior to and during the time of the subject wreck up until her death;

(b)    all elements of the mental and physical pain and suffering endured by Mrs. Debra Mills from the time of the subject wreck and up until her death;

(c)    funeral and burial expenses;

(d)    punitive damages to punish and deter Ford pursuant to O.C.G.A. § 51-12-5.1; and

(e)    attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11  and O.C.G.A. § 9-11-68(e).

148.

Plaintiff James Edward Brogdon, Jr. as Executor of the Estate of Mr. Herman Mills, claims the following damages suffered by Mr. Herman Mills:

(a)    shock, fright, and terror Mr. Herman Mills experienced prior to and during the time of the subject wreck up until his death;

(b)    all elements of the mental and physical pain and suffering endured by Mr. Herman Mills, from the time of the subject wreck and up until his death;

(c)    funeral and burial expenses;

(d)    punitive damages to punish and deter Ford pursuant to O.C.G.A. § 51-12-5.1; and

(e)    attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11 and O.C.G.A. § 9-11-68(e).

## VI.   PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for the following relief:

(a)    That summons issue requiring defendant to appear as provided by law to answer this Complaint;

(b)     That service be had upon defendant as provided by law;

(c)     That Plaintiffs have a trial by jury;

(d)     That Plaintiffs have and recover all compensatory damages recoverable under Georgia law as set forth above;

(e)     That the Court impose punitive damages against Ford with respect to the claim brought against Ford for the Estate of Mrs. Debra Mills;

(f)     That the Court impose punitive damages against Ford with respect to the claim brought against Ford for the Estate of Mr. Herman Mills;

(g)     That the Court require that Ford pay all of Plaintiffs' expenses of litigation, including attorneys' fees; and

(h)     For such other and further relief as the Court shall deem just and appropriate.

Respectfully submitted, this 23rd day of May, 2023.

/s/ James E. Butler, Jr.
JAMES E. BUTLER, JR.
Georgia Bar No. 099625
jim@butlerprather.com
RAMSEY B. PRATHER
Georgia Bar No. 658395
ramsey@butlerprather.com
DANIEL E. PHILYAW
Georgia Bar No. 877765
dan@butlerprather.com

BUTLER PRATHER LLP
105 13th Street
Post Office Box 2766
Columbus, GA 31902
(706) 322-1990

LARAE DIXON MOORE
Georgia Bar No. 223379
lmoore@pagescrantom.com

PAGE SCRANTOM SPROUSE TUCKER &
FORD
1111 Bay Avenue 3rd Floor
P.O. Box 1199
Columbus Georgia 31902
(706) 324-0251