IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| JAMES EDWARD ("Dusty") BROGDON, Jr., as Executor of the Estate of Debra Sue Mills, deceased, and JAMES EDWARD BROGDON, Jr., and RONALD BRIAN ("Rusty") BROGDON, Individually and as surviving children of Debra Sue Mills, and JAMES EDWARD BROGDON, Jr., as Executor of the Estate of Herman Edwin Mills, deceased, and JASON EDWIN MILLS, Individually and as surviving child of Herman Edwin Mills, <br><br> Plaintiffs, <br><br> v. <br><br> FORD MOTOR COMPANY, <br><br> Defendant. | CIVIL ACTION FILE <br> NO. 4:23-cv-00088-CDL |

**PLAINTIFFS RESPONSE TO DEFENDANT FOR MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. 52)**

I. **Introduction**

Plaintiffs respectfully refer the Court to, and incorporate herein, the "introduction" to Plaintiffs' response to Ford's other motion for partial summary judgment, regarding punitive damages. Doc. 78. Plaintiffs do note that none of Ford's arguments, in either motion (Docs. 52

1

and 53), even mention the claims for wrongful death, pain and suffering, and punitive damages brought as a result of injuries to and the death of Mr. Herman Mills.

## Argument and Authority

**II.     There is no credible evidence to support Ford's claim Mrs. Mills was unconscious before the roof crushed down on her.[1]**

Ford bears the burden of proving at this stage the absence of any genuine issue of material fact regarding Ford's claim that Mrs. Mills was in fact unconscious before that roof crushed down on her. Doc. 52-1 at 2–5. *Collins v. GKD Mgmt., LP*, 697 F. Supp. 3d 1308, 1316 (N.D. Ga. 2023) (Batten, J.). Ford cannot do that. The law is, of course, clear: a jury may "infer" consciousness from facts proved.[2]

**A.  The evidence establishes that Mrs. Mills was conscious when the roof crushed down on her.**

There is simply no doubt Mrs. Mills, the driver of the Ford truck, was conscious. *See* Plaintiffs' Statement of Material Facts ("Pls.' SOMF") (contemporaneously filed) ¶¶ 9–30, 71–76. The truck's own "Infotainment" system recorded that she drove from Donalsonville, Georgia to the scene of the wreck on Lake Douglas Drive, driving through Bainbridge, without mishap. Pls.' SOMF ¶ 16; Ex. 37 – Buchner Aff. ¶¶ 11–14 (referring to data downloaded from the truck's

---

[1] Ford asserts that there is no evidence that anything other than driver error caused the Mills' truck to leave the road. This case is about roof crush—whether the truck roof was designed to protect its inhabitants, or whether it was just an umbrella to keep the rain off. *Why the truck left the road has nothing to do with that question.*

[2] *See Cannon v. Barnes*, 357 Ga. App. 228, 229 (2020) ("the jury may infer such consciousness from evidence immediately prior to impact or following her injury"); *Mascarenas v. Cooper Tire & Rubber Co.*, 643 F. Supp. 2d 1363, 1376 (S.D. Ga. 2009) (same); *Monk v. Dial,* 212 Ga. App. 362 (1994) (holding jury could award damages for pain and suffering because plaintiff submitted evidence vehicle veered sharply before the accident and jury could extrapolate consciousness from circumstances).

"Infotainment" system on July 11, 2024.[3]  This data is consistent with the testimony of eyewitnesses Jimmy Lee Cooper and Anthony Harrison, who attest that prior to the wreck Mrs. Mills was driving in a normal fashion at a reasonable speed.  Pls.' SOMF ¶ 17; Ex.38 – Cooper Aff. ¶ 2; Ex. 33 – Harrison Aff. ¶¶ 4,5

When the truck left the roadway, Mrs. Mills actively steered sharply to the left—back toward the roadway.  The steering input was 60 degrees.[4]  She then steered to the right, apparently in an attempt to avoid hitting a telephone pole.  Pls.' SOMF ¶¶ 13–14; Doc. 62 – Buchner Exp. Rep. at 4.[5]  **These are facts—not opinions.**  These facts are derived from the truck's "black box," which Plaintiffs' accident reconstruction expert refers to as the "ACM" and Ford's expert refers to as the "EDR."  Ex. 37 – Buchner Aff. ¶¶ 3–10.

The *undisputed* autopsy results[6] prove there was no physiological reason to think Mrs. Mills was unconscious before the roof crushed down on her.  Pls.' SOMF ¶ 18; Ex. 1 – Eisenstat

---

[3] The data from the "Infotainment" system was not available when Plaintiffs' expert reports were due on February 15, 2024.  That data was downloaded, at Ford's insistence and with the agreement of Plaintiffs' counsel, on July 11, 2024, by Plaintiffs' experts and Ford's experts.  Ex. 37 – Buchner Aff. ¶ 11.

[4] *See* Ex. 37 – Buchner Aff., Exhibit 1 ("steering animation") and Exhibit 3 (showing the 60-degree steer to the left, back toward the road.)

