**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

JAMES EDWARD ("Dusty") BROGDON,          *
Jr., as Executor of the Estate of Debra Sue   *
Mills, deceased, and JAMES EDWARD         *
BROGDON, Jr., and RONALD BRIAN            *
("Rusty") BROGDON, Individually and as      *
surviving children of Debra Sue Mills, and    *
JAMES EDWARD BROGDON, Jr., as            *
Executor of the Estate of Herman Edwin       *
Mills, deceased, and JASON EDWIN           *
MILLS, Individually and as surviving child     *      CIVIL ACTION FILE
of Herman Edwin Mills,                     *      NO. 4:23-cv-00088-CDL
                                        *
        Plaintiffs,                        *
                                        *
v.                                       *
                                        *
FORD MOTOR COMPANY,                    *
                                        *
        Defendant.                       *

---

**PRETRIAL ORDER - JURY**

---

The jury trial in this action is scheduled to begin at 9:00 A.M. on February 3, 2025 at the

Federal Courthouse in Columbus, Georgia. The following constitutes the final pretrial order

entered in the above-styled case after conference with counsel for the parties:

**(1) (a)      The names, addresses, and telephone numbers of all attorneys who personally**

**appeared at pretrial and who will conduct the trial are as follows:**

>       **Plaintiffs:**
>
>       James E. Butler, Jr.
>       Ramsey B. Prather
>       Daniel E. Philyaw
>       Allison Brennan Bailey
>       Butler Prather LLP
>       105 13th Street
>       Columbus, GA 31902

(706) 322-1990;

LaRae Dixon Moore
Page Scranton Sprouse Tucker Ford
1111 Bay Avenue, 3rd Floor
P.O. Box 1199
Columbus, GA31902
(706) 324-0251

Michael B. Terry
Frank Lowrey
Bondurant Mixon & Elmore LLP
1201 W Peachtree St NW #3900
Atlanta, GA 30309
(404) 881-4100

**Ford Motor Company:**

Elizabeth B. Wright
*Admitted Pro Hac Vice*
Elizabeth.Wright@ThompsonHine.com
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114
Telephone:  216-566-5500

Charles E. Peeler
Georgia Bar No.: 570399
Charles.Peeler@Troutman.com
Harold D. Melton
Georgia Bar No.: 501570
Harold.Melton@Troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
600 Peachtree Street, N.E., Suite 3000
Atlanta, GA 30308
Telephone:  404-885-3000

Paul F. Malek
*Admitted Pro Hac Vice*
PMalek@HuieLaw.com
HUIE, FERNAMBUCQ & STEWART, LLP
3291 US Highway 280, Suite 200
Birmingham, AL 35243
Telephone:  205-251-1193

Michael R. Boorman
Georgia Bar No.: 067798
MBoorman@WatsonSpence.com
Philip A. Henderson
Georgia Bar No.: 604769
PHenderson@WatsonSpence.com
WATSON SPENCE LLP
Bank of America Plaza
600 Peachtree Street NE
Suite 2320
Atlanta, GA 30308
Telephone: 229-436-1545

Michael W. Eady
Admitted *Pro Hac Vice*
MEady@ThompsonCoe.com
THOMPSON, COE, COUSINS & IRONS, LLP
2801 Via Fortuna Drive, Suite 300
Austin, Texas 78746
Telephone:  512-708-8200

(b)     The names, addresses, and telephone numbers of all nonparty persons including attorneys who have a fixed or contingent financial interest in this case are as follows:

**Plaintiffs:**

James E. Butler Jr.
Ramsey B. Prather
Archie I. Grubb, II
Butler Prather LLP
105 13th Street
Columbus, GA 31902
(706) 322-1990

LaRae Dixon Moore
Page Scranton Sprouse Tucker Ford
1111 Bay Avenue, 3rd Floor
P.O. Box 1199
Columbus, GA31902
(706) 324-0251

Michael B. Terry
Frank Lowrey
Bondurant Mixon & Elmore LLP
1201 W Peachtree St NW #3900
Atlanta, GA 30309
(404) 881-4100

**Ford Motor Company:** The parties and Plaintiffs' Counsel of record.

If a verdict for the Plaintiffs is entered in an amount greater than Ford's self-insured retention of $25,000,000, Ford's excess insurers would also have a financial interest in this case. Ford purchased excess insurance coverage pursuant to policies issued by the following insurers within the relevant policy or reporting period: Allianz Underwriters Insurance Company, Allianz Global Corporate & Specialty SE, Lloyd's-Apollo Syndicate Management Ltd, Magna Carta Insurance Ltd., Ascot Bermuda Ltd., Liberty Surplus Insurance Corporation, Allied World Assurance Company (AWAC), Arcadian Risk Capital Ltd BDA, General Security Indemnity Company of Arizona (Scor Re), Scor Channel Limited, Lloyd's-Helix Underwriting Partners Ltd. (Somers Re Ltd.), Markel Bermuda Limited, Argo Re Ltd., Vantage Risk Ltd., Lloyd's-MAP (Managing Agency Partners) Syndicate 2791, XL Bermuda Ltd. (AXA), Group Ark Insurance Ltd., Lloyd's-Apollo Syndicate 1969, XL Catlin Syndicate 2003 (AXA XL), Lloyd's-Inigo Syndicate 1301, QBE US Casualty Facility, Great Lakes Insurance SE (Munich Re), Liberty Specialty Markets Bermuda, Hamilton Re, Ltd., Convex Group, HDI Specialty Insurance Company, Canopius Syndicate 4444, Emerald Underwriting Managers, and Arch Reinsurance Ltd.

**(2)  (a)    Companion cases pending in this and other federal / state courts are:**

There are no pending companion cases.

**(b)    Possible derivative claims not now the subject of pending litigation:**

There are no derivative claims not now subject of the pending litigation.

4

**(3) The estimated time required for trial is:**

**Plaintiffs' Estimate:** 2-3 weeks.

**Ford's Estimate:** Ten (10) days, with the Parties having equal time to present their evidence.

**(4) The parties agree that the court has jurisdiction of the parties and the subject matter - jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332(a).**

Mr. Dusty Brogdon and Mr. Rusty Brogdon are citizens of Georgia. Mr. Jason Mills is a citizen of Florida. Ford Motor Company is a citizen of Michigan and Delaware.

**(5) The jury will be qualified as to relationship with the following:**

**Plaintiffs:**

(a) Is there anyone who is related by blood or marriage to James Edward Brogdon, Jr., Ronald Brian Brogdon, or Jason Mills?

(b) Is there anyone who is related by blood or marriage to Paul Malek, Michael Boorman, Philip Henderson, Elizabeth Wright, Charles Peeler, Harold Melton, or Michael Eady?

