IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| JAMES EDWARD BROGDON, JR., *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| vs. | * | CASE NO. 4:23-CV-88 (CDL) |
| | * | |
| FORD MOTOR COMPANY, | * | |
| | * | |
| Defendant. | * | |

O R D E R

One of Defendant Ford Motor Company's experts, Dr. Jamie Downs, has now clarified his analysis supporting his opinion that Debra Sue Mills died of hypertensive heart disease and sudden cardiac dysrhythmia. Downs Aff., ECF No. 329. In light of this clarification and for the reasons that follow, the Court grants Ford's motion for reconsideration of the Court's previous ruling that excluded Dr. Downs's testimony on this issue (ECF No. 310).

STANDARD

Local Rule 7.6 provides that motions for reconsideration shall not be filed as a matter of routine practice. M.D. Ga. R. 7.6. Generally, such motions will only be granted if "the movant demonstrates that (1) there was an intervening development or change in controlling law, (2) new evidence has been discovered, or (3) the court made a clear error of law or fact." *Rhodes v. MacDonald*, 670 F. Supp. 2d 1363, 1378 (M.D. Ga. 2009). Here, Ford

does not contend that new evidence was discovered, nor does it contend that there was an intervening development or change in controlling law. Rather, it contends that the Court made a clear error of law or fact. The wrinkle here is that Ford substantially contributed to the error that it now relies upon in support of its motion for reconsideration.

## DISCUSSION

Under Federal Rule of Evidence 702, an expert witness may only offer opinion testimony if the proponent of the testimony "demonstrates to the court that it is more likely than not" that the witness is qualified to offer the opinion because of his knowledge, skill, experience, training, or education, that the witness's "testimony is based on sufficient facts or data," that the "testimony is the product of reliable principles and methods," and that the "opinion reflects a reliable application of the principles and methods to the facts of the case."

As the Court previously explained, Plaintiffs do not dispute that a forensic pathologist like Dr. Downs is generally qualified to offer an opinion on cause of death following an autopsy that documents the decedent's injuries and conditions. Plaintiffs objected to Dr. Downs's cause of death opinion for Mrs. Mills; Plaintiffs argued that Dr. Downs did not use a reliable methodology and that his opinions were pure *ipse dixit* because he did not clearly state the basis for those opinions. The Court partially

rejected that argument, concluding that Dr. Downs adequately explained and supported with facts his opinion ruling out positional asphyxiation as a cause of death for Mrs. Mills.

The Court, though, found that Dr. Downs did not provide similar support for his opinion that Mrs. Mills died of hypertensive heart disease as a result of a sudden cardiac dysrhythmia occurring in a setting of cardiomegaly. The Court recognized that Dr. Downs originally provided support for his conclusion that Mrs. Mills had an enlarged heart, and he ruled in the enlarged heart as a potential cause of death because an enlarged heart "*can trigger* a sudden cardiac dysrhythmia." Downs Dep. 150:12-17, ECF No. 72 (emphasis added). The problem, though, was that Ford did not point to any portion of Dr. Downs's report or deposition that clearly disclosed the factual basis for his conclusion that a heart problem *did trigger* an irregular heartbeat in Mrs. Mills.

Ford contends that the Court erred in reaching this conclusion. The bulk of Ford's argument, however, oddly focuses on criticizing the opinion of Plaintiff's forensic pathologist, Dr. Jonathan Eisenstat. Ford asserts that if Dr. Eisenstat is allowed to testify about why he ruled out a sudden cardiac event as the cause of Mrs. Mills's death, then Dr. Downs should be allowed to opine that Mrs. Mills did experience a sudden cardiac event that caused her death. Ford further argues that Dr.

3

Eisenstat did not use reliable methodology and that it would be error to allow him to testify. Because Ford spends so much time in its motion for reconsideration of the Court's decision partially excluding opinions of its own expert, Dr. Downs, complaining about the Court's ruling allowing the testimony of Plaintiffs' expert, Dr. Eisenstat, the Court is concerned that in a future appeal the appellate court may be misled into thinking that the Court gave little thought to its conclusion that Dr. Eisenstat should be allowed to testify. So out of an abundance of caution, before addressing the motion for reconsideration as to Dr. Downs, the Court further explains its rationale regarding Dr. Eisenstat.

