**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | |
|---|---|
| JAMES EDWARD BROGDON, JR., et al., | |
| Plaintiffs, | |
| vs. | Case No. 4:23-cv-00088-CDL |
| FORD MOTOR COMPANY, | |
| Defendant. | |

**FORD MOTOR COMPANY'S MOTION FOR NEW TRIAL AND REDUCTION OF**
**PUNITIVE DAMAGES, WITH INCLUDED MEMORANDUM OF LAW**

In accordance with Rule 59, Defendant Ford Motor Company ("Ford") respectfully

moves for a new trial. Ford also requests a reduction of punitive damages to the constitutional

maximum and an additional remittitur below that amount if the Court determines the maximum

exceeds a 1:1 ratio between punitive damages and the relevant compensatory comparator.

**INTRODUCTION**

Mere months after the Georgia Court of Appeals vacated the prior record-setting punitive

damages verdict of $1.7 billion in the *Hill v. Ford* case, the jury in this case set a new record of

$2.5 billion. Unfortunately, the stratospheric verdict in this case can be traced directly to the

now-vacated *Hill* verdict. Following the trial, Ford was presented with evidence showing that,

contrary to this Court's unambiguous instructions, certain jurors made the rest of the jury aware

of the now vacated *Hill* verdict in favor of the plaintiffs and the amount of the verdict, with the

result that "beyond a shadow of a doubt there was an influence." This extraneous information

unfairly prejudiced Ford; requires a full evidentiary examination by the Court; and—based on

the information Ford has received from jurors—necessitates a new trial for Ford.

The poisonous influence of the *Hill* verdict likely explains why the jury found that alleged "roof crush" injuries caused Plaintiffs' deaths on a record that establishes just the opposite. The great weight of the evidence shows: (1) Mrs. Mills experienced a sudden cardiac event immediately before she allowed the truck to run off the road and plummet nose-down at a speed of nearly 50 miles per hour before pitching over; (2) Mr. and Mrs. Mills both experienced physical injuries fully consistent with this significant frontal impact; but (3) neither Mr. nor Mrs. Mills experienced any serious physical injuries from the roof of the truck allegedly crushing down on them after the frontal impact. In "reweighing" the evidence to rule on Ford's motion, the Court need not credit bare assertions by Plaintiffs' experts directly contradicted by the credible evidence.

Perhaps nothing illuminates the contaminating influence of the *Hill* verdict more than the jury's record-breaking $2.5 billion punitive damages verdict. In *Hill*, a jury constrained by the trial court's erroneous sanctions-based issue preclusion rulings imposed a shocking $1.7 billion verdict. Improperly inflamed by knowledge of that verdict here, the jury wrongfully punished Ford based on the (now-vacated) *Hill* verdict by awarding massive punitive damages exceeding the relevant portion of compensatory damages by a stunning $2.495 billion (for a ratio of 535:1).

Should the Court not grant a new trial, it should reduce the punitive damages award to the constitutional maximum of $4,675,000 (or $4,250,000 if the Court sets aside the pain and suffering award to Mrs. Mills). If the Court finds a higher constitutional maximum, it should reduce the award accordingly and grant a remittitur no more than $4,675,000 (or $4,250,000).

## ARGUMENT

### I.     The Court should grant Ford a new trial on multiple independent grounds.

Binding appellate authority holds a new trial should be granted where, as here, the jury received information, outside of trial evidence, indicating that the defendant had been in similar "trouble" before. Because Ford's evidence shows both an extraneous prejudicial influence and a direct impact on the jury's deliberations, the Court should convene a full evidentiary hearing into the matter, after which Ford fully expects that the Court will grant a new trial.

Courts rarely set aside judgments as against the great weight of the evidence. But here, Mrs. Mills ceased controlling the truck before it went off road and plunged into a nose-down crash. Only after this direct frontal impact—which the evidence overwhelmingly shows *did* cause all the significant traumatic injuries to both Mr. and Mrs. Mills—did the truck pitch over onto its roof, which the evidence overwhelmingly shows *did not* cause any significant traumatic injuries to either Mr. or Mrs. Mills. The unsupported speculation of Plaintiffs' expert witnesses cannot overcome the absence of admissible evidence supporting Plaintiffs' causation theory.

As Ford explains in its contemporaneous motion for judgment as a matter of law ("JMOL")—which Ford incorporates by reference—Plaintiffs presented insufficient evidence for the jury to award punitive damages against Ford. At a minimum, the Court should have given Ford's requested instructions relative to punitive damages, which (a) required the jury to find punitive damages only in the circumstances permitted by *Ivy v. Ford Motor Co.*, 646 F.3d 769 (11th Cir. 2011); and (b) defined the terms "willful conduct," "wanton conduct," and an "entire want of care which would raise the presumption of conscious indifference to consequences." Dkt. 357, at 4-5. The failure to give these jury instructions independently authorizes a new trial for Ford.

A.       **The jury improperly considered the *Hill* verdict.**

This Court's first sentence of its first charge instructed the jury that "[y]our decision must be based only on the evidence presented here." Dkt. 367, at 1. The Court similarly instructed the jury "not [to] do any independent research on your own investigation" because "you have got to decide the case solely on what happens in this courtroom." Dkt. 372 (Vol. 2 Tr.), at 14:24-15:7. Neither party introduced the (vacated) *Hill* verdict into evidence, and everyone agreed that referencing the verdict would be improper, Dkt. 280, at 12-13 & n.5; Dkt. 296, at 106:10-21.

Certain jurors nevertheless informed the rest of the jury about the verdict against Ford in *Hill v. Ford Motor Co.*, No. 16-C-04179-S2 (Ga. State. Ct., Gwinnett Cnty. Aug. 26, 2022), as well as the subsequent $1.7 billion punitive damages verdict—a verdict that had been vacated by the Court of Appeals before this trial started. 908 S.E.2d 748 (Ga. App. 2024), *pet. for cert. filed*, No. S250534 (Ga. Dec. 19, 2024). After the jurors informed the others of the verdict, the *Hill* verdict improperly influenced the deliberations. *See* Decl. of Charles E. Peeler, attached as **Exhibit A**; Decl. of Richard Hyde, attached as **Exhibit B**. Because "extraneous prejudicial information was improperly brought to the jury's attention," Fed. R. Evid. 606(b)(2)(A), the Court should fully examine the jury's consideration of the *Hill* verdict and grant Ford a new trial.

"When jurors consider extrinsic evidence," the Eleventh Circuit requires a new trial "if the evidence poses a *reasonable possibility of prejudice* to the defendant." *United States v. Rowe*, 906 F.2d 654, 656 (11th Cir. 1990); *see also BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1471-72 (11th Cir. 1992) (applying same standard in civil case). "The defendant must first establish prejudice by a preponderance of credible evidence. If and when a defendant makes this showing, the burden shifts to the plaintiff to prove that the juror's consideration of the extrinsic evidence was harmless." *Rowe*, 906 F.2d at 1472.