[5] "The Ford ACM recorded that the driver released the accelerator, was actively steering left then right traveling along the grassy swale and approaching the driveway but not braking (Figure 5.) . . .
As the vehicle traveled along the swale, the truck was pointed at a telephone pole and at this time, the driver steered right, such that the vehicle was not aligned with the telephone pole any longer."  Doc. 62 – Buchner Exp. Rep. at 4.

[6] *Dr. Eisenstat's autopsy reports for Mrs. Mills and for Mr. Mills are undisputed.*  Ford's expert Dr. Downs—who was present for the autopsies—does not dispute Dr. Eisenstat's report and testimony that the autopsy revealed nothing to indicate Mrs. Mills might have been unconscious before the roof crushed down on her.  Doc. 71 – Downs' Exp. Rep.  In his deposition, Dr. Sochor confessed, "I'm basing my conclusion on the autopsies that were performed.  The autopsy that was performed in the—there."  Doc. 73 – Sochor Dep. at 242/4–6.  (The autopsies were

Exp. Rep. at 2, 11, 12; Doc. 66 – Eisenstat Dep. at 74/14-16, 75/1–5, 102/1–7, 102/14–16, 103/4–5 ("to me, more likely than not, she is still conscious after the vehicle lands on its roof"), 103/21–22 ("there absolutely is no reason for her to be unconscious").

Eyewitnesses at the scene of the wreck before Mrs. Mills died who saw her in the upside-down truck—including two state troopers and Mr. Harrison, who is a registered nurse—attest that the roof was crushed down on her (she was "bent over nearly double") and she was "having difficulty breathing." Pls.' SOMF ¶¶ 9–12. Mr. Harrison testified that Mrs. Mills "was shaking and was moving her legs slowly. Her eyes were open and bloodshot. She was folded in half pretty bad with the roof pressing down on her. She was having difficulty breathing. I determined that Mrs. Mills had a faint pulse."[7] *Id.* ¶ 10(b).[8]

---

performed by Dr. Eisenstat.) (To explain how Dr. Downs happened to be present for the autopsies—prior to the autopsies, Plaintiffs' counsel wrote to Ford's General Counsel inviting Ford to send someone to witness the autopsies. Ford sent Dr. Downs, a pathologist.) *See also* Ex. 68 – Lewis Rebuttal Rep. at 2, ¶ 7 ("Nowhere in Camacho's [one of Ford's experts] opinions is there any criticism of Dr. Eisenstat's, the pathologist who performed the autopsy on Mrs. Mills for the plaintiffs, autopsy findings or his ruling of the cause of death as 'positional asphyxia with her blunt impact injuries contributing…'").

[7] Georgia State Trooper Brian Palmer testified that, when he cut Mrs. Mills' seatbelt to remove her, she was so tightly constrained, "her legs [were by that time] bent up kind of almost in a fetal position," *that she did not shift or move at all.* Pls.' SOMF ¶10(e); Doc 56 - Palmer Dep. 33/19–24; 56:8–14.

[8] Even without the irrefutable facts that Mrs. Mills drove for an hour to the scene of the wreck without mishap and then steered twice when the truck left the road, this eyewitness testimony alone is enough to defeat Ford's motion—without Plaintiffs' medical evidence, which is *also* dispositive. *See Collins v. GKD Mgmt., LP*, 697 F. Supp. 3d 1308, 1331 (N.D. Ga. 2023) (Batten, J.) (holding that a witness's report that the decedent had been moving was enough to prevent summary judgment on pain and suffering, despite a medical expert's opinion that those movements were unconscious, reflex actions); *Holland v. Cypress Ins. Co.*, No. 2:17-CV-120-RWS, 2020 WL 5742250, at *9 (N.D. Ga. Aug. 21, 2020) (Story, J.), *aff'd in material part, attorneys' fees award vacated, remanded*, No. 20-13538, 2022 WL 1499593 (11th Cir. May 12, 2022)) (holding that some evidence that a decedent "moaned" while lying face down precluded summary judgment as to post-impact pain and suffering, despite there being no expert testimony on whether that moan was a conscious act.)

### B. Ford's "sudden cardiac event" argument is pure speculation.

Ford has come up with a theory that Mrs. Mills suffered a "sudden cardiac event"[9] that caused her to run off the road and rendered her unconscious before the roof crushed down on her.[10] That theory came from one of Ford's "LECs" ("lawyer-expert conferences") for this case held by Ford lawyers and possible experts.[11] Based entirely on that theory, Ford argues that Mrs. Mills suffered no conscious pain and suffering, meaning her Estate is not entitled to recover compensatory or punitive damages. Doc. 52-1 at 2 ("Mrs. Mills was unconscious before the crash and never regained consciousness.").[12]

---

[9] Doc. 71 – Downs Exp. Rep. at 1, 22.