(c) Is there anyone who works for, or has family members who works for, or who have ever been represented by any of these law firms:

1. Butler Prather LLP, Columbus GA

2. Page Scrantom Tucker Sprouse & Ford, Columbus GA

3. Bondurant Mixson & Elmore LLP, Atlanta GA

4. Thompson Hine, Cleveland Ohio

   5.  Huie, Fernambucq & Stewart, LLP , Birmingham Alabama

   6.  Troutman Pepper Hamilton Sanders LLP, Atlanta GA

   7.  Watson Spence, Atlanta GA

(d) Is there anyone who is an officer, director, agent, employee, shareholder, or insurance policy holder with:

   1.  Ford Motor Company

   2.  Allianz Underwriters Insurance Company,

   3.  Allianz Global Corporate & Specialty SE,

   4.  Lloyd's-Apollo Syndicate Management Ltd,

   5.  Magna Carta Insurance Ltd.,

   6.  Ascot Bermuda Ltd.,

   7.  Liberty Surplus Insurance Corporation,

   8.  Allied World Assurance Company (AWAC),

   9.  Arcadian Risk Capital Ltd BDA,

   10. General Security Indemnity Company of Arizona (Scor Re),

   11. Scor Channel Limited,

   12. Lloyd's-Helix Underwriting Partners Ltd. (Somers Re Ltd.),

   13. Markel Bermuda Limited,

   14. Argo Re Ltd.,

   15. Vantage Risk Ltd.,

   16. Lloyd's-MAP (Managing Agency Partners) Syndicate 2791,

   17.  XL Bermuda Ltd. (AXA),

18. Group Ark Insurance Ltd.,

19. Lloyd's-Apollo Syndicate 1969,

20. XL Catlin Syndicate 2003 (AXA XL),

21. Lloyd's-Inigo Syndicate 1301,

22. QBE US Casualty Facility,

23. Great Lakes Insurance SE (Munich Re),

24. Liberty Specialty Markets Bermuda,

25. Hamilton Re,

26. Convex Group,

27. HDI Specialty Insurance Company,

28. Canopius Syndicate 4444,

29. Emerald Underwriting Managers,

30. Arch Reinsurance Ltd.

**Ford Motor Company:**  Ford requests that the jury be qualified as to the following:

- The Court

- James Edward Brogdon, Jr.,

- Ronald Brian Brogdon

- Jason Mills

- Herman Mills

- Debra Sue Mills

- James E. Butler, Jr.

- Ramsey B. Prather

- Daniel E. Philyaw

- Allison Brennan Bailey

- LaRae Dixon Moore

- Michael B. Terry

- Frank Lowrey

- Joshua Brooks

- Bryant Buchner

- Dr. Jonathan Eisenstat

- Brian Herbst

- Paul Lewis

- Steve Meyer

- All fact witnesses in this case.

Ford objects to qualifying the jury as to its excess insurance carriers identified in Section 1(b) above because: 1) doing so would be unfairly prejudicial, and 2) Ford's $25,000,000 self-insured retention for product liability is an amount that would cover any reasonable jury verdict in this case. *See Lewis v. Emory University*, 235 Ga. App. 811, 812 (1999) (noting that it is an open question as to whether the jury must be qualified to excess coverage when plaintiffs seek damages below the excess coverage: "[t]he answer to whether the same rule would apply if the plaintiff sought damages in an amount less than the primary coverage must await another day."). No party has made an "affirmative showing to the trial court … that there is a strong probability" that Ford's excess insurance carriers have a "demonstrable, direct financial stake in the outcome of the case." *Wallace v. Swift Spinning Mills, Inc.*, 236 Ga. App. 613, 614-15 (1999); cf. *Smith v. Crump*, 223 Ga. App. 52, 54 (1996) (affirming trial court's qualification of jurors with respect to an insurance company because "there was a strong probability that the insurance company was to some extent interested in the outcome of the case.").

**Note:** Plaintiffs object to the jury being qualified as to the following persons, as they have no financial interest in the case:

> Associates in the firm Butler Prather LLP (Daniel Philyaw, Allison Brennan Bailey)

> Expert witnesses for Plaintiffs (Joshua Brooks, Bryant Buchner, Jonathan Eisenstat, M.D., Brian Herbst, Paul Lewis, Steve Meyer

> "All fact witnesses in this case"

If the Court qualifies the jury as to Plaintiffs' experts, Plaintiffs request that the Court do the same as to Ford's experts, to-wit:

> Don Tandy

> Michelle Vogler

> Roger Burnett

> Chris Eikey

> Mark Fleming

> Mark Sochor

> Daniel Camacho

> J. C. Upshaw Downs

> Harold Keyserling

**BY THE COURT**: As the Court explained at the pretrial conference, the Court will ask the potential jurors whether they have a relationship with any lawyers or witnesses; simply knowing a lawyer or witness is not necessarily an automatic disqualification. The Court does not intend to question jurors in open court about their relationship to any of the excess insurance carriers in this case. Instead, the Court will solicit that information through a supplemental written juror questionnaire. By January 21, 2025, counsel shall submit to the Court a joint proposed supplemental juror questionnaire on matters that the parties deem necessary (including any relationship to any insurers and information about what type of vehicles the jurors drive). The proposed questionnaire should not take an average person more than fifteen minutes to complete.

**(6)  All discovery has been completed, unless otherwise noted, and the court will not consider any further motions to compel discovery except for good cause shown.  The parties, however, shall be permitted by agreement to take depositions of any person(s) for the preservation of evidence or for use trial.**

Ford requested that Plaintiffs stipulate to authenticity of the materials from the Georgia State Patrol, Grady EMS, Decatur County Fire & Rescue, Bainbridge Public Safety, Climax Fire & Rescue, Mr. and Mrs. Mills' medical records produced in discovery, and photographs from Royce Towing/Chapman's Paint and Body.  It appears that Plaintiffs have stipulated to the authenticity of the records for which depositions of custodians might have been necessary.

**BY THE COURT:**  Any trial exhibits listed in the exhibit list to this pretrial order designated with an * will have to be properly authenticated at trial.  For exhibits without a designated *, authenticity (but not necessarily admissibility) is stipulated.

**(7)  Unless otherwise noted, the names of the parties as shown in the caption to this order are correct and complete, and there is no question by any party as to the misjoinder or non-joinder of any parties.**

**(8)  The following is the plaintiff's brief and succinct outline of the case and contentions:**

On August 22, 2022, Mrs. Debra Mills was driving her 2015 model year Ford F250 "Super Duty" truck to her home on Lake Douglas Road in Decatur County, GA, near Bainbridge.  Her husband Mr. Herman Mills was in the front passenger seat.  Mr. and Mrs. Mills bought the truck new in November 2014. Mr. and Mrs. Mills had been to Donalsonville, GA, some 28 miles away, and had driven through Bainbridge without mishap.  Mr. and Mrs. Mills had lived on Lake Douglas

Road for 33 years.

Mrs. Mills was driving at the 55-mph speed limit. While driving on Lake Douglas Road the truck left the roadway.   The truck's "Airbag Control Module," sometimes called the 'black box', recorded that the driver Mrs. Mills released the accelerator and was actively steering to the left toward the road, then to the right, while driving along a grassy swale beside the roadway.  Mrs. Mills did not apply the brakes; Ford's owner manual warns to "avoid [] braking" if and when the truck leaves the road.