Dr. Eisenstat is a forensic pathologist who served as the chief medical examiner for the Georgia Bureau of Investigation. He has performed more than 4,100 autopsies and assisted in approximately 45,000 autopsies. Dr. Eisenstat opines that Mrs. Mills died of positional asphyxia with her blunt impact injuries contributing due to the roof crush. In his expert report and his deposition, Dr. Eisenstat explained in detail why he ruled in positional asphyxia as Mrs. Mills's cause of death. During his deposition, Ford introduced its sudden cardiac event theory, and Dr. Eisenstat explained why he did not find that a cardiac event caused Mrs. Mills's death. In a later declaration, Dr. Eisenstat further explained why he did not find support for the sudden

4

cardiac event theory.[1]  *See generally* Eisenstat Decl. (Sept. 9, 2024), ECF No. 119.  Finally, in response to Ford's motion to exclude him, Dr. Eisenstat provided a declaration which succinctly summarized his methodology: he performed Mrs. Mills's autopsy using the methods employed by forensic pathologists and medical examiners, and he worked through a differential diagnosis methodology.  *See generally* Eisenstat Decl. (Nov. 27, 2024), ECF No. 236-1.  Thus, the Court remains satisfied that Dr. Eisenstat is qualified to offer the opinions, that the testimony is based on sufficient facts or data, that Dr. Eisenstat used a reliable methodology, and that his opinion reflects a reliable application

---

[1] Ford argued in its September 2024 summary judgment reply brief that the declaration should be excluded under the "sham affidavit" rule.  The Court considered the argument and found that there was no irreconcilable conflict between the declaration and the deposition testimony, and thus no basis to strike the declaration as a sham.  The Court relied on the declaration but found it unnecessary to announce an explicit ruling on this issue in the summary judgment order.
Ford now has a new argument: that the September 2024 declaration should be excluded under Federal Rule of Civil Procedure 37(c)(1), which requires exclusion of evidence that should have been disclosed under Federal Rule of 26(e) but was not, unless the failure was substantially justified or harmless.  Federal Rule of Civil Procedure 26(e)(2) requires supplementation of information contained in an expert's report and information given in an expert's deposition.  In the Court's view, that is what Dr. Eisenstat's September 2024 declaration does, so it is a proper supplemental response.  Even if the declaration were not a proper supplemental response, Ford did not explain how it is prejudicial to allow Dr. Eisenstat to add more details supporting his previously disclosed opinions when those details are based on his consideration of depositions that were taken after his own, including depositions of Mrs. Mills's treating physicians that were taken just before the close of discovery.  The Court declines to exclude the September 2024 declaration under Rule 37(c)(1). Ford's argument is particularly rich given that it was provided a late opportunity to help its expert limp across the Daubert gate.

of the methods to the facts of the case. Ford's criticisms of Dr. Eisenstat's testimony go to its weight, not its admissibility, and can be addressed in a thorough and sifting cross examination. So, to the extent that Ford seeks reconsideration of its decision to deny the motion to exclude Dr. Eisenstat (ECF No. 223), that motion is denied.

The Court turns to Ford's argument that Dr. Downs used a reliable methodology and correctly applied it to the facts of this case.[2] Ford asserts that Dr. Downs used the Forensic Autopsy Performance Standards, which generally employ a differential diagnosis analysis. Under such an analysis, a pathologist rules in potential causes of death and then systematically rules out all causes but one. The Court accepts, as it previously did, Ford's representation that Dr. Downs intended to perform a differential diagnosis analysis. And, as the Court already concluded, Dr. Downs ruled in several potential causes of death for Mrs. Mills: blunt force injuries that Mrs. Mills sustained in the wreck, positional asphyxiation, and a sudden cardiac event. Dr. Downs adequately explained why he considered these potential causes of death— including a sudden cardiac event. Downs Dep. 150:12-17 (noting

---

[2] Dr. Downs's expert report and deposition do not explicitly name the methodology he used. During the pretrial conference, Ford's counsel argued that Dr. Downs "conducted a differential type diagnosis or analysis" to reach his opinions. Hr'g Tr. 37:7-9, ECF No. 296. In its motion for reconsideration, Ford disclosed for the first time that Dr. Downs used the Forensic Autopsy Performance Standards.

6

that Mrs. Mills had an enlarged heart, which can trigger a sudden cardiac dysrhythmia). But Ford's response to the motion to exclude Dr. Downs only focused on why Dr. Downs *ruled in* a sudden cardiac event, and it was not clear to the Court from the record before it that Dr. Downs had adequately *ruled out* the blunt force injuries Mrs. Mills sustained in the wreck.