In determining the proper "investigative procedure" regarding a claim of improper extrinsic evidence, a district court should examine (1) "the certainty that some impropriety has occurred" and (2) "the seriousness of the accusation." *United States v. Ifediba*, 46 F.4th 1225, 1238-39 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 2586 (2023). "The more serious the potential jury contamination, especially where alleged extrinsic influence is involved, the heavier the burden to investigate." *Id.* at 1239. Thus, "[w]hen a party makes a colorable showing of extrinsic influence, the court must investigate to determine whether the influence was prejudicial." *Id.*[1]

At 4:41 p.m. on February 14—the day of the punitive damages verdict—Juror Number 36 called the office number of Charles Peeler, counsel for Ford, and left a voicemail message. In the conversations that followed (including in text messages attached to Mr. Peeler's Declaration), Juror 36 communicated the following:

1. Juror 36 thinks that the foreperson and Juror Number 52 knew of the verdict against Ford in the *Hill v. Ford* case during deliberations of Phase I of the case dealing with liability and compensatory damages.

2. During the Phase II deliberations on punitive damages, the foreperson and Juror 52 brought to the jury's attention that the punitive damages verdict against Ford in the *Hill v. Ford* case was $1.7 billion.

3. During the discussion of the $1.7 billion punitive verdict in the *Hill v. Ford* case, a comment was made, "this could be a record breaker."

*See* Peeler Decl. ¶ 8 & Ex. 1. As stated in one text from Juror 36 (*id.* Ex. 1, at 3):

---

[1] *See also United States v. Herring*, 568 F.2d 1099, 1104-05 (5th Cir. 1978) (applying *ABA Standards Relating to Fair Trial and Free Press* § 3.5(f) (1968), in addressing similar issue).

> The only thing I have follow up on from earlier would be; and I think the way the question was phrased was : Do I think there was any influence on this verdict because of what others knew and provided with the other jurors in response to the previous verdicts (ie: Hill case) and monetary amounts awarded: I will tell you now that my sworn testimony would be. Yes beyond a shadow of doubt there was an influence, based on what I heard and witnessed in that juror room.

Juror Number 6 thereafter confirmed to Ford's investigator Richard Hyde that the *Hill v. Ford* verdict had been discussed by the jury in the compensatory phase of the case. *See* Decl. of Richard Hyde ¶ 5.

In the Eleventh Circuit's *Brantley* decision, a defendant presented evidence that a juror told the other jurors the defendant had "been in this kind of trouble before." *United States v. Brantley*, 733 F.2d 1429, 1439 (11th Cir. 1984). Although the district judge held two *in camera* hearings to investigate this allegation, he refused to allow defense counsel to question the juror and refused to ask the juror written questions submitted by defense counsel. *Id.* The Court of Appeals reversed, explaining: "A party claiming that an improperly influenced jury returned a verdict against [it] must be given an opportunity to prove that claim." *Id.* (quoting *United States v. Forrest*, 620 F.2d 446, 457 (5th Cir. 1980)). Thus, in response to such an allegation, the trial judge "must conduct a *full investigation* to ascertain whether the alleged jury misconduct actually occurred; if it occurred, he must determine whether or not it was prejudicial." *Id.*

Here, the February 18 text message from Juror 36 states "beyond a shadow of a doubt" that there was "influence" on this verdict because of what others knew and said regarding the

*Hill* verdict. This improper extrinsic evidence—which Ford "had no opportunity to challenge," *id.* at 1441, even though the *Hill* verdict had been vacated—highly prejudiced Ford.[2]

Moreover, "[f]ailure by the jury to follow the court's instructions, which results in prejudice to the moving party, is a proper ground for a new trial." *AlphaMed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1355-56 (S.D. Fla. 2006) (granting motion for new trial because jury considered, *inter alia*, defendants' litigation conduct in other cases). Here, despite the Court's instructions that the jurors should base their verdict solely on the evidence at trial, the jury considered and discussed the *Hill* verdict, warranting a new trial.

### B. The jury's causation findings contravene the great weight of the evidence.

Under Rule 59, the district court "is free to weigh the evidence" and grant a new trial if "the verdict is against the clear weight of the evidence." *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016). The Eleventh Circuit has affirmed the grant of a new trial where the evidence supporting the verdict was "so attenuated and weak that we cannot say the district court abused its discretion in concluding that the first jury verdict was against the great weight of the evidence." *Ard v. Sw. Forest Indus.*, 849 F.2d 517, 521 (11th Cir. 1988). The presence of expert testimony supporting the verdict does not preclude the grant of a

---

[2] *See, e.g., Herring*, 568 F.2d at 1103-04 (presuming "that some prejudice of impermissible dimension did in fact exist" as a result of alleged exposure to newspaper article regarding trial); *United States v. Howard*, 506 F.2d 865, 866 (5th Cir. 1975) (reversing verdict against defendant and remanding for inquiry regarding extrinsic evidence that defendant "had been in trouble before"); *see also* Fed. R. Evid. 404; *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1351 (3d Cir. 1975) (finding references to prior verdicts prejudicial: "A jury is likely to give a prior verdict against the same defendant more weight than it warrants. The admission of a prior verdict creates the possibility that the jury will defer to the earlier result and thus will, effectively, decide a case on evidence not before it."); *Sullivan v. NFL*, 34 F.3d 1091, 1113 (1st Cir. 1994) (holding evidence of prior cases involving defendant inadmissible "[b]ecause of the inherently prejudicial nature of" such cases); *VirnetX Inc v. Apple Inc.*, 121 U.S.P.Q.2d 1049, 2016 WL 4063802, at *4-8 (E.D. Tex. July 29, 2016) (granting new trial based on references to prior verdict).

new trial when, "in reweighing the evidence," the district court does not assign the testimony "great weight when considered against the defendant's largely undisputed evidence."[3]

This Court also has granted a new trial where the verdict was "against the great weight of the evidence" and where "the damages awarded by the jury are so grossly excessive that the jury was likely swayed by passion or prejudice." *Richardson v. Mason*, 956 F. Supp. 2d 1372, 1380 (M.D. Ga. 2013) (citations omitted). Recognizing that "[j]uries are not immune from human fallibility, and they sometimes get it wrong," and that "appropriate deference to jury verdicts does not mean blind allegiance to them," this Court explained: "Just as the Court must not unduly intrude upon the province of the jury, it is a dereliction of duty to allow a verdict to stand that is not authorized by the evidence." *Id.* at 1374-75, 1381.

Here, Plaintiffs had the burden to establish by a preponderance of the evidence that a design defect in the Super Duty roofs proximately caused Mr. and Mrs. Mills' injuries and deaths. Dkt. 367, at 9, 12-13. While Ford respectfully submits no reasonable jury could find for Plaintiffs on proximate cause, at a minimum a new trial should be granted because the jury's causation conclusions contravene the great weight of the evidence. Similarly, if the Court does not set aside the jury's award of pain and suffering damages to Mrs. Mills as a matter of law, a new trial should be granted because that verdict is against the great weight of the evidence.

### 1. The evidence overwhelmingly shows that both Mr. and Mrs. Mills died from causes unrelated to the F-250's roof.

Plaintiffs posit that "roof crush" caused Mrs. Mills to die from positional asphyxiation and caused Mr. Mills to die from pneumonia. The evidence overwhelmingly shows otherwise.

---

[3] *Id.* at 521-22. *Cf. Ins. Co. of N. Am. v. Valente*, 933 F.2d 921, 925 (11th Cir. 1991) (reversing denial of motion for new trial on liability where "[t]here was no real evidence" to support jury's verdict and "no antithetic evidence to contradict" defendant's experts' testimony).