[10] Doc. 71 – Downs Exp. Rep. at 1, 22; Doc. 70 – Sochor Exp. Rep. at 13; Doc. 72 – Downs Dep at 150/1–10, 149/5–11 (when the roof crushed down on her "I think she was already dead, so she couldn't be conscious"); Doc. 73 – Sochor Dep. at 265/4–6 ("What caused her death was a cardiac dysrhythmia"), 267/2–3 ("that would explain why she suddenly didn't control her car, let it drive off the road, didn't have any input"). Of course, Dr. Sochor's testimony about Mrs. Mills not having "any input" is contradicted by the irrefutable facts revealed by the truck's black box showing volitional steering 58 degrees left, back to the road, then when that failed, to the right. Doc. 62 – Buchner Exp. Rep. at 4; Ex. 37 – Buchner Aff. ¶¶ 3–10.

[11] Ford expert Dr. Sochor admitted that the idea Mrs. Mills "was having some kind of dysrhythmia prior to leaving the road" came up at one of the LEC's (lawyer-engineering conferences) held by Ford's lawyers and possible experts." Doc. 73 – Sochor Dep. at 102/13-103/3. *See also id.* at 99/11-13 (at one of the LECs, "I discussed the injuries especially with Jamie Downs and discussed the injuries with Dr. Camacho."). Reference is made to "possible experts" (Doc. 73 – Sochor Dep. at 102/13-103/3) because not all the regular Ford testifiers who attended the LECs have been named as experts for Ford in this case. For example, Dr. Elizabeth Raphael, who has testified about biomechanics for Ford some fifty times and who inspected the Mills truck (*id.* at 105/23-25), was present for the LECs about this case (*id.* at 102/10-16, 103/9-12) but is not named as an expert for Ford in this case. Instead of Raphael handling the biomechanics chore for Ford in this case, Dr. Sochor is designated to do that. Dr. Sochor hasn't kept track of how many times he testified for Ford. *Id.* at 51/8–55/3. Ford also had several other regular testifiers inspect the Mills truck but did not name them as expert witnesses: Greg Miller, Michael Leigh (whose affidavit Ford has filed, Doc. 77), Bob Pascarela, and Eric Kalis.

[12] Ford's testifiers disagree about what the supposed "cardiac event" was. Ford's Dr. Downs testified that it was his opinion that the "enlarged heart" itself caused a "heart attack" on the day

5

Ford's "sudden cardiac event" theory is based entirely on Ford expert Dr. James Downs' claim that Mrs. Mills had a "very, very significantly enlarged heart" (Doc. 72 – Downs Dep. at 150/12–13) *and* Ford expert Dr. Mark Sochor's claim that "*looking through her medical records, she suffered from dysrhythmia for decades.*" Doc. 73 – Sochor Dep. at 266/22–24 (emphasis added).[13] The medical records and testimony of Mrs. Mills' prior treating physicians refute Ford's claims of a "very enlarged heart" and "dysrhythmia for decades." Moreover, they refute any idea Mrs. Mills had a "cardiac condition" and disprove Ford's "sudden cardiac event" theory.

Mrs. Mills' cardiologist, Dr. William Ellis of Thomasville (now retired), was deposed by Ford lawyer Boorman, at Ford's request, on July 17, 2024. He treated her off-and-on for many years. Pls.' SOMF ¶ 22; Ex. 40 – Dep. of William Ellis, M.D. at 84/2–10. Mrs. Mills' internist, Dr. Sydney Cochran of Bainbridge, was deposed by Ford lawyer Wright, at Ford's request, on July 16, 2024. Dr. Cochran treated Mrs. Mills for "several years." Pls.' SOMF ¶ 22; Ex. 41 – Cochran Dep. at 12/18–21.

Contrary to Ford's claim that Mrs. Mills had a "very, very significantly enlarged heart," Dr. Ellis testified that references to heart size in the medical records showed her heart size was

---

of the wreck. Doc. 72 – Downs Dep. at 152/7–12. Ford's Dr. Sochor disagrees: "I didn't say she had a heart attack. I said she had a dysrhythmia . . ." Doc. 73 – Sochor Dep. at 267/18–19; 268/6-7 ("dysrhythmia is different than a heart attack"). Dr. Sochor claims that because of the "dysrhythmia" Mrs. Mills "doesn't react" to the truck running off the road—"doesn't do anything,"—and that is what led Ford's expert witnesses to claim "she was having a medical event." Doc. 73 – Sochor Dep at 102/24–103/3. That claim is of course disproved by the irrefutable "black box" evidence that Mrs. Mills steered 58 degrees to the left—back toward the road, and then to the right. Pls.' SOMF ¶¶ 13–14; Ex. 37 – Buchner Aff. ¶ 9; Doc. 62 – Buchner Exp. Rep. at 4.

[13] Notably, Dr. Sochor admitted that the word "dysrhythmia" does not appear in his expert report. Doc. 73 – Sochor Dep. at 268/23–269/10. That is consistent with his testimony that this "dysrhythmia" idea came from one of Ford's LECs. *See* n. 11.