The truck ran over a grassed-over driveway culvert and went up in the air, came down on its front end and then rolled over on its roof. The roof collapsed and was crushed.  Both Mr. and Mrs. Mills were pinned in their seats by the collapsed roof, bent over almost double.  Two Georgia State Troopers who arrived at the scene of the wreck have both testified that both Mr. and Mrs. Mills were wearing their seat belts, and were wearing their seat belts properly.  In fact, when State Trooper Brian Palmer cut the seat belt Mrs. Mills was properly wearing her body did not move at all because it was pinned between the seat and the collapsed roof.

Mrs. Mills was alive when witnesses arrived at the scene soon after the wreck.  She died at the scene due to positional asphyxia – in short, she suffocated to death.

Mr. Mills had multiple injuries from the roof crush and was life-flighted to a hospital where he lingered for nine days before dying as a result of the injuries he suffered as a result of the roof crush.

From lists pried out of Ford over the years, Plaintiffs' counsel have tallied some nearly 300 lawsuits and claims like this - roof crush in a rollover involving a 1999-2016 "Super Duty"

truck or 2000 through 2005 Ford Excursion with substantially similar roofs.[1]  Each of those wrecks was notice to Ford that the roofs were dangerous. The enormous volume of these claims is further evidence Ford knew of the dangers posed by the roofs of its "Super Duty" trucks.  Of course, not every wreck with roof crush in one of the "Super Duty" trucks resulted in a lawsuit or a claim; Ford was surely on notice of many additional wrecks with roof crush and injuries from the roof crush.

Ford sold the "Super Duty" trucks with the same or substantially similar roofs for 17 years – from the model year 1999 through the model year 2016.  The "Super Duty" trucks include F250s, F350s, and F450s.  Ford sold some 5.5 million of those trucks.

Ford has known for over 20 years the roofs on those trucks are defective and dangerously weak and would collapse during a rollover wreck and crush the occupants inside.

The roofs on the "Super Duty" trucks did not meet the minimum federal law requirements for roof strength; did not meet Ford's own internal roof strength standards; did not come close to meeting the roof strength standard of Ford's own Volvo division; and did not come close to meeting the roof strength standard for a "good" roof strength rating from the Insurance Institute for Highway Safety (IIHS).   That organization is an independent safety rating group set up and funded entirely by liability insurance companies.  According to its rating system, the roof on the "Super Duty" trucks was below "poor."  Ford has known that since 2009, when IIHS first started rating vehicles for roof strength.

---

[1] As further discussed herein, during the 2014 trial of *Trejo v. Ford*, Ford admitted during its closing argument that the Excursion and the "Super Duty" have the same roof.  In *Trejo*, the jury found that roof defective, and also found the defective roof caused injury and death to the plaintiff's husband.  In 2017, the Nevada Supreme Court affirmed that verdict.  *See Ford Motor Company v. Trejo*, 402 P.3d 649 (Nev. 2017).

Ford documents show that Ford has known for decades how to build strong, safe roofs –
from as far back as the days of the "Model A" in the early 1930s and the days of the Ford Falcon
and Ford's Mercury Comet in the early 1960s.

The roof for the "Super Duty" trucks was originally designed by Ford engineers in the
mid-1990s. Around that time, Ford executives sent a directive that costs be reduced so money
could be saved in the trucks, thereby increasing Ford's profits.  As a result, Ford took metal out
of roof components and Ford weakened the roof.  After Ford weakened the roof as originally
designed, Ford did no actual physical testing of the roof strength.

Ford's own engineers have admitted that the roof could have been made five times
stronger or even ten times stronger. Ford's own corporate representative witness has admitted
that a stronger roof could have been built for $100 per truck.  Ford pocketed at least $550 million
in profits by foregoing safety and saving that extra $100 per truck.

Despite knowing the roofs would collapse in rollover wrecks, Ford never warned anyone
of the danger.   To this day, Ford insists the roofs are "absolutely safe" – despite knowing about
at least 285 other wrecks which resulted in lawsuits or claims.

Ford had managed, by lobbying the federal government, to get its heavy duty trucks like
the "Super Duty" exempted from the federal minimum standard for roof strength.  In the early
2000s, the federal agency "NHTSA" (National Highway Traffic Safety Administration) indicated
it was going to remove that exemption and raise the then-existing, very low federal minimum
roof strength standard, which dated from 1971.  In response, Ford assembled a team of Ford
engineers for what Ford called the "Enhanced Roof Strength Project for Super Duty Trucks" or
"ERSP."  In a matter of months those engineers designed a roof that was five times stronger than
the existing "Super Duty" roof.   That was done by September 2006.  Ford executives knew

about and monitored the progress of the stronger ERSP roof. Yet, for the next 10 years, Ford executives refused to use the stronger roof in the heavy "Super Duty" truck. Ford executives have never explained that decision. Ford testifying witnesses have never revealed who made that decision.

Ford did not warn anyone that it had designed and knew how to build a stronger roof.

At the same time Ford sold the 2015 model F250 to Mr. and Mrs. Mills, with the weak roof designed 20 years earlier, Ford *did* put a much stronger roof in its lighter light-duty truck, the F150.  Obviously in a rollover wreck the heavier "Super Duty" truck needs a stronger roof than the lighter F150 truck.

Ford did not warn anyone who bought or rode in the heavier "Super Duty" truck that Ford had available and could have used a much stronger roof in those trucks.

In 2009, Ford paid an automotive component manufacturer named Autoliv to do actual rollover roof crush testing of the F250 with the weak roof.  Autoliv makes and sells airbags and seatbelts.  Ford was having Autoliv design a "side canopy airbag" for use in Ford trucks.   The F250 tested by Autoliv rolled over 2 ½ times.  The roof was crushed flat.  That is deadly dangerous to occupants.  Ford was present for the testing, and had the test reports, photographs, and videos.  The Mills wreck was 13 years later.

Ford did not warn anyone that in 2009 tests paid for by Ford proved that in a foreseeable rollover wreck the "Super Duty" roof could be crushed flat.

By 2015, Ford had designed the next generation "Super Duty" truck, to be sold as the 2017 model, with a five-times-stronger roof.  Ford paid Autoliv to do rollover roof crush testing of that truck.  After 3 ¾ rolls, the roof on that truck was hardly damaged at all.  It did not collapse.  It was not crushed.  Ford was present for the testing, and had the test reports,

photographs, and videos.  The Mills wreck was 7 years later. Ford did not tell anyone or warn

anyone that it had in fact designed and could have manufactured the "Super Duty" trucks in 2015

with a five-times-stronger roof.

In 2014, in *Trejo v. Ford*, a Nevada jury found the "the same roof" as the roof in the

subject "Super Duty" to be defective. That was eight years before the Mills' wreck.  *Trejo* was a

products liability suit against Ford that arose from a rollover wreck in which the roof of a 2000

Ford Excursion crushed down, injuring the plaintiff and killing her husband.  During its closing

argument in the *Trejo* trial, Ford admitted that the Ford Excursion roof at issue in that case was

"virtually identical" to the Ford "Super Duty" truck roof at issue in this case.  Ford admitted the

Ford Excursion roof and the "Super Duty" roof *"are the same roof*."  In 2017, the Nevada

Supreme Court *affirmed* the verdict of the *Trejo* jury finding the roof defective.  *See Ford Motor*

*Company v. Trejo*, 402 P.3d 649 (Nev. 2017).  In its opinion affirming the verdict, the Nevada

Supreme Court stated specifically that "Ford based its design of the Excursion on Ford's line of

Super Duty pickup trucks, such as the F250, F350, and F450."  *Id.* at 651.  The *Trejo* jury verdict

occurred 8 years before the Mills' wreck.  The Nevada Supreme Court opinion affirming that

verdict occurred 5 years before the Mills' wreck.