Before the Court issued its order excluding Dr. Downs, the Court reviewed Dr. Downs's expert report, including Dr. Downs's acknowledgement that blunt force injury was a significant condition he observed for Mrs. Mills, as well as several pages cataloguing Mrs. Mills's injuries that likely occurred because of the wreck, such as fractures, soft tissue bleeds, lacerations, and contusions. Ford contends in its motion for reconsideration that the Court missed some critical information which it claims clearly establishes that Dr. Downs unequivocally ruled out blunt force trauma as a cause of death:

> [Mrs. Mills] had isolated scalpular blood. The calvarium and skull floor were intact. Intracranial epidural, subdural, and subarachnoid blood were absent. The brain, cerebellum, and brainstem all lacked identified injury. The posterior neck dissection documented left upper back blood and T1-C7 spinous process fractures with expected associated blood. Although epidural blood was present at the low cervical-upper thoracic spine level, this is a well-known postmortem artifact and of no diagnostic value in this case. The presence of epidural blood to the T6 level is associated with the documented posterior rib fractures. The absence of any identified spinal cord trauma or intrathecal blood confirms the artifactual nature of the former finding and the minor nature of the latter. The impressed areas in the back are of no

7

> significance, as no blood is associated with these, supporting that these are postmortem artifacts and not actual injuries.

Downs Report 3, ECF No. 71. This language is repeated later in the report, followed by another paragraph:

> By convention, if an unnatural element (here the perimortem blunt force injuries from the motor vehicle collision) plays any part in death, no matter how small, the manner is deferred to the unnatural element(s), thus the manner of death here is designated as "accident" despite the subject surviving the initial event. The notable other documented clinical conditions made this subject more susceptible to the sustained wounds from the collision.

*Id.* at 28.[3]

Perplexingly, Ford did not highlight these statements for the Court until it filed the pending motion for reconsideration. Moreover, the Court is not convinced that it should have concluded that these statements unequivocally establish that Dr. Downs ruled out blunt force trauma as a cause of death for Mrs. Mills. The Court reads the first paragraph to mean that (1) there was no identifiable injury to Mrs. Mills's brain, so she did not die of a brain injury, (2) the blood observed Mrs. Mills's neck and upper back probably occurred after she died, so it was not evidence that she died of a neck injury, (3) Mrs. Mills did not have spinal cord trauma or blood in the intrathecal space, so her fractured ribs should be considered minor, and (4) the impressions on Mrs. Mills's

---

[3] In contrast, Dr. Downs had this to say about Plaintiffs' positional asphyxiation theory: "The clinical picture and data simply do not support asphyxiation as a factor in either death." Downs Report 28.

back were made after she died. The Court read the second paragraph to mean that Dr. Downs concluded that the manner of Mrs. Mills's death was an accident because the pre-death blunt force injuries from the wreck played some part in her death. Taken together, these paragraphs do not clearly convey that Dr. Downs concluded to a reasonable degree of medical certainty that none of the blunt trauma injuries Mrs. Mills suffered in the wreck caused her death. Therefore, the Court did not make a clear error of fact or law in its original ruling excluding this part of Dr. Downs's testimony based on the record as it existed at that time.

Notwithstanding this lack of clarity, which should have been obvious to counsel, the Court permitted Ford to supplement the record with an affidavit from Dr. Downs clarifying his opinion. He has done so and now makes clear that he ruled out blunt force trauma as a contributing cause of Mrs. Mills's death and he explains why. Downs Aff. ¶¶ 18-20. Having thus eliminated all other possible causes of death, it is Dr. Downs's opinion that Mrs. Mills died of a sudden cardiac event. The Court finds that Ford has now (albeit belatedly) demonstrated by a preponderance of the evidence that Dr. Downs's opinion regarding cause of death is "based on sufficient facts or data," that the "testimony is the product of reliable principles and methods," and that the "opinion reflects a reliable application of the principles and methods to the facts of the case." Based on this current record, it would

likely be clear error to exclude Dr. Downs's opinions regarding cause of death. Accordingly, the Court grants the motion for reconsideration (ECF No. 310) and will allow Dr. Downs to testify as to Mrs. Mills's cause of death just as the Court will permit Dr. Eisenstat to testify on that same subject.[4]

IT IS SO ORDERED, this 24th day of January, 2025.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA

---

[4] The Court acknowledges that a non-frivolous argument exists that Ford waived any right to supplement the record with Dr. Downs's recent affidavit given that the information contained in it was available prior to the Court's original ruling excluding the opinions. However, given the ambiguity in Dr. Downs's expert report, the Court declines to find waiver under the circumstances. Because the clarifying affidavit, read in conjunction with the original report, makes clear that the opinions should not be excluded, the Court finds reconsideration appropriate. Despite Plaintiffs' counsel's advocacy skills, the Court found it unnecessary to await a response to the supplemental affidavit before making this ruling today. The time of counsel and the Court can be better spent on other things.

10