*First*, extensive testimony and documentation supports Ford's position that Mrs. Mills suffered a fatal cardiac event while driving that had nothing to do with the truck's roof. It is undisputed that the truck gradually left the road, that Mrs. Mills released the accelerator, and that Mrs. Mills never applied the brakes even as the truck slammed into a culvert at more than 50 miles per hour and became airborne. Dkt. 378 (Vol. 6 Tr.), at 49. Plaintiffs' counsel conceded during closing argument that he had no explanation for those events if Mrs. Mills were conscious. 02/13/25 Rough Tr. 15:21-22, 16:17-18. Nor does the record provide any such explanation: there was no evidence that Mrs. Mills left the road due to a vehicle defect, road debris, another vehicle, an animal, bad weather, distracted driving, or any alternative cause.

There *was* evidence, however, that Mrs. Mills had a significantly enlarged heart; had been hospitalized for chest pains just two months before the accident (in addition to numerous other reports of chest pain); had 20 years of documented cardiac problems; and had multiple other cardiac risk factors. *E.g.*, 02/12/25 Rough Tr. 168-69; [Dr. Sochor, Dr. Eisenstat, Ellis, and others]. Those factors included smoking, obesity, diabetes, high blood pressure, emphysema, tachycardia, heart palpitations, peripheral arterial disease, peripheral edema, hypothyroidism, dyspnea, a poor diet, a lack of regular exercise, and a family history of heart disease. [*Id.*]

It is also undisputed that Mrs. Mills died within minutes of the crash. [Harrison.] All the experts agree Mrs. Mills did not suffer serious traumatic contact injuries that could have caused sudden death. Dkt. 378 (Vol. 6 Tr.), at 236-38; [Dr. Sochor; Dr. Eisenstat; Mr. Lewis.] Plaintiffs' own experts testified that on the abbreviated injury scale, neither Mr. nor Mrs. Mills had injuries greater than AIS 3 (*i.e.*, no "Severe," "Critical," or "Maximal" injuries). Eisenstat Tr. 188:8-15.[4]

---

[4] Ford attaches an excerpt of the rough trial transcript containing the testimony of Dr. Eisenstat ("Eisenstat Tr.") as **Exhibit C**.

Nor did imaging from the post-exhumation autopsy show any traumatic life-threatening injuries that would explain a death within minutes. Dkt. 378 (Vol. 6 Tr.), at 236-38.

Dr. Camacho provided expert testimony that no radiological evidence indicated Mrs. Mills suffered chin-to-chest bruising that one would expect to see "[i]f the roof [was] pushing down" on her. *Id.* at 230-31. Plaintiffs' expert also noted the absence of chin and chest bruising. Eisenstat Tr. 157:13-20. If Mrs. Mills had been compressed by a crushed roof to such an extent she could not breathe, then the radiological scans would reflect bruising all over her shoulders and upper back. Dkt. 378 (Vol. 6 Tr.), at 225, 228-29. But Mrs. Mills' back was "pristine," to use Dr. Camacho's terminology. *Id.* This is unsurprising given other evidence showing that Mrs. Mills' seated height was shorter than the driver's headrest; that photos immediately after the crash showed the headrest to be upright; and that a firefighter much larger than Mrs. Mills had room to climb through the driver's side window and into the driver's side area of the overturned cabin with his gear. *Id.* at 140; DX 16.12; DX 16.12A.

Moreover, the record also shows that Mrs. Mills' physical (non-cardiac) injuries were caused by the truck's initial nose-down impact at 50 miles per hour—not from the subsequent "pitch-over" onto the roof. It is undisputed that this frontal impact was equal in severity to a 35-mph rigid crash barrier test, which car companies and the National Highway and Traffic Safety Administration ("NHTSA") routinely run as part of a New Car Assessment Program ("NCAP"). 02/12/25 Rough Tr. 98-100; DX 237.1; DX 237.2. Dr. Sochor testified based on his 25 years of experience as an emergency room physician treating patients involved in frontal collisions that Mr. and Mrs. Mills' rib, sternum, and spinal injuries mirrored injuries documented by the NCAP test. 02/12/25 Rough Tr. 130-31, 171-72. Dr. Camacho similarly explained that Mrs. Mills' liver and chest injuries aligned with a frontal impact. Dkt. 378 (Vol. 6 Tr.), at 205-24, 232-34. This

evidence further disproves Plaintiffs' roof-based causation arguments. As Dr. Sochor explained, only a cardiac event could explain the totality of the circumstances surrounding Mrs. Mills' tragic death.

*Second*, the great weight of the evidence likewise establishes that Ford's roof did not proximately cause the death of Mr. Mills. As with Mrs. Mills, Dr. Sochor testified that Mr. Mills' injuries matched injury patterns documented in frontal collision tests and were inconsistent with pressure applied by a large flat object like a roof to Mr. Mills' back. *E.g.*, 02/12/25 Rough Tr. 175. While Plaintiffs attributed Mr. Mills' pneumonia to rib and spine fractures, Dr. Camacho provided unrebutted radiological testimony that the limited bruising on Mr. Mills' shoulders and back was not the result of a force that could have caused those fractures. Dkt. 378 (Vol. 6 Tr.), at 248-54. The fractures instead came as forces pushed Mr. Mills up and into his seatbelt during the frontal portion of the accident. *Id.* at 239-48.

Mr. Mills had a low oxygen condition before the accident, moreover, and already had a physician-prescribed oxygen tank at home for COPD. 02/12/25 Rough Tr. 174-75; Eisenstat Tr. 169:12-23. Yet he was breathing and talking at the scene, and there was no evidence on the radiological scans of forceful chin-to-chest contact that might have limited his breathing long-term. [Harrison, Sanchez, Swicord, and Dr. Camacho.] It is also undisputed that when first responders removed Mr. Mills from the vehicle and gave him oxygen, his breathing normalized. Eisenstat Tr. 169:2-11. Each of these factors firmly supports a conclusion that any contact between Mr. Mills and the roof did not proximately cause his death.

### 2. The absence of evidence supporting Plaintiffs' proximate cause theory is not cured by the speculation of Plaintiffs' experts.

In contrast to the thorough analyses from Drs. Camacho and Sochor, Plaintiffs' experts Paul Lewis and Dr. Eisenstat provided testimony riddled with omissions and inconsistencies.

*First*, Mr. Lewis and Dr. Eisenstat did not (and could not) offer any radiological testimony contradicting Dr. Camacho's pivotal interpretation of Mr. and Mrs. Mills' scans. Although Mr. Lewis said he could read a radiological *report*, he admitted that he is not qualified to understand and interpret the underlying CT and MRI *scans*. Lewis Tr. 4:2-5, 45:3-9.[5] Dr. Eisenstat also conceded he is not qualified to read or interpret the scans and would defer to a radiologist like Dr. Camacho trained in reading them. Eisenstat Tr. 130:12-15, 186:1-10.

The scans themselves provide much more sensitive diagnostic information than merely examining bruising on a decomposed body during an exhumation autopsy. Dkt. 378 (Vol. 6 Tr.), at 226. Indeed, Dr. Eisenstat admitted that because the bodies had been exhumed, the decomposition process obscured efforts to document the bruising. Eisenstat Tr. 97, 140. He even used decomposition to attempt to explain away his listing of organs in his autopsy report for Mrs. Mills that she admittedly *did not have* as a result of previous surgeries. *Id.* at 127, 140.