"normal" and that he did not see any indication by any treating physician that she had a "very significantly enlarged" heart. Pls.' SOMF ¶ 23; Ex. 40 – Ellis Dep. at 90/18–22.[14] Dr. Cochran *also* testified there was no indication of that in any of the medical records he reviewed. Pls.' SOMF ¶ 26; Ex. 41 – Cochran Dep. at 112/10–113/3.[15] Ford's representation that "all the medical experts agree that Mrs. Mills had an enlarged heart" is erroneous.[16]

Contrary to Ford's claim that Mrs. Mills "suffered from dysrhythmia for decades," cardiologist Dr. Ellis testified that he saw "no significant evidence of any problems with her heart" except for tachycardia (occasional fast heart rate) which "was controlled by medication." Pls.' SOMF ¶¶ 27–29; Ex. 40 – Ellis Dep. at 84/2–10, 84/23–85/6. Her heart rate was normal "for the most part," except "I think there might have been one [medical record] that heart rate was 111 or something like that" which is "a little high." *Id.* at 87/1–7. Mrs. Mills' heart rate "was not dangerous." *Id.* at 91/8–17. That tachycardia did not ever pose the risk of sudden death. *Id.* at 85/7–15, 86/14. Dr. Ellis testified that Mrs. Mills "did not have coronary disease.

---

[14] The referenced medical records included PX 348, Debra Mills' medical records from Dr. Ellis' firm, Cardiovascular Consultants of South Georgia; and PX 349, Debra Mills' Medical Records from Dr. Roy Reardon of Colquitt, Georgia.

[15] The records referred to were Dr. Cochran's own records, including 27 exhibits Ford's lawyer put in the Record. Pls.' SOMF ¶ 26; Ex. 41 – Cochran Dep. at 12/22–13/8.

[16] For that representation, Ford cites, *inter alia*, "Deposition of Jonathan Eisenstat at 80/15." Doc. 52-1 at 5. That is a misrepresentation. *See* Doc. 66 – Eisenstat Dep at 80/15 ("a little bit enlarged"); 81/6 ("slightly enlarged"); 144/6 ("mildly enlarged"); 151/1–3 ("probably at the upper level of normal."). Dr. Eisenstat testified that he did not reference her "slightly enlarged" heart in his report because that "didn't play a role in her death. *Id.* at 150/11–13. After getting grilled about Ford's "very significantly enlarged claim" in his deposition, Dr. Eisenstat researched the matter and found that her heart was in the upper range of normal. Ex. 39 – Eisenstat Aff. ¶ 10).

We know that." *Id.* at 66/1–5; *id.* at 65/7–12.  Her minor chest pain was "atypical," which means "we did not think she had coronary disease." *Id.* at 44/10–22.

*Asked directly by Ford lawyer Boorman to agree that* "the fact that she had that 20-year history [of tachycardia] increases her risk of having sudden death from a cardiac event; doesn't it?", Dr. Ellis refuted that statement:

> A: Actually, it—it's the reverse for me. It would reassure me that this was quite benign.
> MR. BUTLER: Quite what?
> THE WITNESS: Quite benign if she'd gone, you know, 21 years, you know, with minimal symptoms over that period of time.

*Id.* at 67/15–23.[17]  Dr. Cochran *also* testified that he saw no reference to dysrhythmia in Mrs. Mills' medical records.  Ex. 41 – Cochran Dep. at 113/8–114/21.[18]

Plaintiffs' expert Dr. Eisenstat concurs with the testimony of Mrs. Mills' prior treating physicians, based upon his own review of Mrs. Mills' prior medical records.  Pls.' SOMF ¶¶ 74, 75, 76; Ex. 39 – Eisenstat Aff. ¶¶ 4, 6, 9, 10.  Dr. Eisenstat has testified, "I find no support anywhere for Ford's 'sudden cardiac event' theory." *Id.* ¶ 11.

---

[17] Dr. Ellis testified that Mrs. Mills' "minor chest pain complaint" *was not a "cardiac symptom"*. *Id.* at 19/8–9; 43/22–44/9 ("all the EKGs that we had run that I saw in the records were all normal and with normal rates over the -- over the preceding 20 years, 21 years or so;" *Id.* at 84/15-22 (ditto)); *id*. at 87/15-17 ("the resting EKGs were always normal."). *Dr. Ellis wrote in his medical records "this is not a cardiac symptom"* meaning "I did not think the pain was originating from the heart." *Id*. at 90/6–10 (emphasis added).

[18] Dr. Cochran also testified that a stress test she had two years before her death was "normal." *Id.* at 92/17–19.  Dr. Cochran testified that he had treated many members of her family and none of them had significant coronary issues, including Mrs. Mills' mother, who lived "into her 90s." *Id.* at 118/6–18.

Dr. Ellis testified it was "very unlikely" Mrs. Mills had a "cardiac moment" that caused her to go off the road. Pls.' SOMF ¶ 71; Ex. 40 – Ellis Dep. at 65/14–25, 67/5–14.[19] Dr. Cochran also testified it was "not likely" that Mrs. Mills suffered a "sudden cardiac event" which rendered her unconscious and caused her to run off the road so that she was unconscious when the roof crushed down on her. Pls.' SOMF ¶ 72; Ex. 41 – Cochran Dep. at 115/22–116/23. Dr. Eisenstat has testified that Mrs. Mills was "clearly conscious." Pls.' SOMF ¶¶ 18, 73.