Ford did not warn anyone that it knew the much stronger roof would completely prevent

roof collapse and roof crush, thus protecting the occupants.

For years, in lawsuits, Ford has claimed that roof strength does not matter.  In lawsuits

Ford claims that the occupants dive down to the top of the roof in the nano-second before the

roof crushes down on them.

Ford is making that argument – that roof crush doesn't matter because of 'diving' – in this

case, in opposition to Plaintiffs' claims for punitive damages.  But Ford has not named a single

employee to testify at the trial of this case.  Ford has not named as an expert witness any of the authors or actual participants in the supposed "studies" upon which that argument is based.  Ford does not have a single witness to testify at the trial who was personally involved in any of those so-called "studies."

That "diving" argument has been thoroughly discredited. It has been rejected by the federal agency NHTSA. It has been rejected by the Insurance Institute for Highway Safety.

More importantly, if Ford ever actually believed that argument then Ford had a duty to make sure people did not 'dive' into the roof – by using seat belt systems that would prevent such diving. Ford knew how to do that.  Ford did not do that.

Instead, Ford strung the seat belt thru a device called a "D-ring" on the "B-pillar," the roof pillar which separates the front side window from the rear side window. Ford did that despite knowing, from countless rollover wrecks of which Ford had notice and from the Autoliv rollover testing, that in a rollover the B-pillar on these "Super Duty" trucks would collapse. Collapse of the B-pillar meant the seat belt would be loosened, which means that there was even less to keep the occupant in his or her seat.

But Ford's own documents show Ford never believed the "diving" argument Ford has made in lawsuits as an excuse for weak roofs.   Ford has long known of the critical connection between roof crush and injuries.

As early as 1968, Ford knew "people *are* injured by roof collapse" and that "it is a significant number."  In 1970, a Ford safety engineering evaluation stated that "buckling failures" in the roof "result in a possible head injury producing object."

In 1987, a Ford Light Truck Safety Design Guideline Strategy stated that it is necessary for "the roof structure to minimize the risk of restrained occupant injury" and recommended

16

"establishing a guideline that exhibits criteria proportionately better than the [FMVSS] 216 requirements."

In 2000, Ford authorized the publication of a paper which outright stated "the crush resistance of roof structures is ***critical*** to minimizing injuries and enhancing occupant survival during rollover crashes." That paper was authored by a Ford "Crash Safety Technical Specialist" Ph.D. engineer who worked in Ford's "Crash Safety" department. *Ford's management and legal department reviewed and approved that paper before it was published.*

Debra and Mr. Herman Mills were married for nearly 30 years. For decades they worked together at Mills Welding & Fabrication, located on Lake Douglas Road between Bainbridge, GA and Climax, GA. Mr. and Mrs. Mills lived in a house right next to the Mills Welding office and shop. Mills Welding continues in operation, run by the Mills' sons Rusty and Jason. Mills Welding provides welding and metals fabrication services both at its Lake Douglas Road location and at customers' factories and other locations.

This lawsuit is brought by the three sons of Mr. Herman Mills and Mrs. Debra Mills. Their names are James Edward Brogdon – nickname "Dusty," Ronald Brian Brogdon – nickname "Rusty", and Jason Edwin Mills. Although Dusty and Rusty were the sons of Mrs. Mills by her first marriage, and Jason was the son of Mr. Mills by his first marriage, the three were raised together as brothers by Mr. and Mrs. Mills. Rusty and Jason now operate Mills Welding. Dusty lives in Cataula, GA where he owns and operates Columbus Custom Hardwood & Tile Company. Both Mr. and Mrs. Mills named Dusty as the Executor of their Wills.

**(9) The following is the defendant's brief and succinct outline of the case and contentions:**

On August 22, 2022, Debra Sue Mills was driving her 2015 Ford F-250 Super Duty pickup truck, and her husband, Herman Mills, was riding as the front seat passenger. Mrs. Mills was

driving at approximately 55 MPH when she came to a slight curve in the road and released the F-250's throttle. Mrs. Mills' truck drifted off the road to the right and continued traveling at highway speed through a grassy area. Mrs. Mills did not apply the brakes or deliberately turn the steering wheel at any point as and after the F-250 left the road. After traveling some distance off-road, the F-250 struck a driveway drainage culvert at 51 MPH, causing the F-250 to go airborne for a distance of 81 feet. The truck eventually smashed into the ground twice, nose first, and then pitched end-over-end onto its roof. There is no dispute that Mrs. Mills was responsible for causing the crash at issue.

Plaintiffs and their experts have failed to articulate why Mrs. Mills drove her truck off the road, failed to brake or intentionally steer, and drove straight into a concrete culvert. The evidence shows that Mrs. Mills suffered a cardiac event, leading to the truck leaving the road. The path of Mrs. Mills' F-250 drifting off the road, without correction or steering, is consistent with Mrs. Mills suffering a sudden cardiac event. Further, Mrs. Mills' body was exhumed and an autopsy conducted in August 2023. The autopsy showed that Mrs. Mills had a grossly enlarged heart. Her medical records also reveal that for several years, Mrs. Mills suffered from tachycardia, hypertension, high blood pressure, and several other serious medical conditions, including conditions that are known to cause or contribute to cardiac problems. After reviewing the evidence, Ford's medical experts Dr. Mark Sochor and Dr. Jamie Downs both opine that Mrs. Mills suffered a sudden cardiac event, whereupon she lost control of the F-250 and it ran off the road.

Mrs. Mills was not conscious at the time of the accident due to the cardiac event and therefore did not experience any conscious pain and/or suffering. Anthony Harrison, a registered nurse who was traveling behind the Mills' truck, was the first to render aid. According to Mr.

Harrison, Mrs. Mills never spoke or made a sound, and "[there was] no obvious purposeful movement." When Mr. Harrison initially checked for a pulse, he said that he felt a faint heartbeat. However, when he checked a second time shortly after, he was unable to find a pulse. Mrs. Mills was pronounced dead at the accident scene.

Mrs. Mills received thoracic injuries (broken ribs and a lacerated liver), and Mr. Mills received predominantly thoracic injuries (broken ribs, fractured clavicle, and a lacerated spleen) from the frontal impacts when the truck slammed nose down into the ground, before pitching over. None of their injuries were life-threatening. Mrs. Mills' death was caused by the sudden cardiac event that precipitated the accident. She had no physical injuries consistent with positional asphyxia. Mr. Mills was life-flighted to Tallahassee Memorial Hospital, where he died nine days later. His death was caused by his overall poor health (heart conditions and cancer) that compromised his ability to heal from his chest injuries. None of Mr. or Mrs. Mills' thoracic injuries were caused by roof deformation and it is undisputed that neither Mr. Mills nor Mrs. Mills sustained any serious (or worse) injuries to their neck or head.