CT and MRI scans must be read by someone who is qualified to do so. Dr. Camacho's trial testimony regarding what those scans reflect is uncontested. Plaintiffs could have called the Tallahassee Memorial Hospital radiologist who read Mr. Mills' radiological scans, but they chose not to. Plaintiffs also could have retained their own radiologist to review the scans taken during the autopsies on the exhumed bodies, but they did not do that either.

As Dr. Camacho explained, CT scans are highly sensitive for detecting bruising in soft tissues. The scans did not reveal any bruising on Mrs. Mills' shoulders or upper back indicative of pressure applied by roof crush. The bruising on Mr. Mills referenced by Mr. Lewis was superficial at best and not the result of a force that could have caused his injuries. And while Mr.

---

[5] Ford attaches an excerpt of the rough trial transcript containing the testimony of Mr. Lewis ("Lewis Tr.") as **Exhibit D**.

Lewis and Dr. Eisenstat inferred from first responder affidavits that Mr. and Mrs. Mills had difficulty breathing because they were "folded over," there was no radiological evidence of a forceful chin-to-chest interaction caused by pressure from the roof. *Supra* at 10-11. Mr. Lewis also relied on made-for-litigation medical illustrations purportedly documenting Mr. and Mrs. Mills' injuries, even though Dr. Camacho explained that the radiology images proved the illustrations (a) incorrectly documented several of the injuries at issue and (b) illustrated injuries not documented in Dr. Eisenstat's autopsy reports. Dkt. 378 (Vol. 6 Tr.), at 225-30, 235-36, 251-53. Dr. Eisenstat conceded that he did not talk with the illustrator about actual measurements or sizing of the bruising, instead allowing the illustrator to mark bruising in the general area. Eisenstat Tr. 146:2-14.

*Second*, Mr. Lewis and Dr. Eisenstat trivialized highly relevant evidence about the forces and injuries caused by the truck's frontal impact *before* the truck pitched over onto the roof. Mr. Lewis claimed to have considered alternative causes for the injuries of Mr. and Mrs. Mills. Lewis Tr. 19-20. But he never considered or excluded the extensive evidence showing that (1) the vehicle's initial nose-down impact at 50 miles per hour was equal in severity to a 35-mph NCAP crash barrier test, and (2) the injuries of Mr. and Mrs. Mills replicated injuries associated with those tests. *Supra* at 10-11. Indeed, Mr. Lewis conceded he did not review a single frontal crash test of any type to compare the expected injuries in those crashes to the injuries Mr. and Mrs. Mills received. Lewis Tr. 49:23-50:1.[6]

---

[6] When Mr. Lewis discussed cases in which he had testified about torso injuries, he said "I deal with a lot of those in both frontal crashes, side impact crashes, rear crashes, I'm looking at torso injuries as well as head, neck, and spine injuries all the time." *Id.* at 67:17-68:3. Mr. Lewis did not testify to seeing torso injuries in rollover or pitch-over accidents like the one here.

Dr. Eisenstat also failed to properly rule out the frontal crash forces, acknowledging that "a couple of [Mr. Mills' injuries] could be from the seatbelt if you have a big frontal impact." Eisenstat Tr. 72:1-8. But he insisted "the pressure of the roof on [Mr. Mills'] upper back" caused the remainder, *id.* at 71:24-72:9—even though the truck's frontal impact was far more severe than the subsequent pitch-over, NCAP testing shows frontal impacts produce the same injuries, and undisputed radiological scans show that those exact injuries occurred here.

*Third*, Mr. Lewis and Dr. Eisenstat failed to rule out compelling evidence that Mrs. Mills suffered a sudden cardiac event rendering her unconscious. Neither expert offered any explanation why Mrs. Mills would have let the truck drift off the road or why she never applied the brakes at any point during the accident. And neither disputed that Mrs. Mills had multiple cardiac risk factors, including chest pains that led to her hospitalization just two months before the accident. Dr. Eisenstat did not even consider whether Mrs. Mills had a sudden cardiac event before he reached his initial differential conclusion that she died of positional asphyxiation. *Id.* at 135:15-136:7, 159:1-20. While Plaintiffs later tried to discount a sudden cardiac event, they narrowly focused on a "heart attack" (i.e., a myocardial infarction) arising from coronary artery disease, which is the only cardiac event that (a) Dr. Eisenstat could discuss based on the condition of the heart at the autopsy and (b) Dr. Ellis could discuss as Mrs. Mills' (non-expert) treating cardiac physician (who admittedly had not seen her in two years and who did not render any opinions to a reasonable degree of medical certainty). Plaintiffs offered absolutely no evidence or testimony to rule out a sudden cardiac event (i.e., a problem with the heart's electrical system that cannot be found via autopsy) that rendered her unconscious.

*Fourth*, Mr. Lewis and Dr. Eisenstat ignored other evidence in attributing Mrs. Mills' death to positional asphyxiation. Positional asphyxia occurs when the occupant's position does

not allow for life-sustaining breathing. But Dr. Eisenstat did not measure the space inside the interior of the truck. Eisenstat Tr. 152:12-25. Among other things, both he and Mr. Lewis ignored the fact that Mrs. Mills' seated height was below the top of the driver's seat headrest. Both ignored testimony from Colby Swicord, a firefighter much larger than Mrs. Mills, who explained that he had enough room to move around inside the driver's side of the overturned truck. Dkt. 378 (Vol. 6 Tr.), at 138-140; DX 5.3. And neither considered that Mr. Mills did not die from positional asphyxiation, even though Mr. Mills was nine inches taller than Mrs. Mills and seated in a more deformed area of the vehicle. Eisenstat Tr. 152:15-25. If Mrs. Mills were conscious, she would have had room to move and breathe.

*Fifth*, and finally, Plaintiffs' experts never provided an occupant kinematic analysis to support their conclusions. JMOL Mot. 4-7. Whether and where Mr. and Mrs. Mills contacted the roof during the pitch-over depends on how their bodies moved in the vehicle at the time. Dr. Sochor thus based his causation testimony for Ford on the accident sequence, occupant kinematics during the crash, and the corresponding occupant injury patterns, each of which he described in detail. *E.g.*, 02/12/25 Rough Tr. 147-52. But Plaintiffs did nothing of the sort. Dr. Eisenstat admitted he was not qualified to address occupant kinematics, Eisenstat Tr. 130:9-11, and Mr. Lewis never offered any testimony on the subject.

If these and other deficiencies do not authorize judgment for Ford as a matter of law, they at least demonstrate that the jury's proximate cause determinations contravene the great weight of the evidence. This Court should grant Ford a new trial.

### 3.    The award of pain and suffering damages to Mrs. Mills goes against the great weight of the evidence showing she was unconscious before the truck pitched over.

Pain and suffering damages can only be recovered where the decedent consciously experienced pain or was conscious of impending death. *Grant v. Ga. Pac. Corp.*, 521 S.E.2d 868,

870 (Ga. App. 1999). In accordance with Plaintiffs' "roof crush" theory, the Court instructed the jury that Plaintiffs had to prove Mrs. Mills' consciousness by a preponderance of the evidence "*after* the 2015 Ford F-250 truck made impact with the ground following the wreck." Dkt. 367, at 14-15 (emphasis added). Plaintiffs did not come close to meeting that burden.