The testimony of those physicians is consistent with (while Ford's speculation is inconsistent with) *the irrefutable facts* that Mrs. Mills drove without mishap for an hour from Donalsonville to the scene of the wreck and the truck's "black box" shows that after the truck ran off the road, Mrs. Mills steered sharply to the left—back toward the road.

There is not merely a jury question about Ford's "unconscious" claim—there's a real question whether Ford's speculation is admissible in evidence at all. It will be the subject of a motion in limine. There should be limits beyond which a party cannot simply make things up.[20]

Given all the evidence contrary to Ford's claim Mrs. Mills was "unconscious" before the roof crushed down on her—from scene witnesses, from Mrs. Mills' two independent prior

---

[19] Ford will in its reply brief surely make references to Dr. Ellis' comment that Plaintiffs' counsel suggested what would be "good for his client." Plaintiffs offer this anticipatory response: Dr. Ellis affirmed that he had never spoken to Plaintiffs' counsel Mr. Butler nor "laid eyes" on him before the week prior to Dr. Ellis' deposition, and Dr. Ellis' testimony was not affected by anything Mr. Butler said. Ex. 40 – Ellis Dep. at 96/3–14.

[20] The evidence that Mrs. Mills endured conscious pain and suffering is compelling. Dr. Eisenstat has opined that Mrs. Mills died from "positional asphyxia" as a result of being pinned between the crushed roof and her seat. Pls.' SOMF ¶¶ 93, 95, 100; Ex. 1 – Eisenstat Exp. Rep. at 2, 10. "Positional asphyxia deaths . . . would take at least many seconds to minutes before becoming unconscious and at least minutes before death." Ex. 1 – Eisenstat Exp. Rep. at 12. Mrs. Mills "experienced conscious pain and fear" as well as "the fear of impending doom as she asphyxiated while being crushed between the collapsed roof and her seat." *Id.* at 2, 11.

treating physicians (and from the medical records of a third, Dr. Reardon), and from Dr. Eisenstat—Ford's argument that it is entitled to judgment as a matter of law is frivolous.

### III. Ford seeks summary judgment about a claim not made—there is no separate restraint system defect claim to strike.[21]

Ford asks that the Court strike a claim Plaintiffs never made. Doc. 52-5 ("the separate defect allegations encompassing the restraint system [seat belt] in the 2015 F-250 should be stricken."). This is a roof defect case.[22] Doc. 1, ¶ 1 ("Mrs. Debra Mills and her husband Mr. Herman Mills were both injured *by the defective roof* on their 2015 Ford F250 'Super Duty' truck."); ¶ 79 ("*roof crush*" caused the fatal injuries). *See also* ¶¶ 81, 83, 84, 120. [23]

The point of Mr. Meyer's expert reports is to demonstrate the obvious truth that *if* Ford itself ever believed in its "diving" argument, then Ford had both the duty and the ability to prevent that from happening.[24] Doc. 1 (Complaint) ¶ 99; Ex. 5 – Meyer Exp. Rep. at 23;[25] Ex. 6

---

[21] A cynical person might think Ford has done this in hopes it can claim a "win" on something—to mask the fact that its two motions are frivolous.

[22] Ford continues to assert that there is no evidence that anything other than driver error caused the Mills' truck to leave the road. Again, this case is about roof crush and the question of why the truck left the road has nothing to do with that question.

[23] The word "roof" is used 158 times in Plaintiffs' Complaint. The word "restraint" is *not used at all*. The term "seat belt" is used only 4 times (three times in ¶ 34, which addresses Ford's historical knowledge about the non-risk of "diving," and once in ¶ 48, in reference to the fact that the company Autoliv is a "supplier of airbags and seat belts").

[24] Ford *does not claim* that either Mr. or Mrs. Mills "dived" into the roof before the roof crushed down on them; *instead* Ford makes that argument to excuse its sale of over 5 million trucks with known weak roofs. Pls.' SOMF ¶44; Doc. 78 - Pls.' Resp. to Ford motion (Doc. 53) ("Introduction" at 3).

[25] Mr. Meyer's expert report discusses the many alternative designs Ford could have used if it believed "diving" was actually occurring during rollovers and wanted to keep vehicle occupants better restrained in their seats. Since Ford intends to try to assert the "diving" argument, *if Ford is allowed to do so* then Plaintiffs' restraint expert will explain how "Ford did not do what could be done to prevent 'diving.'"

– Meyer Suppl. Rep. at 2–4. (As to whether Ford itself actually believes that argument, *see* Pls.' SOMF ¶¶ 7 (out of 285 known lawsuits and claims, Ford says it won only five; presumably Ford settled the others), 82–88, 90–92.) Ford's "roof crush doesn't matter"/ "diving" stuff litters Ford's motions and expert reports.[26] That is why Mr. Meyer's expert report discusses the many alternative designs Ford could have used if it believed "diving" was actually occurring during rollovers and wanted to keep vehicle occupants better restrained. Since Ford intends to try to assert the "diving" argument, *if allowed to do so*, then Plaintiffs' restraint expert will explain how "Ford did not do what could be done to prevent 'diving.'"