Plaintiffs' singular design-defect claim against Ford is that the F-250's roof should have been stronger. However, the evidence will show Ford's roof design was consistent with the state of the industry and stronger than its competitors at the time it was designed and developed. Ford met its roof strength targets for the truck, as demonstrated by computer aided engineer (CAE) calculations and physical testing by the government that confirmed those calculations. The F-250, and the roof structure in particular, were reasonably safe as designed, state of the art, and not defective in any manner. But moreover, the evidence will also show that adding additional metal or creating a "stronger" structure, for which Plaintiffs and their experts advocate, would neither improve safety nor change the outcome in this accident. Mrs. Mills was in the process of dying

when the F-250 pitched over. Mr. Mills sustained his injuries when the F-250 slammed nose-down into the dirt, *before* pitching over onto its roof.  The deformation of the roof in this crash did not cause the death of either Mrs. Mills or Mr. Mills.

Additionally, the evidence will show that punitive damages are not authorized in any amount. Although this line of Super Duty trucks was exempt from compliance with FMVSS 216 - the federal roof strength standard - Ford nevertheless selected deliberate and robust roof strength targets for its Super Duty line of trucks.  Ford analyzed materials related to the importance of roof strength and concluded that a certain level of roof strength is desirable and needed, but beyond a certain level, adding additional strength to the roof and supporting pillars does not generally impart an additional benefit to occupants involved in rollover crashes. For over fifty years, Ford and other automobile manufacturers have been studying rollover crashes and injury causation.  Crash studies, laboratory studies, field data analysis, and statistical analysis have all been analyzed and show that there is no causal relationship between roof strength and injury causation.  As a consequence of having considered the testing, the studies, and the data, Ford significantly invested in other technologically advanced safety features that had the potential to make a difference, including Ford's Safety Canopy System and Roll Stability Control. These efforts by Ford are the opposite of conscious indifference to consequences.

**(10)**      **The issues for determination by the jury are as follows:**

**By Plaintiffs:**

a.   Whether the roof on the Mills' 2015 Ford F-250 "Super Duty" truck was defective and/or unreasonably dangerous.

b.  Whether Ford Motor Company breached its duty to warn of defects and unreasonable dangers in the subject Super Duty trucks, either before or after Mr. and Mrs. Mills purchased their truck.

c.  Whether Ford Motor Company's actions showed willful misconduct, *or* malice, fraud, wantonness, oppression, *or* that entire want of care which would raise the presumption of conscious indifference to consequences.

d.  Whether the defects and dangers in the "Super Duty" truck's roof proximately caused enhanced injuries over and above those Mr. Herman Mills would have sustained had the roof not collapsed and injured him during the August 22, 2022 wreck.

e.  Whether the defects and dangers in the "Super Duty" truck's roof proximately caused enhanced injuries over and above those Mrs. Debra Mills would have sustained had the roof not collapsed and injured her during the August 22, 2022 wreck.

f.  The amount of compensatory damages to be awarded to the Estate of Mr. Herman Mills.

g.  The amount of compensatory damages to be awarded to the Estate of Mrs. Debra Mills.

h.  The amount of damages to be awarded for the full value of the life of Mr. Herman Mills.

i.  The amount of damages to be awarded for the full value of the life of Mrs. Debra Mills.

j.  The amount of punitive damages to be awarded against Ford Motor Company and in favor of the Estate of Mr. Herman Mills.

k.  The amount of punitive damages to be awarded against Ford Motor Company and in favor of the Estate of Mrs. Debra Mills.

l.  The amount of attorneys' fees and expenses of litigation to be awarded against Ford.

**By Ford:**

A.  Whether the roof of the subject 2015 Ford F-250 was defectively designed.

B.  Whether the alleged roof design defect proximately caused the death of Debra Sue Mills.

C.  Whether the alleged roof design defect proximately caused the injuries and death of Herman Mills

D.  Whether Ford failed to warn of some alleged hazard in the roof of the subject 2015 Ford F-250.

E.  Whether that alleged failure to warn proximately caused the death of Debra Sue Mills.

F.  Whether the alleged roof design defect proximately caused the death of Herman Mills

G.  Whether Debra Sue Mills experienced any conscious pain and suffering.

H.  The amount of non-economic damages for Debra Sue Mills' pain and suffering, if any.

I.  Whether Herman Mills experienced any conscious pain and suffering.

J.  The amount of non-economic damages for Herman Mills' pain and suffering, if any.

K.  The amount of non-economic damages for the full value of the life of Debra Sue Mills, if any.

L.  The amount of non-economic damages for the full value of the life of Herman Mills, if any.

M.  The amount of funeral and burial expenses for Debra Sue Mills.

N.  The amount of funeral and burial expenses for Herman Mills.

O. Apportionment of fault pursuant to O.C.G.A. § 51-12-33.

P. Whether Plaintiffs have proven by clear and convincing evidence that Ford's design of the 2015 Ford F-250 roof amounted to willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences such that punitive damages are authorized.

Q. If punitive damages are authorized, the amount of punitive damages, if any, as proven by clear and convincing evidence.

**(11)    If a tort action, specifications of negligence, including applicable code sections, are as follows:**

**Plaintiffs:**  Plaintiffs seek recovery against Defendant Ford under the following laws: strict liability in tort (e.g., O.C.G.A. § 51-1-11 and general strict liability principles); conduct manifesting a reckless or wanton or willful disregard for life and safety, and failure to warn (e.g., O.C.G.A. § 51-1-11); punitive damages (O.C.G.A. § 51-12-5.1); and attorneys' fees and expenses (O.C.G.A. § 13-6-11 and other applicable law).

**Ford Motor Company:**  Ford denies it was negligent in any manner.  The design of the 2015 F-250 was reasonably safe in all respects and complied with all applicable Federal Motor Vehicle Safety Standards.

**(12)    If a contract action, the terms of the contract are as follows (or, the contract is attached as an exhibit to this order):**

Not applicable.

**(13)**    **The types of damages and the applicable measure of those damages are as follows:**

**Plaintiffs:**

a.    Compensatory damages for the fright, shock, and terror, and the mental and physical pain and suffering that Mr. Herman Mills endured as a result of being crushed and injured and later killed by the defective roof on the 2015 Ford F-250 Super Duty truck;

b.    Compensatory damages for the fright, shock, and terror, and the mental and physical pain and suffering that Mrs. Debra Mills endured as a result of being crushed and injured and killed by the defective roof on the 2015 Ford F-250 Super Duty truck;

c.    Compensatory damages for the wrongful death of Mr. Herman Mills the measure of which under Georgia law is the full value of the life of Mr. Herman Mills, as though he had not died;

d.    Compensatory damages for the wrongful death of Mrs. Debra Mills the measure of which under Georgia law is the full value of the life of Mrs. Debra Mills , as though she had not died;

e.    Funeral and burial expenses;

f.    Punitive damages to punish and deter Ford pursuant to O.C.G.A. § 51-12-5.1;

g.    Attorneys' fees and expenses of litigation pursuant to O.C.G.A. § 13-6-11;

h.    Damages, including attorneys' fees and expenses of litigation, pursuant to O.C.G.A. § 9-11-68(e); and

i.    For such other and further relief as the Court shall deem just and appropriate.