*First*, Plaintiffs' own witnesses admitted they could not establish that Mrs. Mills was conscious after the truck pitched over on its roof. No witness at the crash scene testified that Mrs. Mills spoke or was conscious. And while Plaintiffs seized on evidence suggesting Mrs. Mills was *alive* for a few minutes, their medical expert (Dr. Eisenstat) admitted that "Debra Sue Mills was unconscious" by "the time anyone got to her." Eisenstat Tr. 165:10-11.

*Second*, evidence regarding the events leading up to the truck's pitching over confirm that Mrs. Mills was unconscious. Dr. Eisenstat agreed that, other than certain alleged steering evidence from the truck's event data recorder ("EDR") discussed below, he had "no evidence that Debra Sue Mills was conscious when she left the road." Eisenstat Tr. 187:23-188:2.

As an initial matter, the EDR data strongly indicates that Mrs. Mills was unconscious when the truck left the road. During the time the truck traveled off road, the EDR recorded (1) no braking activity at all and (2) a complete release of the accelerator, both of which indicate that Ms. Mills had already been rendered unconscious and lost control of the vehicle. Dkt. 378 (Vol. 6 Tr.), at 49; 02/12/25 Rough Tr. 113:8-10. The absence of either active steering to regain the road or active braking to bring the truck to a safe stop adds to the great weight of the evidence showing that Mrs. Mills experienced a sudden cardiac event and lost consciousness long before the truck pitched over at the end of the crash. And Dr. Eisenstat's testimony that Mrs. Mills did not experience any traumatic injuries that would have rendered her unconscious—while also admitting she was unconscious by the time anyone got to her—similarly accords with the great

weight of the evidence showing that Mrs. Mills already had experienced a sudden cardiac event rendering her unconscious.

Regarding the alleged EDR steering evidence, Dr. Eisenstat relied on Mr. Buchner, who opined that the recorded steering wheel movement meant Mrs. Mills must have been conscious between the time the truck left the road and when it finally pitched over onto its roof. But the EDR only recorded steering wheel *movement*, not whether that movement resulted from steering by the driver or terrain-caused changes to the orientation of the wheels. As pictures from the scene confirm, the truck followed a relatively straight path after it left the paved road, with the minor EDR-recorded movement of a three-degree angle change at the tires being fully consistent with terrain-induced steering. This also fully accords with Mrs. Mills being unconscious and letting go of the steering wheel entirely as the truck left the road.

For the reasons stated in Ford's JMOL, the Court should enter judgment as a matter of law on the claim of Mrs. Mills' estate for pain and suffering damages. At a minimum, this finding goes against the great weight of the evidence, entitling Ford to a new trial.

**C.    The Court erred by not giving Ford's requested instructions on punitive liability.**

"A refusal to give a requested jury instruction amounts to an abuse of discretion when (1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party." *Brink v. Direct Gen. Ins. Co.*, 38 F.4th 917, 923 (11th Cir. 2022). Ford requested, but this Court did not give, two instructions regarding the standard for punitive liability. One instruction would have informed the jury that "[i]f reasonable people can disagree with respect to a design choice, a manufacturer's selection of one of those choices is neither willful, wanton, nor the product of an entire want of care that raises the presumption of conscious

indifference to consequences." Dkt. 357, at 4. The other would have defined for the jury the terms "willful conduct," "wanton conduct," and "an entire want of care that would raise the presumption of conscious indifference to consequences." *Id.* at 5.

Both instructions "dealt with an issue properly before the jury." *Brink*, 38 F.4th at 923. And the instructions "correctly stated the law." *Id.* As the Eleventh Circuit explained in *Ivy*, 646 F.3d 769, Georgia cases establish that the standard for punitive damages "is not satisfied where there is a bona fide dispute as to the propriety of the defendant's actions," *id.* at 776-77 (citing, e.g., *MDC Blackshear, LLC v. Littell*, 537 S.E.2d 356, 361 (Ga. 2000)). The *Ivy* Court applied that principle in affirming the grant of summary judgment to Ford, notwithstanding expert testimony that a vehicle was defective, where Ford "had expended considerable effort" to resolve a safety problem that "the scientific and engineering community ha[d] been studying for some thirty years." *Id.* at 777-78. Ford's requested instruction that punitive damages are inappropriate when manufacturers select a design about which "reasonable people can disagree" thus tracks *Ivy* and Georgia law.

Ford's related instruction defining the terms included in Georgia's punitive damages statute also tracks Georgia law. "Willful conduct demonstrates an actual intent to do harm or inflict injury." Dkt. 357, at 5; *Ford Motor Co. v. Cosper*, 893 S.E.2d 106, 116 (Ga. 2023). "Wanton conduct is so reckless or so charged with indifference to consequences as to be the equivalent in spirit to actual intent." Dkt. 357, at 5; *Cosper*, 893 S.E.2d at 116. And "[a]n entire want of care that would raise the presumption of conscious indifference to consequences means an intentional disregard of the rights of another." Dkt. 357, at 5; *Taylor v. Devereux Found., Inc.*, 885 S.E.2d 671, 683 (Ga. 2023).

Just as courts begin their analysis of "willfulness," "wantonness," and "conscious indifference" by clarifying what those terms actually mean, *see Ivy*, 646 F.3d at 773; *Cosper*, 893 S.E.2d at 112, 115-17, the "ordinary citizen[s]" deciding Ford's fate should have received the same information, *United States v. Dilg*, 700 F.2d 620, 625 (11th Cir. 1983). Trial courts cannot instruct lay jurors in "broad strokes" about the "bare elements" of the law and expect the jury to "deduce all of the finer-grained implications that must logically follow." *United States v. Takhalov*, 827 F.3d 1307, 1318, *modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016). Courts therefore "ha[ve] a duty to give instructions that are meaningful and translated into terms the jury can understand" in the context "of this particular case." *King v. Allstate Ins. Co.*, 906 F.2d 1537, 1543 (11th Cir. 1990). But the jury never heard that punitive damages are unavailable in the design defect context "[i]f reasonable people can disagree with respect to a design choice" and the defendant did not "intentional[ly] disregard" the plaintiff's rights. Dkt. 357, at 4-5. These omissions "resulted in prejudicial harm" to Ford, *Brink*, 38 F.4th at 923, given the abundant evidence showing that Ford reasonably resolved the complex design questions at the center of this case. JMOL Mot. 9-14; *infra* at 25-28.

## II.     The jury's unprecedented punitive damages award far exceeds constitutional limits.

It is undisputed that Ford complied with all safety regulations, spent substantial resources to implement additional life-saving safety designs, and aligned its decision-making with decades of scientific studies concerning rollover occupant safety that have been universally accepted throughout the industry. Punitive damages should not be available in such a case. *See Stone Man, Inc. v. Green*, 435 S.E.2d 205, 206 (Ga. 1993) (finding punitive damages generally unavailable where defendant "adhered to environmental and safety regulations"); *Ivy*, 646 F.3d at 776-77 (finding punitive damages unavailable where evidence reflects a "bona fide" scientific dispute); JMOL Mot. 9-14. Yet the jury awarded $2.5 billion—the largest punitive damages verdict in

Georgia history and 535 times the apportioned compensatory damages to which punitive damages could attach.[7] Even if the Court does not enter judgment for Ford or grant Ford a new trial, the jury's $2.5 billion award is unconstitutional and should be substantially reduced.