It is a fact that the restraint system on the subject trucks *is* defective—attaching the seat belt to the B-pillar in a vehicle with such a weak roof is indisputably stupid. When the roof collapses, the effectiveness of the belt is impeded. Ex. 5 – Meyer Report at 22.[27] But in this wreck, it was the collapsed defective roof that caused the injuries to and deaths of Mr. and Mrs.

---

[26] *See, e.g.*, Doc. 74-1 – Eikey Exp. Rep. for Ford at 9 (stating "further strengthening or reinforcing the roof and supporting pillars does not change or reduce the risk of injury or occupant neck loading, because deformation is not the cause of the injury or peak neck loading. In a roof-to-ground impact associated with a rollover accident, peak neck loading occurs before any significant roof deformation.").

[27] "Most relevant in [this] case, the upper torso belt anchor (D-ring) in this seat belt system is mounted to a deformable B-pillar that will foreseeably move downward and inboard as the roof pillars crush and deform during a rollover . . . [A]n analysis of the B-pillar/D-ring deformation indicates that significant seat belt looseness would have likely been generated by the downward deformation/displacement of both the left and right-side B-pillars/D-rings. This deformation would have introduced additional webbing looseness into the torso belts . . ."

11

Mills. Pls.' SOMF ¶¶ 93–102.[28] This Court has had recent experience with this same dynamic—proof that a consequence of a weak, collapsed roof is diminished effectiveness of the seat belt.[29]

There is no claim here on which to grant summary judgment.[30]

### IV.    Plaintiff has provided ample evidence that Mrs. Mills died of positional asphyxia.

Ford contends "there is *no evidence* that Mrs. Mills died of positional asphyxiation." Doc. 52-1 at 8 (emphasis added). John Denney used to say, "the beginning of wisdom is to call a

---

[28] Plaintiffs' contentions in connection with the restraint system are *not separate from* their claim of defect regarding the roof structure. Rather, they are *the result of* the defect in the roof. This is affirmed by Mr. Meyer's testimony. Doc. 64 – Meyer Dep. 107/23–108/3 (in "*the same crash*" with "*the same roof deformation*" different restraint designs would not have made a difference to the Plaintiffs' injuries"). Plaintiffs' restraint expert's other opinions, including those related to the alternative designs that Ford could have implemented such as all-belts-to-seats ("ABTS") or cinching latch plates, are related to Plaintiffs' claim for punitive damages and used to rebut Ford's defenses to punitive damages liability via the "diving" argument.

[29] In *Christian v. Ford Motor Company*, Case No. 4/22-CV-00062-CDL (M.D. Ga.), the plaintiffs similarly did not have a claim for a defect in the restraint system, but planned to offer evidence as to how roof crush would impact the seatbelt. *See, e.g.,* Doc. 120 - 01/25/2024 Pretrial Conference Hrg. Tr. 49/11–16 ("part of the testimony in the case is that when the roof collapses the seatbelt is connected to the B Pillar; which is part of the roof structure. So it's not a claim of defect, but that will be in the case; that it will loosen the seatbelt as the roof is collapsing."). Ford understood that was part of the plaintiffs' claims in *Christian*. *Id*. at 50/23–24 (THE COURT: . . . Ford knows that's part of the claim; I take it? MR. THOMAS: Yes, Your Honor.").

[30] Ford also spends much of its motion arguing against a claim Plaintiffs never made—a claim for "pre-impact pain and suffering." Maybe Ford plans, in its reply brief, to claim Plaintiffs make that claim because of this: Doc. 1 ¶¶ 157(a) & 158(a). If it was not clear, this was intended to claim damages for shock, fright, and terror experienced as the truck roof crushed down on Mr. and Mrs. Mills, and from then on until their deaths. Plaintiffs *made, and make,* no claim for "pre-impact" pain and suffering before the roof crush. The Complaint makes no mention of *pre-impact* shock, fright, or terror. Obviously, since Mr. and Mrs. Mills were never informed of the defects of their truck's roof—as made clear by Count 3 of the Complaint (failure to warn)—they could not have anticipated the roof collapsing down on them. Thus, there is no claim for pre-impact pain and suffering upon which to grant summary judgment.

12

thing by its right name." But since calling Ford's contention by its proper name in this brief could result in censure, undersigned counsel will simply refer to it as a "head-scratcher."

Dr. Eisenstat is Plaintiffs' board-certified expert pathologist. Dr. Eisenstat is the former Chief Medical Officer of the Georgia Bureau of Investigation. Ex. 1 – Eisenstat Exp. Rep. Ex. 1 (CV). Dr. Eisenstat testified in both *Hill* trials; Ford did not challenge his qualifications. Dr. Eisenstat conducted the autopsy in this case, with Ford's pathologist, Jamie Downs, present.