**Ford Motor Company:**  Plaintiffs are not entitled to damages from Ford in any amount. If the case is submitted to the jury, Ford requests the Court instruct the jury regarding the measure of damages permitted under Georgia law.

**(14)**    **All material undisputed facts established by the pleadings, depositions, or admission of the parties are attached hereto as <u>Exhibit A</u>, are signed by counsel, and will be submitted to the jury at the beginning of trial.**

**BY THE COURT:** The parties did not submit an Exhibit A, so there are no stipulated facts.

**Plaintiffs:** Plaintiffs have requested that Ford Motor Company stipulate to the authenticity of its Form 10-K reports submitted to the Securities and Exchange Commission.

**Ford Motor Company:** Ford has requested that Plaintiffs stipulate to authenticity of the materials from the Georgia State Patrol, Grady EMS, Decatur County Fire & Rescue, Bainbridge Public Safety, Climax Fire & Rescue, Mr. and Mrs. Mills' medical records produced in discovery, and photographs from Royce Towing/Chapman's Paint and Body.

**Response by Plaintiffs:** Based upon representations of Ford's Counsel that Ford's exhibits comprised of the above-listed materials are complete and unaltered, Plaintiffs do not currently object to the authenticity of these materials.

**(15)    Pursuant to the court's usual practice, pleadings will not be submitted to the jury.**

Ford also objects to Plaintiffs' Outline of the Case in Section 8 above being read to or submitted to the jury.

**BY THE COURT:**  The Court does not intend to read verbatim to the jury either side's outline of the case or contentions.  The Court will provide the jury with a balanced description of the parties' contentions that is adequate to determine whether any juror has any familiarity with the case or any of the issues in the case.

**(16)    Special authorities relied upon by Plaintiffs relating to peculiar legal questions are as follows:**

**BY THE COURT**: The Court addressed the "special authorities" listed below (many of which were also presented to the Court as part of motions in limine ) at the pretrial conference and in a subsequent written order regarding the pretrial conference rulings. Those rulings govern this case.

25

**Expert Testimony Regarding a Corporation's "State-of-Mind"**

An expert witness is not permitted to offer opinions regarding a corporate defendant's "state of mind." *Buckner v. Boston Scientific Corporation*, 2023 WL 4139377, at *5 (M.D. Ga. 2023) (Land, J.). However, an expert may "testify[] about [a corporate defendant's] internal documents to the extent that they explain a basis for [the expert's] opinions." *Id.*

**A "Corporate Representative" at Trial Can Only Testify Based on Such Witness's Own Personal Knowledge**

Unlike a Rule 30(b)(6) *deposition*, a corporate representative *at trial* must have personal knowledge as to the facts to which he intends to testify. *Union Pump Co. v. Centrifugal Technology Inc.*, 404 Fed. App'x. 899, 907–08 (5th Cir. 2010); *Stryker Corp. v. Ridgeway*, 2016 WL 6585007, at *3 (W.D. Mich. 2016).

**Arguments Seeking Jury Nullification are Not Allowed.**

Ford's argument that roof crush has no connection to injuries is an impermissible attempt at jury nullification. Ford has argued, in this case and others, that there is no causal connection between roof deformation and injuries in rollover wrecks. *See, e.g.*, Doc. 38 - Ford Resp. Br. to Pls.' Mot. to Supplement Exp. Rep. at 10; Doc. 105 - Vogler Rep. at 16.; Doc. 53-1 - Ford's Mot. for Partial Summ. J. at 2; Doc. 53-2 - Ford's Stmt. Of Undisputed Material Facts ¶ 30.i. This argument is contrary to law. Were the jury to issue a defense verdict in accordance with an argument that roof deformation has no causal relationship to occupant injury, it would nullify law. In addition, if a jury were influenced to reduce the damages awarded, or not to impose punitive damages upon Ford, based in any part upon Ford's argument that roof deformation has no causal relationship to occupant injury, that would nullify law.

49 CFR § 571.216, also known as Federal Motor Vehicle Safety Standard (FMVSS) No. 216, entitled "Roof Crush Resistance," was promulgated by the National Highway Traffic Safety

Administration (NHTSA), with the authorization of the Secretary of Transportation and

Congress, for the stated purpose of "reducing deaths and injuries due to the crushing of the roof

into the occupant compartment in rollover crashes." FMVSS 216 first went into effect in 1973,

requiring that automakers build vehicles with a strength-to-weight ratio of at least 1.5. Since

then, NHTSA has strengthened FMVSS 216—most significantly in 2009, when NHTSA

amended the standard to raise the required strength to weight ratio to 3.0 for passenger cars and

expanded the regulation's scope to include heavier vehicles. In doing so, NHTSA publicly stated

that it had investigated Ford's argument that roof crush has no causal relationship to injuries in

rollovers, and found that, to the contrary, "as [roof] intrusion increases, the probability of, and

severity of injury also increases." Roof Crush Resistance; Phase-In Reporting Requirements, 74

Fed. 14 Reg. 22,348 (May 12, 2009), at 22378–79. NHTSA's position, promulgated in its

regulations, always has been and continues to be that "a stronger roof of a vehicle saves lives and

prevents incapacitating injuries in a rollover crash." Y.-J. Kweon, "Evaluation of FMVSS No.

216a, roof crush resistance, upgraded standard, Report No. DOT HS 813 027," at 41, National

Highway Traffic Safety Administration (November 2020) (PX 785) (emphasis added).

A properly promulgated regulation published in the Code of Federal Regulations, like

FMVSS, has the full force and effect of law. *United States v. Leekley*, 377 F. Supp. 3d 1318,

1327 (N.D. Fla. 2019). "Jury nullification constitutes the proposition that the jury may disregard

the law as provided by the trial court and instead decide a case based upon considerations that

have no legal justification[.]" 172 Am. Jur. Trials 507. "It is well-established that parties and

their counsel may not seek jury nullification at any time during trial, including through the

introduction of irrelevant evidence or through argument." *United States v. Funches*, 135 F.3d

1405, 1409 (11th Cir. 1998).