A.    **The punitive damages award violates due process.**

"The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). Due process thus requires courts to "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff" caused by the defendant "and to the general damages recovered." *Id.* at 426. The U.S. Supreme Court has "mandated" that trial and appellate courts scrutinize punitive damages awards based on three guideposts: (1) "the degree of reprehensibility of the defendant's conduct," (2) the "ratio between punitive and compensatory damages," and (3) "the disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases." *Id.* at 418-19, 425, 428.

All three of those markers confirm that the punitive damages here are grossly excessive. The jury's $2.5 billion award dwarfs the applicable compensatory comparator by a ratio of 535:1. Ford's regulatory compliance, additional safety investments, and good-faith allocation of resources based on extensive research demonstrate no reprehensibility. And the comparable civil penalties are small.

---

[7] The Court entered judgment for $4,675,000 in post-apportionment damages for pain and suffering and $21,271,209.80 in post-apportionment damages for wrongful death and funeral expenses. Dkt. 361, at 1-3 (Phase I verdict); Dkt. 368, at 2-3 (judgment). Only the pain and suffering awards would authorize punitive damages under Georgia law. *See infra* at 24-25.

Consistent with *State Farm*'s observation that a ratio "equal to compensatory damages[] can reach the outermost limit of the due process guarantee" when "compensatory damages are substantial," 538 U.S. at 425, this Court should reduce punitive damages to match the substantial compensatory damages apportioned to Ford on claims to which punitive damages can attach.

### 1. Federal courts use 1:1 as the "benchmark" ratio in cases where compensatory damages are substantial.

Punitive damages "must bear a 'reasonable relationship' to compensatory damages." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580 & n.32 (1996). Supreme Court precedent further establishes that (1) "few awards" significantly exceeding "a single-digit ratio between punitive and compensatory damages" will "satisfy due process"; (2) a punitive award "equal to compensatory damages[] can reach the outermost limit of the due process guarantee" when "compensatory damages are substantial"; and (3) "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety" even when compensatory damages are insubstantial. *State Farm*, 538 U.S. at 425.

These principles provide critical constraints in a system where "punitive damages pose an acute danger of arbitrary deprivation of property" and "the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses." *Id.* at 417. The Eleventh Circuit has reiterated that "punitive damages should have a reasonable relationship to compensatory damages." *Williams v. First Advantage LNS Screening Sols. Inc.*, 947 F.3d 735, 748 (11th Cir. 2020). Echoing *Gore*, 517 U.S. at 580-81, and *State Farm*, 538 U.S. at 425, *Williams* recited the "long legislative history" providing for sanctions of no more than "quadruple damages," 947 F.3d at 748-49. It also repeated (twice) the Supreme Court's observation that a 1:1 ratio can be the constitutional maximum in cases involving substantial compensatory damages. *Id.* at 749, 754-55. And it directed the district court

to reduce a "startling" $3.3 million punitive damages award to $1 million so punitive damages exceeded the $250,000 in compensatory damages by $750,000 instead of $3,050,000. *Id.* at 765-66. Here, the jury's $2.5 billion punitive damages award exceeds the relevant $4,675,000 in compensatory damages by $2,495,325,000.

Courts outside the Eleventh Circuit also recognize the importance of the Supreme Court's ratio constraints. As the Seventh Circuit recently explained, *State Farm* "instructs that a 'substantial' award merits a ratio closer to 1:1." *Saccameno v. U.S. Bank Nat'l Assoc.*, 943 F.3d 1071, 1090 (7th Cir. 2019). The Third Circuit likewise observed that courts consistently "use[] a 1:1 ratio as a benchmark where compensatory damages are substantial." *Jurinko v. Med. Protective Co.*, 305 F. App'x 13, 28 (3d Cir. 2008) (collecting cases).[8] Plaintiffs cannot dispute the "substantial" multi-million dollar compensatory damages award by the jury here. *See State Farm*, 538 U.S. at 426 (describing $1 million compensatory award as substantial); *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1069 (10th Cir. 2016) (noting "many cases" have also considered "compensatory damages less than $1,000,000 [to be] substantial"). So, the proper benchmark in this case should be a ratio of 1:1. *Saccameno*, 943 F.3d at 1090; *Jurinko*, 305 F. App'x at 28; *cf. Williams*, 947 F.3d at 755 (beginning due process analysis by considering a "default 4:1 ratio" where compensatory damages totaled $250,000).

---

[8] *See, e.g.*, *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 603 (8th Cir. 2005) (holding that punitive damages "must be remitted" to "a ratio of approximately 1:1" given "the $4,025,000 compensatory damages award in this case"); *Hudgins v. Sw. Airlines, Co.*, 212 P.3d 810, 830 (Ariz. Ct. App. 2009) (reducing punitive damages to reflect a "one-to-one ratio" as "guided by the Supreme Court's suggestion in *State Farm*"); *see also Mendez-Matos v. Municipality of Guaynabo*, 557 F.3d 36, 55 (1st Cir. 2009); *Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470, 490 (6th Cir. 2007); *Dawe v. Corrs. USA*, 506 F. App'x 657, 660 (9th Cir. 2013); *Roby v. McKesson Corp.*, 219 P.3d 749, 770 (Cal. 2009); *Online Oil, Inc. v. CO&G Prod. Grp., LLC*, 419 P.3d 337, 351 (Okla. Civ. App. 2017).

### 2. The compensatory component of the 1:1 ratio should not include damages attributable to Mrs. Mills or damages for wrongful death.

The first step in determining the proper ratio requires correctly calculating the amount of pertinent compensatory damages. Under federal law, Plaintiffs cannot include the 15% of damages the jury attributed to Mrs. Mills. Under state law, Plaintiffs cannot include the $25 million in damages the jury awarded for wrongful death.

*First*, the compensatory comparator should exclude damages caused by someone other than the defendant. The Supreme Court held that the ratio guidepost examines "the relationship between the penalty and the harm to the victim caused by *the defendant's* actions," not harm caused by the plaintiff or a third party. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 435 (2001) (emphasis added). Every federal court of appeals to consider the question agrees it is "improper" to "calculat[e] the punitive-to-compensatory ratio by using the full compensatory award when a defendant is only liable for a portion of the damages."[9]

This Court similarly "remit[ted] the punitive damages award" against multiple defendants to three times the "apportioned compensatory damages as to each Defendant." *H&L Farms LLC v. Silicon Ranch Corp.*, No. 4:21-cv-134, 2023 WL 6973211, at *12 & n.7 (M.D. Ga. Oct. 23, 2023)[10]; *see also id.* at *11 (noting original ratio "[a]fter apportionment" was "7.94 times the compensatory damages awarded"). Calculating the ratio in this way "more accurately reflects the true relationship between the harm for which a particular defendant is responsible, and the punitive damages assessed against that defendant." *Planned Parenthood*, 422 F.3d at 961. Here, the jury determined that Ford was responsible for 85% of the harm and Mrs. Mills the remaining

---

[9] *Lompe*, 818 F.3d at 1068 & n.26; *Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 961 (9th Cir. 2005); *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1026 (8th Cir. 2000).

[10] *Recons. denied*, 2023 WL 8622987, *motion to amend denied*, 2024 WL 4728899.

15%. Dkt. 361, at 3. Just as the Court reduced Plaintiffs' compensatory damages by the percentage of Mrs. Mills' fault, Dkt. 368, at 2; O.C.G.A. § 51-12-33, so too should the compensatory damages included in the *State Farm* ratio be reduced.