Ford's contention is a "head-scratcher" because it *is* Dr. Eisenstat's expert opinion that Mrs. Mills died of positional asphyxiation. Pls.' SOMF ¶¶ 95, 100; Ex. 1 – Eisenstat Exp. Rep. at 2; *see also id.* at 10, 12. *Ford knows that; Ford's lawyer Ms. Wright asked Dr. Eisenstat about that* **eighteen times** *in his deposition.*[31] Additionally, Plaintiffs' biomechanical expert Paul Lewis Jr. has opined that "when the Ford came to rest on its roof, and Mrs. Mills' body was severely entrapped with the structures of her head, neck, chest, and abdomen unable to expand to breathe in air and **she asphyxiated to death**." Ex. 58 – Lewis Exp. Rep. at 9, ¶ 2.15

Of course, expert opinion *is* evidence the Court must consider at the summary judgment stage.[32] Ford may not ignore the expert opinion and testimony of Dr. Eisenstat or of Plaintiffs' biomechanical expert, Paul Lewis.[33] Ford also contends there is no evidence that Mrs. Mills

---

[31] Doc. 66 – Eisenstat Dep. at 94, 97, 100, 105, 112, 114, 117, 119, 133, 175, 180 & 195.

[32] A district court may not "simply ignore [expert] testimony or deem the expert not credible." *Moore v. GEICO Gen. Ins. Co.*, 633 Fed. App'x 924, 931 (11th Cir. 2016) (defendant's argument that expert opinion "cannot create a genuine dispute of material fact" is "simply incorrect." *Id. See, e.g., Newmann v. United States*, 938 F.2d 1258, 1262 (11th Cir. 1991); *Childers v. Morgan Cnty. Bd. of Educ.*, 817 F.2d 1556, 1559 (11th Cir. 1987); *Allison v. W. Union Tel. Co.*, 680 F.2d 1318, 1322 (11th Cir. 1982).

[33] Ford states that it "intends on filing a Motion to Exclude Dr. Eisenstat's testimony," but Ford has not done so. Doc. 52-1 at 10, n.26. Ford had more than four months in between Dr. Eisenstat's deposition on April 12 and the dispositive motion deadline on August 15 to file such a motion. It has filed no such motion.

died of positional asphyxiation because, in Ford's telling, there is no evidence that "Mrs. Mills could not extricate herself" from the truck. Doc. 52-1 at 10. Ford is ignoring the sworn testimony of multiple scene witnesses. Pls.' SOMF ¶¶ 9–12. [34]

In another head-scratcher, Ford contends "nothing from the autopsy on Mrs. Mills' exhumed body supports a diagnosis of positional asphyxiation." Doc. 52-1 at 11. That ignores Dr. Eisenstat's expert report and deposition testimony, and appears to be based on nothing but the opinions of one of Ford's experts, Dr. Camacho, who was once a radiologist. [35]

Ford also contends that "Plaintiffs cannot dispute Dr. Camacho's conclusion that Mrs. Mills' injuries were not consistent with positional asphyxiation." Doc. 52-1 at 11. Putting aside that Dr. Camacho has not practiced medicine since at least 2021 [36] and is not licensed to practice

---

[34] Ford makes so many misstatements about Dr. Eisenstat in its brief, it is hard to keep up with them all. For example, without citation, Ford contends Dr. Eisenstat based his testimony that Mrs. Mills could not extricate herself on "the testimony of witnesses at the scene that Mrs. Mills was barely breathing." Doc. 52-1 at 10. Plaintiffs simply observe that, among other things, Dr. Eisenstat considered the testimony of two Georgia State Troopers and the other scene witnesses (including EMTs and a Registered Nurse) in forming his opinions. Ex. 1 – Eisenstat Exp. Rep. at 2 ("Facts and Data Considered"). Similarly, Ford contends Dr. Eisenstat based his testimony on "a picture of the deformed roof not taken at the scene, but taken after the vehicle was turned back over," Doc. 52-1 at 10, but Ford cites nothing for that misstatement either. As Ford knows from Dr. Eisenstat's deposition, Dr. Eisenstat had reviewed photos of the truck at the scene of the wreck. Ford elicited that very testimony from Dr. Eisenstat. Doc. 66 – Eisenstat Dep. at 64/14–20. Indeed, Dr. Eisenstat reviewed the very photo Ford insinuates in its brief Dr. Eisenstat did not review.

[35] Ford contends that "petechial hemorrhages on the eyelids" are "*generally* present in asphyxia cases," citing no proof of that claim. Doc. 52-1 at 11. Ford ignores Dr. Eisenstat's testimony that, with positional asphyxiation, "sometimes you see" petechiae and "sometimes you don't." Doc. 66 – Eisenstat Dep. at 117/18–21.

[36] It is noteworthy that Ford did not even file the deposition of its expert witness Dr. Camacho. Had Ford done so, the citation would be to his deposition at 46/11-13. That failure is noteworthy because Dr. Camacho is the witness upon whom Ford depends to contend that Mr. and Mrs. Mills were not wearing their seat belts properly—an argument reprised from Ford's performance

14

medicine in the state where he lives,[37] *the phrase "positional asphyxiation" does not appear in Dr. Camacho's expert report **or** deposition.*[38]  Dr. Eisenstat and Mr. Lewis have *both* opined Mrs. Mills' injuries *are* consistent with positional asphyxiation.  Pls.' SOMF ¶¶ 18, 73, 95, 100; Ex. 58 – Lewis Exp. Rep. at 2 ("she died due to positional asphyxia as documented in her autopsy report"), 6, 12, 16 (¶ 2.15), 17 (¶¶ 2.18, 2.21).