By arguing to the jury that there is no causal relationship between roof deformation and injuries in a rollover crash, Ford attempts to induce the jury to disregard FMVSS 216—nullifying the law.[2]

**A Ford expert witness may not testify to his own opinion that roof crush doesn't matter ("no causal relationship to injury") based on his own prior experience working for Ford without being subject to cross-examination about the entirety of that experience.**

Ford intends to have its expert witness Chris Eikey testify to his own opinion that roof crush doesn't matter.[3]  Ford claims that opinion from Eikey is based on his own "23 years of experience working for Ford." Doc. 230 at 5-6.[4]

An expert's opinions must be "based on sufficient facts or data." Fed. R. Evid. 702(a) (emphasis added).  As the Eleventh Circuit explained just a few months ago, an opposing party is entitled to test the "credibility" of the expert's opinions through "vigorous cross-examination." *Rappuhn v. Primal Vantage, Company, Inc.*, 2024 WL 2930448, at *4 (11th Cir. 2024).  Plaintiffs are entitled to cross-examine Eikey regarding the entirety of the "experience working for Ford" upon which his opinions are supposedly based.  That includes all that Eikey knows, or should know, about what Ford's actions reveal about whether the "roof crush doesn't matter" argument has any validity, and whether Ford itself actually believes that argument.  Just as one example, that "vigorous cross-examination" of Eikey must include cross-examination about the fact Ford has settled hundreds of "Super Duty" truck and Ford Excursion roof crush/rollover cases and claims. Whether Eikey considered or ignored that fact before presuming

---

[2] At the final pre-trial on December 12, 2024, the Court denied Plaintiffs' request regarding their "jury nullification" argument.  [Doc. 296 at p. 113:8-10.]

[3] It is undisputed that Eikey had no personal involvement in the so-called "studies" upon which that Ford argument is based – he was a child when one such 'study' was done (Malibu) and was not personally involved in the other such "studies" upon which Ford purports to rely.

[4] Ford may intend to have another expert witness who is also a former Ford employee, Roger Burnett, do the same, and for the same reason.   If so, this section applies to that attempt as well.

to testify to his stated opinion that "roof crush doesn't matter" is crucial to the credibility of that opinion, and to the credibility of Ford itself.

Eikey certainly knows about Ford's own actions relevant to its "roof crush doesn't matter" argument.   His job at Ford was litigation support. Doc. 205 at 159/16-20.  He worked in what Ford euphemistically calls the "Office of Automotive Safety."  Doc. 74-1 (Eikey Exp. Rep.) at p. 4. In that capacity he has testified for Ford more than 70 times.  Doc. 213 at n.4.  Eikey is well familiar with actions taken by Ford with respect to lawsuits and claims alleging that roof crush in the subject trucks killed or injured people. He is also well familiar with how Ford's legal team formulates arguments to deal with such lawsuits.   Doc. 205 at 164/20-165/14.[5]  *See* Doc. __ for further argument and citation regarding this subject.

**(17)    Special authorities relied upon by defendant relating to peculiar legal questions are as follows:**

Ford incorporates its previously filed Motions for Partial Summary Judgment, FRE 702 Motions to Exclude, and Motions *In Limine*.

Further, although the Georgia Court of Appeals recently set aside the verdict in *Hill v. Ford* and ordered a new trial, Plaintiffs' Counsel take the position in their Notice of Intent to Seek Certiorari from the Georgia Supreme Court that the *Hill* verdict should be reinstated.  As such, it would be a waste of the Court and the Parties' time and resources to try the punitive damages portion of this case at this time, as O.C.G.A. § 51-12-5.1(e)(1) would bar pursuit of punitive damages in this case if the *Hill* verdict is reinstated.

---

[5] Discussion of Eikey's familiarity with what Ford calls "litigation engineering conferences" ("LECs") – meetings held by Ford's lawyers and experts to formulate opinions.

**(18)      The following are lists of witnesses the:**

**(a) Plaintiff <u>will</u> have present at trial:**

James Edward Brogdon, Jr.

Ronald Brian Brogdon

Jason Mills

**(b) Plaintiff <u>may</u> have present at trial:**

<u>In person</u>:

    Joshua Brooks

    Bryant Buchner

    Dr. Jonathan Eisenstat

    Brian Herbst

    Paul Lewis

    Steve Meyer

    Harold "Gator" Bryant

    Charles "BB" Barwick

    Earl Boyett

    Max Bryant

    Eddie Ervin

    Daniel Frewell

    Ervin Flanders

    Sheriff Wiley Griffin

    Randall & Marilyn James

Lauren Brogdon

Brandi Brogdon

<u>In person or by video</u>:

Jimmie Lee Cooper

Anthony Harrison

Trooper Brian Palmer (GSP)

Trooper Jacob Sanchez (GSP)

EMT Kristen Drexler

EMT Courtney Pollock

Sr. Trooper Brett Wilkinson (retired)

Fireman Trenton Russ

Dr. J. Sydney Cochran

Dr. William Ellis


<u>By video</u>:

Jason Balzer

Joseph Weishaar

Sal Caruso

Carl Zaas

Lawrence Queener

Stephen Kozak

Ram Krishnaswami

Ridha Baccouche

Derrick Kuzak

**(c) Defendant <u>will</u> have present at trial:**

None.

**(d) Defendant <u>may</u> have present at trial:**

1.  Anthony Harrison: 911 Caller

2.  Jimmy Lee Cooper: Eyewitness

3.  Trooper Jacob Sanchez: Georgia State Patrol

4.  Kristin Drexler: Decatur County EMS

5.  Colby Swicord: Bainbridge Fire Department

6.  Roger Burnett: Fact Witness

7.  Chris Eikey: Fact Witness

8.  Roger Burnett: Expert

9.  Daniel Camacho, MD, Ph.D.: Expert

10. J.C. Upshaw Downs, MD: Expert

11. Chris Eikey: Expert

12. Mark Fleming, Ph.D., P.E.: Expert

13. Harold Keyserling, MD: Expert

14. Mark Sochor: Expert

15. Don Tandy: Expert

16. Michelle Vogler: Expert

17. Harold Bryant from Royce Towing to authenticate photographs.

18. A representative from Grady EMS to authenticate medical records

19. A representative from MSA Orthopedic to authenticate medical and radiology records

20. A representative from Bainbridge Pharmacy to authenticate medical records

21. A representative from Care360 to authenticate medical records

22. A representative from Archbold Memorial to authenticate radiology records

23. A representative from J. Sydney Cochran, M.D. P.C. to authenticate medical records

24. A representative from Memorial Hospital & Manor to authenticate medical records

25. A representative from Archbold Cancer Center to authenticate medical records

26. A representative from Archbold Medical Center to authenticate medical records

27. A representative from Archbold Specialty Clinic to authenticate medical records

28. A representative from Cardiovascular Consultants of South GA to authenticate medical records

29. A representative from Tallahassee Memorial Hospital to authenticate medical records

30. A representative from Southern Interventional Pain Center to authenticate medical records

31. A representative from Hughston Clinic to authenticate medical and radiology records

32. A representative from Albany Vascular Specialist Center to authenticate medical records

33. A representative from Tallahassee Orthopedic Clinic to authenticate medical records

34. A representative from Radiology Associates of Tallahassee to authenticate medical records[6]

<u>Ford's Objection</u>: Plaintiffs identified Charles Edward Barwick, Early Boyett, Max Bryant, Ervin Flanders, and Sheriff Wiley Griffin on May 21, 2024.  Ford objects to these witnesses

---

[6] Ford Motor Company: It appears that Plaintiffs have stipulated to the authenticity of the records for which these custodians at Nos. 17 through 34 have been identified. To the extent that is confirmed at the Pretrial Conference, Ford will have no need to call these witnesses at trial.

testifying on any topic other than the value of the lives of Mr. and Mrs. Mills.  Ford attempted to clarify this issue in an email of November 14, 2024, but Plaintiffs did not respond.