*Second*, the compensatory comparator should exclude damages for wrongful death (which include funeral expenses, *see Gay v. Piggly Wiggly Southern, Inc.*, 358 S.E.2d 468, 473 (Ga. App. 1987)). The Georgia Supreme Court held nearly a century ago that punitive damages "are not available" in wrongful death actions because Georgia's wrongful death statute already contains a "penal" element and an intention to impose a "double penalty" is "not to be imputed" to the legislature. *Engle v. Finch*, 139 S.E. 868, 869 (Ga. 1927); *Roseberry v. Brooks*, 461 S.E.2d 262, 268 (Ga. App. 1995). This Court thus observed at trial that Plaintiffs "cannot obtain punitive damages connected to the wrongful death claim." 02/13/25 Rough Tr. 1:14-15. But that is precisely what including wrongful death damages in the compensatory component of the due process ratio would achieve. Every dollar of wrongful death damages included in the punitive damages ratio authorizes one or more dollars of punitive damages, even though punitive damages indisputably would have been $0 if Plaintiffs had only recovered damages for wrongful death. This Court should not permit Plaintiffs to obtain a larger punitive recovery based on wrongful death damages simply because the jury awarded compensatory damages on another claim to which punitive damages can attach.

Multiple cases confirm as much. The Eleventh Circuit looks to state law in determining which damages should be treated as "compensatory" for purposes of the constitutional ratio. *See Action Marine, Inc. v. Cont'l Carbon, Inc.*, 481 F.3d 1302, 1321 (11th Cir. 2007). And wrongful death damages in Georgia "primarily" serve "to punish the defendant" rather than "compensate [the] plaintiff for the loss she has sustained," *Savannah Elec. Co. v. Bell*, 53 S.E. 109, 112 (Ga.

1906), meaning additional punitive damages are categorically unavailable, *Engle*, 139 S.E. at 869. Courts elsewhere likewise find it "appropriate to construct the ratio by looking only to the count on which punitive damages were awarded." *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 82 n.9 (1st Cir. 2001); *see also Dubey v. Pub. Storage, Inc.*, 918 N.E.2d 265, 282 (Ill. Ct. App. 2009). Accordingly, this Court should exclude the $25,024,952.70 million in wrongful death damages from the compensatory ratio component and focus its ratio analysis on the $4,675,000 in post-apportionment damages for which punitive damages were available (which would be reduced to $4,250,000 if the Court sets aside Mrs. Mills' pain and suffering award of $500,000). *See supra* at 20 n.7.

### 3. The reprehensibility guidepost does not support a higher ratio.

The lack of reprehensibility of Ford's conduct, coupled with the substantial compensatory damages already awarded, confirms that the maximum constitutional ratio should be at or near 1:1—far below the 535:1 ratio reflected by the current $2.5 billion verdict.

"It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm*, 538 U.S. at 419. Courts "determine the reprehensibility of a defendant by considering" five factors, which the Supreme Court identified in *Gore* and paraphrased in *State Farm*. *Id.* "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award" at all, "and the absence of all of them renders any award suspect." *Id.*

Three of the Supreme Court's reprehensibility factors heavily favor Ford. No evidence shows Ford "target[ed]" consumers with "financial vulnerability." *Id.* No evidence shows Ford acted with "intentional malice, trickery, or deceit." *Id.* And no evidence shows Ford "repeatedly

engaged in prohibited conduct while knowing or suspecting that it was unlawful." *Gore*, 517 U.S. at 576-77. To the contrary, Ford's design and sale of the subject trucks "had [not] been adjudged unlawful on even one occasion." *Id.* at 579. Ford complied (and continues to comply) with all safety regulations. And the factfinders that previously considered similar defect allegations on the merits sided with Ford. Dkt. 53-1, at 6 & n.4; Dkt. 53-3; Dkt. 53-4; Dkt. 53-5.

The remaining reprehensibility factors also favor Ford. While the "harm caused" in this case "was physical as opposed to economic," *State Farm*, 538 U.S. at 419, the jury's conclusion that *Ford* caused the harm contravenes the great weight of the evidence, *see supra* at 7-17. And "nonviolent [torts] are less serious than [torts] marked by violence or the threat of violence." *Gore*, 517 U.S. at 575-76. Ford did not act with "violence" or a "threat of violence."

As for whether Ford's conduct "evinced an indifference to or a reckless disregard of the health or safety of others," *State Farm*, 538 U.S. at 519, the record supports Ford for the same reasons that Ford qualifies for judgment as a matter of law on punitive liability, *see* JMOL Mot. 9-14. It is undisputed that (1) at least approximately 98% of properly belted occupants survive rollover crashes without serious injuries, (2) Ford invested substantial sums to develop groundbreaking electronic stability control, rollover stability control, and rollover activated safety canopy technologies that further mitigate the risk of injury in rollover crashes, and (3) Ford allocated its resources based on a belief shared throughout the industry and supported by decades of science that "the amount of roof crush during a crash has little effect on actual occupant injury," much less occupant injury allegedly caused by the roof structure. DX 173; DX 409; DX 527.1; DX 533; 02/06/25 Rough Tr. 69-70; 02/11/25 Rough Tr. 13-14, 50-51, 176. Such conduct is a "far cry" from the "intentional, malevolent behavior" and "flagrant disregard of . . . federal rights" that the Eleventh Circuit has characterized as reflecting heightened

reprehensibility. *Williams*, 947 F.3d at 755-56; *see also Boerner*, 394 F.3d at 603 (reducing punitive damages from $15 million to $5 million "despite evidence that [defendant] exhibited a callous disregard for the adverse health consequences of smoking" because "there is no evidence that [defendant] intended to victimize its customers").

Consistent with crash studies and Ford's alternative safety investments, NHTSA observed that occupants "sustain head or neck injuries" even without "a significant amount of roof crush" when "their upside-down body weight places forces on the neck" as "their head hits the roof." 02/11/25 Rough Tr. 174-76; DX 176. And NHTSA long maintained that Plaintiffs' preferred roof metric (strength-to-weight ratio) was not appropriate for heavier vehicles like Super Duty trucks. 49 C.F.R. § 571.216 (S3(a)). When NHTSA changed the standard, Ford immediately complied despite its good-faith disagreement regarding the costs and benefits of NHTSA's new requirement.

Tellingly, NHTSA limited its updated roof standard to recent model years (not including Mr. and Mrs. Mills' truck), 49 C.F.R. § 571.216a (S9), required a lower strength-to-weight ratio for heavier vehicles than for lighter vehicles, *id.* (S5.2), and decided to forego a strength-to-weight standard altogether for vehicles with a gross vehicle weight rating exceeding 10,000 pounds, *id.* (S3.1(a)). Consistent with the agency's stated mission to "save lives, prevent injuries, and reduce economic costs due to road traffic crashes," About NHTSA, https://www.nhtsa.gov, those decisions reflect a recognition of the tradeoffs and scientific complexities involved. Indeed, NHTSA noted that "[t]he vast majority of the benefits of the rule" come from vehicles lighter than the F-250. 74 Fed. Reg. 22348-01, 22360-61, 22366-67 (estimating that applying a strength-to-weight requirement to vehicles in the F-250's weight class would eliminate only two fatalities per year across the entire industry). Ford's adherence to NHTSA's regulatory scheme does not

warrant a large ratio or a finding of heightened reprehensibility. "[C]ompliance with county, state, and federal regulations is not the type of behavior which supports an award of punitive damages" at all, *Stone Man*, 435 S.E.2d at 206, much less the $2.5 billion award here.