V.    **Ford ignores a clear issue of material fact on Plaintiffs' failure to warn claims.**

Ford criticizes Plaintiffs for having "no warnings expert."  Doc. 52-1 at 14.  This Court has rejected such contentions when the defendant has *completely failed* to warn about a known defect.  *Bullock v. Volkswagen Group of America, Inc.*, 107 F.Supp.3d 1305, 1316 (M.D. Ga. 2015). ("The issue is whether a warning should have been given at all . . . . A jury can understand this issue without a warnings expert.").  It is undisputed that Ford failed to warn—and still refuses to warn—about this well-known (285 lawsuits and claims) defect.  Pls.' SOMF ¶¶ 7, 8(a), 8(b), 33–35, 39–42, 52–57, 59–67.

Ford completely disregards the clear Georgia law regarding failure to warn claims.[39]  Georgia law is crystal clear:  automakers like Ford have a duty to warn citizens when the automaker knows that a vehicle is dangerous—even if the manufacturer acquires that knowledge

---

in *Hill v. Ford.*  That contention is wholly made up, and contrary to the eyewitness testimony of two Georgia State Troopers.  Pls.' SOMF ¶ 12.

[37] The un-filed-by-Ford Camacho deposition at 45/5–9.

[38] Dr. Camacho even disclaimed having an opinion about Mrs. Mills' cause of death. Camacho Dep. at 148/19–22.

[39] Instead, Ford cites two irrelevant Texas district court cases applying Texas law.

after the vehicle is sold. *Chrysler Corp. v. Batten*, 264 Ga. 723, 724 (1994). That duty is enshrined in Georgia statute, O.C.G.A. §51-1-11(c).[40]

Where, as here, the defendant issued *no warning at all*, the failure-to-warn cause of action has only three elements, spelled out in *Ford Motor Co. v. Gibson,* 283 Ga. 398, 403 (2008).[41] All are satisfied here.[42]

## CONCLUSION

Ford's motion (Doc. 52) should be denied.

This 12th day of September, 2024.

Respectfully submitted,

*/s/ James E. Butler, Jr.*
JAMES E. BUTLER, JR.
Georgia Bar No. 099625
jim@butlerprather.com
RAMSEY B. PRATHER

---

[40] "Nothing contained in this subsection shall relieve a manufacturer from the duty to warn of a danger arising from use of a product once that danger becomes known to the manufacturer."

[41] "[A]s there exists *some evidence* [1] from which a jury could conclude *that Ms. Gibson was unaware of* (and could not have obviously known about) the potential dangers posed by the Marquis, [2] *that Ford was aware of the dangers* and failed to adequately warn Ms. Gibson of them, and [3] *that the very dangers of which Ford failed to warn Ms. Gibson came to fruition* during the car accident that ultimately killed her, [Ford's] argument is without merit." *Ford v. Gibson*, 283 Ga. 398, 403 (2008)

[42] *First*, there is no way Mr. and Mrs. Mills could have known of the danger posed by Ford's roofs. Ford not only failed to warn—it has maintained the roofs are "absolutely safe." Pls.' SOMF ¶ 69. *Second*, there is no doubt Ford was aware of the danger. Pls.' SOMF ¶¶ 7, 8(a), 8(b), 31–70. *See also* Doc. 78 - Pls.' Resp. to Doc. 53. In 2009, *thirteen years before Mr. and Mrs. Mills were killed*, the rollover testing Ford paid Autoliv to conduct graphically proved the defect and the danger. *Third*, Ford cannot deny that "the very danger[]" as to which Ford failed to issue a warning—i.e., the dangerously weak Super Duty roof—is what "ultimately killed" Mr. and Mrs. Mills. The photographic evidence alone proves that; the testimony of several eyewitnesses and of Plaintiffs' experts Eisenstat and Lewis prove that. Pls.' SOMF ¶¶ 62, 65, 93–95, 98, 100–102; Ex. 1 – Eisenstat Exp. Rep. at 2; Ex. 58 – Lewis Exp. Rep. at 6, 8.

Georgia Bar No. 658395
ramsey@butlerprather.com
DANIEL E. PHILYAW
Georgia Bar No. 877765
dan@butlerprather.com
ALLISON B. BAILEY
Georgia Bar No. 478434
Allison@butlerprather.com
BUTLER PRATHER LLP
105 13th Street
Post Office Box 2766
Columbus, GA 31902
(706) 322-1990

LARAE DIXON MOORE
Georgia Bar No. 223379
lmoore@pagescrantom.com
PAGE SCRANTOM SPROUSE TUCKER & FORD
1111 Bay Avenue 3rd Floor
P.O. Box 1199
Columbus Georgia 31902
(706) 324-0251

***Attorneys for Plaintiffs***

**CERTIFICATE OF SERVICE**

I certify that, on September 12, 2024, served the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Docs. 52)** on Defendants' counsel via email.

*/s/ James E. Butler, Jr.*