Response by Plaintiffs to Ford's "objection:"  That is the topic upon which those named witnesses will testify.

**Opposing counsel may rely on representation by the designated party that it <u>will</u> have a witness present unless notice to the contrary is given in sufficient time prior to trial to allow the other party to subpoena the witness or obtain this testimony by other means.  Counsel should be prepared to state at the pretrial conference objections to any witness listed.**

**(19)    Attached hereto as <u>Exhibit B</u> is a list of all depositions that each party intends to introduce at trial.  If parties do not intend to read the entire deposition into the record, page and line designations and counter designations should be included.**

**Plaintiffs list is attached as Exhibit B along with Plaintiffs' Objections to Ford's Counter Designations as Exhibit B2.**

**Ford Motor Company: Ford's Objections and Counter Designations are attached as Exhibit B1.**

**<u>BY THE COURT</u>**: The Court consolidated the three exhibit Bs into a single document.  The Court has issued a separate order regarding deposition designations.

**(20)    Attached hereto as <u>Exhibit C</u> is a list of all exhibits that each party intends to tender into evidence at trial.  (*Please designate with an asterisk (\*) those exhibits to which an authenticity objection exists.*)**

**(21)    Attached hereto as <u>Exhibit D-1</u> is Plaintiffs' proposed form of all possible verdicts to be considered by the jury.  Attached hereto as <u>Exhibit D-2</u> is Ford's proposed form of all possible verdicts to be considered by the jury.  <u>BY THE COURT</u>**: The parties submitted three documents labeled Exhibit D: Exhibit D-1A, D-1B, and D-2.  The Court consolidated the three exhibit Ds into a single document.

**(22)    The possibilities of settling the case are:**

**Plaintiffs:**  The possibilities of settling this case are unknown.

**Ford:**  Unlikely.

**(23)    A jury of twelve will be selected and all jurors shall participate in the verdict unless excused from service by the court.  No alternates will be selected.**

**<u>BY THE COURT:</u>**  Plaintiffs collectively shall have three peremptory challenges, and Defendant shall have three peremptory challenges.

**(24)    The parties are notified that if this action is settled after jurors have been summoned and it is too late to notify jurors that it is no longer necessary for them to report for jury service, the cost of compensating those jurors who report for jury service unnecessarily shall be taxed as costs upon the parties, as the Court determines appropriate.**

**(25)    Other matters:**

**Plaintiffs:**  Ford is also represented in this case by Harold Melton, Esq.  Plaintiffs respectfully request that Ford and its lawyers be instructed that neither they nor their witness are permitted to refer to Mr. Melton as "Justice Melton," "Justice," or "Judge" in front of the jury

and are not permitted to refer to the fact Mr. Melton was previously Chief Justice of the Supreme Court of Georgia, or a judge in any capacity.  During the pretrial conference hearing, the Court ordered that Mr. Melton be referred to only as "Mr. Melton or Harold and not Justice or Judge Melton." 12/12/24 Pretrial Conference Hrg. Tr. 69:11-12.

At 2:52 p.m. on December 23, 2024 – the date the parties' Revised PPTO was due per Court Order, Ford sent its revised exhibit list.  On that revised exhibit list Ford highlighted certain exhibits.  Ford has added 58 previously unidentified exhibits (54-1 thru 54-45, 432-439, and 519-523).  Plaintiffs have no choice but to object to the authenticity of those, since the parties' joint revised PPTO is due today, and Plaintiffs' counsel will not have time to research what those exhibits are.

**BY THE COURT:**  The Court does not intend to waste the jurors' valuable time listening to unnecessary testimony regarding authenticity when there is no actual dispute over authenticity. The parties should resolve any remaining authenticity issues well in advance of trial.

**Ford Motor Company:**  Plaintiffs' Trial Exhibit List contains several vague, ill-defined descriptions of documents (e.g., No. 84 "Photo – Georgia State Patrol", No. 364 " Safety Product Development", No. 821 "Structural Analysis"). Ford objects to these ambiguous identifications as improper.  **BY THE COURT**: The Court expects the parties to work out this dispute; it should not be complicated for Plaintiffs' counsel to clarify which documents they intended to identify as exhibits 84, 364, and 821..

Submitted by:

s/ _____
JAMES E. BUTLER, JR.
Georgia Bar No. 099625
jim@butlerprather.com

36

RAMSEY B. PRATHER
Georgia Bar No. 658395
ramsey@butlerprather.com
DANIEL E. PHILYAW
Georgia Bar No. 877765
dan@butlerprather.com
ALLISON B. BAILEY
Georgia Bar No. 478434
allison@butlerprather.com
BUTLER PRATHER LLP
105 13th Street
Post Office Box 2766
Columbus, GA 31902
706-322-1990
LARAE DIXON MOORE
Georgia Bar No. 223379
LMoore@PageScrantom.com
PAGE SCRANTOM SPROUSE
TUCKER & FORD
1111 Bay Avenue 3rd Floor
P.O. Box 1199
Columbus Georgia 31902
706-324-0251

**_Counsel for Plaintiffs_**


/s/ _____
Elizabeth B. Wright
_Admitted Pro Hac Vice_
Elizabeth.Wright@ThompsonHine.com
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114
Telephone:  216-566-5500

Charles E. Peeler
Georgia Bar No.: 570399
Charles.Peeler@Troutman.com
Harold D. Melton
Georgia Bar No.: 501570
Harold.Melton@Troutman.com
TROUTMAN  PEPPER  HAMILTON  SANDERS
LLP
600 Peachtree Street, N.E., Suite 3000

37

Atlanta, GA 30308
Telephone:  404-885-3000

 Paul F. Malek
*Admitted Pro Hac Vice*
PMalek@HuieLaw.com
HUIE, FERNAMBUCQ & STEWART, LLP
3291 US Highway 280, Suite 200
Birmingham, AL 35243
Telephone:  205-251-1193

Michael R. Boorman
Georgia Bar No.: 067798
MBoorman@WatsonSpence.com
Philip A. Henderson
Georgia Bar No.: 604769
PHenderson@WatsonSpence.com
WATSON SPENCE LLP
Bank of America Plaza
600 Peachtree Street NE
Suite 2320
Atlanta, GA 30308
Telephone: 229-436-1545

Michael W. Eady
Admitted *Pro Hac Vice*
MEady@ThompsonCoe.com
THOMPSON, COE, COUSINS & IRONS, LLP
2801 Via Fortuna Drive, Suite 300
Austin, Texas 78746
Telephone:  512-708-8200


***Counsel for Defendant***
***Ford Motor Company***

*** ORDER ***

It is hereby ORDERED that the foregoing, including the attachments thereto, constitutes the pretrial order in the above case and supersedes the pleadings and that this pretrial order may not be further amended except by order of the court to prevent manifest injustice.  The Court notes that it has issued written orders that address some of the issues described in the pretrial order. Those rulings obviously apply unless vacated by the Court.

This 30th day of December, 2024.


S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE
MIDDLE DISTRICT OF GEORGIA