### 4. Comparable civil penalties do not support a higher ratio.

The Supreme Court's final guidepost compares punitive damages to "[t]he most relevant civil sanction under . . . state law." *State Farm*, 538 U.S. at 428. The most comparable civil penalties for the misconduct alleged here come from the Georgia Fair Business Practices Act, which proscribes "[u]nfair or deceptive acts or practices in the conduct of consumer transactions," O.C.G.A. § 10-1-393(a), including "[mis]representing that goods or services are of a particular standard, quality, or grade," *id.* § 10-1-393(b)(7). Violations of the Act carry "[a] civil penalty of up to a maximum of $5,000, *id.* § 10-1-397(b)(2)(B)—a fraction of the astronomical punitive damages awarded here. The *State Farm* guideposts mandate a substantial reduction of punitive damages.

### B. The punitive damages award is otherwise unconstitutional.

State and federal prohibitions on "excessive fines" independently invalidate the jury's punitive damages award as "grossly disproportional" to both the "gravity" of Ford's purported misconduct and the "actual damages award." U.S. Const. amend. VIII; Ga. Const. art. I, § 1, ¶ XVII; *United States v. Bajakajian*, 524 U.S. 321, 334 (1998); *Colonial Pipeline Co. v. Brown*, 365 S.E.2d 827, 832-33 (Ga. 1988) (plurality op.). These provisions constrain punitive damages in Georgia because O.C.G.A. § 51-12-5.1(e)(2) permits the State to "extract payments" as a form of "punishment." *Austin v. United States*, 509 U.S. 602, 609-10 (1993); *Colonial Pipeline*, 365 S.E.2d at 830-31. And the punitive damages here violate the Excessive Fines Clauses for the same reasons they violate due process. *See supra* at 20-28.

The punitive damages award also defies the Supreme Court's directive that "a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *Gore*, 517 U.S. at 571-72, 585 (discussing dormant commerce principles). Plaintiffs' counsel repeatedly emphasized the number of Super Duty trucks on the road nationwide and encouraged the jury to punish Ford for all of those trucks, not just trucks in Georgia. Dkt. 374 (Vol. 10 Tr.), at 83-85, 93-94. The jury's $2.5 billion award suggests it heeded that invitation and impermissibly "use[d] evidence of out-of-state conduct to punish [Ford] for action" that has not been found unlawful anywhere else. *State Farm*, 538 U.S. at 422.

### C.     The Court should reduce punitive damages to the maximum constitutional ratio of 1:1.

Because "the constitutional limit of a punitive damage award is a question of law not within the province of the jury," the Eleventh Circuit and "every [other] circuit to address th[e] question" have recognized that "a court is empowered to decide the maximum permissible amount without offering a new trial." *Saccameno*, 943 F.3d at 1092 (collecting cases); *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1330-31 (11th Cir. 1999). "Unlike a remittitur, which is discretionary with the [trial] court and which [appellate courts] review for an abuse of discretion, a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause." *Johansen*, 170 F.3d at 1331 (citations omitted). Ford therefore requests that the Court reduce the punitive damages judgment to the constitutional maximum. As explained above, the Supreme Court's guideposts indicate the maximum is $4,675,000 (or $4,250,000 if the Court sets aside the pain and suffering award to the estate of Mrs. Mills).

Separately, if the Court believes the constitutional maximum to be a larger number, Ford also requests that the Court order a traditional remittitur to no more than $4,675,000. Federal courts "can (and should) reduce a punitive damages award sometime before it reaches the outermost limits of due process." *Saccameno*, 943 F.3d at 1085-86; *see also Payne v. Jones*, 711 F.3d 85, 96-97 (2d Cir. 2013) (holding federal trial courts have "considerabl[e]" authority to set aside punitive damages awards on excessiveness grounds without "find[ing] that the jury's award was so excessive as to violate due process"). To the extent the Court concludes that due process does not mandate Ford's requested reduction, a remittitur to no more than $4,675,000 (with a new trial option for Plaintiffs) would appropriately reduce the jury's excessive $2.5 billion award to "fall within a range of reasonable damages." *H&L Farms*, 2023 WL 6973211, at 15 n.11.

## CONCLUSION

The Court should grant Ford a new trial on both liability and damages. If the Court does not grant Ford a new trial on liability and damages, it should reduce punitive damages to the constitutional maximum of $4,675,000. If the Court determines the constitutional maximum exceeds that amount, it should enter judgment for the constitutional maximum and grant an additional remittitur to no more than $4,675,000.

Respectfully submitted this 14th day of March, 2025.

<table>
<tr><td></td><td>*/s/ Harold D. Melton*</td></tr>
<tr><td>Michael R. Boorman</td><td>Charles E. Peeler</td></tr>
<tr><td>Georgia Bar No. 067798</td><td>Georgia Bar No. 570399</td></tr>
<tr><td>Philip A. Henderson</td><td>Harold D. Melton</td></tr>
<tr><td>Georgia Bar No. 604769</td><td>Georgia Bar No. 501570</td></tr>
<tr><td>WATSON SPENCE LLP</td><td>TROUTMAN PEPPER LOCKE</td></tr>
<tr><td>999 Peachtree Street NE</td><td>600 Peachtree Street, N.E.</td></tr>
<tr><td>Suite 1130</td><td>Suite 3000</td></tr>
<tr><td>Atlanta, GA 30309</td><td>Atlanta, GA 30308-2216</td></tr>
<tr><td>Telephone: 229-436-1545</td><td>Telephone: 404-885-3000</td></tr>
<tr><td>mboorman@watsonspence.com</td><td>harold.melton@troutman.com</td></tr>
<tr><td>phenderson@watsonspence.com</td><td>charles.peeler@troutman.com</td></tr>
</table>

Paul F. Malek
*Admitted Pro Hac Vice*
HUIE, FERNAMBUCQ
    & STEWART LLP
3291 US Highway 280
Suite 200
Birmingham, AL 35243
Telephone: 205-251-1193
pmalek@huielaw.com

Elizabeth B. Wright
*Admitted Pro Hac Vice*
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114
Telephone: 216-566-5500
Elizabeth.wright@thompsonhine.com

Michael W. Eady
*Admitted Pro Hac Vice*
THOMPSON, COE, COUSINS
    & IRONS, LLP
2801 Via Fortuna Drive, Suite 300
Austin, Texas 78746
Telephone: 512-708-8200
meady@thompsoncoe.com

*Attorneys for Defendant Ford Motor Company*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

James E. Butler, Jr.
Ramsey B. Prather
Daniel E. Philyaw
Allison Bailey
BUTLER PRATHER LLP
105 13th Street
Post Office Box 2766
Columbus, GA 31902
jim@butlerprather.com
ramsey@butlerprather.com
dan@butlerprather.com
allison@butlerprather.com

Larae Dixon Moore
PAGE SCRANTOM SPROUSE TUCKER & FORD
1111 Bay Avenue 3rd Floor
P.O. Box 1199
Columbus, GA 31902
lmoore@pagescrantom.com

Frank M. Lowrey IV
Michael B. Terry
BONDURANT MIXON & ELMORE LLP
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA 30309
lowrey@bmelaw.com
terry@bmelaw.com

This 14th day of March, 2025.

*/s/ Harold D. Melton*
Harold D. Melton
Georgia Bar No. 501570