```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF GEORGIA
                    COLUMBUS DIVISION
              _____


BROGDON ET AL., PLAINTIFFS   : 4:23-CV-00088-CDL

          VS.                : FEBRUARY 13, 2025

FORD MOTOR COMPANY, DEFENDANT : COLUMBUS, GEORGIA


_____
```

```
           TRANSCRIPT OF JURY TRIAL: VOLUME IX OF X
             BEFORE THE HONORABLE CLAY D. LAND,
                UNITED STATES DISTRICT JUDGE

                       APPEARANCES
```

FOR THE PLAINTIFFS:

MS. ALLISON BRENNAN BAILEY, 105TH 13TH ST, COLUMBUS, GA 31901,

ALLISON@BUTLERPRATHER.COM

MR. DANIEL EVAN PHILYAW, 12 LENOX POINTE NE, ATLANTA, GA
30324, DAN@BUTLERPRATHER.COM
MS. LARAE D. MOORE, PO BOX 1199, COLUMBUS, GA 31902,

LMOORE@PAGESCRANTOM.COM

MR. RAMSEY B. PRATHER, 105 13TH ST. COLUMBUS, GA 31901,

RAMSEY@BUTLERPRATHER.COM

JAMES E. BUTLER, JR. 105 13TH ST, COLUMBUS, GA 31902

JIM@BUTLERPRATHER.COM


FOR THE DEFENDANT:
MR. CHARLES EDWARD PEELER, 600 PEACHTREE ST NE, STE 3000,

ATLANTA, GA 30308 CHARLES.PEELER@TROUTMAN.COM

MS. ELIZABETH B. WRIGHT, 3900 KEY CENTER, 127 PUBLIC SQR

1   CLEVELAND, OH 44114, ELIZABETH.WRIGHT@THOMPSONHINE.COM

2   MR. HAROLD D. MELTON, 600 PEACHTREE ST NE STE 3000 ATLANTA, GA

3   30308, HAROLD.MELTON@TROUTMAN.COM

4   MR. MICHAEL R. BOORMAN, 999 PEACHTREE ST NE, STE 1130,

5   ATLANTA, GA 30309, MBOORMAN@WATSONPENCE.COM

6   MR. MICHAEL EADY, 2801 VIA FORTUNA STE 300 AUSTIN, TX 78746

7   MEADY@THOMPSONCOE.COM

8   MR. PAUL F. MALEK, 3291 US HWY 280 STE 200 BIRMINGHAM, AL

9   35243 PMALEK@HUIELAW.COM

10  PHILIP HENDERSON, 600 PEACHTREE ST NE STE 2320 ATLANTA, GA

11  30308 PHENDERSON@WATSONSPENCE.COM

12  _____

13

14              JOAN DRAMMEH, CVR, CCR

15          JOAN_DRAMMEH@GAMD.USCOURTS.GOV

16

17  INDEX

18  OPENING CLOSING ARGUMENT BY MR. BUTLER       6    12
    CLOSING ARGUMENT BY MS. WRIGHT              35    11
19  REBUTTAL CLOSING ARGUMENT                    75    21
    JURY CHARGE                                  88     2
20  JURY QUESTION NO. 1                         122    24
    JURY QUESTION NO. 2                         124     5
21  CERTIFICATE OF OFFICIAL REPORTER            159     1

22

23

24

25

```
1    Thursday, February 13, 2025 08:40:26
2                        --- PROCEEDINGS ---
3           COURT SECURITY OFFICER:  All rise, United States
4    District Court for the Middle District of Georgia is now in
5    session.
6           THE COURT:  Be seated, good morning.  Everybody
7    ready, Mr. Butler?
8           MR. BUTLER:  Yes, sir.
9           THE COURT:  Ms. Wright?
10          MS. WRIGHT:  Yes, Your Honor.
11          THE COURT:  Let me just clarify one item before we
12   get started.  Mr. Boorman, is it Ford's contention -- I
13   understand that you cannot obtain punitive damages connected
14   to the wrongful death claim -- but is it Ford's contention
15   that if the jury found in favor of the Plaintiff on the estate
16   claim for only funeral expenses; that they cannot obtain a
17   punitive damages claim -- can I obtain punitive damages on
18   behalf of the estate?
19          MR. BOORMAN:  If I can have one moment to talk to
20   Mr. Eady?
21          THE COURT:  I'm interested in your position with
22   regard to Georgia law, with regard to whether they have to
23   obtain recovery of conscious pain-and-suffering on the estate
24   claim in order to obtain a punitive damages award.
25          MR. BOORMAN:  Yes, Your Honor.  Our position is that
```

1    they do have to be awarded pain and suffering.  Our position

2    is that in a wrongful death claim any damages as it relates to

3    the wrongful death claim would be duplicate and it has to

4    attach under Georgia law to another claim and that it's our

5    position that has to be the pain-and-suffering claim not the

6    funeral expense.

7           THE COURT:  That was the implication of your brief

8    in your motion for judgment as a matter of law, but do you

9    have Georgia authority that says a punitive damages award

10   cannot connect to an estate claim for funeral expenses?

11          MR. BOORMAN:  To be honest, Your Honor, I don't

12   think I have seen it broken down just like that.  What I

13   believe the case law says is that it can attach to

14   pain-and-suffering and so I think the Court is left with --

15          THE COURT:  Okay, you don't have any clear authority

16   that says that the punitive damages cannot attach solely to

17   the funeral expenses?

18          MR. BOORMAN:  Or that it can attach to another

19   claim, you are correct, Your Honor.

20          MR. LOWREY:  I don't have that case either, we'll

21   focus on that.  This is what I can tell you, all of those

22   cases under Georgia law saying what is required for punitive

23   damages; they stand for this proposition if they are

24   accumulated debt.  You can't award punitive damages without

25   there being some compensatory damages; that's the limiting

```
 1    principle.  I have never seen a case and I don't know why it
 2    would make any sense for it to be a particular type of
 3    compensatory damage, suffering versus funeral expenses.  But
 4    we will focus on that, Your Honor.
 5              THE COURT:  Okay, it may not be necessary.  Let's
 6    bring the jury down.  The stipulation as to the funeral
 7    expense amount is not going out with the jury.  I told them
 8    what it was so you may want to remind them of the number in
 9    your closing because they will not have the stipulation with
10    them during the deliberations.
11              MR. BUTLER:  Yes, sir.
12    [JURY ENTERS COURTROOM.]
13              THE COURT:  Ladies and gentlemen welcome back, I see
14    everybody survived that rain.  I hope it didn't wake you up in
15    the middle of the night like it did me, but it was quite a
16    storm.  We are at the point where the lawyers are allowed to
17    give closing arguments in the case.  The Plaintiff has the
18    burden of proof on their claims so the Plaintiffs lawyer gets
19    to give an opening argument and then Defendant's lawyer will
20    be able to give the closing argument on behalf of the
21    Defendant.  And then the Plaintiffs lawyer will be able to
22    come back and give a rebuttal closing.
23              After the closings are finished I will then instruct
24    you on the law in the case that you must apply and then you
25    will go to the jury room to begin your deliberations on the
```

1    case.  As I told you before, earlier in the case, anything the

2    lawyers say is not evidence.  The evidence is the sworn

3    testimony from the witnesses and any exhibits that have been

4    admitted.  If your recollection of the evidence is different

5    than what the lawyers say it is then you should rely on your

6    recollection of that evidence, but it is important for the

7    lawyers to be able to give you their argument as to why they

8    think they should prevail so you should give them your careful

9    attention.

10            Mr. Butler, you are recognized to give the opening

11    closing argument for the Plaintiff.

12                        OPENING CLOSING ARGUMENT

13            MR. BUTLER:  Good morning ladies and gentlemen, we

14    are nearing the end and I want to say again to each of you

15    thanks for your service.  I hope when this is all over this

16    week you will be glad you served and you will be proud of what

17    you did; and will believe that you have done justice, full

18    justice; and that you have done some good that's the goal.  We

19    are all in times of trouble comforted by ideas, and stories,

20    and quotations and one of my favorites is this.  You probably

21    have heard it before.  Some of you may have heard it before.

22    I have said it lots of times.  I say it to myself regularly.

23            An old guy was walking down to the beach and he sees

24    this kid on the beach throwing something back into the surf.

25    And he walks down and asks the kid, son, what are you doing.

1    And kid says well all these starfish washed up on the beach

2    and when the sun gets up they will all die.  So, I'm throwing

3    them back in the surf.

4            The old guy says, well, son there's thousands on

5    them on this beach.  You can't save them all.  And the kid

6    leans down and picks one up and throws it into the surf and he

7    says, well, I saved that one.  That's one of the reasons we're

8    here.  You have an opportunity in this case to save some

9    people and we hope you'll take it advantage of that

10   opportunity.

11           Judge Land just mentioned again the burden of proof.

12   The burden of proof is as he told you before the trial started

13   the preponderance of the evidence; that means more likely than

14   not.  We lawyers like to call it 50 percent plus or better.

15   But in this case the Plaintiffs, our side, have done a whole

16   lot more than 50 percent plus a feather in proving our case.

17           The most important fact in this case I believe is

18   that no one came from Ford to defend these roofs, nobody, no

19   roof engineer, no executives, nobody.  Nobody that's supported

20   by Ford.  Nobody is here now or has been here during this

21   trial who is authorized to speak to you from that witness

22   stand on behalf of Ford and to tell you what Ford Motor

23   Company claims, and says, and believes.  Nobody.  All you've

24   got is Ford lawyers, lawyers hired by Ford, and expert

25   testifiers hired by Ford.  Two of them were former Ford

1    employees; that ain't the same thing.  As Mr. Eikey told you

2    sitting in that chair, I am not authorized to speak for Ford

3    Motor Company.  Nobody is here from Ford.

4           I've never seen anything like this.  I've been doing

5    this 48 years.  I've never seen a case where the Defendant,

6    which is this corporation, had nobody at the trial at no time.

7    There's no executive to explain why Ford kept selling

8    5.2 million of these truck with this roof despite knowing that

9    people were getting killed, paralyzed, and injured.  Remember

10   Mr. Herbst 50 OSIs, Judge Land authorized us to show you.

11          What was the year of the first wreck?  1992.  What

12   was the first model year of the Super Duty truck with this

13   roof?  1999.  They flooded in.

14          Remember Plaintiff's Exhibit 133 that memo by ERSP

15   team member, Jason Balzer, second page; why is this important?

16          What's he talking about?  Lawsuits.

17          That's 2005, ladies and gentlemen; that's 17 years

18   before Mr. and Mrs. Mills were killed.

19          Ford's own engineers on the ERSP team; what's their

20   concern?  Lawsuits.  They poured in.

21          Ford did nothing about it.  There's nobody here to

22   explain to you why Ford did nothing about it.  There's nobody

23   here to explain to you why Ford put a five times stronger roof

24   on the 2015, lighter F150, but not on the Super Duty.

25          Mr. Eikey talked about resources, and a business

1    plan, and the cycle.  Ford Motor Company started putting

2    stronger roofs on the F150, the lighter truck, in 2009.  They

3    could've had a five times stronger roof on these Super Duties

4    in 2015, on the truck that Mr. and Mrs. Mills bought.

5              They could have done that.

6              Why didn't they do it?  Nobody is here to explain to

7    you why they didn't do it.  Is there something about the

8    people who drive F150s that makes their safety more important

9    than the people who drive F250s, and 350s, and 450s?  Nobody

10   has mentioned that from the Ford side, why the distinction?

11             Mr. Eikey talked about what F250s, 350s, and

12   450s are used for.  They are used for farms, and ranches,

13   and work and hauling stuff around.  What is this distinction

14   in the minds of the Ford Motor Company between safety for

15   those who drive the light trucks -- Ford's bestselling vehicle

16   -- and those who drive the heavy trucks?  Nobody from Ford has

17   even attempted to explain that to you.

18             There's no executive from Ford to explain why it is

19   -- and you saw the document 181 -- I won't spend time calling

20   up documents because you've seen them.  Plaintiff's

21   Exhibit 181 is that executive summary.  Who does it come from?

22   Well, I think an executive summary comes from executives.

23   Mr. Caruso said it was cost-containment.  They ordered

24   engineers to remove stuff, metal from the roof, remove parts

25   from the roof to save money.

1             How much did they save?

2             These are my notes from the flip chart, from opening

3    statement.  Everything I wrote down there we have proved.  Not

4    50 percent plus a feather, but 100 percent.

5             They saved $520 million, that's undisputed; that

6    means more profit.  They probably saved a lot more than that.

7    And what did they do?  The engineers designed the roof.  They

8    did the CAE, computer analysis of that roof.  And now they say

9    they've lost the source codes, so there's no way to verify the

10   computer analysis.  But after the computer analysis they

11   weakened the roof.

12            Mr. Lowery walked Dr. Vogler through that; do you

13   remember that?  All those concern details came after the April

14   1996 supposed computer analysis.  They weakened the roof that

15   they already knew was too weak.  Remember uncontested

16   testimony, Bruno Barthelemy, the guy who was in charge of this

17   roof initially and ultimately got walked out of the building,

18   has testified multiple times he could have made it five times

19   stronger, ten times stronger.

20            The first question is why didn't he?  The second

21   question is when he didn't; why did Ford executives order the

22   engineers to weaken the roof?  There's no doubt that they did.

23            And the next question for an executive if we had one

24   to ask; is why is it that after Ford Motor Company weakened an

25   already weak roof, Ford did no physical testing of that

1    weakened roof?  That's undisputed ladies and gentlemen.  Dr.

2    Vogler admitted every bit of it when Mr. Lowery was asking her

3    questions.  Undisputed.

4          Now, they claim they did no physical testing.

5    Credibility is up to you.  The witnesses, claims, what anybody

6    says; it's for you to decide whether you believe it's true or

7    not.

8          I don't believe that was true.  Surely they did some

9    physical testing.  They just never produced it.  Of course we

10   know what it would show.

11         How do we know what it would show, well, because

12   every test ever done on this roof, every calculation of this

13   roof strength, has led to a calculation of strength to weight

14   ratio, SWR, of 1.1.; there is 1.21; there was 1.25; and I

15   think one test, one of the Ford witnesses claimed it was 1.3.

16   Remember those numbers, and look at this, it will be out in

17   evidence with you because it's in evidence.

18         Plaintiff's Exhibit 175, this is an IIHS roof

19   strength-to-weight list.

20         Let me put it on the Elmo.

21         Whether it's 1.1, or 1.23, look where that comes on

22   the IIHS scale of roof strength.  I mean, it's in the bottom

23   half of poor.  They talked about state-of-the-art among other

24   things they are doing.  By 2015, this is undisputed, Brian

25   Herbst told you and no witness from Ford disagreed.  By 2015

the GM and Chevrolet heavy trucks were 135 percent stronger

than the Ford Super Duty.  By 2015, the Dodge heavy trucks

were 70 percent stronger.

Now, what was the state-of-the-art when Ford was

building Mr. and Mrs. Mills' F250?  I have got it buried in my

notes and I'm getting ahead of myself, but you remember we put

that on.  Mr. Lowery had walked Dr. Vogler through that.

GM, Dodge, Nissan, Toyota were all building trucks

with SWRs that range from the high 4.5, I think it was, to a

low for Dodge of 2.971.  2.97 is almost three times 1.1, which

is what Ford sold to Mr. and Mrs. Mills.

What was Ford doing in 2015?  They were building a

truck with the strength-to-weight-ratio of 5.85; that's five

and a half times stronger.  The same year.

They could've done that for Mr. and Mrs. Mills.  And

if they had done that we wouldn't be here today.  We could

have found something else to do in February 2025.

Ford sold these trucks for 18 years.  They sold

5.2 million of them and nobody is here to defend the roofs.

Not a single Ford roof engineer came to take that witness

stand.  Not a single member of the ERSP team came to take that

witness stand.  There are 20 of them, 20 of them.  Almost all

of them are still employed by Ford.

Hey, there's direct flights from Detroit, Michigan

to Atlanta.  I've been on them many times.  All you gotta do

```
 1   is fly down here and rent a car, or have somebody pick you up,
 2   and drive you to 120 12th Street Columbus, Georgia; take the
 3   stand and tell the ladies and gentlemen of the jury, why, why,
 4   why did they do this?
 5           I want you to keep this in mind as you deliberate.
 6   Keep in mind that Ford had open access to this truck, stored
 7   at Ray's Body Shop, in Reynolds, Georgia, because Ray is a
 8   good friend of Mr. Giles.  He's got an enclosed facility and
 9   he keeps it locked up, so that's why it's there.  Ford had
10   open access to the vehicle, multiple vehicle inspections, 13
11   Ford experts inspected this truck.
12           How many testified?  Four of the ones who inspected
13   this truck.
14           Let's talk about the autopsies.  Next to nobody from
15   Ford being here, this is the second most stunning part of this
16   case and it's amazing to me.  The bodies are like the truck.
17   They are important evidence.  There had to be autopsies.  If
18   you don't do autopsies there's no telling what Ford's lawyer
19   could say.  The former Chief Medical Examiner for the Georgia
20   Bureau of Investigations.  I don't know anybody better.  He
21   was with GBI from 2004 to 2022 or something like that, a long
22   time.  So that's who we got to do the autopsies.  And we told
23   Ford, you can send whoever you want to the autopsies so they
24   sent this Dr. Downs, a pathologist from South Carolina, who
25   used to be with the GBI and left and Dr. Eisenstat talked
```

```
1   about that.
2            There's a nondisclosure agreement that Dr. Downs had
3   to sign about the reasons for his departure, undisputed, but
4   that's who Ford chose, Dr. Downs to send to the autopsies.
5   And they sent Harold Keyserling who is a radiologist from
6   Atlanta who's on the staff of Exponent.  We heard Mr. Herbst
7   say they have been paid over $150 million dollars through 2017
8   or early 2017 by Ford Motor Company to provide expert
9   witnesses, Exponent.  Harold Keyserling makes more than a
10  radiologist.  Who did Ford put on the witness stand that was
11  at the autopsies?
12           Nobody.
13           They didn't call Dr. Keyserling.  They didn't call
14  Dr. Downs.  What Dr. Eisenstat said about the autopsies is
15  undisputed.  I mean, this is not a credibility thing; there's
16  no dispute.  He's the only pathologist who testified.  He is
17  the only person who testified who was at the autopsies.
18           Why is that important?
19           Remember what Dr. Eisenstat said?  I asked him, did
20  Dr. Downs say to you anything about this Ford argument about
21  heart attack and unconscious during the autopsies?
22  Dr. Eisenstat is holding her heart in his hands.  They do
23  slices.  Dr. Eisenstat and Dr. Downs looked at the heart under
24  a microscope.
25           I asked Dr. Eisenstat, did Dr. Downs say anything to
```

1    you about a heart problem?

2              No.

3              Where is Dr. Downs?  Why didn't they call him?

4              That's why.  That's why.  They put Dr. Downs on the

5    stand it would have been absolutely crystal clear to you that

6    this stuff about a heart attack, cardiac event was just more

7    of Ford making stuff up.

8              Let me talk about how bad the roof crush was.  I

9    think this is important.  Dr. Sochor he talked about how he

10   said that Mrs. Mills had room to move inside that vehicle with

11   her hair trapped.  Undisputed her hair trapped between the

12   headrest and the roof.  She had room to move.  She was bent

13   over double.

14             Let's show that exhibit, the one we did yesterday,

15   where Dr. Sochor drew a line across it.

16             Room to move, this guy, that Ford's lawyers put on

17   that witness stand said.

18             Look at that.  Remember they made him draw a line.

19   Her hair is trapped.  Remember the roof is crushed down in

20   that V.  You saw that.  The roof is crushed down in a V.  She

21   is next to the console, between next to the console and

22   through the inboard side of the header.  Her hair is caught

23   between the headrest and the roof.

24             Look now -- This is Ford lawyer's own witness,

25   Sochor, drew that line of what four-to-six-inches is above the

1    console.  She is bent over nearly double.  I don't know how

2    she was bent over that far.  But truth is she's a little bit

3    heavy, 5'1, 163 pounds, one record says.  She's kind of round.

4    How in the world did could she get bent over like that?

5              The roof was totally collapsed down on her; that's

6    how.

7              What did Nurse Harrison say when he first called

8    911?  You've heard that tape twice and I won't play it again.

9    You will have it back with you and you can play it if you want

10   to.  He said a lot of stuff about her.  She's moving.  Her

11   eyes are open.  She's badly altered.  She's bent over pretty

12   badly in half; that's not an exact quote just something almost

13   like that.  And when he was kneeling down on the ground, in

14   the grass, looking in her window to asses her, and when he

15   moved over to where you can reach into the broken windshield

16   to take her pulse or for her wrist, he didn't even know Mr.

17   Mills was there.  He couldn't see across the truck.

18             Now, how far -- I should have measured this and I

19   did not -- How far in a F250 from the driver is the passenger?

20    You can reach over and touch their shoulder.  He couldn't see

21   that far the roof crush was crushed so bad.

22             Ford's own witness Colby Swicord told you

23   four-to-six-inches above the console.  And then Ford's lawyer

24   tried to get Dr. Sochor to say he didn't know what part of the

25   console it was.  And Ramsey got Dr. Sochor to admit the

1  console is flat.  You can see it's flat, right there,

2  four-to-six-inches.

3          Plaintiff's Exhibit number 84, please.

4          How bad was the roof crushed?  Look at this.  It's

5  flat on the passenger side.

6          Plaintiff's Exhibit 47.12A, please, ma'am.

7          Look at that.  Mr. Prather drew that yellow line.

8  There is that V totally collapsed right over where her head

9  was trapped.  Now, and remember this Mr. Swicord said that the

10  roof was collapsed so bad they couldn't get Mr. Mills' head

11  out from under the console; that was the main problem.  That's

12  why it took 26 minutes to get Mr. Mills out.

13          Now why is this V important?  Let me tell you why.

14  Because what happened here is the header failed.  You saw

15  those concern details.

16          Remove outer header, and there was another one

17  about, down gauge some part of the header.  I forget that or

18  is that Plaintiff's Exhibit 189?  The header collapsed.  How

19  often did it collapse?  In every single one of the 50 OSIs

20  Brian Herbst showed you the header was collapsed, it failed.

21  Failure points, failed, every single one of them.

22          Who knew this about the OSIs?

23          Ford knew about every one of them starting from

24  1999.  They weakened the header, the header was failing in

25  wreck, after wreck, after wreck, after wreck.  All across the

```
 1   United States of America Ford knew about it, but they kept

 2   selling these trucks and not warning anybody.

 3             Let me talk about why she ran off the road.

 4             Nobody knows why she ran off the road.

 5             And the court of law is not a place for speculation.

 6             A verdict is supposed to be based on evidence,

 7   facts, not speculation.  Human beings, me, you, nearly

 8   everybody -- there may be somebody more perfect than I am that

 9   doesn't do this -- we always, if we don't know the answer to

10   something we try to come up with an answer; that's called

11   speculation, assumption.

12             Do you remember how many times Mr. Swicord said

13   assume?  I wasn't going to say anything but I finally had to

14   object to saying assume, assume, assume.

15             You don't assume things that's not evidence.

16             Evidence is the facts.

17             Nobody knows why she ran off the road.  There are

18   only two people that could know why she ran off the road and

19   they are both dead, killed by Ford.  It really doesn't matter

20   why she ran off the road.  In lawyer talk it is called

21   irrelevant, because it's not the running off the road that

22   killed her and killed him.

23             It's the roof crush.

24             Debra Mills didn't design and sell these roofs.  The

25   roof should not have crushed down on them.
```

1          Ford kept talking about the fact there was no

2    breaking; that's a fact.  We don't know why she didn't break.

3    She's not here to tell us.  We do know what the Georgia State

4    Patrol photographs prove.

5          Exhibit 13.02.  I should have these organized but at

6    10:30 last night I gave out and it didn't get done.

7          Remember it's undisputed perception reaction time is

8    about 1.5 seconds.  The whole thing happened in about 3

9    seconds.  She runs off the road and she tries a left steer;

10   that's undisputed a 58-degree left steer.  I'm going to get

11   back to that in a minute, undisputed.  It doesn't work.

12         Why doesn't it work?  Gravity has got the heavy

13   truck, the side of the road slopes to the right.  There is

14   grass.  It might have been wet.  We don't know for sure.  If

15   you watch the dash-cam you can see rain hitting Trooper

16   Sanchez's windshield.

17         But if the left steer doesn't work and what does she

18   see there?  She's got open green.

19         She doesn't know that the culverts there.  You can't

20   see it.  That culvert is not used.  The driveway is over here

21   for the folks that live over here.  Here's their driveway.

22   There's a field road over there and you can't see the culvert

23   so she's seeing green.

24         Should she have braked?

25         Well, I think she should have, yeah.

1          Why didn't she?  We don't know, but we do know that

2    she steered to the right of that telephone pole and she had

3    clear green grass or she thought she did.

4          Remember Mr. Tandy tried to tell you that she was

5    headed straight for the telephone pole.

6          You know there ought to be some limit to making

7    stuff up.  Here's the Defense Exhibit.  The tracks lead to the

8    right of the telephone pole.  The truck ended up to the right

9    of the telephone pole.

10          Mr. Tandy also tried to tell you that this is two

11   separate strikes in the ground.  That this four-ton truck hit

12   the ground and bounced up in the air like a pogo-stick and

13   bunny-hopped again; that's nonsense.

14          You saw the aerial photograph that Brian Buchner

15   did; it's one solid piece of sand with this truck slid across

16   it.

17          You heard from the sons of Ms. and Mr. Mills.  Rusty

18   and Jason are on that road all the time.  This place where

19   their parents got killed is still there; there's still no

20   grass growing where that truck hit.

21          Let's talk a minute about this heart attack

22   unconscious argument that Ford has come up with.  At various

23   times Ford's lawyers and testifiers have said heart attack,

24   cardiac event, sudden cardia event.  They can't make up their

25   minds what to call it.

1              Listen to the Judge's charge.  Judge Land will tell

2     you that Ford contends Mrs. Mills is at fault for causing this

3     wreck.  Let that sink in.  Ford claims Mrs. Mills is at fault

4     for causing this wreck.

5              Ford also claims to claim she was unconscious.  Now,

6     if she was unconscious she couldn't be at fault.

7              I'm not at fault for something I do in my sleep.

8              What that tells me is that Ford's team either does

9     not believe it's own argument about heart attack and

10    unconscious or they just can't make up their mind.  It reminds

11    me of bass fishing.  I meant to ask this in voir dire; how

12    many of you all go bass fishing.  I used to be before I got my

13    second breath and started working all the time.  I've got a

14    really cool tackle box.  I've got a couple of them.  I've got

15    every lure you can buy at Walmart.  I'm going to run out of

16    time.

17             What Ford has done here is like a bass fishing.  You

18    throw out one lure and you catch a bass and then they quit

19    biting that lure so you go to another lure.  And what their

20    goal is they've got all of these diversions.  They hope to

21    hook one of you with one lure, one diversion, like heart

22    attack, unconscious; and hook some other Juror with another

23    lure.  Then what happens is when you get back in the jury room

24    and to get a verdict you come up with a compromised verdict, a

25    lower verdict; that's what this is all about.  That's why they

1  do it.

2          Probably one of the other crucial facts here is that

3  Ford could not get a cardiologist to come testify about their

4  heart attack theory.  We called Dr. Ellis, 40-years

5  cardiologist, the founder of the biggest cardiology firm in

6  South Georgia.  He came to testify.  He knew Mrs. Mills.  He

7  treated Mrs. Mills and I don't have the time but you saw the

8  flip chart again yesterday.  I wrote up here two points and

9  I'll summarize what he said about their heart attack and her

10  being unconscious theory with an acronym and I hope Judge Land

11  doesn't call me down.  The acronym is B.S.  That's what

12  Dr. Ellis talked about.

13          Not only that, early on in this case we were

14  criticized because we didn't have a radiologists.  I beg to

15  differ, yes, we did.  We had a radiologist in this case.  His

16  name was Dr. Camacho from California.  What did he testify to?

17  I don't have any radiological evidence that supports anything

18  that would cause sudden death.  Those are his words.  He's our

19  radiologist.  He doesn't support the heart attack theory.

20          Where did this come from?  It's undisputed.  Dr.

21  Sochor admitted it.  Ford got all these lawyers and experts in

22  one of these LECs, and they came up with the idea of claiming

23  that she had a heart attack.

24          That's the spinner-bait or maybe the rubber-worm.

25  They are going to try to hook somebody with that one.  More of

1  making stuff up.

2          Defect.  Can there be any doubt?  Look at this.  The

3  first thing to hit the ground was this running light.  This is

4  the actual running light; it's made out of plastic.  Plastic

5  running light was stronger than the roof.

6          What's our best evidence of defect?  Ford's own

7  F150, 5.85 SWR in 2015.  Ford could've put a stronger roof on

8  the Super Duty.  There's no doubt that it's safer.  You saw

9  the comparison between the two rollover crash tests.

10  Plaintiff's Exhibit 255, which crushed flat.  And then in

11  2015, the same year as the model year on Mr. and Mrs. Mills

12  truck Ford tested the 2017 model year roof, three times

13  stronger.  You saw that in Plaintiff's Exhibit 81, undamaged.

14  I mean, the windshield is not even knocked out.

15          Then we've got Dr. Baccouche, Ford's own Ph.D.

16  engineer "crash safety technical specialist" who wrote that

17  article, talking about how roof strength is crucial for

18  occupant survival.  Approved for publication by Ford Motor

19  Company's management and legal department.

20          This is an interesting little sideline here.  Ford's

21  own conduct is contrary to what it's lawyers and testifiers

22  tell you.  They say roof crush doesn't matter, there's no

23  causal relationship; then why did they put a 5.85 SWR roof on

24  the 2015 F150?  They say roof crush doesn't matter, then why

25  did they authorize Dr. Baccouche to publish that article

1    saying it's crucial?

2            We've also got on the issue of defect other

3    standards.  We've got ISH standard, 4.0 SWR.  Volvo standard

4    -- that was a Ford division through 2010 -- Volvo standard

5    3.5.

6            With respect to their argument about roof crush

7    doesn't matter it makes no sense.  It's contrary to

8    commonsense.  No question a stronger roof is safer.

9            NHTSA rejected that argument.

10           IIHS not only rejected it but mocked it.  IIHS said,

11   Dr. Vogler admitted this, roof strength not only matters, it

12   matters a lot.

13           This may be the acid test about whether roof

14   strength matters.  Starting in 2009 Ford put a much stronger

15   roof on the F150.  Now, how many wrecks did Ford bring to your

16   attention where somebody in a F150 with that strong roof

17   rolled over, and its roof crushed, and somebody's in there?

18           One.  The Kao case; do you remember that?  That's

19   the only one they mentioned, one.  2009 through today, one

20   wreck where there's a claim of roof defect and somebody being

21   injured in one of these F150 with a strong roof.

22           Now, what's the truth of that case?  Brian Herbst

23   told you that he inspected that truck and said it wasn't a

24   good case because the roof didn't cause the injury. Mr. Eikey

25   got up there and denied that.  Mr. Eikey when I was asking the

1    question, denied that Ford took the position that the cause of

2    injury was modifications to the truck with the truck being

3    used for off road.

4          And then, yesterday, Judge Land admitted into

5    evidence Plaintiff's Exhibit 867A; which was Ford's answer to

6    the lawsuit, where Ford said it believes the truck had been

7    modified and that caused the injury, making stuff up.

8          I want to talk about injuries in a moment.  The

9    Judge is going to tell you that about this claim that we keep

10   hearing that Mr. and Mrs. Mills were fragile.

11         How many times have we seen this list of Mrs. Mills'

12   medical complaints?  I mean over and over.  I bet you're going

13   to see it again.  I don't know about you but I'm tired of

14   seeing them.  Here's what the Judge is going to charge you.

15   When evaluating the extent of injuries for which you hold Ford

16   Motor Company responsible, you should accept that Ford takes

17   the decedents in whatever condition it finds them at the time

18   its conduct contributed to their injuries.  Charged that in

19   opening statement.  Keyword is contributed.

20         Ford bears the risk that those injuries may be more

21   severe because of the actual physical condition that the

22   decedents were in before Ford's conduct caused injury to them.

23         Ford argues that it's not their fault because these

24   people were old and not in the best health; that's their whole

25   case.

1          The law is Ford doesn't benefit from that fact.  All

2     kinds of people drive these Super Duty trucks, old people.

3     I'll tell you from my own personal perspective 74 is not old.

4     Old people, young people, sick people, healthy people; Ford

5     has got to protect them all.  That's no defense, no defense,

6     that these people had any medical maladies.

7          Let me talk about the seatbelt stuff.  Why do they

8     make the seatbelt accusation against Mrs. Mills about wearing

9     it under her arm?  It makes no sense.  There's no question at

10    all that she had injuries that can only be consistent with

11    wearing her shoulder belt in the right spot.  No explanation

12    for that, except shoulder belt being in the right place.  It's

13    undisputed.

14         Where is their pathologist?  They talked about their

15    pathologist in opening statement.  Where is he?  They didn't

16    put him on the stand.  They were afraid to put the guy on the

17    stand; that's a fact.

18         Why do they talk about shoulder belt under the arm?

19    Because Ford cannot resist throwing shade on the victims,

20    accusing the victims of something.  The victims are always

21    wrong about something.  That's just psychology.  It's so easy

22    for individuals to find fault with the person next to you or

23    some other person.  It's a little harder to focus on something

24    like a corporation.  There's no evidence that she was wearing

25    her seatbelt improperly.  You heard Jason Mills testify,

1    nobody had ever seen her do that.  Herman Mills wouldn't

2    tolerate it.  He was safety conscious.  All of that is

3    undisputed.

4            If it makes you angry I think it should; it's

5    attacking Mrs. Mills for something that's simply not true.

6            Two State Troopers said that she was wearing her

7    seatbelt properly.  Jacob Sanchez filled out the State Trooper

8    form.  Safety equipment, look at the code.  You will have the

9    code back with you, Number 3 shoulder and lap belt.  Brian

10   Palmer cut the seatbelt.  Colby Swicord said he did.  I don't

11   remember where that came from.  He got confused and I started

12   to go into it and decided not to.

13           There's no question that the roof crush caused

14   massive injuries to both Mr. and Mrs. Mills.  You're going to

15   have this back with you.  It's impossible this did not.  If

16   you look at how much she was bent over, look at how much he

17   was bent over; 26 minutes they couldn't get him out of the

18   darn truck.

19           Let's start with Mr. Mills.  Here's the medical

20   illustration.  Those don't come -- When the truck hits the

21   ground you heard Dr. Sochor admit, the NCAP test which had the

22   same Delta V change in velocity as this wreck when the truck

23   hit in the ground at 35 miles an hour.  NCAP test says that

24   the risk of serious injuries is 10 to 15 percent for somebody

25   with AIS3 or less.  Dr. Sochor said these were AIS2 for both

1    of them, 10 to 15 percent.

2         You're talking about burden of proof 50 percent plus

3    a feather.  It is 85 to 90 percent more likely than not that

4    these people were not seriously injured by that ground strike.

5    Dr. Sochor had to admit this; that's way more likely than not.

6    Look at the injuries.  Ain't no seatbelt there.  When it hit

7    the ground the only evidence that they had any impact inside

8    the vehicle when they hit the ground was the seatbelts, lap

9    belt and shoulder belt.  That's it.  They didn't hit the

10   steering wheel.  They didn't hit dashboard.  They hit nothing

11   when they hit the ground.

12        You don't get those back and back of the head

13   injuries from a seatbelt.  There ain't no seatbelt there.

14   Their argument -- Ford said in the opening statement and had

15   the witnesses testify there were no injuries from the roof

16   crush, and it is preposterous.

17        Plaintiff's Exhibit Number 357, Mrs. Mills'

18   injuries.  I forgot to mention, Mr. Mills had I think it was

19   four thoracic spine fractures.  There they are; that's right

20   there.  Three's no seatbelt there.  That's roof crush from

21   being bent over double.

22        Mrs. Mills, Plaintiff's Exhibit 357, look at this,

23   back injuries; two of her spinous processes fractured.  There

24   was no seatbelt there.  Head injuries.  There is no seatbelt

25   up there.  Their argument of no injuries is preposterous.

1          Dr. Eisenstat's injury illustrations are undisputed
2  and there is no evidence to the contrary.  Why do Ford's
3  lawyers keep talking about all of these medical maladies that
4  Mr. and Mrs. Mills supposedly had?
5          The reason is very simple, dollars.  They think that
6  will cause you to devalue the lives of Herman and Debra Mills.
7          What did Dr. Ellis say about Herman Mills?  They
8  talked a lot about him having leukemia and COPD.  We talked
9  about Herman Mills yesterday, leukemia was in remission, not a
10 problem.  COPD.  Here's the fact, Mr. and Mrs. Mills were not
11 destined to die in August of 2022.  Ford took them from their
12 families and Ford took their lives from them.
13         We're going to talk to you about the claims in this
14 case and you're going to have a verdict form out with you and
15 I'll show you what it looks like.
16         THE COURT:  It's already on their screens.
17         MR. BUTLER:  I'll make notes on here.  I want them
18 to see what we're going to ask them to do.
19         Here's the verdict form.  The first thing it starts
20 off we ask that you check that the claims on behalf of Debra
21 Mills' estate claim; I ask you to check we the Jury find in
22 favor of the Plaintiffs; and there's is the amount of funeral
23 bills.  There is no question they are entitled to recover
24 funeral bills.
25         The next question is about pain-and-suffering.

1    You're supposed to fill in an amount there for Mrs. Mills'

2    pain and suffering.  There's no question she had

3    pain-and-suffering.  She was upside down, bent over double,

4    difficulty breathing; that's undisputed.  She suffocated to

5    death; that's undisputed.

6            Where is their pathologist to dispute Dr. Eisenstat?

7            How long was she in that condition?  We don't know.

8    That's the honest answer.  We don't know.

9            Dr. Sochor said, "Mrs. Mills is dead like five

10   minutes after all of this occurred".  That's about the only

11   thing I agree with Dr. Sochor about.  That sounds about right.

12   We know there was some time period between the wreck and Nurse

13   Harrison getting there.  We know that there was two and a half

14   minutes between the two 911 calls.  So, we know that for some

15   period of minutes she was bent over double, upside down,

16   difficulty breathing with that roof crushed on top of her and

17   her hair caught.  So we are going to ask you to return a

18   verdict for pain-and-suffering in the amount of $2.5 million.

19           For Mr. Mills, the next thing on the verdict form is

20   a wrongful death claim.  The Judge is going to charge you that

21   you can find for the Plaintiffs on the wrongful death claim if

22   you find that the injury caused by Ford directly and

23   significantly contributed to the cause of death.

24           There's no question that it contributed to the cause

25   of death.  It doesn't have to be the only cause.  Roof crush

```
 1   doesn't have to be the only cause of death, but did it
 2   contribute to the cause of death?  I told you that in opening
 3   statement; that's the law.  No question, it contributed to her
 4   cause of death.
 5           The next question is what do we find on the wrongful
 6   death claim and how much should you return your verdict for
 7   the amount of wrongful death?  I'll get to that in a minute.
 8           Let's talk about Herman Mills' pain-and-suffering.
 9   There's no question that he had pain-and-suffering.  He was
10   upside down, in pain, undisputed, moaning, holding his wife's
11   hand.  Get a picture of this, holding his wife's hand, and it
12   took 26 minutes to get him out.  Ford said he didn't have any
13   pain-and-suffering.  Obviously, he did.  We ask for a verdict
14   for the pain-and-suffering of Mr. Mills in the amount of
15   $9 million.  Nine days in that Tallahassee hospital and every
16   moment caused by this wreck.
17           Let's talk about wrongful death damages.  Judge is
18   going to charge you about wrongful death damages.  Georgia's
19   wrongful death statute is one of the noblest things I've ever
20   heard of.  Georgia's wrongful death statute says that the
21   value of a wrongful death claim is the value of the person's
22   life, not to their family, but to themselves as though they
23   had lived; that is not an easy concept to grasp.
24           What is my life worth to me the rest of my life?
25   That's what it means.  Well, you know, some people may say I
```

1    have exaggerated notions personally about the value of what

2    the rest of my life is.  But the point of the statute is to

3    put a full value on human life.  The whole point of the law is

4    to value human life.

5            I ask that you consider the importance of memories,

6    the importance of families, the importance of precious

7    memories they will never get to make.  Two people in love

8    always together enjoying their retirement.  Three sons.

9    They've lost opportunity to watch their son's successes.  They

10   have lost the opportunity to do all those things that they

11   were doing for those eight grandchildren.

12           You heard the damages witnesses testify about what

13   kind of people they are.  The most moving to me was Reverend

14   David Grubbs talking about Herman Mills.  This is a guy who

15   has been a preacher for 28 years.  He said of Herman Mills, he

16   was the finest person he had ever met; that's the kind of

17   people we're dealing with here.  Helping people, teaching

18   people.  Sheriff Griffin, Sheriff of the County, as fine a man

19   as we have in Decatur County.  Debra, a cut-up, always busy,

20   cooking and canning and caring for family, planning birthday

21   parties.  Ford took all of that away from them; that's what

22   they lost.  They also lost the opportunity to live out their

23   life together and to die in dignity and in serenity, not

24   upside down in a Ford pickup truck because Ford knew people

25   were getting killed, paralyzed, and injured by the roofs of

1    those trucks.  That ain't no way to go.  Ford didn't have the

2    right to do that to them.  No more trips with the family to

3    Mexico Beach, to the mountains, and to Biloxi.

4         Is there any amount of money that Herman or Debra

5    Mills would be willing to take to give up all that they lost?

6    You know the answer to that question, no; that's the truth.

7    Is there any amount of money that's too much for the full

8    value of their lives?  Ask yourself that, when you get back

9    there.

10         You will have in evidence something called an

11   annuity mortality table that tells you about the average life

12   expectancy for people, male and female, at certain ages.  It's

13   called the annuity mortality table from 1949.  It's updated.

14   It's not the life expectancy as of 1949.

15         We are going to ask you to return a verdict for the

16   full value of Debra Mills' life in the amount of $20 million.

17   And a verdict for the full value of Herman Mills' life in the

18   amount of $20 million.  That's what we ask.  What you do is

19   entirely up to you; that's for you to decide.  There is no

20   calculator you can use to come up with the average value of a

21   human life.  That would be totally contrary to the whole idea

22   of the Georgia statute of wrongful death statute.

23         The next-to-last thing I want to show you all is

24   about punitive damages.  The Judge will tell you the purposes

25   of punitive damages is to punish and to deter.  Deter is the

1   most important word there.  We will talk more about this in my

2   final argument, but there's no question Ford knew these roofs

3   were killing, paralyzing, and injuring people.  Brian Herbst

4   firm alone, an engineering firm in Goleta, California has had

5   41 of this cases, 50 OSIs.  Ford has not come in here and told

6   you how many people have been killed, paralyzed, and injured

7   by these roofs.  Nobody knows that better than Ford.  They can

8   tell you that, but they don't.  They don't want to tell you

9   that.

10          The purpose of punitive damages is to stop it.  All

11   you've got to do on this form is say, yes, to punitive

12   damages.  If you do say, yes, to punitive damages there will

13   be a very short of what we call phase two.  After your verdict

14   you will come back in here.  There will be two very brief

15   witnesses.  One is an economist and the other one is Mr.

16   Eikey, I am going to put him back on the stand and ask him

17   about some Ford documents.  That's all it will take.

18          I've got to sit down.  We ask you to say, yes, to

19   punitive damages.  A very short phase two and then you will

20   decide the amount of punitive damages.  We will talk about

21   that then.

22          Ladies and gentlemen, I'll say this now although I

23   will get an opportunity to get back up.  On the issue of

24   attorneys fees the Judge is going to charge you about that.

25   The basic idea is what Ford has done with these roofs over all

1    these many years since 1999 is bad faith.  The Judge will

2    charge you about that.

3              So thank you for your attention ladies and

4    gentlemen.

5              Thank you, Your Honor, for the time and I'll be back

6    up in just a bit.

7              THE COURT:  Let's clear that chart out of Ms.

8    Wright's way and then she can give her closing.

9              Ms. Wright, you are recognized to give the closing

10   argument on behalf of the Defendant.

11             MS. WRIGHT:  Thank you Your Honor.

12             Thank you all very much.  I appreciate your time

13   here today.  As I said last Tuesday, last week, Ford and the

14   Plaintiffs do not agree on what caused or contributed to Mr.

15   and Mrs. Mills' death in August of 2022, but what I told you

16   last week remains the case today.

17             This case is not about the roof.  This is about an

18   incredibly sad event and I feel for the families having to sit

19   here and listen to it, but Mrs. Mills had a cardiac event.

20   She ran off the road and very soon after the truck pitched

21   over she passed away.

22             Mr. Mills was injured, but those injuries were not

23   life-threatening.  Had he not been 74 and in poor health he

24   would not have gotten pneumonia.  Nothing about the roof,

25   which is what we are here about, contributed to their deaths.

1          Plaintiffs and Ford both brought you witnesses.

2     Your job is to decide the credibility of those witnesses;

3     which witnesses had the education, training, and the

4     experience to reach the opinions they've reached; which

5     witnesses actually did work and showed you the work they did;

6     and which witnesses ignored evidence; and which witnesses just

7     plain got things wrong?

8          Think about what you heard from the lawyers.  The

9     Judge has told you that what we lawyers say is not evidence,

10    but what did you hear when we each examined our witnesses?

11    The Plaintiff's lawyers with their witnesses did all the

12    talking, we had all of those leading objections.  While Ford's

13    lawyers let their witnesses do the talking.  And what did you

14    hear when we cross-examined the witnesses?  Plaintiffs'

15    lawyers badgered the witnesses.  How much money have they been

16    paid; even though their own experts are paid?  How many times

17    have you testified; their own experts have testified?  How

18    many times did they ask them to read documents they had never

19    seen and didn't have the basis to talk about?

20         We tried very hard to point out where the witnesses

21    made mistakes.  Where they failed to consider relevant

22    evidence.  And where they simply weren't qualified to render

23    an opinion.  That's the background against which you have to

24    decide this case; this vehicle, in this case, not in any other

25    vehicle and it starts with the accident.

1          A clear day, open road, and then those tire marks

2    gradually leave the road.  We've seen this many times.  You

3    heard from Mr. Tandy and Mr. Buchner.  They both start here

4    with the Georgia State Patrol photographs.  Straight tire

5    marks 200 feet completely unobstructed.  You heard that Mrs.

6    Mills had the time brake, the time to steer, and she neither

7    braked nor steered.  Instead, while never touching the brakes

8    she slammed into this culvert.  The truck is launched

9    airborne, sails over 80 feet until it slams -- and you're

10   tired of seeing this -- nose down, a second time, and pitches

11   over onto its roof.

12          Fifty miles an hour it impacts that ground, 50 miles

13   an hour.  And then this is where we have our first dispute,

14   whether there was any intentional steering by Mrs. Mills and

15   it's your first opportunity to make a credibility

16   determination.  Don Tandy, an engineer who is an expert in

17   vehicle dynamics and he has actually designed suspension

18   systems on vehicles.  Mr. Tandy explained in great detail how

19   the steering on the truck works.  What it means when the

20   wheels encounter an object in the terrain.  How drag could put

21   a vehicle slightly up slope.  He showed you that if your front

22   wheels move just 3 degrees it will move that steering wheel

23   60 degrees with no one touching it.  But then you have Mr.

24   Buchner.

25          Mr. Buchner is a materials engineer.  He used the

wrong size tires as you recall, which means he didn't get that

right.  He's never worked for an automotive manufacturer.  He

is definitely not an expert in vehicle dynamics and he has

never designed a suspension system.  He showed you that the

steering wheel on his PowerPoint hit 58 degrees to the left,

and 63 degrees to the right, as if that was a really big deal;

and it had to have been done intentionally.  Mrs. Mills had to

have intentionally done that.

It was only on cross-examination that he finally

admitted that all that steering input really only moved this

truck front wheels 3 degrees.  He claimed -- and this is not

Ford -- this is Mr. Buchner is the one who claims that Mrs.

Mills deliberately, intentionally ran her truck off the road

and deliberately, intentionally never braked her vehicle.

Ford has never said that Mrs. Mills did this intentionally or

deliberately.  We do not believe she did.  We don't believe

that Mrs. Mills intentionally caused this accident.

The only person who has told you she intentionally

did that is, in fact, Mr. Buchner; and what does he do?  Let's

look at the police photos and the reason this defies

commonsense.  The police photos show you the path that the

vehicle was headed and it is headed directly -- you see here

-- to these two poles right here.  Why would she directly head

towards there?  When you look at the tire marks you can see

they are headed directly for those poles.  There's not an

1    effort to evade them.  It's going straight towards those

2    poles; that defies commonsense.  Mrs. Mills is not going to

3    intentionally runoff the road, choose not to brake, and choose

4    to steer directly towards those poles.

5            And then the second dispute between Mr. Tandy and

6    Mr. Buchner.  Mr. Tandy showed you how the truck must have

7    slammed down at that 35-degree angle based on the event data

8    recorder and the physical evidence at the scene.  There are

9    clearly two different disturbances with a section undisturbed.

10   Right here we have one big hole, and we have a whole area

11   right here, there's no disturbance, none at all.  And

12   Mr. Tandy showed you that the event data recorder recorded

13   this impact, right here, this big impact in less than a

14   quarter of a second followed by a second impact.

15           Mr. Buchner ignored that event data recorder,

16   ignores that quarter of a second, and he asks you to believe

17   that the car instead slides the entire way from here to here.

18   He has no explanation for why we have this place in the

19   middle, right here, where it's undisturbed.  There's no

20   evidence of the grille pushing through that area.

21           They alter show you some photographs taken weeks

22   later from above long after.  I submit the only photograph

23   that shows you what happened that day, not what people may be

24   seeing three years later, is this photograph.  This is not

25   disturbed at all through here.  It's two hits.  So who do you

believe?  Plaintiffs are fighting really hard for Mr. Buchner
because they know that if you pick up on his errors, if Mr.
Buchner is wrong, all of Plaintiffs' other experts who rely on
him fall like a house of cards.

I want to look at Mr. Tandy's animation just one
more time.  Mrs. Mills gradually goes off the road for
200 feet.  She hits that slope, the culvert.  She goes
airborne for 80 feet, hits, bounces, and pitches over; that's
what happened here.  And the only explanation for these two
spots, the only explanation for what happened is what
Mr. Tandy explained.

We talked about how the accident happened.  Now you
can decide, did the Plaintiffs prove that it was the roof that
actually caused Mr. and Mrs. Mills' injuries and deaths.  In
answering that question I want to start with the eyewitnesses,
eyewitnesses who aren't friends of the family.  And I
completely understand Trooper Palmer.  He is a very close
friend of the family.  It must have been difficult for him to
come in here, but keep in mind he's a close friend of the
family.

I want to start with Mr. Harrison.  He's the one who
arrived on the scene almost immediately after the accident and
this is what he finds.  He runs over Mrs. Mills, goes through
the windshield.  As you will recall the windows are completely
intact on the vehicle on the side.  He feels for pulse and

```
1   it's faint.  I think what Dr. Sochor explains is threading.

2   Within a couple of minutes though when he returns her pulse is

3   gone.

4           No one has testified that Mrs. Mills was ever

5   conscious during any of this time, not a single witness, not

6   Mr. Harrison, not Trooper Palmer, not Trooper Sanchez.  No one

7   said she is conscious.  No one says she's talking and for Mrs.

8   Mills that's good.  I wouldn't want her to be having had this

9   event.

10          The Court will tell you it's the Plaintiffs' burden

11  to prove that she was conscious when she left the road and

12  after the crash, not Ford's.  So try as they might to shift

13  the burden to us it's not our burden.  The only reasonable

14  explanation we can come to is that she was not conscious.  I

15  think we heard several times the argument that she must have

16  been conscious because she had been conscious for 64 years, 11

17  months, and 11 days; and that just doesn't make sense.  She

18  wasn't conscious when she left the road.

19          No one should believe that Mrs. Mills intentionally

20  and deliberately drove off this road.  And if only one witness

21  who came to you who actually talked about beyond Mr. Harrison

22  getting in the vehicle, actually working to try to extricate

23  Mrs. Mills and Mr. Mills and that was Colby Swicord.  He

24  didn't come in the Plaintiffs' case-in-chief.  We brought you

25  Mr. Swicord.  He's the firefighter who arrives on the scene
```

```
 1   shortly after that 911 call that he heard and came in his
 2   personal vehicle.  The only person we heard from who actually
 3   attended them, who helped pull them out.  But why is he
 4   important?  Because what Mr. Swicord can tell you is -- you
 5   saw him -- I think he described himself as not a slender man,
 6   but he was not that big.  I'm going to be kind to him.  He
 7   told you with his gear on, he was able to crawl through the
 8   driver's window and cross the driver's occupant space,
 9   completely unobstructed.  He was specifically asked, was the
10   roof in your way as you climbed across that driver's side; and
11   he said, no.
12           He was asked, was there some deformed V that you had
13   to get over pushing on you, and he said, no.  There was no
14   obstruction until he reached that center console which is much
15   further away from where Mrs. Mills was sitting.
16           And there's physical evidence.  You don't have to
17   just believe what Mr. Swicord told you.  Here's the photo of
18   Mr. Swicord and if we can please zoom in on him.  You can see
19   for yourself all the room that Mr. Swicord had to get in that
20   vehicle.  If Plaintiffs' version of the deformation of the
21   roof is true, Mr. Swicord could not have crawled through that
22   truck.  If Mrs. Mills, at 5-foot-one, didn't have room in
23   there, Mr. Swicord never would have.  If you're unclear about
24   Mr. Swicord's testimony think about what happened to him on
25   cross.
```

1          You heard that Plaintiffs typed up an affidavit,

2    handed it to him in a law office, had him sign it; and then he

3    told you the words in the affidavit weren't his words and that

4    what he was telling you from the witness stand was the truth,

5    what he saw; and in cross he was berated.  But he's not a paid

6    expert.  He's a volunteer firefighter who stopped to help two

7    people who had been involved in a violent crash.  While

8    off-duty he does what he does.  He happens to have his gear in

9    the car.  He crawls through that overturned truck.  I realize

10   that the Plaintiffs don't like his testimony because it

11   doesn't fit the narrative, but Mr. Swicord did not deserve to

12   be berated on the stand.  But as they say, a picture is worth

13   a thousand words.

14          Not only do we have Mr. Swicord climbing into the

15   driver's side of the vehicle, but in the opening, Mr. Butler

16   said -- and I quote -- "the roof crushed down so bad that her

17   headrest was turned horizontal".  Remember that?  Her headrest

18   was crushed so bad it was turned horizontal; was that true?

19          No.

20          That's what you were told the evidence would show.

21   It's not a horizontal.  If anything what you see here is that

22   headrest is vertical.  You don't see the roof anywhere on the

23   headrest or the top of the seat on the driver side at all.

24   Consistent with exactly what Mr. Swicord told you.

25          So we know the headrest was vertical.  We can see

1    here nothing is crushing down on it.

2            I will tell you that Plaintiffs photograph where

3    Mr. Prather, who is not a witness here, put a yellow line is

4    not evidence.

5            What's evidence is what you see here.  Not only do

6    we have the headrest vertical, nothing pressing on the seat,

7    plenty of room for Mr. Swicord to get in there.  You have to

8    ask, what happened to Mrs. Mills?

9            She ran off the road.  She's 5-foot-one with all

10   that room in that vehicle.  There was no reason for her to go

11   off the road.  You heard there were no other vehicles, no

12   animals, no road conditions -- we saw the police photos -- no

13   debris, no nothing.  But she was found unconscious when

14   Anthony Harrison got there a minute later.  It's not

15   speculation having ruled out everything else to believe that

16   Mrs. Mills had a cardiac event that rendered her unconscious.

17   There was more than enough room for her to move, and there's

18   no explanation for why she would intentionally driver her

19   husband, who she loved and herself off that road.

20           So that brings us to what caused her death.  On the

21   one hand we have Dr. Camacho and Dr. Sochor; and on the other

22   hand we have Dr. Eisenstat and Mr. Lewis.  Another chance to

23   look at the credibility gap between the witnesses.

24           Dr. Camacho, Plaintiffs counsel tried to disparage

25   him by referring to his ivory tower education from Stanford

1    and Duke because Dr. Camacho has impeccable credentials.  He's

2    a neuroradiologist who also happens to have a Ph.D. in

3    biomechanics.  The two doctors that Ford brought you were both

4    medical doctors from two different specialties and they're

5    both biomechanics.  Dr. Camacho has a Ph.D.  He has read

6    nearly a quarter of a million imaging studies.  He was

7    thorough.  He was diligent.  He's good at his job.

8            He went through all Mrs. Mills post-mortem MRIs,

9    CTs, and x-rays.  I know some people know what that means, a

10   lot of work to do.  He was the only witness who did that.  But

11   he didn't just tell you up here what injuries he found.  He

12   didn't have someone else draw you a picture of what injuries

13   he found.  He showed you where those injuries were and where

14   they were not on the actual radiological images for both, Mr.

15   and Mrs. Mills.  His presentation, his analysis, it was

16   thorough; it was detailed.  We went through a lot of scans up

17   here.  We could have gone through a lot more.  He took the

18   time to do it.  And he didn't just tell you what loads would

19   have created each of those injuries.  He demonstrated it for

20   you both with his model and with his hands.

21           He wanted to support every single thing he told you

22   with an image.  He never said just believe me and it was

23   backed by the engineering and the medicine because he has

24   both.  Now, Mrs. Mills, he explained she had no serious head

25   or neck injuries.  He found no traumatic injuries that

1  could've caused or explained a sudden death; and a cardiac

2  event isn't something you see on a radiological image.  She

3  had bruising on her upper and lower abdomen in what he

4  described as a classic seatbelt sign for someone who happens

5  to have their shoulder belt under their arm.

6       He did not set out to decide where her shoulder belt

7  was.  He simply reviewed all of the images.  The reason he

8  tells you where her should belt was, is because it explains

9  the other injuries she got.  But he also told you had she been

10  wearing the belt properly over her shoulder she would have

11  gotten different injuries in slightly different places, but

12  the constellation would have been somewhat similar and yet he

13  got berated.

14       Dr. Camacho was yelled at on the stand because he

15  didn't accept witness testimony about where Mrs. Mills belt

16  was.  And Dr. Camacho doesn't care where her belt is.  He is

17  just telling you what he sees on the images.  He kept saying,

18  I rely on my objective findings.  Witness testimony doesn't

19  change what's on those images.  Thankfully for all of us

20  that's good.  Would you want your radiologist to stand by what

21  he sees on a scan or change it because someone off the street

22  said something else?  It's objective evidence.

23       Dr. Camacho then went through all of the injuries.

24  He explained in details the rib fractures on Mrs. Mills.  Her

25  sternum fracture, those spinous processes in the back, and the

little compressions in the front.  He explained how when you

load into the belt when it comes right here.  Her loading is a

little different than her husband's.  She's over that belt.

There's no compression from the back.  You don't see the

spinous processes broken from an impact.  What you see is the

loading, the distraction, and the pulling.  If we can put up

please -- we're not going to go through all of them -- but

just by way of example he showed you these.  He showed you the

little fractures and the compression in the front.  He didn't

hide any injury from you.  He told you where all of the

injuries were, spinous processes.  Then he showed you what

injuries that weren't there.  And perhaps the most telling of

all of them -- were their claim that it was the roof that

crushed down on her -- was the upper back.  You see those

green arrows.  There is absolutely -- I think he used the word

pristine -- no evidence of a hematoma, or edema, the fluid

that could cause swelling in her back.  None.  And he told you

the liver laceration was indisputably from a seatbelt.

          He even looked at the small areas of blood or edema

that she had elsewhere.  None of those were a traumatic

injury.  But then quite frankly most interestingly what I

found is what we just saw from Plaintiffs closing.  Doctor

Camacho took the illustrations that Dr. Eisenstat had

testified about.  You may recall on direct Dr. Eisenstat said

to Plaintiffs Counsel, these are accurate.  I'm standing by

1    them.  When I asked him, did you talk to the illustrator and

2    measure and check to make sure these were right he said, oh

3    no, I didn't check.

4            Dr. Camacho testified that those illustrations that

5    you just saw do not accurately reflect injuries that Mrs.

6    Mills sustained.  In fact, as you heard, they don't even match

7    his autopsy report.  I will give you a couple of highlights.

8    I won't go through them all.  There was absolutely no evidence

9    of left shoulder belt bruising.  You see it right here.  I

10   have to remember it switched.  No evidence of any bruising in

11   the shoulder.  Remember that because we are going to see it

12   with Mr. Mills.  He had classic bruising.  He had a large

13   hematoma.  Mrs. Mills had none.  And yet on the illustration

14   we have this large area here, and what did Dr. Camacho tell

15   you?  He read Dr. Eisenstat's report.  And on the back of Mrs.

16   Mills, over her right shoulder -- having nothing to do with

17   her shoulder belt, on the right shoulder -- Dr. Eisenstat said

18   that a one-by-one-and-a-half-inch hematoma.  I don't need a

19   measuring tape to know that's not one-to-one-half-inches.  But

20   Dr. Camacho did the conversion; that's about 5 inches by about

21   two and a half inches.  So even what he claims in his autopsy

22   he saw, when they put it on the illustration, it's

23   exaggerated. It's meant to make you think there's something

24   there that's not.  Dr. Camacho told you this isn't there at

25   all on her back, not at all.  And we saw her back a moment

1    ago.

2             Then the second thing he showed us as example was

3    this whole baseball cap of bruising we see on Mrs. Mills.  And

4    you may recall Dr. Eisenstat's autopsy report said no scalp

5    edema.  He said, oh yes, that's another mistake I made.  A

6    mistake big enough that he actually has nearly a baseball cap

7    size of it.  And yet Dr. Camacho who looked at the

8    radiological images told you there's no -- any evidence except

9    for perhaps right there; it's a very small spot.  It could be

10   from just resting on the bottom of the roof.  Nothing.  These

11   illustrations are not accurate and are designed to mislead.

12            Will you take that down?  Thank you.

13            Dr. Eisenstat, where to start.  He was touted as the

14   former head -- Chief Medical Examiner of the GBI, but that's

15   where his credentials stop and end.  In fact, you heard that

16   he testified incorrectly has resulted in innocent people going

17   to jail.  You've heard that a judge found him not credible

18   when he let them out of jail.

19            But what did he do in this case?  I started going

20   down the list with him of the mistakes he made, but then we

21   found a few more and I just didn't bother to add them.  Dr.

22   Eisenstat has the scans of Mrs. Mills body.  His job is to do

23   the autopsy.  And we just heard a moment ago he's got the only

24   autopsy and it's accurate and it's right.  We know from Dr.

25   Eisenstat that's not true.  He found a uterus where there

1   wasn't one.  He found a gallbladder where there wasn't one.

2   He didn't find this atherosclerotic aorta.  In fact, he

3   specifically says -- you'll have his autopsy report -- no

4   atherosclerotic changes on the aorta; and yet they were on the

5   radiology scans and in Mrs. Mills' medical records, which you

6   also will have.

7         He ignored and wholly failed to note her heart

8   disease or her enlarged heart.  He tried to convince you that

9   a woman of 5'1" with a 396-gram heart that puts her in the

10  90th percentile; that somehow that's normal.  Somehow that's

11  not important enough to put on his autopsy report.

12        He also ignored all of her other medical problems.

13  Why?  He didn't put them on his final diagnosis.  Although

14  when you see the two autopsies you will see for Mr. Mills he

15  included those things; for Mrs. Mills, he did not.

16        Why is this?  Well, he didn't look at her medical

17  records.  He didn't consider the radiology.  He had a decedent

18  who had no traumatic head or neck injuries that could explain

19  what happened to her.  None.  And he wasn't the least bit

20  interested in trying to find out.  He had already decided in

21  his autopsy what happened; that's more disturbing than

22  anything else.  He decided based on finding nothing in the

23  autopsy that was traumatic that it was going to be positional

24  asphyxia without considering any of her medical conditions;

25  without considering that long list of 17 medications she was

```
1   on to try to deal with those medical conditions; and without

2   considering all of the risk factors she had for cardiac

3   disease.

4           And you heard that cardiac disease isn't just the

5   plumbing; it's not just your arteries; it's the electrical

6   part.  They never looked at that and Dr. Eisenstat never

7   considered it.  And why did he not consider it?  Because Mrs.

8   Mills having this medical history and having a cardiac event

9   doesn't fit with the narrative that it's the roof.  He didn't

10  consult a radiologist.  Had he consulted Dr. Camacho he would

11  have seen no traumatic injuries from him either.  But instead

12  he was given some affidavits, fed them by Plaintiffs Counsel,

13  words written by the Plaintiffs, not the witnesses said they

14  are folded and bent.  And then he decided she had positional

15  asphyxia.  But even for his positional asphyxia opinion he did

16  no analysis.

17          If he had simply looked at the vehicle photos from

18  the scene, let's zoom in again, he would have known that she

19  could not have had positional asphyxia.  If he had looked at

20  the photo of Mr. Swicord climbing in there he would have known

21  she didn't have positional asphyxia.  If he had looked at the

22  exemplar work and seen, and we will see this in a little why,

23  the exemplar sitting in the vehicle; the steering wheel

24  doesn't allow them to be folded over.  The steering wheel and

25  column are in their way.  And if he had looked at the
```

```
 1    radiology or consulted a radiologist, he would have seen no

 2    forceful chin to chest evidence.  None.  Her airway could not

 3    have been blocked.  And that's what we heard from Dr. Camacho.

 4    And, again, Dr. Camacho just said, I'm looking at the images.

 5            If you think about it why would someone with

 6    Dr. Camacho's credentials come in here -- this is his

 7    livelihood -- why would he come in here and say, I see

 8    something on an image that's not there?  That's not what

 9    radiologists do.

10            Now, Dr. Eisenstat we asked about consciousness.

11    You may recall in his deposition he said, I don't have any

12    evidence.  I don't know whether she was conscious or not.  But

13    then up there he said, but if Mr. Buchner tells me she

14    intentionally steered off the road well then she must have

15    been conscious, at least at some point.  But if Mr. Tandy's

16    right and Mrs. Mills did not intentionally steer off the road;

17    and Dr. Camacho is right; and Dr. Sochor is right, then he has

18    no evidence of consciousness.  He admits that.

19            What is the real evidence from Dr. Eisenstat?  What

20    did he really do?  You heard him admit that the rib fractures,

21    the sternum fracture, the liver laceration, and the spinous

22    processes could have been in that frontal impact.  I went

23    through each one and asked him that.

24            Could the ribs be from the frontal?

25            Yes.
```

1          The liver lacerations be from the frontal?

2          Yes.

3          Could the sternum?

4          On each, he said, yes.

5          But then he said, but at least some injury has to be

6     from the roof.  Which one?  Did he ever show you which rib

7     fracture was from the roof?  No, because it doesn't make

8     sense.  So that's Dr. Eisenstat and Dr. Camacho.

9          Then we get to the biomechanics.  We have

10    Dr. Sochor.  You heard from him yesterday.  He's an emergency

11    room physician.  He is a biomechanical with a masters.  He's a

12    medical examiner.  He treats live patients in catastrophic car

13    crashes in his level one trauma center.  And he treats cardiac

14    patients regularly in the ER.  Someone who teaches medicine in

15    the medical school in Virginia, teaches engineering,

16    biomechanic engineering, in the engineering school.  That's

17    what we have, a medical physician and a biomechanic.  And then

18    you have Mr. Lewis.

19          Mr. Lewis has an industrial engineering degree and a

20    master's in biomedical engineering, but he's not a biomechanic

21    engineer.  Mr. Lewis has to rely on Mr. Buchner.  If

22    Mr. Buchner is wrong about his one-impact theory -- Mr. Lewis

23    admitted he never analyzed this with two impacts.  He has to

24    rely on Dr. Eisenstat.  But if all this work that Dr. Camacho

25    did says that Dr. Eisenstat is wrong or that Mr. Lewis is

```
 1   wrong.

 2            Dr. Sochor sat up there yesterday and explained the

 3   actual movement of Mr. and Mrs. Mills in the vehicle.  And he

 4   showed you animations, if you'll recall, of the truck with Mr.

 5   and Mrs. Mills in it, grayed it out, so you could see exactly

 6   what their bodies did at each impact.  He went through both of

 7   those.  Did anyone, including Mr. Lewis, ever really describe

 8   or show you what was happening to Mr. and Mrs. Mills' bodies

 9   when they were in these impacts?  The answer is, no.

10            He also went through his analysis as to why Mrs.

11   Mills could not have passed away from positional asphyxia.

12   Starting with the fact that she was heard breathing at the

13   scene.  She had those agonal breaths.  The amount of occupant

14   pace, we see it again right here all of this occupant space.

15   The photos of the truck at the scene, not afterwards.

16   Mr. Swicord being able to get in there.  And then he showed us

17   the surrogate work he did.  This is Mr. Lewis's surrogate.

18   First of all, he has the headrest forward, as you know from

19   the photos it's not where it was.  But the top of his

20   surrogate's head as he admitted is below the top of the

21   headrest even though it's in the wrong position here.

22            And Dr. Sochor explained to you that if Mrs. Mills

23   was upside down she can't be folded over because that steering

24   wheel and that steering column are right in her way.  And he

25   considered her poor health and her heart issues.
```

As for Mrs. Mills' cause of death, Dr. Sochor who we talked about regularly treats cardiac patients. He's not a cardiologist, nobody disagrees. He's reviewed the records more recently than Dr. Ellis but he's not a cardiologist. But he found no traumatic injuries, that kind of surprised him. Why would Mrs. Mills be dead so quickly at the scene if she didn't have a traumatic head or neck injury? So what did he do? He said I have got to go through the medical records. I have to find out if something else was going on. This is what he found out was going on.

Many of these explain her poor health: diabetes, hypertension, emphysema, tachycardia, palpitations, PVCs, chest pain, all of these things; and she's going to the cardiologist for 20 years. Whether she has a normal EKG or a normal stress test only tells you her arteries aren't blocked. It doesn't tell you about the rest of her heart and what's happening with it. Unfortunately, you'll see from the medical records, Dr. Ellis says time and again she comes back, but I can't figure out what's wrong. But he does nonetheless diagnose her with all of these conditions. And you know she has an enlarged heart; it's at 396 grams at autopsy. While we keep hearing there's no evidence of an enlarged heart beforehand, you'll see Exhibit 345, pages 101 and 108, both of those documents talk about Mrs. Mills having an enlarged heart before this accident. And apparently seeing some other

```
 1   cardiologist whose name we were never given because we would

 2   have taken their deposition.

 3          So we don't know why it is that Dr. Ellis wasn't

 4   able to figure out what was wrong with her.  But we know he

 5   diagnosed her with all these things when she was on 17

 6   medications.  We also know that shortly before this accident

 7   Dr. Sochor considered all of her risk factors, none of which

 8   are disputed.  We also know that right before this accident,

 9   the month or two before Mrs. Mills had chest pains she was

10   hospitalized.  She was home cutting vegetables, had chest

11   pains, and had to go to the hospital, and she was admitted.

12   She wasn't sent home after being seen in the ER.  Given her

13   enlarged heart, no traumatic injuries, this incredible history

14   of health issues, and cardiac issues; the only reasonable

15   conclusion a physician could come to is that she had a cardiac

16   event that rendered her unconscious when she left the road and

17   died shortly thereafter.  This constellation of problems, her

18   medical records, do not suggest that Mrs. Mills intentionally

19   drove off the road as the Plaintiffs would have you believe.

20          Mr. Lewis, I pointed out in his report he said that

21   not one of Mrs. Mills' injuries were from this frontal.  This

22   vehicle that slammed into the ground at 50 miles an hour.  A

23   woman who is -- I shouldn't say 64 is old, because that makes

24   her my age -- into the ground, doesn't get a single injury in

25   that frontal, not one.  Is that believable?  Dr. Eisenstat
```

1    doesn't believe it.  I tried to figure out Mr. Lewis, are you

2    backing off of this; are you not backing off of this?  Because

3    he didn't show us how these injuries happened.  I don't know

4    what he thinks.  I don't know where her thinks they came from,

5    but I did say:  Can you show me any cases you've worked on,

6    any papers you've written, where you talk about torso injuries

7    in a rollover or a pitchover?  He couldn't.  But on redirect

8    Plaintiffs Counsel asked him about investigations of accidents

9    involving torso injuries and his answer was, I looked at many,

10   many over the years in a frontal, side, and rear impacts.  Not

11   one word from Mr. Lewis about ever finding torso injuries in a

12   rollover or pitchover from the roof.

13        The testimony on Mr. Mills followed much the same

14   pattern.  Dr. Camacho went through as you recall all of those

15   images: the fractures, the sternum, the clavicle, the

16   compression fractures, the splenic laceration because he's

17   somewhat compromised from his leukemia and some hemorrhages.

18   Once again, he always had the images to support them.  Once

19   again, no serious head or neck injuries that would have

20   contributed to his death.  And all we really heard about from

21   Plaintiffs experts was the risk of serious head and neck

22   injuries.  Neither Mr. or Mrs. Mills ever had any serious head

23   or neck injury.

24        But what did Dr. Camacho have?  He also had evidence

25   of a very large hematoma on Mr. Mills right shoulder.  Look

1    right there.  Look at the size of this right here, compared to

2    the other shoulder.

3              This is what Mrs. Mills' shoulder looked like.

4              This is what Mr. Mills' shoulder looked like.

5              There's no question Mr. Mills was wearing his

6    shoulder belt over his right shoulder.  And imagine the load

7    -- I think he described it as something bigger than a golf

8    ball -- the load that was required to produce that hematoma.

9              Dr. Camacho and Dr. Sochor explained to you how he

10   had to move up and forward to load that as this vehicle

11   pitched down into that frontal and flopped over.  When you

12   compare this on Mr. Mills to the fact that Mrs. Mills'

13   shoulders looked like that, there's no question he had his

14   belt over his shoulder and she did not.

15             You also remember when he described the other

16   fractures he talked about how our ribcage in this area is a

17   hoop.  And he turned it this way so you could see and how he

18   pressed down, you are going to get injuries in places other

19   than where the load is.  And he showed you the stick analogy.

20   You put the load on the end it cracks in the middle.  So when

21   Mr. Lewis tells you that the only place you could have gotten

22   a seatbelt injury was on that one-and-seven-eighth inch place,

23   where the belt came that's nonsense; that's not medicine.  It

24   also may be because Mr. Lewis is not a doctor he doesn't

25   appreciate that and he must not appreciate the forces; and the

fact that you don't just get a seatbelt load exactly where the seatbelt is.  It dissipates over the entire area.

Dr. Camacho showed you the physical evidence, they did not.  And then what did he do?  Dr. Camacho once again took those illustrations that we keep being shown.  The ones that Dr. Eisenstat had commissioned but never checked.  And we learned once again that they were wrong.  Dr. Camacho explained to you he found little bits of a superficial edema, mild superficial meaning very little in these few places.

But where does Dr. Eisenstat show you?  He's got all of this.  Look at all of this.  There is absolutely none of that on the radiology.

And then this is the edema on the right shoulder.  Plaintiffs tell you that Mr. Mills is properly belted with a shoulder belt over his right shoulder.  How is it that Dr. Eisenstat has not even the hint of a bruise on his right shoulder?  And yet we just saw there's a very large ball-size hematoma on his shoulder.  He shows you absolutely nothing.  Why would that be?  I don't know.  The CT images as we learned if there's a superficial bruise on the skin it absolutely will show on a CT image.  Dr. Eisenstat did nothing to support the fact that Mr. Mills injuries are from the roof.  He once again admitted no serious head or neck injuries and I went through all of Mr. Mills injuries.  Could the rib fractures be from the roof?  Yes.  Could the clavicle, could the sternum, all of

1    those things?  He said, yes, they could.  But at least one of

2    them has to be from the roof.  Which one and how did he get

3    it?  And he couldn't tell us which one.

4         You wonder why that is.  And you wonder why any of

5    this matters because Mr. Mills' side of the vehicle had such

6    extensive deformation and yet he just had some rib fractures,

7    no head, no cervical injury.  He is found lying flat on the

8    top of the roof.  Whatever he has on his head, his head is now

9    as he waits for unfortunately 26 minutes, he has contact with

10   the roof there.  But Mr. Lewis did no independent work.  We

11   went through his report.  He cuts and pastes from Mr. Buchner.

12   He cuts and pastes from Dr. Eisenstat.  And he cuts and pastes

13   from Mr. Herbst.  He didn't actually do anything.

14        I just heard Plaintiffs Counsel criticize us for not

15   calling Jamie Downs.  After eight days and we heard from

16   Dr. Camacho and Dr. Sochor, I realized they had addressed all

17   of the injury causation, all of the medical issues.  And at

18   five o'clock yesterday I looked and said I don't want to waste

19   anymore of your time.  Dr. Downs is going to tell you the same

20   thing.  If that bothers you that's on me.  I made that

21   decision yesterday that I wasn't going to call him.

22        There is absolutely no evidence in this record

23   before you that the roof contributed to Mr. and Mrs. Mills'

24   death.  Mrs. Mills has this litany of injuries and risk

25   factors for a cardiac condition.  We know she was

```
 1    noncompliant.  And that day in August is when all those

 2    conditions gave way to a sudden cardiac event.  There is no

 3    other reasonable explanation.  Mr. Mills with his compromised

 4    system we don't blame him for having COPD, hypertension, and

 5    leukemia and all of that.  We don't blame him for that.  It's

 6    just a fact that most people, as you heard from Dr. Sochor and

 7    Dr. Camacho, would walk out of the hospital with broken ribs.

 8    He couldn't because of all these other things that went on

 9    with him.  But those rib injuries came from him loading that

10    belt, not from the roof.

11            So as I said in opening, this is not a roof case and

12    quite frankly you can stop everything right now because there

13    is no causation here.  But because Mr. Butler is talking about

14    the roof a lot and not so much about what caused their deaths

15    I am going to talk about the roof again.  I want to put the

16    crash in context.  This is where Mr. Herbst and everyone

17    agrees.  Of all crashes that occur, 97 percent involve

18    vehicles that have the tires on the ground and only 3 percent

19    are rollovers.  And then Mr. Herbst tells you of that

20    3 percent that are rollovers, only 2 percent are pitchovers.

21    Meaning .06 percent of every accident is a pitchover.  And

22    here we didn't just have a pitchover, we had two frontals and

23    then a pitchover; which comes to our next credibility gap.

24            On the one hand we have Chris Eikey.  Yes, you did

25    hear from former Ford engineers.  And, yes, you did hear from
```

 1    Ford engineers who actually have roof experience.  Chris
 2    Eikey, who is a former Ford engineer, has actually designed
 3    and developed the roof on production vehicles.  And you heard
 4    from Dr. Michelle Vogler who has a Ph.D. from Stanford in
 5    mechanical engineering.  She has spent decades and she
 6    described it to you researching, testing, and evaluating
 7    vehicle structures.
 8            On the other hand Plaintiffs brought you Mr. Herbst.
 9    Mr. Herbst has never worked for an auto manufacturer.  He has
10    never designed any automotive component that has ever gone in
11    to a production vehicle.  He has spent his career criticizing
12    manufacturers with no automotive experience at all.
13            Now Mr. Herbst as we've heard from both him and
14    Dr. Vogler regularly claims that roofs made by many different
15    manufacturers are defective.  And he's testified against those
16    manufacturers and others.  And that list I think Mr. Malek put
17    up here, General Motors, Dodge, Chrysler, Jeep, Toyota,
18    Nissan, Honda, Isuzu, Land Rover, Kia, Hyundai.  Dr. Vogler
19    told you he testified against BMW.  This list is long.  As
20    Mr. Eikey explained you can look at the two witnesses,
21    98 percent of all properly belted occupants in vehicles with
22    roofs including ones like the one in our vehicle, walk away
23    from rollover crashes with less than serious injuries.
24    Treatable.
25            Everyone agrees that no vehicle can be made injury

```
 1    proof.  The challenge is, as Mr. Eikey explained, what do we
 2    do for those 2 percent of the people who can get injured in a
 3    rollover?  Mr. Eikey explained you don't just make a strong
 4    roof stronger.  The data shows and we shoed you this data,
 5    that even as roofs have become stronger it does not reduce the
 6    risk of occupant injury.  It has not reduced the risk of
 7    occupant injury.  You would think if Plaintiffs were to
 8    believe there would be a curve and there's not.  Instead of
 9    adding more metal that the data shows is not going to improve
10    safety, Ford and other manufacturers, this is not just Ford;
11    have been developing cutting edge technologies and we've
12    talked about some of those.  Roll stability control, trying to
13    make sure the vehicle doesn't roll in the first place.
14    Electronic stability control and that safety canopy; those
15    things actually improve occupant safety.
16              Now I've heard Mr. Butler argue that this is all
17    something we lawyers have concocted to defend lawsuits, but
18    that's not true.  The public docket proves that that is false.
19    It's not just Ford's lawyers concocting this.  This is
20    actually what the industry believes.  We have 16 manufacturers
21    here.  All of these manufacturers not just Ford rely on 60
22    years of rollover crash test research.  All of this has been
23    presented to NHTSA, all of this.  Sixteen manufacturers, it's
24    not just Ford.
25              And instead, Mr. Butler talks about Dr. Baccouche.
```

1    And what they don't tell you and what Mr. Eikey did explain is

2    that the Baccouche article that they tout that just quotes the

3    216 standard at the beginning, which didn't happen to apply to

4    this truck, is that that was about a research project looking

5    at a hybrid material -- a new material that hadn't been used

6    -- that would be able to support 6,000 pounds in a 2016 test.

7    It was not about occupant safety.  It wasn't about how to

8    protect people in rollovers.  It was about could we had come

9    up with the new material.  That roof in that research project

10   was never put on any production vehicle.  That wasn't learned

11   until direct examination of the Dr. Baccouche at the end.  And

12   Dr. Baccouche readily admitted I am not an expert in occupant

13   crash safety or injury mechanism.  I was just looking at the

14   hybrid roof and quoting 216.  If anyone wants to know what

15   Ford's position and that of other manufacturer's is on roof

16   strength, they just have to go to that NHTSA docket.

17        Dr. Vogler, she showed you that when this truck is

18   inverted on a horizontal platen, you saw that, it can

19   withstand over 30,000 pounds.  And in response to a question

20   about down gauging, was this up gauging, and down gauging,

21   during the development of this truck, she explained that the

22   whole roof is a system.  You may remember them asking, I just

23   want to talk about this, the top of the roof.

24        She said, you can't.  The whole roof is a system

25   that includes the A-pillars, the B-pillars, the headers, the

1  roof rails.  And she explained what they are calling down

2  gauging was actually a net up gauge.  Because if you will

3  recall the original design was going to be 1.2.  It was moved

4  to 2.4.  And that down gauge was 2.4 to 2.35.

5          Dr. Vogler said that means nothing.  It already had

6  up gauged from 2.4 to 2.35, doesn't change the strength of the

7  roof.  But she went on to say if you need proof as to whether

8  this vehicle has a strong roof all you have to do is look at

9  the vehicle in this case.  She walked you through the

10  A-Pillar, the B-Pillar, the C-pillar, the roof rails.

11          Look at the driver's side of this vehicle.  It's

12  intact and she explained to you how there was no V.  She used

13  science and engineering concepts to explain that in addition

14  to Colby Swicord.

15          That yellow line you saw drawn, it wasn't ever drawn

16  there by an expert.  It was drawn by a lawyer.

17          She explained to you that the proof that this shows

18  you that the roof deformation is not indicative of whether

19  there is going to be a serious injury.

20          Now let's look at the passenger side where Mr. Mills

21  was.  The amount of deformation is significantly greater than

22  on the driver's side.  Mr. Mills was conscious.  He was

23  talking at the scene.  He had a glasgow coma scale of 15,

24  meaning he wasn't missing a single tick on that scale.  Not

25  quite like that, but he had a 15 glasgow coma scale, and

1   everyone admits he had no serious head or neck injuries.  Does

2   anybody want to be in this accident?  No.  But what he walked

3   a way with were torso injuries primarily.

4          Next, you heard from Mr. Burnett.  Once again, Mr.

5   Burnett was a former Ford engineer.  There were, in fact, Ford

6   engineers here for you in the courtroom.  And he explained

7   every vehicle has those design specifications that are written

8   by engineers.  They applied every component, every

9   subcomponent, every system.  He explained that design

10  specifications for each parts of those are more than a

11  thousand pages and they are written by engineers not Ford

12  executives.  Ford executives aren't going to be able to

13  explain to you the design specifications or the design

14  process.  The process of designing, and developing, and

15  testing vehicles like the F150 takes more than a thousand

16  engineers and maybe five years.  And then Mr. Burnett went on

17  to identify for you some of the restraint safety components in

18  this F250.  What did he tell you from this long list?  Only

19  two of these are required by regulation.  The other eight are

20  not required at all because when Ford has an opportunity to

21  make the roof stronger it does.

22          Going back to Mr. Herbst, as Dr. Vogler told you, he

23  says the same thing in every case he has against every other

24  manufacturer about the roof.  He finds photograph of other

25  vehicles that have been in crashes.  He calls them other

```
 1   incidents.  He told you nothing about any of those crashes.
 2   He didn't tell you how they happened or what the vehicle
 3   dynamics were.  He told you nothing about those other crashes,
 4   but then he criticizes the manufacturer he's been paid to
 5   testify against.  Forty-eight of those 50 other incidents he
 6   showed you involve vehicles that do not have all of these
 7   safety features like the Mills truck did, including the safety
 8   canopy which we know deployed in this incident.  And you going
 9   to hear from the Judge, he can't use those incidents to show
10   causation; they have no bearing on it.  As we've said, the
11   roof didn't cause their injuries.
12           Mr. Herbst claims this vehicle is defective because
13   it doesn't have his 4.0 standard.  His 4.0 standard means that
14   every peer vehicle for the F250 in 2015 would have been
15   defective.  When they talk about the Chrysler being 70 percent
16   more, it's still under two; it would be defective.  When he
17   talk about the General Motors being 1.35 times stronger;
18   that's barely over two; it's still defective in his world.  He
19   wants to talk about NHTSA, let's talk about NHTSA.
20           When NHTSA changed the rules and put in 216 for
21   these vehicles, it didn't adopt that Herbst standard.  In
22   fact, as we heard, NHTSA tested the Super Duty not once but
23   twice.  And to this day NHTSA has never recalled that vehicle.
24   It has never even opened a defect investigation.  So then Mr.
25   Herbst talks about those Autoliv tests.  I'm not sure how many
```

1    times we've heard about them.

2            Neither the 2009 nor the 2015 tests involved a

3    pitchover.  They all involved rollovers.  As we've heard

4    people move differently in rollovers than they do in

5    pitch-overs.  Neither were designed to test roof structure.

6    They were designed to test the deployment time of the safety

7    canopy.  Most importantly, neither of those tests replicate

8    this crash.  The Mills truck doesn't have the same degree of

9    deformation as we saw in those Autoliv tests.  That doesn't

10   look like that Autoliv test you saw in 2009.  They don't have

11   any response for it because they want you to ignore that this

12   vehicle looking like this on Mrs. Mills side, had two frontal

13   impacts at 50 miles per hour and flipped over.

14           And then finally we've heard a lot about the ERSP

15   team; it's the Big Bang.  Can you imagine why it's called the

16   Big Bang?  As Mr. Eikey said, it's a brainstorming team.  And

17   Mr. Eikey actually told you he worked with that team.  To say

18   no engineer came and knew anything about it, Mr. Eikey did;

19   and he taught it was an advance of the new regulations.

20   Plaintiffs have played selective deposition testimony from

21   Ford engineers that they were able to target.  He knew they

22   were not rollover crash test engineers.  He then asked them

23   about the documents they had never seen.  And yet we had

24   Mr. Eikey here, someone who actually does rollover crash

25   testing on roofs; that's the person to have asked.  They chose

1    not depose the rollover crash safety engineers for that time

2    period.

3            This was shared with me right before I came and I

4    can't take credit for it.  When you're considering the

5    credibility of Mr. Tandy and Mr. Buchner, and importantly

6    Dr. Vogler and Mr. Eikey versus Mr. Herbst, and Dr. Camacho

7    and Dr. Sochor versus Dr. Eisenstat and Mr. Lewis; think about

8    this, when talking about design and medical issues.

9            If you are jumping out of an airplane would you

10   rather have someone pack your parachute who has designed,

11   tested, and researched parachutes; or someone who just comes

12   in and criticizes the people who do?

13           Which of those people would you rely upon to decide

14   whether Ford acted reasonably in choosing this roof?

15           Now, the Judge is going to read you instructions.

16   You are going to be told that for Plaintiffs to win they have

17   to prove two things: the roof has a design defect; and that

18   defect proximately caused the injuries and deaths of Mr. and

19   Mrs. Mills.  They have to prove both.  We talked at the

20   beginning there's no causation.  You can stop right there.

21   But to decide whether it has a design defect you going to

22   decide whether the manufacture acted reasonably in choosing a

23   particular design for the roof.

24           We talked about all the evidence that Ford had that

25   it reacted reasonably.  We have Dr. Vogler.  We have Mr.

```
 1  Eikey.  We have all the other manufacturers out there.  There
 2  will be many factors you'll see her that you can consider.
 3  One of the factors though is the likelihood of the danger.  We
 4  already heard from Mr. Herbst that the accident in this case,
 5  there's a .06 percent chance of this kind of accident
 6  happening.  And in the frontal part of that we know there's a
 7  very low chance of ever getting a serious injury.
 8          As you will hear from the Judge, you can only award
 9  damages to the Plaintiffs if you find both one and two.  As
10  we've talked for two weeks, this is not roof case.  It didn't
11  cause their injuries.  And after what happened to Mrs. Mills,
12  we're not going to tell you she intentionally ran off the
13  road.  Mr. Butler talked about damages so I am just going to
14  mention it briefly.
15          The Judge is going to instruct you that the law
16  seeks to ensure that the damages awarded are fair to both
17  parties.  We've seen headlines about many, many dollars being
18  given -- fair is not meant -- a particular case.  The loss of
19  Mr. and Mrs. Mills is very sad.  We've heard from nine family
20  and friends about them.  They obviously were wonderful people.
21   They loved their families.  They've done a marvelous job
22  raising three boys who are married, have children, have jobs.
23  They're wonderful people.  No one will ever suggest anything
24  other, but that sympathy cannot prejudice your decision.
25          Over the years we heard about them having good times
```

1   together, but I think we also heard from Mr. Mills' closest

2   friend that at this point in his life he liked to stay home,

3   and sit on his chair, and hadn't seen him in probably eight

4   months.  His life had changed.  We know from their medical

5   records that they weren't in best health at this point.  But

6   keep in mind if you were to reach damages, which I don't

7   believe you will, the issue is fairness.

8           The Plaintiffs also have a claim for punitive

9   damages.  We heard a little bit about that from Mr. Butler.

10  He has about 25 minutes left.  I think we will probably hear

11  more about that.  There's no basis for punitive damages here.

12  Not only is the roof not defective, but the evidence is

13  overwhelming that that roof had nothing to do with their

14  injuries or deaths.  Because they brought the claim Judge Land

15  is going to instruct you that to prove it, it's clear and

16  convincing evidence, a much higher standard.  He's going to

17  tell you it's only appropriate if you can show that Ford's

18  actions showed willful misconduct, wantonness, or an entire

19  want of care; which raises a presumption of conscious

20  indifference.

21          Punitive damages are not to compensate, but to deter

22  or to punish.  There's no basis for deterring or punishing

23  Ford for this vehicle.  Because of that you shouldn't have to

24  consider punitive damages at all.

25          But I want to talk about some more reasons why Ford

1    should never be punished.  The roof here has never violated a
2    regulation, a law, or been subject to a government recall; and
3    NHTSA knows all about it.  People who break the law get
4    punished; that didn't happen here.  This F250 after an
5    extensive analysis of the vehicle and occupant safety, was
6    signed off on.  You heard Dr. Vogler and Mr. Eikey talk about
7    this lengthy sign-off process.  Plaintiffs would have you
8    believe that every single of the thousand engineers conspired
9    to put a defective roof on the road to hurt people who
10   purchase Ford trucks; that would be a terrible business and it
11   makes no sense.
12          The alliance of automobile manufacturers, we talked
13   about this a moment ago, agrees there's no causal connection
14   between roof strength and serious injury or death.  Plaintiffs
15   would have you believe that all of these automakers are in a
16   conspiracy to put defective roofs on the road; that's
17   nonsense.  You've seen the research proving that increasing
18   roof strength doesn't reduce the risk to serious injury or
19   death.  Plaintiffs would have you believe that all these
20   researchers, who found no causal relationship, conspired to
21   put defective roofs on the road to hurt people.  Everyone
22   agrees there is no injury proof vehicle.
23          And finally Ford has invested heavily in safety
24   innovation and occupant protection.  They were first on the
25   market with the safety canopy airbags, which deployed in this

1     accident.  They developed and installed the accident

2     avoidance.  Plaintiffs would have you believe that Ford

3     invested millions and millions of dollars in air bags and

4     stability control so it could knowingly put a defective

5     vehicle on the road.  Brian Herbst says Ford could have saved

6     $6-9 dollars if they put in a stronger roof; that's not

7     profits over safety, it's nonsense.  Ford has an entire

8     engineering group that spends its day researching and

9     evaluating accidents.  Companies who don't care about safety

10    don't do that.

11          NHTSA which knows exactly what Ford is doing, has

12    tested the roof.  They have not issued a recall.  Is there

13    some grand conspiracy with NHTSA?  I don't think so.  With

14    everything you've heard there is no good faith basis to

15    suggest that Ford acted with wanton, or malice, or anything

16    else respect to design.

17          Mr. Butler showed you the verdict form that you're

18    going to be given and on this verdict form you are going to

19    only need to answer the first four questions in the first two

20    sections.  Because the evidence shows you this roof did not

21    cause her injuries or death and it's not defective.  They have

22    to prove both.  We ask that you find in favor of Ford.  And on

23    the wrongful death claim, the answer is the same.  The answer

24    for all of these is the same; which means you should never get

25    to Section 3.

1          If for some reason you were to get to Section 3,

2     that means you don't believe that Mrs. Mills had a cardiac

3     event and you have concluded that Mrs. Mills intentionally

4     drove off the road, intentionally didn't brake, and

5     intentionally sent her and her husband airborne in this

6     accident.  If for some reason that were to happen, you would

7     have to answer, yes.  In that case, who is responsible for

8     what happened but Mr. and Mrs. Mills for a hundred percent?

9          And then just to finish up the verdict form, which I

10    don't believe you'll get to page 4, after all the things Ford

11    has done, no grand conspiracy.  What they care about is

12    occupant safety.

13         We've reached the end and you're probably grateful

14    that we have.  I appreciate you spent two weeks listening to

15    this.  I know it hasn't been easy for the family, but this

16    case is not about sympathy.  Mr. Butler is going to come up

17    here and for 25 minutes probably tell you the same things

18    we've heard before.  Ford's lawyers are bad.  Ford is bad.

19    That's not the case.  I am going to ask you to put aside

20    sympathy, and put aside the rhetoric, and look at what really

21    happened in this case because it's not about sympathy; and

22    it's not about Ford's lawyers.  I am going to ask that you

23    return a verdict for Ford and complete the verdict form, the

24    first four sections, and say no.  Thank you.

25         THE COURT:  Mr. Butler, we've been down here her for

```
 1    two hours.  Do you want to go now, or do you want to take a
 2    short break?
 3            MR. BUTLER:  I prefer to take a short break and
 4    organize my notes, Your Honor.
 5            THE COURT:  I think the ladies and gentlemen would
 6    appreciate the break.  Since we've been down here about two
 7    hours.  We will take a short break ladies and gentlemen for
 8    about 15 minutes and then we will come back and have the
 9    concluding argument and the Court's instructions.  Do not
10    discuss the case during the break.
11    [RECESS]
12    Thursday, February 13, 2025 08:34:37
13
14            COURT SECURITY OFFICER:  All rise.
15            THE COURT:  Ms. Wright gave you at 25 minutes.  I
16    had you at about 15.  So we'll compromise and you have 20.
17            MR. BUTLER:  Ms. Moore had 24 minutes, Your Honor.
18    She was the timekeeper.
19            THE COURT:  All right, we'll give you 24.  My clock
20    may have been a little fast.  Let's bring them in.
21            Mr. Butler, you may proceed with the final rebuttal
22    closing argument.
23                    FINAL REBUTTAL CLOSING ARGUMENT
24            MR. BUTLER:  Thank you Your Honor.  Ladies and
25    gentlemen I have 24 minutes left.  I said before the break I
```

1    was going to try and organize my notes.  I looked at them and

2    gave up so I'm just going to ramble around.

3           I did forget one thing when I showing you the

4    verdict form.  Under three Contributory Negligence and

5    Allocation of Fault, we ask that you write in there, no.

6    Trying to blame Mrs. Mills just write, no, please.  And that

7    is because Mrs. Mills had nothing to do with the roof crush.

8    The roof crush is what caused the injuries; that's undisputed.

9    They wouldn't call Dr. Downs, roof crush contributed to

10   causing the deaths.

11          And the Judge is going to charge you that.  I said

12   it in the opening statement.  I said it before when I was up

13   here.  I will say it, again, contributed to causing the death.

14   You will hear that in the charge.

15          Mark Twain famously said, a lie gets halfway around

16   the world before the truth can get its pants on; and that's

17   true.

18          I cannot unpack all that you've just heard.  I won't

19   even try.  But I will say this, please say, yes, to punitive

20   damages and try to stop it.  I don't want to have to do this

21   anymore because when I have to do this it means somebody got

22   killed or badly hurt and I'm tired of it.  You can't really

23   stop it.  I'm not trying to blow smoke at you.  You're not

24   going to stop it, but you can try and help stop it.  And to

25   help stop it you've got to reach those who would not grace

1    this courtroom with their presence, the executives of Ford

2    Motor Company who made these decisions.  You've got to reach

3    them.  And you reach them with punitive damages.

4            Compensatory damages for pain and suffering and

5    wrongful death; that's for the family; that's for them.

6            Punitive damages focuses on Ford.

7            Maybe the second most important thing I want to say

8    to you is about this sympathy.  We don't want any sympathy.

9    This family is fine.  They are okay in their grief.  They are

10   working through it.  They don't need anybody's sympathy; they

11   don't want it.  Sympathy doesn't do anybody any good.

12           Ms. Wright just said there was, "no grand

13   conspiracy" and Ford "really cares about safety".  Where is

14   somebody from Ford?  With all due respect to Ms. Wright, she's

15   just a lawyer paid by Ford to come talk to you.  She's just a

16   lawyer just like I'm just a lawyer.

17           In all of that closing argument of an hour and 15

18   minutes, there was not one word about the value of the

19   pain-and-suffering endured by Mr. and Mrs. Mills, not one word

20   about the value of the lives of Herman Mills and Debra Mills.

21   Ford's lawyers' position is the Ford Motor Company has no

22   responsibility here, none at all for anything; that's their

23   position.

24           It seems to be that Ford almost admits that these

25   roofs are a piece of junk.  They could not really deny that,

 1    but Ford's position is we didn't happen to kill these two

 2    particular American citizens from Decatur Georgia; that's

 3    really their argument.

 4            And then Ford asks through their lawyer, Ms. Wright,

 5    for fairness.  Fairness.  For 18 years they sold these trucks

 6    with this roof, sold 5.2 million of them.  3-point-something I

 7    forget what Mr. Herbst testified to, without dispute, over

 8    3 million of them are still on the roads; do you know what

 9    that means?  Remember August of 2022, Mr. Eikey told you about

10    that.  He was a Ford representative at a trial of one of these

11    cases, called Hill, in Gwinnett County, in August 2022.

12    That's on Mr. Herbst OSI list, the Hill wreck, Plaintiffs'

13    Exhibit 216, you saw it.  Another red F250 turned over, roof

14    crushed flat, two-and-a-half-rollovers.  It's almost a perfect

15    mirror of the 2009 crash test, when the roof is crushed flat,

16    two-and-a-half rolls.  If you remember in that crash test -- I

17    won't take the time to show you again -- Plaintiffs' Exhibit

18    255, the driver's dummy's hand is laying out under the crushed

19    roof like this.  If you look at Plaintiffs' 216, you can see

20    Mr. Hill's hand laying out just like this, almost the very

21    image.  This is going to keep happening.  That's why we say,

22    say yes to punitive damages and let's try to stop it.

23            Ms. Wright said that this truck has not been

24    recalled.  Mr. Burnett -- was it Burnett, or Eikey, or Vogler,

25    I've lost track.  You asked him didn't you, Burnett, about

```
 1    recalls?  We asked one of those witnesses.  I can't remember
 2    which one it was.  Name a time in the history of NHTSA when
 3    NHTSA has ever caused an involuntary recall -- that is over
 4    the automakers objection -- of any vehicle to get it off the
 5    road.  Have you heard any evidence from Ford that NHTSA has
 6    ever done that?  This is a federal government agency that's
 7    closely tied to the automakers.  They are never going to do
 8    that.  They never have.  There is no evidence they have
 9    anyway.  It think they have one time in 1979; that's not in
10    evidence.  There's nobody here from Ford to ask about it.  I
11    did ask Mr. Eikey about it and he said he didn't know about
12    that.  In 1989 he was probably in grammar school.
13          Ms. Wright said Ford invested heavily in safety
14    installed the first side canopy airbags.  And it was on -- Mr.
15    Eikey testified about this one -- the 2002 Ford Explorer.  And
16    one of the reasons we would have liked to have a witness from
17    Ford is to ask that witness; why is it that Ford decided to
18    put side canopy airbags for rollover protection on the 2002
19    Ford Explorer?  The answer would be marketing.  You all know
20    the story of that.  Nobody's here from Ford so we couldn't get
21    it into evidence.  That's one of the main reasons nobody came
22    from Ford is if you bring somebody from Ford and put them in
23    that witness chair you get a lot more evidence than what you
24    were able to hear in the trial of this case.
25          Ford's lawyer attacked Mrs. Mills, attacked Brian
```

1    Herbst, and Dr. Eisenstat, attacked the lawyers for the Mills

2    family.  Remember the word berated?  Berated.  That what she

3    said we berated this witness, and that witness, and some other

4    witness.

5            And then she called the scene witnesses that we

6    called to testify "someone off the street".  We're talking

7    about a registered nurse, a flight nurse, Mr. Harrison and two

8    state troopers and she calls them someone off the street and

9    says, you ought to believe their hired-gun-experts over

10   "someone off the street".

11           She criticized Dr. Ellis, so did Dr. Sochor.

12   Remember that plumbing versus electricity thing?  Made up,

13   making stuff up.

14           Ms. Wright said that we didn't like Mr. Swicord's

15   testimony.  I beg to differ.  He's the one that talked about

16   Mr. and Mrs. Mills holding hands in that upside down truck.

17   Nobody else talked about it.  He did, their witness.  He's the

18   one that talked about 4-to-6-inches above -- The roof crushed

19   down within 4-to-6-inches above the console; that is

20   devastating testimony for Ford.  Can you imagine that?  I

21   won't go get my ruler but it's like this; that's how much room

22   was above that console.

23           The roof crushed right to the inboard side of the

24   driver seat; that's what that means.  And her hair got caught

25   between the headrest -- which was vertical before the truck

1   was turned back over -- the headrest and the roof and she's

2   bent over double.

3          And Mr. Mills, the testimony is undisputed, is

4   leaning toward the console himself; which is why he wasn't

5   bent over quite as bad as her because the wreck threw him over

6   this way and the roof crushed down.  He still had roof crush

7   injuries, but his position was a little different.

8          Ms. Wright showed you those photographs of Colby

9   Swicord at the truck.  He's climbing into the backseat.  Mr.

10  and Mrs. Mills were not in the backseat.  There was room on

11  the back seat on Mrs. Mills' side.  Colby Swicord testified he

12  could not get to Mr. Mills from the driver side because of the

13  roof crush.

14         She attacked Dr. Eisenstat about the uterus and the

15  gallbladder.  What did Dr. Downs admit to you about what he

16  saw at the autopsy about the uterus and the gallbladder?  You

17  don't know do you?

18         Why don't you know?

19         Because they wouldn't put him in the witness chair.

20  That's why you didn't know.

21         We're talking about decomposed bodies.  There are

22  some parts of the bodies that are hard to visualize.  And

23  Dr. Downs would have told you that if he would have come here.

24         There is no evidence contrary to the testimony of

25  Dr. Eisenstat because they wouldn't put their pathologist in

1   that chair.  There's no evidence that her uterus or her

2   gallbladder mattered.  Their argument is her heart.  That's

3   what they're talking about.  It's undisputed Dr. Eisenstat

4   held the heart in his hands and both he and Dr. Downs looked

5   at slides of her heart.

6           Ms. Wright said Dr. Sochor said that Mrs. Mills

7   could not have been folded over.  Back to the first 911 tape,

8   Nurse Anthony Harrison folded over in half pretty bad.  He

9   testified to that, so did Trooper Palmer, so did Trooper

10  Sanchez.

11          On the issue of the truck roof, Ms. Wright made an

12  argument that amounted to rollovers don't matter much.

13  Remember the 3 percent, 2 percent, this and that?  Rollovers

14  don't matter much.

15          What did Mr. Eikey admit, their expert?  Twenty-five

16  thousand people killed just about every year in rollover

17  wrecks.  They do matter.  They matter to the Mills family,

18  they mattered a lot to Mr. and Mrs. Mills, they mattered a lot

19  to all of those people in those 50 OSIs, Other Similar

20  Incidents, they matter to everybody in the United States of

21  America and elsewhere riding around in one of these trucks.

22          She talked about cutting-edge technologies.  Here's

23  a cutting edge technology, take the roof they put on the 2009

24  F150 that was three times stronger than this one, or the roof

25  they put on the 2015 F150 that was over five-and-a-half-times

1    stronger than this one, put that on Mr. and Mrs. Mills truck

2    if Ford is interested in safety.  That was cutting edge

3    technology.  The 2015 F150 roof, did great, 5.585 SWR.

4           Why did Ford do that?

5           Because they know it matters.  Roof strength

6    matters; that's crucial.  Ford could have put that on their

7    truck and we wouldn't be here.

8           Apparently Ford is still arguing this roof crush

9    doesn't matter thing.  NHTSA rejected that.  The federal

10   government agency rejected that.  The Insurance Institute for

11   Highway Safety, an independent outfit, created and funded by

12   the liability insurance companies rejected that.

13          You know there's a reason -- you may have noticed

14   this -- I had a hard time getting Mr. Eikey to answer

15   questions.  I don't know if you noticed that.

16          I expected that and there's a reason for that.

17   Mr. Eikey could not give direct answers to my questions

18   without killing Ford on punitive damages; that's why he bobbed

19   and weaved so much.

20          This business about claiming this was not a

21   rollover.  I don't know why Ford plays those word games.  If

22   the truck is like this and it ends up like this, the truck has

23   rolled over.  It doesn't make any difference whether they call

24   it a pitch over or what.  The issue is the failure modes and

25   in all 50 of those OSIs the failure modes were the same: the

header, the A-pillar, and the B-pillar; that's what matters, where the roof fails.  The case is about the roof.

There was talk about Mr. Camacho and positional asphyxia.  In this case Dr. Camacho admitted that he did not even analyze whether the lungs showed characteristics of positional asphyxia.

He admitted that in the case of Cayden Montgomery a three-and-a-half-month old baby when he defended the child seat manufacture, he did analyze whether the condition of the lungs was characteristic of positional asphyxia.  Ford's lawyers didn't want him to do that for this case because they knew what the result would be.

Ms. Wright just said that, "Judge Land will tell you Plaintiffs have to prove she was conscious".  He will not tell you that.

Listen to the charge. It won't be in the charge.

Ms. Mills was conscious for 64 years, 11 months, 11 days all the way to Donaldsonville to Johnson's Produce and some service station, through Bainbridge, all the way back through Bainbridge and all the way back the 3.7 miles from her house.  And here's the ultimate test of consciousness.

The black box is not opinion it's fact.  Bryant Buchner said that and Tandy did not dispute it.  The black box if fact.  What does it prove?  This is undisputed.  Right turn.  Why does she turn right?  We don't know.  There is a

1    curve there and I don't know -- she wasn't paying attention or

2    something -- you can speculate about why she turned right

3    slightly and it took her off for the road.  Then there's a 58-

4    degree steer to the left; that's like that.  That's like that.

5    That's back toward the road.  If she was unconscious the

6    steering wheel wouldn't turn to the left at all, much less

7    58 degrees, because she's going down hill to the right.

8    Steering wheels will follow tires and tires will go downhill;

9    gravity will cause that.  And then steer to the left didn't

10   work.  There's a steer to the right.  Where did the tracks

11   lead to?  Where did the truck end up?  To the right of

12   telephone pole.

13          And then there's this, the ultimate, it's

14   undisputed.  Tandy wouldn't touch this.  The black box shows

15   that while the truck was up in the air the steering wheel was

16   turned back centered to zero; that's in the black box.

17   Somebody turned the steering wheel back to the center while

18   the truck was in the air.  We know she was conscious until the

19   roof crush.  Ten minutes.

20          Dr. Eisenstat testified there was nothing to render

21   her unconscious seen in her autopsy; that is undisputed.

22   There's no evidence from Ford that she was conscious.  Ford

23   has put up no evidence to prove she was unconscious.  They

24   didn't call Dr. Downs; that was they're evidence she was

25   unconscious.  They didn't call her.

1          There's talk about their ages.  I knew Ms. Wright

2    would do this.  He was 74 and she was 64.  To quote one of my

3    heroes Augustus McCrae, "the older the fiddle the sweeter the

4    music".  These folks were in the golden years of their lives,

5    retired, and enjoying each other, enjoying their families and

6    their grandchildren.  Why are diamonds more valuable than

7    glass? Because there's fewer of them.  The time they had left

8    in their lives was precious.  Precious.

9          There was mention of proximate cause.  Here's what

10   Judge Land is going to charge you on proximate cause:  There

11   may be more than one proximate cause in an event.  Now, if you

12   all get back there and get confused about proximate cause,

13   don't feel bad.  Lawyers and judges have a hard time sorting

14   out proximate cause.  It means something that caused something

15   else.  And there may be more than one proximate cause to an

16   event.  There may be more than one proximate cause to some

17   injuries, one thing caused one ending and one thing caused

18   another.  There may be able more than one proximate cause to

19   the death.  All we have to prove is that there was a proximate

20   cause to the injuries in the death.

21          Remember this, Dr. Sochor -- I also didn't mention

22   the charge on bad faith and attorneys fees.  We're asking for

23   attorney's fees and Judge Land will charge you what bad faith

24   means in terms of attorneys fees.  We ask you to check, yes,

25   and we will come back in phase two and put up some very brief

```
 1   evidence about the amount of attorney's fees.  "When a
 2   defendant engages in bad faith, which amounts to a conscious
 3   decision to do something wrong, such as consciously deciding
 4   to sell a product even though it knew of a dangerous condition
 5   that was likely to pose serious harm to users, plaintiffs are
 6   entitled to attorneys fees".  Three ain't no doubt about that.
 7   Ford did all those things.
 8           Let me say this, who gets what, is not your concern.
 9   Lawyers, family members, who gets what, is not your concern.
10   Your only job is to return a true verdict that does full
11   justice, that's it.
12           We ask you return a verdict that gives meaning to
13   the deaths of Mr. and Ms. Mills and their injuries.  And a
14   verdict that recognizes the value of their lives.  The full
15   value of the life of Herman Mills to himself, as though he had
16   lived; and the full value of the life of Debra Mills to
17   herself, as though she lived.  I will close now.  Ms. Moore
18   has been great keeping me on time.
19           This case and our cause was in our hands.  Now, it
20   is in your hands.  We've done the best we can do.  Now, it's
21   up to you.  We ask that you do your duty and that you try to
22   make a difference; and try to put a stop to this; try to do
23   what's right and what's just.  And again, we hope that when
24   you do and you're through, you'll be glad you served, proud
25   you served; and you will know that you did some good.  Thank
```

1    you very much.  Thank you, Your Honor.

2          JURY CHARGE:  Ladies and gentlemen, this day has

3    been a long day coming, you've been a long time coming, you've

4    been here since last Monday and the Court has noticed your

5    attention to the lawyers and the evidence and appreciate you

6    doing your civic duty so thoroughly and conscientiously.

7          It's now my job to instruct you on the law that you

8    must apply in deciding this case.  I have typed it up and put

9    it in this little typed-up form.  And you will have this with

10   you in the jury room during your deliberations.  So if you are

11   in those deliberations, you want to go back and review what I

12   am about to tell you, this will be back there and you will

13   have it available to you during your deliberations.

14         Ladies and gentlemen, this day's been a long time

15   coming, you've been here ever since last Monday.  And the

16   Court has noticed your attention to the lawyers and the

17   evidence and appreciate you doing your civic duty so

18   thoroughly and conscientiously.  It is my job to instruct you

19   on the rules of law that you must use in deciding this case.

20   When I have finished you will go to the jury room and begin

21   your discussions, sometimes called deliberations.

22         Your decision in this case must be based only on the

23   evidence that has presented in this courtroom.  You must not

24   be influenced in any way by sympathy for or prejudice against

25   anyone. You must follow the law as I explain it, even if you

1    do not agree with that law and you must follow all of my

2    instructions as a whole. You must not single out or disregard

3    any of the instructions on the law.

4           The fact that a corporation is involved as a party

5    must not affect your decision in any way. A corporation and

6    all other persons stand equal before the law and must be dealt

7    with as equals in a court of justice. When a corporation is

8    involved, of course, it may act only through people as its

9    employees; and, in general, a corporation is responsible under

10   the law for the acts and statements of its employees that are

11   made within the scope of their duties as employees of the

12   company.

13          As I said before, you must consider only the

14   evidence that I have admitted in the case. that evidence

15   includes the testimony of witnesses and the exhibits that have

16   been admitted.  Anything the lawyers have said is not evidence

17   and is not binding on you.

18          You should also not assume from anything I may have

19   said that I have any opinion about any factual issue in this

20   case. Except for my instructions to you on the law, you should

21   disregard anything I may have said during the trial in

22   arriving at your own decision about the facts.

23          It is your recollection and your interpretation of

24   the evidence that matters.

25          In considering that evidence you may use reason and

1   common sense to make deductions and reach conclusions. You

2   should not be concerned about whether the evidence is direct

3   evidence or circumstantial evidence.

4       Direct evidence for example is the testimony of a

5   person who asserts that he or she has actual knowledge of a

6   fact, such as an eyewitness.

7       Circumstantial evidence is proof of a chain of facts

8   and circumstances that tend to prove or disprove a fact. There

9   is no legal difference in the law in the weight that you may

10   give to either direct or circumstantial evidence.

11       When I say that you should consider all the

12   evidence, I do not mean that you must accept all the evidence

13   as true or accurate. You should decide whether you believe

14   what the witness had to say, and how important you found that

15   testimony to be.  In making that decision you may believe or

16   disbelieve any witness, in whole or in part.  The number of

17   witnesses testifying concerning a particular point does not

18   necessarily matter.

19       To decide whether you believe any witness I suggest

20   that you ask yourself a few common sense questions:

21       1. Did the witness impress you as someone who was

22   telling the truth?

23       2. Did the witness have a particular reason not to

24   tell the truth?

25       3. Did the witness have a personal interest in the

1    outcome of the case?

2         4. Did the witness seem to have a good memory?

3         5. Did the witness have the opportunity and the

4    ability to accurately observe the things that the witness

5    testified about?

6         6. Did the witness appear to understand the

7    questions clearly and answer those questions directly?

8         7. Did the witness's testimony differ from other

9    testimony or other evidence?

10         You should also ask yourself whether there was

11    evidence that a witness testified falsely about an important

12    fact.  And ask whether there was evidence that at some other

13    time a witness said or did something, or did not say or do

14    something, that was different from the testimony that the

15    witness gave during the trial.

16         But keep in mind that a simple mistake does not mean

17    a witness was not telling the truth as that witness remembered

18    it.  People naturally tend to forget some things or to

19    remember them inaccurately.  So, if a witness misstated

20    something, you must decide whether it was because of an

21    innocent lapse in memory or an intentional deception.  The

22    significance of your decision on that may depend on whether

23    the misstatement is about an important fact or an unimportant

24    detail.

25         Ladies and gentlemen, when scientific, technical or

1  other specialized knowledge might be helpful, a person who has

2  special training or experience in that field is allowed to

3  state an opinion about the matter.

4        But that does not mean you must accept the witness's

5  opinion.  As with any other witness's testimony, you must

6  decide for yourself whether to rely upon the opinion.

7        When a witness is being paid for reviewing and

8  testifying concerning the evidence, you may consider the

9  possibility of bias and should view with caution the testimony

10 of such witness where court testimony is given with regularity

11 and represents a significant portion of the witness's income.

12        Ladies and gentlemen, in this case, the Plaintiffs,

13 those parties bringing the case, they contend that the roof of

14 the Mills' 2015 Ford F-250 truck was defectively designed.

15        Because Debra and Herman Mills are deceased, they

16 obviously cannot bring the claims themselves.  So under the

17 law, some of the claims must be brought by the representative

18 of their estates, which in this case is James Edward Brogdon,

19 Jr., and some of the claims must be brought by their surviving

20 children.  In this case, James Edward Brogdon, Jr. and Ronald

21 Brian Brogdon are the surviving children of Debra Mills, and

22 Jason Edwin Mills is the surviving son of Herman Mills.  In

23 these instructions, I will sometimes refer to Debra and Herman

24 Mills as the decedents or the deceased.

25        Under the law, the estate of a deceased person may

1    bring claims for expenses of the estate, such as funeral

2    expenses, and for conscious pain and suffering of the

3    deceased.  The surviving children of a deceased person may

4    bring claims for the wrongful death of that person, with

5    damages measured as the full value of the life of the

6    decedent.

7              So in this case, James Edward Brogdon, Jr., as the

8    executor of the estate of Debra Mills, brings claims on behalf

9    of the estate for the funeral expenses caused by her death and

10   for the pain and suffering she suffered between the time of

11   the alleged roof crush and the time of her death.  Mr. Brogdon

12   contends that these damages were caused by a design defect in

13   the roof of the F-250 truck that she was driving at the time

14   of the wreck.

15             Mr. Brogdon, is also the executor of the estate of

16   Herman Mills, and as the executor of the estate of Herman

17   Mills he brings similar claims on behalf of Herman Mills'

18   estate for funeral expenses and pain and suffering, which he

19   contends were caused by the defective design of the roof.

20             Separate from these claims brought on behalf of the

21   Mills' estates, the surviving sons of Debra and Herman Mills

22   bring claims in their individual capacities for the wrongful

23   deaths of Debra and Herman Mills.  James Edward Brogdon, Jr.

24   and Ronald Brian Brogdon bring the claim for the wrongful

25   death of their mother, Debra Mills.  Jason Edwin Mills brings

1    the claim for the wrongful death of his father, Herman Mills.

2    They claim that their parent's deaths were caused by the

3    defective design of the roof in the F-250 truck.

4        You must consider each of these claims separately

5    and they are set out separately in the verdict form which

6    you're already seen in which I will go over in a moment.

7        To find in favor of a Plaintiff on the design defect

8    claims, you must find that there was a design defect and that

9    the design defect proximately caused injuries and/or death to

10   Herman and/or Debra Mills. I will explain just a moment the

11   elements of the design defect claim, in other words what the

12   Plaintiffs must prove to prevail.

13       It is the responsibility of the Plaintiffs to prove

14   every essential part of their claims by a preponderance of the

15   evidence. This is sometimes called the burden of proof or the

16   burden of persuasion.

17       A preponderance of the evidence simply means an

18   amount of evidence that is enough to persuade you that the

19   Plaintiff's claim is more likely true than not true.

20       In deciding whether any fact has been proved by a

21   preponderance of the evidence, you may consider the testimony

22   of all of the witnesses, regardless of who may have called

23   them, and all of the exhibits received in evidence, regardless

24   of who may have produced them.

25       And as I said, you should consider each claim

1    separately. If the proof fails to establish any essential part

2    of a claim by a preponderance of the evidence, you should find

3    against the Plaintiffs and for the Defendant on that claim.

4         Ladies and gentlemen, all of the Plaintiffs claim

5    that the roof of the Mills' 2015 Ford F-250 truck was

6    defectively designed and that the design defect proximately

7    caused injuries and death to Debra and Herman Mills.

8         I will now instruct you on what the law is in

9    Georgia which is he law that applies here with regard to

10   design defects.  The manufacturer of a product that is sold as

11   new property may be liable or responsible to the legal

12   representative of any person who is injured and dies because

13   of a defect in the product that existed at the time the

14   manufacturer sold the product.  However, a manufacturer of a

15   product is not an insurer, and the fact that a product may

16   cause an injury does not necessarily make the manufacturer

17   liable.  A product may be found to be defective because of its

18   particular design.  Although a manufacturer is not required to

19   ensure that a product design is incapable of producing injury,

20   the manufacturer has a duty to exercise reasonable care in

21   choosing the design for a product.

22        To prevail on their design defect claims, Plaintiffs

23   must establish the following elements by a preponderance of

24   the evidence:

25        1) the roof of the Mills' 2015 Ford F-250 truck had

1  a design defect; and

2          2) the design defect in the Mills' 2015 Ford F-250

3  truck proximately caused injuries and/or death to Debra and

4  Herman Mills.

5          As I noted previously, the estates of Debra and

6  Herman Mills assert claims for their funeral expenses and the

7  conscious pain and suffering that were caused by the alleged

8  defect. And the surviving sons make claims for their deaths

9  caused by the alleged defect.

10          To determine whether a product suffers from a design

11  defect, you must balance the inherent risk of harm in a

12  product design against the utility or benefits of that product

13  design.  You must decide whether the manufacturer acted

14  reasonably in choosing a particular product design by

15  considering all relevant evidence, including the following

16  factors:

17          1) the usefulness of the product;

18          2) the severity of the danger posed by the design;

19          3) the likelihood of that danger;

20          4) the avoidability of the danger, considering the

21  user's knowledge of the product, publicity surrounding the

22  danger, the effectiveness of warnings, and common knowledge or

23  the expectation of danger;

24          5) the user's ability to avoid the danger;

25          6) the technology available when the product was

1    manufactured;

2            7) the ability to eliminate the danger without

3    impairing the product's usefulness or making it too expensive;

4            8) the feasibility of spreading any increased cost

5    through the product's price or by purchasing insurance;

6            9) the appearance and aesthetic attractiveness of

7    the product;

8            10) the product's utility for multiple uses;

9            11) the convenience and durability of the product;

10            12) alternative designs for the product available to

11    the manufacturer; and

12            13) the manufacturer's compliance with industry

13    standards or government regulations.  If you decide that the

14    risk of harm in the product's design outweighs the utility of

15    that particular design, then the manufacturer exposed the

16    consumer to greater risk of danger than the manufacturer

17    should have in using that product design, and the product is

18    defective.  In determining whether a product was defective,

19    you may consider evidence of alternative designs that would

20    have made the product safer and could have prevented or

21    minimized the plaintiff's injury.  In determining the

22    reasonableness of the manufacturer's choice of product design,

23    you should consider the following:

24            1) the availability of any alternative design at the

25    time the manufacturer designed this product;

1          2) the level of safety from an alternative design

2     compared to the actual design;

3          3) the feasibility of an alternative design,

4     considering the market and technology at the time the product

5     was designed;

6          4) the economic feasibility of an alternative

7     design;

8          5) the effect an alternative design would have on

9     the product's appearance and utility for multiple purposes;

10    and

11         6) any adverse effects on the manufacturer or the

12    product from using an alternative design.

13         Ladies and gentlemen, in determining whether a

14    product was defective, you may also consider proof of a

15    manufacturer's compliance with federal or state safety

16    standards or regulations and industry-wide customs, practices,

17    or design standards.  The Federal Motor Vehicle Traffic Safety

18    Act provides that the Federal Motor Vehicle Safety Standards

19    are "a minimum standard for motor vehicle or motor vehicle

20    equipment performance."  Compliance with a federal motor

21    vehicle safety standard does not necessarily mean that a

22    product is not defective, although compliance with such

23    standards or regulations is a factor to consider in deciding

24    whether the product design selected was reasonable considering

25    the feasible choices of which the manufacturer knew or should

have known.  However, a product may comply with such standards
and regulations and still contain a design defect.

Ladies and gentlemen, if you find by a preponderance
of the evidence that the roof of the Mills' 2015 Ford F-250
truck had a design defect, then you must determine whether the
injuries and/or deaths of Debra and Herman Mills were
proximately caused by that design defect.  Proximate cause
under the law means that cause which, in a natural and
continuous sequence, produces an event, and without which
cause such event would not have occurred.  In order to be a
proximate cause, the act or omission complained of must be
such that a person using ordinary care would have foreseen
that the event, or some similar event, might reasonably result
therefrom.  There may be more than one proximate cause of an
event.  When I use the expression "proximate cause," I mean a
cause that, in the natural or ordinary course of events,
produced the decedent's injury and/or death.  It need not be
the only cause, nor the last or nearest cause.  It is
sufficient if it combines with another cause resulting in the
injury.

Ladies and gentlemen, for the estates' claims, for
conscious pain and suffering, you must determine whether the
design defect proximately caused the decedent's pain and
suffering.  You may only find in favor of the particular
Plaintiff on that claim if you find by a preponderance of the

1    evidence that there was a design defect and that defect

2    proximately caused the decedent's pain and suffering. To find

3    in favor of the Plaintiffs on the wrongful death design defect

4    claims and the estate's claims for funeral expenses, you must

5    find that that particular decedent's death was proximately

6    caused by the design defect.  In considering the wrongful

7    death claims, you may find that an injury caused death if the

8    injury (1) was itself the cause of death or (2) directly and

9    significantly contributed to the cause of death.

10            As you will see in a moment on the verdict form,

11    you've already seen it, but I'll explain it in a little more

12    detail in a moment.  You must consider the design defect

13    claims separately for Debra and Herman Mills, and you must

14    consider the estate claims separately from the wrongful death

15    claims.  But for each of the claims, in order to find in favor

16    of the Plaintiff asserting that particular claim, you must

17    find that the Plaintiff has proven by a preponderance of the

18    evidence that a design defect proximately caused the injury

19    and/or death to the decedent for whom the Plaintiff is

20    asserting that claim.

21            Ladies and gentlemen, if you find that the

22    Plaintiffs have carried their burden of proving one or more of

23    their claims against Defendant by a preponderance of the

24    evidence, then you must consider the issue of Plaintiff's

25    compensatory damages.

1        Compensatory damages are given as pay or

2   compensation for injury done.  When one party is required to

3   pay damages to another, the law seeks to ensure that the

4   damages awarded are fair to both parties.  If you believe from

5   a preponderance of the evidence that Plaintiffs are entitled

6   to recover, you should award to Plaintiffs such sums as you

7   believe are reasonable and just in this case. As I previously

8   explained, Plaintiffs are the proper legal representatives for

9   Debra and Herman Mills, who are the decedents or the deceased.

10       You may only award compensatory damages for the

11  claims based on the injuries of a decedent if you find that

12  Plaintiffs proved that a design defect proximately caused

13  injuries to that decedent.  You may only award compensatory

14  damages for the claims based on the death of a decedent if you

15  find that Plaintiffs proved that a design defect proximately

16  caused death to that decedent.

17       As to the claims asserted on behalf of the estates

18  of Debra and Herman Mills, you should consider the following

19  elements of compensatory damage, to the extent you find that

20  Plaintiffs have proved them by a preponderance of the

21  evidence, and no others:

22       (1) Damages for the physical and mental injuries a

23  decedent consciously suffered before death, including physical

24  pain and suffering, discomfort, and mental and emotional

25  distress; and

1              (2) Damages for reasonable funeral and burial

2    expenses for the decedent.

3              With regard to funeral and burial expenses, the

4    parties agreed by stipulation to the amount for each decedent,

5    so you should accept the amount as having been proved. With

6    regard to the damages for a decedent's physical and mental

7    injuries, you are instructed that pain and suffering and

8    mental and emotional distress are legal items of damages.  The

9    measure is the enlightened conscience of fair and impartial

10   jurors.  Questions of whether, how much, and how long a

11   decedent suffered are for you to decide.  But, damages for

12   pre-death physical and mental injuries are only recoverable if

13   you find from a preponderance of the evidence that the

14   decedent consciously experienced such injuries.  You may not

15   award such damages if you find that the decedent was not

16   conscious of any physical or mental injuries.  Also, in this

17   case, Plaintiffs would only be entitled to recover damages for

18   physical or mental injuries that decedents consciously

19   suffered after the 2015 Ford F-250 truck made impact with the

20   ground following the wreck if you find that the injuries were

21   proximately caused by the allegedly defective roof design.

22   When evaluating the extent of injuries for which you hold Ford

23   Motor Company responsible, you should accept that Ford takes

24   the decedents in whatever condition it finds them at the time

25   its conduct contributed to their injuries.  Ford bears the

1  risk that those injuries may be more severe because of the

2  actual physical condition that the decedents were in before

3  Ford's conduct caused any injury to them.

4          As to the claims asserted by the surviving sons for

5  the wrongful deaths of Debra and Herman Mills, the measure of

6  damages for those claims is the full value of the life of the

7  decedent, from the decedent's perspective.  The full value of

8  the life of the decedent or the deceased, as shown by the

9  evidence, is the full value of the life of the deceased

10  without deduction for necessary or other personal expenses of

11  the deceased if that person had lived.  The full value of the

12  life of the deceased is not limited to the amount of money

13  that could or would have been earned had the deceased not been

14  killed.

15          In arriving at the full value of the life of a

16  decedent, you, the Jury, may consider the intangible value of

17  the decedent's life to himself or herself, for as long as you

18  think he or she may have lived.  This means you can also

19  consider the value of noneconomic intangible items that the

20  decedent would have attained at the end of the decedent's life

21  as if the decedent had lived.  The noneconomic intangible

22  value of life cannot be precisely quantified, but it includes

23  loss of enjoyment of life, society, advice, example, and

24  counsel, as measured from the point of view of the decedent.

25  You would also consider the life expectancy of decedent.  You

may determine the life expectancy of a person when the person's age is shown without any other direct evidence on that subject.  In deciding this matter, you are also entitled to consider the evidence pertaining to the person's health, habits, surroundings, and method of living.

There is also another way in which you may determine the life expectancy of a plaintiff.  There has been introduced into evidence a copy of a mortality or annuity table.  If you desire to determine from this table the life expectancy of a person, look up that person's age in one column, and across from the age column, you will find the life expectancy of a person of that age.  Life expectancy shown on any such table is merely a guide that you may follow while considering the evidence as a whole.

If you insert your own age into that table trying to figure out your life expectancy don't be too concerned about it, but you can use that as a guide in determining the life expectancy in a case like this.

Ladies and gentlemen, Ford Motor Company denies that the roof of the 2015 Ford F-250 truck was defectively designed.  Ford Motor Company also denies that any design defect proximately caused injuries and death to Debra and Herman Mills. Even if Plaintiffs prove their claims against Ford Motor Company by a preponderance of the evidence, the damages against Ford Motor Company may be reduced if Ford

Motor Company proves its affirmative defense of comparative fault by a preponderance of the evidence.  I caution you that Ford Motor Company does not have to disprove the Plaintiff's claims, but if Ford Motor Company raises an affirmative defense, the only way it can prevail on that specific defense is if Ford Motor Company proves that defense by a preponderance of the evidence.

Ford Motor Company contends in the alternative that Debra Mills was responsible for causing the wreck and that she was responsible for the injuries that she and Herman Mills suffered.  This is an affirmative defense called comparative fault on which Ford Motor Company bears this burden of proof. So, if you find in favor of any Plaintiff on a design defect claim and you award compensatory damages, you must also determine whether Ford Motor Company proved by a preponderance of the evidence that Debra Mills was negligent and that her negligence was a proximate cause of her injuries and death and the injuries and death of Herman Mills.

To establish this affirmative defense, Ford Motor Company must establish by a preponderance of the evidence that:

1) Debra Mills was negligent in her operation of the 2015 Ford F-250 truck; and

2) Debra Mills's negligence proximately caused injuries and death to herself and/or Herman Mills.

1          Negligence means the absence or failure to use that

2    degree of care and skill that is used by ordinarily careful

3    persons under the same or similar circumstances.  A driver

4    must use that degree of care and skill ordinarily employed by

5    drivers generally under similar conditions and like

6    surrounding circumstances.  A driver acts negligently if she

7    does not use that degree of care that is used by ordinarily

8    careful drivers under the same or similar circumstances.

9    Negligence may consist either of doing something that a

10   reasonably careful driver would not do under like

11   circumstances, or of failing to do something that a reasonably

12   careful driver would do under like circumstances. In addition,

13   Ford Motor Company contends that Debra Mills violated certain

14   laws, including a Georgia law on Driving on Roadway Laned for

15   Traffic, which requires a driver to maintain the lane while

16   driving.  A violation of laws is called negligence per se,

17   which means negligence as a matter of law.  It is your duty to

18   decide whether such a violation took place or not.  The

19   verdict form will provide a space for you to answer whether

20   you find that Ford Motor Company proved that Debra Mills'

21   negligence in her operation of the 2015 Ford F-250 truck

22   proximately caused any of the damages that you consider

23   awarding to the Plaintiffs.

24          If you find that Debra Mills was negligent, then you

25   must determine whether her negligence was a proximate cause of

1    the injuries and deaths of Debra and Herman Mills.  And making

2    that determination you should use the definition of proximate

3    cause that I previously have instructed you on.

4         If you find that Debra Mills was negligent and that

5    her negligence was a proximate cause of her injuries and death

6    and/or the injuries and death of Herman Mills, then you would

7    indicate her percentage of fault on the verdict form.  And

8    we'll go over that in a moment.  If you assign any percentage

9    of fault to Debra Mills, I will reduce the amount of damages

10   you have found by that percentage, you will not make that

11   reduction.  If you make the award of damages you make the

12   amount of damages you find to have been proximately caused by

13   the design defect.  And then in this next section you will

14   assign a percentage of fault if you find that she was

15   negligent and proximately caused injuries of death.  And then,

16   I after you return your verdict will make the deduction based

17   on the percentage you enter on the verdict form, if any.

18        If you find that the fault of Debra Mills was equal

19   to or greater than the fault of Ford Motor Company, then the

20   Plaintiffs asserting the claim for the estate of Debra Mills

21   and the Plaintiffs asserting the Debra Mills wrongful death

22   claim would not be entitled to recover any damages.

23        However, if you find that Debra Mills's fault was

24   equal to or greater than the fault of Ford Motor Company, this

25   would not prevent the Plaintiffs asserting the Herman Mills

estate claim and the Herman Mills wrongful death claim from

recovering damages; but Ford Motor Company would only be

responsible for a percentage of those damages based, in the

Herman Mills' claim, based on your finding as to Ford Motor

Company's percentage of fault.

As I just stated previously, you should not make the

deductions to the damages in the verdict form. You should only

enter the percentages of comparative fault, if any, and the

Court will make any necessary reductions in the final judgment

based upon your findings as to the percentage of fault.

Ladies and gentlemen, if you find in favor of

Plaintiffs on one or more of their estate claims, the claims

asserted on behalf of the estate, which are the claims for

funeral expenses and conscious pain and suffering, if you find

in their favor, on any of those claims, and you award

compensatory damages, on those claims, then you would next

determine whether Plaintiffs have proved that that aggravating

circumstances exist that warrant an award of additional

damages called punitive damages.

Punitive damages, when authorized, are awarded not

as compensation to a plaintiff but solely to punish, penalize,

or deter a defendant.  For punitive damages to be authorized,

Plaintiffs must prove by clear and convincing evidence that

Ford Motor Company's actions showed willful misconduct,

wantonness, or that entire want of care that would raise the

1    presumption of conscious indifference to consequences.  If

2    Plaintiffs fail to prove by clear and convincing evidence that

3    Ford Motor Company's actions showed willful misconduct,

4    wantonness, or that entire want of care that would raise the

5    presumption of conscious indifference to consequences, then

6    you may not award punitive damages.  Mere negligence, even if

7    it amounts to gross negligence, will not authorize the

8    imposition of punitive damages.

9           Clear and convincing evidence is a different and

10   higher burden of proof than the preponderance of the evidence

11   standard which I previously explained.  Clear and convincing

12   evidence is defined as evidence that will cause you the jury

13   to firmly believe each essential element of the claim to a

14   high degree of probability.  Proof by clear and convincing

15   evidence requires a level of proof greater than a

16   preponderance of the evidence, which was the standard in

17   determining compensatory damages, but less than the standard

18   for proof beyond a reasonable doubt; which is the standard in

19   a criminal case, which this case is not.

20          At this stage, you will simply answer on the verdict

21   form whether you find that punitive damages should be awarded.

22   If you answer yes we will reconvene for the parties to

23   introduce evidence as to what amount of those punitive damages

24   should be.  After that evidence is introduced, you will

25   deliberate again as to what amount of punitive damages you

1    decide to award.

2          If you find in favor of the Plaintiffs on one or

3    more of their claims and you award compensatory damages, then

4    you must also determine whether Plaintiffs proved they are

5    entitled to recover their litigation expenses, including their

6    attorney's fees.  This will also be on the verdict form as

7    you've seen.

8          To prevail on their claim for litigation expenses,

9    including attorney's fees, the Plaintiffs must prove by a

10   preponderance of the evidence that Defendant acted in bad

11   faith. Bad faith means bad faith connected to the alleged

12   design defect in this case.  Simply making an honest mistake,

13   or exercising poor judgment, or acting negligently does not

14   standing alone amount to bad faith.  Bad faith contemplates a

15   conscious decision to do something wrong.  In evaluating

16   whether the Defendant here engaged in bad faith, you may

17   consider whether Defendant consciously decided to sell a

18   product even though it knew of a dangerous condition that was

19   likely to pose serious harm to product users.

20         At this stage, as with the punitive damages, you

21   will only answer the question whether litigation expenses,

22   including attorneys fees, should be awarded.  If you answer

23   yes, we will reconvene for the parties to introduce evidence

24   as to the amount.  That would be done in the same phase as the

25   punitive damages phase and you will then deliberate on what

1  amount, if any, for litigation expenses including attorney's

2  fees that you award.

3         We're almost finished.  Ladies and gentlemen, the

4  fact that I have given you instructions concerning the issue

5  of Plaintiff's damages should not be interpreted in any way as

6  an indication that I believe that the Plaintiffs should, or

7  should not, prevail in this case.  That's not my job, that's

8  your job.

9         Your verdict must be unanimous in this case must be

10  unanimous, in other words, all twelve of you must agree in

11  order to deliver a verdict in this case.  Your deliberations

12  will be secret, and you will never have to explain your

13  verdict to anyone.

14         Each of you must decide this case for yourself, but

15  only after considering the evidence with all of the other

16  jurors.  So you must discuss the case with one another and try

17  to reach an agreement.  While you are discussing the case, do

18  not hesitate to reexamine your own opinion and change your

19  mind if you become convinced that you were initially wrong.

20  But do not give up your honest beliefs just because others

21  think differently or because you simply want to get the case

22  over with.  Remember that, in a very real way, you are judges

23  in this case, you are judges of the facts.  Your only interest

24  is to seek the truth from the evidence that you have heard and

25  seen.

1          In this case you have been permitted to take notes

2     and some of you have taken advantage of that opportunity and

3     have made notes from time to time.  You will have those notes

4     available to you during your deliberations, but you should

5     make use of them only as an aid to your memory.  In other

6     words, you should not give your notes any precedence over your

7     independent recollection of the evidence or the lack of

8     evidence; and neither should you be unduly influenced by the

9     notes of other jurors.

10          I emphasize that notes are not entitled to any

11     greater weight than the memory or impression of each juror as

12     to what the testimony may have been.

13          When you get to the jury room, you'll choose one of

14     your members to act as your foreperson.  And that foreperson

15     will direct your deliberations and speak for you in court.

16          I have prepared a verdict for your convenience.  And

17     I am descent at this technology, we're about to see how

18     descent I am.  I will try to pull this up on my computer and

19     hopefully it will come up on your screen.

20          This is the official verdict form.  The lawyers have

21     copies which are exact copies of this one.  But you'll see

22     this has original on it.  So this is the one that the

23     foreperson will fill out after you unanimously agree to the

24     entire verdict.  We'll also send copies up there so all twelve

25     of you will have a copy if you want to go through with it

 1    together and have one there for each of you.

 2            The verdict form starts with the caption of the

 3    case, which is simply the parties in the case.  Then you'll

 4    see the Plaintiffs or those persons I previously described and

 5    the types of claims that they are asserting.  And then the

 6    case number.  And then we have verdict.

 7            And the way we separated this out is claims on

 8    behalf of Debra Mills, and then there's a separate section,

 9    claims on behalf of Herman Mills.  So you consider them

10    separately.

11            First of all we talked about the Debra Mills estate

12    claim, the claim brought for the estate, on behalf of the

13    estate, and I told you the elements that the Plaintiff would

14    have to prove on that claim.

15            You would then find one or the other.  You would

16    find, we the jury find in favor of Plaintiffs James Edward

17    Brogdon, Jr., as executor of the estate of Debra Mills, and

18    award damages against Ford Motor Company as follows and then

19    you would enter in those blanks the damages if any that you

20    find for those particular items of damage.

21            Or, you checked that little blank before the we the

22    jury, and then enter the damages if you find that the

23    Plaintiffs have proven that claim.  Or if you find that

24    Plaintiffs have not proven that claim, you would check beside,

25    we the jury find in favor of Ford Motor Company.  So those are

1    your options for that claim.

2         Next we're going to go to the claim of Debra Mills

3    for her wrongful death.  You've got two choices there, we the

4    jury find in favor of Plaintiff's, James Edward Brogdon, Jr.

5    and Ronald Brian Brogdon, individually and as the surviving

6    children of Debra Mills, and award damages against Ford Motor

7    Company as follows.  And then there's a blank there if you

8    find that Ford has proven that claim by a preponderance of the

9    evidence based on the elements that I had previously

10   instructed you on, that's where you would enter the amount of

11   damages that you find on that claim, for the full value of

12   Debra Mills life.  If you find that the Plaintiffs have not

13   proven that claim then you would check thereby the language,

14   we the jury find in favor of Ford Motor Company as to that

15   claim.

16        Section Two, we go to claims on behalf of Herman

17   Mills and they mirror the way it was set out for Debra Mills

18   but you've got to decide it separately for Herman Mills.  And

19   first is the estate claim, we the jury find in favor of

20   Plaintiff James Edward Brogdon, Jr. as executor of estate of

21   Herman Mills, and award damages against Ford Motor Company as

22   follows.  And then you would make a determination of whether

23   you think Ford Motor Company has proven that claim.  And if

24   you find damages you would enter that on those two blanks or

25   one or more of those blanks.  It would be your decision.

1          Or if you find Plaintiff has not proven that claim,

2    you would check, we the jury find in favor of Ford motor

3    company.

4          Then we go to Herman Mills wrongful death claim, we

5    the jury find in favor of Plaintiff Jason Edwin Mills,

6    individually and as a surviving child of Herman Mills and

7    award damages against Ford Motor Company as follows, and

8    there's a blank for you to check that, if you find Plaintiff

9    has proven that claim, and a place for you to put in the

10   damages for the full value of Herman Mills life or if you find

11   plaintiff has not proven the elements of that claim, you would

12   check, we the jury find in favor of Ford Motor Company.

13         Now if you have found in favor of the Plaintiffs and

14   awarded damages on any of those claims, then you go to this

15   next section which is contributory negligence and allocation

16   of fault.  I instructed you on what that means, that this is

17   the affirmative defense that Ford asserts and that they have

18   the burden of proving this.

19         The first question there, that you've got to answer,

20   is do you find by a preponderance of the evidence that any

21   negligence on the part of Debra Mills contributed as a

22   proximate cause to any of the damages that you have awarded to

23   any of the Plaintiffs.  If you answered that question, no,

24   then you don't need to answer the rest of the questions in t

25   his section.  If you answer it, no, that means that you have

1   found that Ford has not proven by preponderance of the

2   evidence that any negligence on Debra Mills part contributed

3   as a proximate cause to any of the damages you've awarded to

4   any of the Plaintiffs.  And you go to the next section, 4, if

5   you answer that question, yes, that you do find that she was

6   contributorily negligent and that her negligence was a

7   proximate cause of the damages, then this next section is

8   where you would allocate the fault between Debra Mills and

9   Ford Motor Company, obviously if you find she is not at fault

10  you wouldn't get to that section.  But if you find that she is

11  and that her fault was a proximate cause of the damages that

12  you've awarded, then this is where you put in a percentage of

13  fault as to Ford and Debra Mills.  The total of those two

14  percentages needs to add up to 100.  I probably should have

15  put 100-percent on that bottom line, but those two percentages

16  need to add up to 100-percent.

17          Next section is the punitive damages section.  If

18  you had found in favor of the Plaintiffs or any of the

19  Plaintiffs on the estate claims, and have awarded damages on

20  the estate claims, then you would come to the punitive damages

21  question.  Punitive damages are not awarded on the wrongful

22  death claim, but they are only awarded if you found in the

23  Plaintiff's favor on the estate claims and awarded damages on

24  those claims.  So you would then come to this question, do you

25  find that Plaintiffs proved by clear and convincing evidence

1    that punitive damages should be awarded against Ford Motor

2    Company, and you would answer that, yes, or, no, don't put any

3    amount in there, just, yes, or, no.  And then the next

4    question is with regard to litigation expenses.  If you've

5    found that -- if you have awarded damages to the Plaintiff on

6    any of their other claims, you would then answer this

7    question, do you find that claimants proved by a preponderance

8    of the evidence that they are entitled to recover litigation

9    expenses, including attorneys fees from Ford Motor Company.

10   And then you simply answer that, yes, or, no.  Then the

11   foreperson will sign the verdict form and date it, and that

12   signature will indicate that all 12 of you have agreed to it.

13   Now, I'm going to send up that original and that is the one

14   that needs to be returned to the Court after all 12 of you

15   agree to it, but I am going to also send you a copy so you all

16   can follow along if you want to do that during your

17   discussion.  And I will also send up separate copies of the

18   instructions so each of you can have a copy of these

19   instructions if you want those while you are deliberating.  We

20   will also make sure that the exhibits have been properly

21   downloaded, the ones that have been admitted.  You've seen the

22   screen up there with the mouse and everything, I guess, in the

23   jury room, you should be able to go to the exhibit numbers and

24   click on the mouse and that exhibit should magically appear on

25   the screen.  Mr. Gunn is going to show you how that operates.

1    He's not going to be able to during your deliberations, but

2    he's give you little tutorial to start.

3            We also going to send up hard paper copies of all

4    those exhibits so if somebody wants to go through those

5    instead of pulling it up on the screen you'll be able to do

6    that.

7            I do want to mention to you that you've heard during

8    the trial that there was mention of a number of "illustrative

9    exhibits," illustrative exhibits, and you will recall me --

10   the original verdict is not going to have a little wheel mark

11   on it, so we will definitely know whether this is the original

12   or not. she would call me -- Those illustrative exhibits

13   aren't going to be the jury room.  Those were only admitted

14   for illustrative purposes while somebody was testifying, so

15   you won't have those up there.  So if somebody says, well,

16   where is this, and if somebody says, well, that was an

17   illustrative exhibit, that is why it is not up there.  The

18   only exhibits that will be up there are the ones that were

19   actually admitted, they were not just illustrative exhibits.

20   Now, you can consider the illustrative exhibits in your

21   deliberations because that was part of the testimony but you

22   just will not have those physical exhibits with you up there

23   during those deliberations.

24            MR. MELTON:  Your Honor, may we approach.

25            THE COURT:  I'm not finished.

```
 1            MR. MELTON:  We will wait.
 2            THE COURT:  If you wish to communicate with me at
 3    any time, ladies and gentlemen, during your deliberations
 4    something that I did not necessarily encourage.  I don't
 5    discourage it, but, you've got your job and I've got mine, and
 6    I can't decide the case for you, so don't send me
 7    down questions that seek my input on the evidence because I'll
 8    simply send you back an answer that I cannot answer that
 9    question.  But if you do wish to ask me some kind of question
10    and want an answer then I'll be glad to respond.  And the way
11    you should communicate is to write down that message or
12    question, give it to the court security officer, he will then
13    bring it to my attention.  I will assemble the lawyers to say
14    this is a question from the jury, I want to get your input
15    before I respond and then I will probably send you back a
16    written response to your question.
17            Now, it may be, I can't help you with that, but I
18    just ask you to be patient during that process because it may
19    take you little time to get everybody in here in the
20    courtroom, the lawyers and for me to consult with them before
21    I respond.
22            One question or information that I don't need and
23    that you should not send to me is your break down, the score,
24    I don't need to know if it's 6-to-6, or 8-to-4, or 9-to-3,
25    that information is irrelevant to me and I really don't need
```

1    to know that information.  So the only information I really

2    need to know is when it is, 12-to-0, which would mean that you

3    have reached a verdict.

4            I am about to let you go but counsel apparently

5    wants to come to the bench.

6            MR. MELTON:  My apologies.  The Section 2-A

7    referring to the claims on Mr. Mills, there was a clear

8    inadvertent statement, I think you said, "if Ford failed to

9    prove."  I just -- it's clearly inadvertent, I just want to

10   make sure the jury understands that --

11           THE COURT:  On the Q-A?

12           MR. MALEK:  Walking through the verdict form?

13           MR. MELTON:  Yes.  You started here, I believe you

14   wound up by saying, if Ford proved -- or failed to prove --

15   something along those lines, but you started by placing the

16   burden on Ford --

17           MR. BUTLER:  You're saying -- Plaintiffs failed to

18   prove --

19           MR. MELTON:  Yes.

20           THE COURT:  Okay.

21           MR. MELTON:  Yes, it happened in two places.

22           THE COURT:  On the Herman Mills claim?

23           MR. MELTON:  I think in just a general statement

24   that you may have inadvertently's spoken, and you didn't

25   intend to imply anything.

```
 1                    THE COURT:  Okay.

 2                    MR. MELTON:  Something along those lines --

 3                    THE COURT:  All right.

 4                    MR. MELTON:  Thank you Judge.

 5                    THE COURT:  Okay, ladies and gentlemen, you probably

 6      picked up on this.  I apparently got tongue-tied once or twice

 7      on the verdict form with regard to the "burden of proof" and I

 8      think I went over enough of the instructions for you to know

 9      who has the burden of proof.  But I just want you to make sure

10      it's clear, that when I went through the verdict form that you

11      are answering those questions about whether the Plaintiff, you

12      find in their favor or not, the burden of proving that is on

13      the Plaintiffs bringing the claim.  The only burden of proof

14      that Ford's has is on there affirmative defense of

15      contributory negligence.  But the Plaintiffs have to prove

16      that the "design defect" proximately caused those injuries and

17      damages with regard to each of those claims.

18                    If I misstated that, that is unintentional.

19                    All right, you may go and hopefully in a little bit

20      you'll get those Chick Fila sandwiches, enjoy your lunch and

21      your deliberations.  Mr. Gunn will be up in a moment with the

22      exhibits and showing you how to do that.  You shouldn't start

23      your deliberations until he comes up with all the exhibits.

24                    You may go.

25      [Jury exits the courtroom.]
```

```
 1                              - - -
 2              THE COURT:  First of all, is my curative instruction
 3    satisfactory to Ford?
 4              MR. MALEK:  Yes, Your Honor.
 5              THE COURT:  The one I just gave?
 6              MR. MELTON:  Yes, Your Honor, thank you.
 7              THE COURT:  Are there any objections to the charge
 8    as delivered that have not previously been stated for the
 9    record by the Plaintiffs?
10              MR. LOWREY:  None, your Honor.
11              THE COURT:  By the Defendant?
12              MR. MELTON:  No, Your Honor.
13              THE COURT:  I'm assuming we've got all the exhibits
14    straight and we will deliver those up there soon and they will
15    begin their deliberations.
16              I don't require you to stay here at the courthouse,
17    but you need to be close by and easily reachable in case they
18    send a question that needs to be answered, we don't really
19    want to make them wait very long when they send those
20    questions, so just be easily reachable.
21              We'll be in recess awaiting a verdict.
22    [RECESS]
23    Thursday, February 13, 2025 12:43:11
24    JURY QUESTION NO. 1
25
```

```
 1                COURT SECURITY OFFICER:  All rise.
 2                THE COURT:  Okay, they want to know if they can have
 3      the toy truck during deliberations.
 4                MS. WRIGHT:  It is fine with us.
 5                THE COURT:  Yes, or no?
 6                MR. BUTLER:  Which truck?
 7                THE COURT:  They said the -- example trucks, is what
 8      they said.
 9                MS. WRIGHT:  I think those were used.
10                MR. MELTON:  If you don't mind, we're going to run
11      and get one, we can compare trucks, real quick.
12                THE COURT:  Let me get that note, I think it said,
13      plural.
14                Note states exactly the following:
15                "Can the jury use the example trucks used by
16      Defendant/Plaintiff?"
17                So whichever trucks were used that's what they want
18      to see, so, the question is, if you don't object I will send
19      them up.  If somebody objects I will not send them up.
20                MR. BUTLER:  No objection.
21                THE COURT:  Any objection by the Defense?
22                MS. WRIGHT:  No, Your Honor.
23                THE COURT:  Are we still waiting?
24                Okay, send them up there.  Tell them they can't keep
25      them.
```

```
 1              That's it, for now.
 2    [RECESS]
 3    Thursday, February 13, 2025 13:04:19
 4    Thursday, February 13, 2025 08:34:37
 5    [JURY QUESTION]
 6              COURT SECURITY OFFICER:  All rise, this Honorable
 7    Court is session.
 8              THE COURT:  This is the question.
 9              This is the question:
10              "Can we have a more definitive definition of
11    defect?"
12              It's about two-and-a-half-pages, maybe that's the
13    problem, it's too verbose.
14              My intended response is, the law regarding defect is
15    described in the courts instructions, no, additional
16    instructions will be provided.
17              Any objection to that, by the Plaintiffs?
18              MR. BUTLER:  No objection, Your Honor.
19              THE COURT:  Defendants?
20              MS. WRIGHT:  No, Your Honor.
21              THE COURT:  Okay, provide that to whoever sent it
22    down and we'll wait some more.
23                              JURY VERDICT
24    Thursday, February 13, 2025 18:38:42
25              THE COURT:  Bring the jury in.
```

1          You must be the Foreperson, you've got all the
2    paperwork.
3          FOREPERSON:  Yes, Your Honor.
4          THE COURT:  Have you all reached a verdict?
5          FOREPERSON:  Yes, Your Honor.
6          THE COURT:  Is it unanimous?
7          JUROR:  Yes, Your Honor.
8          THE COURT:  If you give it to the court security
9    officer, I will publish the verdict.
10          All right, it appears to be in order, I will now
11    publish the verdict.
12          In the case of James Edward Brogdon Junior et al v.
13    Ford Motor Company, Case 4:23-CV-00088, with regard to the
14    claims of Debra Mills, Debra Mills estate claim.
15          We the jury find in favor of Plaintiff James Edward
16    Brogdon, Junior. as executor of the estate of Debra Mills and
17    award damages against Ford Motor Company as follows.
18          Funeral expenses $12,352.80.
19          Conscious pain and suffering $500,000.
20          With regard to Debra Mills' wrongful death claim, we
21    the Jury find in favor of Plaintiff's James Edward Brogdon
22    Junior and Ronald Brian Brogdon, individually and as the
23    surviving children of Debra Mills, and award damages against
24    Ford Motor Company as follows:
25          Full value of Debra Mills' life $15-million-dollars.

1              Claims on behalf of Herman Mills, Herman Mills

2    estate claim.  We the jury find in favor of Plaintiff James

3    Edward Brogdon, Junior, as executor of the estate of Herman

4    Mills and award damages against Ford Motor Company as follows:

5              Funeral expenses $12,599.90.

6              Conscious pain and suffering $5 million.

7              Herman Mills wrongful death claim.  We the Jury find

8    in favor of the Plaintiff Jason Edwin Mills, individually and

9    as the surviving child of Herman Mills, and award damages

10    against Ford Motor Company as follows:

11              Full value of Herman Mills' life $10 million.

12              With regard to contributory negligence and

13    allocation of fault.  Do you find by a preponderance of the

14    evidence that any negligence on the part of Debra Mills

15    contributed as a proximate cause to any of the damages that

16    you have awarded to any of the Plaintiffs?

17              Answer, yes, the allocation is as follows:

18              Ford Motor Company 85 percent.

19              Debra Mills 15 percent.

20              Punitive damages.  Do you find that Plaintiffs

21    proved by clear and convincing evidence that punitive damages

22    should be awarded against Ford Motor Company?

23              Answer, yes.

24              Litigation expenses including attorney's fees.  Do

25    you find that Plaintiffs proved by a preponderance of the

1    evidence that they are entitled to recover litigation expenses

2    including attorney's fees from Ford Motor Company?

3              Answer, yes.

4              Signed by the Foreperson, Rachel Strauss.

5              Rachel Strauss, dated February 13th of 2025.

6              The verdict appears to be in order, but I will let

7    counsel look at it and let me know if they have any objection

8    to the form.

9              Any objection to the form by Plaintiffs?

10             MR. BUTLER:  No, Your Honor.

11             MS. WRIGHT:  No, Your Honor.

12             THE COURT:  All right, no objection to the form by

13   either party.

14             Okay, ladies and gentlemen, as you know we're going

15   to come back in the morning and do this second phase because

16   there's going to be some evidence that needs to be presented,

17   it shouldn't take long as far as the evidence goes and then

18   the lawyers will be able to give you another closing argument

19   which will not be as long and I will give you some

20   instructions which will be not nearly as long and then you

21   will deliberate with regard to this second phase as to the

22   amount of punitive damages and the amount of attorneys fees

23   and there will be no third phase, that will be the end of it

24   after that.  But we will get started in the morning at 9:00

25   a.m. although you have reached a verdict on part of the case

```
1   you still should not discuss the case with anyone, you
2   shouldn't discuss the case among yourselves, the only time you
3   should discuss the case is when all 12 of you are up there in
4   e jury room together and you shouldn't do any kind of
5   investigation or research.  If any of this appears in the
6   newspaper or on any of the press which I don't know that it
7   will, you should disregard that until after we're finished
8   with the case in its entirety.  So you may go at this time, we
9   will see you back here at 9:00 a.m. in the morning.
10  [Jury dismissed.]
11        THE COURT:  Okay, I know everybody is tired, but I
12  want to get everything ironed out before we start in the
13  morning with regard to the instructions in the second phase as
14  well as the verdict form.  I've got it on my desk.
15        We have sent to out late this afternoon a copy of
16  the instructions on the second phase which is far as punitives
17  go is mainly from the Georgia Superior Court pattern charge
18  with a couple of revisions to try to address one concern, but
19  what's the Plaintiffs objections or suggested improvements to
20  the instructions?
21        MR. LOWREY:  We like the charges, like the verdict
22  form, we didn't see anything to change.
23        THE COURT:  Defendant?
24        MR. MELTON:  Your Honor, we have a couple of
25  comments on the first alternative, with Mr. Eady for that and
```

1  then I have one comment on the second.

2          THE COURT:  Mr. Eady.

3          MR. EADY:  Yes, Your Honor, preliminarily I believe

4  the Court was to give us a limiting instruction in connection

5  with the network profitability information after the briefing

6  on around the 21st of January.

7          THE COURT:  I tried to cover that in this charge, I

8  tried to cover those concepts that I thought needed some

9  restriction and limitation in this charge, I just decided to

10 do it at the final charge.

11         MR. EADY:  We Ford Motor Company in connection with

12 the Court's first two charges, with Number 1, request that its

13 requested instructions contained in ECF 319, Phase 2

14 instructions 41-through-45 be given in the alternative.  In

15 case those instructions are denied, Ford Motor company would

16 request that there's an additional Georgia Suggested Pattern

17 Jury Instructions that are not included in the Court's set and

18 what's missing in the Court's set are Suggested Pattern Jury

19 Instructions 66.771.

20         THE COURT:  I need to see what those are.  I thought

21 for sure we had included all the Georgia Superior Court

22 pattern charges on punitive damages.

23         MR. EADY:  There are a couple of ones that are

24 omitted, Your Honor.

25         THE COURT:  Tell me what they are.

```
1              MR. MELTON:  First one.

2              THE COURT:  Do you have an extra copy?

3              MR. MELTON:  I may have an extra copy.

4              THE COURT:  I may have it here.  Okay, I've got your

5    proposed jury instructions, hold on.  Give that to somebody

6    else.  My intention was to include all of the Georgia Superior

7    Court pattern charges on punitive damages that applied and

8    then we just made a slight modification to try to address the

9    one concern.

10             The defendant Ford Motor Company, tell me which

11   numbers you claim are in the Suggested Pattern Charges of the

12   Georgia Superior Court Pattern Charges?

13             MR. EADY:  Your Honor, they are 66.771, after

14   territory -- and 66.772, dissimilar conduct, now there is a

15   preparatory explanation --

16             THE COURT:  Wait a minute Mr. Eady.  I mean, are you

17   trying to get me to give these charges or are you just

18   planning them in here for appeal.  If you want me to consider

19   it, you need to slow down just a little bit.

20             All right, apparently what I have got as your

21   pattern charges goes up only to 48, I've got what you filed on

22   January the 21st that goes up to page 62.  If you file some

23   more stuff that --

24             MR. EADY:  No, Your Honor, let me back and slowdown

25   a little bit.  Ford has requested instructions that we timely
```

1    filed with our complete set.  And those are the ones that the

2    Court is just mentioning and those are in document 319 and

3    those are 40 -- I believe 40 has been given, and its 41, 42,

4    43.

5            THE COURT:  Let's slow down.

6            MR. EADY:  And 44.

7            THE COURT:  Because you represented to the Court

8    that these charges were from the Georgia Superior Court

9    Pattern Charges and I'm looking at 41, and it is not from the

10   Georgia Superior Court Pattern Charges.

11           MR. EADY:  That's why I think I probably spoke a

12   little fast, so --

13           THE COURT:  What I want to know first, and I'm

14   saying that the only charges that should be given necessarily

15   are the Georgia Superior Court Pattern Charges, to me though

16   this is a state law question with Constitutional implications

17   which I understand but certainly the Georgia Pattern would be

18   the place to start.  My intention in the charge was to include

19   all of the pattern Georgia charges on punitive damages and

20   then I made a couple of adjustments to try to address at least

21   one or two of the Constitutional issues about you can't punish

22   this defendant for harm that they caused to someone else.  The

23   punishment has to be for the harm to these Plaintiffs.  That's

24   how I advise the charge.  I thought that's what part of what

25   the Defendant was seeking.

```
1              But I need to know first is which Georgia Superior
2     Court Pattern Charge on punitive damages have I not included
3     in my proposed charge, because if there is one, it was an
4     oversight.
5              MR. EADY:  There's two.
6              THE COURT:  Where are those found in your proposed
7     charges.
8              MR. EADY:  They are pieces in the proposed charge,
9     they are not verbatim.
10             THE COURT:  Okay, I don't really understand that.
11    Where what number charges have you proposed that include parts
12    of the Superior Court Pattern Charges on punitive damages,
13    because I'm not seeing a citation to that in here.
14             I'm looking at what you filed at ECF 319.
15             MR. EADY:  Yes, Your Honor.
16             THE COURT:  I'm looking at Phase 2, which starts on
17    Page 30 -- starts on page 40, not Page 40, but Structure 40.
18             MR. EADY:  Your Honor, let me cross-reference these.
19    The Court will go to 44.
20             THE COURT:  44, okay.  I'm at 44.  I see no citation
21    to the Georgia Superior Court Pattern Charge.
22             MR. EADY:  There's no citation but if the Court will
23    put up Georgia Suggested Pattern Jury Instructions 66.771,
24    which we have a copy here, and put those side-by-side, the
25    Court will find that that is based upon that Suggested Pattern
```

```
 1   Jury Charge, and this a Federalism Instruction, it is based in
 2   the Pattern Instructions, it's under the topic
 3   Extraterritoriality, which would be the same.
 4           THE COURT:  All right let me read it.
 5           Okay, I do believe we missed this one.
 6           What is Plaintiff's position with regard to this
 7   extraterritoriality.  I am now looking at the Georgia Pattern
 8   Charge on that.  What's the problem with charging the Georgia
 9   Pattern Charge on that.
10           MR. LOWREY:  The second sentence is going to be
11   confusing in the context of this case, Your Honor.
12           You may not however consider for the issue of
13   punitive damages any conduct that was lawful, where it when it
14   occurred.  Lawful is going to be confusing to the jury whether
15   that includes being tortious and actual common-law, that's one
16   problem.  The other is there's no indication that there's any
17   state where it is lawful to sell a product that's defective
18   under a law that, Your Honor, charged the jury.
19           THE COURT:  Well, that's true.  Does this come out
20   of a case where there were certain business practices that one
21   state may have outlawed and other states may not have?  I
22   think that's the context of this.
23           MR. EADY:  This is coming from BMW versus Ford.
24           MR. LOWREY:  But it is not a jury charge.
25           THE COURT:  Was that a business practices case?
```

1          MR. LOWREY:  It was the bad paint jobs on the BMWs,

2     or the restored cars that were past off as new.

3          THE COURT:  How is the jury going to evaluate that?

4     The claim here is that there was a design defect in the F250

5     vehicle that applied to all F250 vehicles during certain

6     calendar years.

7          How are they going to evaluate that it maybe, quote,

8     "lawful" in some states to sell vehicles with design defects

9     and unlawful and others.

10         MR. EADY:  I think that's the point, Your Honor,

11    they don't know and these law standards are different in every

12    state, and is some states they have not even allowed recovery

13    of punitive damages.  Some states on the product liability

14    follow 402-A, some states have a statutory requirement.  But

15    whether it's lawful, or unlawful, it cannot be considered.

16    The only thing that can be considered is the impact upon

17    Georgia and its residence and that's what the suggested

18    Georgia Pattern Jury Instruction Georgia covers.

19         THE COURT:  I've captured part of this where I have

20    revised or added to the Georgia Pattern Charge by cautioning

21    the jury that Ford Motor Company may only be punished in this

22    case for the conduct that harmed Debra and Herman Mills,

23    therefore your award of punitive damages may not punish Ford

24    Motor Company for any impact of its conduct on individuals who

25    are not parties to this case.

1          I think that is more tailored to the facts of this

2   case than this extraterritorial pattern charge so.

3          MR. EADY:  Your Honor, we would respectfully

4   disagree because Georgia is going to give -- the jury is going

5   hear evidence of I assume profitability --

6          THE COURT:  Yes, sir.

7          MR. EADY:  -- and net worth or some form of that and

8   that goes beyond Georgia, but it can only impose punitive

9   damages based upon the injuries in this case so it's going to

10  ovulate, use that information.

11         THE COURT:  Yes, I understand the challenge that

12  some of the language in some of the cases presents without an

13  answer and this charge was an attempt to address in a balanced

14  way the issue I thought was raised in those cases.

15         I'm going to charge it as is, as far as that issue

16  goes.  But you noted it for your appeal.

17         What other instructions -- first of all from the

18  Georgia Superior Court Pattern Charges do you contend that I

19  have not included?

20         Just so the record is clear I did not include

21  verbatim the Superior Court charge 66.771 but I tailored that

22  same concept in principle in the charge that I intend to give

23  just so it's clear on the record.

24         MR. EADY:  Your Honor, my understanding that you're

25  also refusing to give Ford Motor Company's Instruction Number

```
1    44 and ECF 319 as well?

2           THE COURT:  Is that your version of the Superior

3    Court Charge 66.771?

4           MR. EADY:  It is, Your Honor.

5           THE COURT:  Yes, I think I've covered the applicable

6    principles that need to be covered with regard to the cases

7    you cite in support of Instruction 44.

8           Well, I guess I should -- Mr. Lowrey, you and

9    Mr. Butler are going to be defending the Court's decision on

10   this issue with the 11th circuit; do you feel comfortable

11   with what the Court has done?

12          MR. LOWREY:  Give me just a second, Your Honor.

13          Yes, I'm comfortable that you deny that instruction,

14   I believe you capture the salience principles.  I mean the

15   complication is one that you've noted which is the conduct

16   directed at a large number of people is entirely relevant to

17   reprehensibility, relevant to the terms, but you can punish

18   the conduct but only the conduct that injured the Mills, I

19   think you've captured that as best as you can.

20          THE COURT:  What about this concept that they ought

21   to be charged that if it's lawful in some state and not this

22   state than they can't be held responsible for punitives, my

23   view is that doesn't seem adjusted to the facts of this case.

24          MR. LOWREY:  It's not adjusted to the evidence.

25   There's no reason to believe -- and the fact that some states
```

```
 1    don't allow punitive damages is irrelevant, just because there

 2    is no punitive damages doesn't make the conduct, quote,

 3    "lawful."

 4              THE COURT:  What's next Mr. Eady?

 5              MR. EADY:  Your Honor, the next one.

 6              THE COURT:  Are there any other Georgia Superior

 7    Court Pattern Charges that you think I've not given?

 8              MR. MELTON:  Your Honor, in that same section, Item

 9    Number 7, where the instruction refers to any other pertinent

10    circumstances, that does come from the Pattern Charges but the

11    comment on that section from those Pattern Charges suggests

12    that this catchall is from Georgia case law but may violate

13    due process State Farm versus Campbell.

14              THE COURT:  I don't have a problem with taking that

15    out.

16              MR. LOWREY:  I've lost where we are.

17              THE COURT:  We are on Page 2 of my proposed charge,

18    first full paragraph where it says, "when considering the

19    amount you may consider the following factors," and then that

20    Number 7 catchall, which is just quoted from the Georgia

21    Pattern.  I think if I am going to list factors they may

22    consider I don't think there's a need to have a catchall

23    there.

24              MR. LOWREY:  I'm sure I'm going to agree with Your

25    Honor -- oh, there it is, any other pertinent circumstances,
```

```
 1   no, you can get rid of that.
 2              THE COURT:  I'm going to delete that.
 3              All right, Mr. Melton is, 1 and 0, so far.
 4              MR. EADY:  Yes, Your Honor, the rest of the ones
 5   that we have on 41.
 6              THE COURT:  I'm trying to do this methodically, is
 7   there any Georgia Superior Court Pattern Charge that you
 8   contend that I have not given?
 9              MR. EADY:  There's one that the Court did not give
10   however we don't have it in our set.
11              THE COURT:  Meaning you didn't request it?
12              MR. EADY:  We didn't request in that form, that's
13   correct.
14              THE COURT:  What is it?  What Georgia Superior Court
15   Pattern Charges that I didn't give?
16              MR. EADY:  It would be 66.772.
17              THE COURT:  And what is that claim.
18              MR. EADY:  Is called, dissimilar conduct.
19              THE COURT:  We're trying to print that out.
20              MR. MELTON:  Your Honor, it should be what I handed
21   to the Court.
22              THE COURT:  Is there evidence that dissimilar
23   conduct contributed to the harm in this case?
24              MR. EADY:  Did it contribute to the harm in this
25   case?  All of the accidents that were considered, as other
```

1    accidents, were dissimilar.

2          MR. LOWREY:  This is talking about conduct and

3    procedures of the defendant and so I am curious to what other

4    conduct and procedures of Ford they think the jury might think

5    -- mistakenly think is the basis for punishment.

6          MR. EADY:  Well, it can only be one conduct

7    allegedly harmed the Mills, that can be the only conduct.

8          THE COURT:  Basically what they have found is that

9    Ford with the regard to the design of the roof acted wantonly

10   or demonstrated a complete absence of care that would

11   demonstrate consciousness disregard for the consequences with

12   regard to this specific design.  That's what they found in

13   order to answer this question, yes.  So what is there

14   dissimilar -- Mr. Butler's not going to be able to come in, in

15   his closing argument and argue that these people make terrible

16   airbags and that had something to do with it.  The argument is

17   going to have to be focused on the design defect related to

18   the roof on these trucks, so I'm not sure what dissimilar

19   conduct there is out there that they need to be cautioned

20   about.

21         MR. EADY:  We're just making sure that they are

22   completely focused on just the conduct that allegedly caused

23   the --

24         THE COURT:  I have no doubt that they are focused on

25   the design defect that led to the alleged to ROOF CRUSH.  If

1   Mr. Butler veers into some other design defect on this 250

2   truck or any other vehicle of Ford, I would be astonished but

3   if he does he'll be reprimanded for it.  I'm not going to give

4   that charge, I don't think it's adjusted to the facts of this

5   case.

6          What other Georgia Superior Court Pattern Charge did

7   the Court not give?

8          MR. EADY:  None, Your Honor, the rest of them are

9   non-pattern jury charges.

10         THE COURT:  Okay, let's go over those.  If those --

11  were those submitted as part of ECF with the Document 319?

12         MR. EADY:  Yes, Your Honor.

13         THE COURT:  If they are, I've considered all those

14  and decided not to include them so you've got that preserved

15  unless the parties agree that there's something in those

16  charges that they think it would be wise to include.

17         MR. EADY:  Your Honor, just for the record those are

18  requested jury instructions 41, 42, 43, and 45.

19         THE COURT:  I looked at them in crafting this charge

20  as I said it is based almost entirely on the Georgia Pattern

21  Charge with some revision to taking into consideration what I

22  understand to be some of the Constitutional concerns but if

23  all counsel agree that I have omitted something than I am

24  obviously willing to include a charge that nobody objects to.

25         Mr. Lowery?

1          MR. LOWREY:  Just rereading these, I didn't think

2     there's anything here that we need to add.  Can I huddle with

3     my colleagues for a brief second?

4          THE COURT:  Yes.

5          At this stage of the game it would seem to be

6     prudent to err on the side of including something if there's a

7     close call.  I haven't seen it, but I'm amenable to it.

8          MR. LOWREY:  We are good with what you've done, Your

9     Honor.

10          THE COURT:  All right.  Mr. Eady, you have preserved

11     your record for the next phase; any other?

12          MR. EADY:  Your Honor, we have some objections to

13     the Court's proposed Phase 2, instructions, and I have a

14     couple and I know Mr. Melton does too.  With respect to Charge

15     Number 1, on Page 2, beginning with the first full paragraph

16     where it says, the measure of punitive damages should be

17     determined by your enlighted conscious as a fair and impartial

18     jury.  That is a Suggested Pattern instruction from 66.74 of

19     the Georgia Suggested Pattern Jury Instructions.  And we would

20     object to that as being too vague and providing no guidance

21     let alone Constitutional guidance to render a fair and

22     Constitutionally punitive damages verdict.  Enlightened

23     consciousness is meaningless.

24          THE COURT:  Well, it's a well-established, quote,

25     "meaningless" principle in the law that has been applied for

1   probably hundreds of years to first of all pain-and-suffering

2   awards and I think sustained.  And I'm certain punitive damage

3   awards, this is in the Georgia Pattern Charge, but in any

4   event, you made your objection.

5          MR. EADY:  Yes, Your Honor.  We would that sentence

6   be removed.

7          THE COURT:  Okay, I'm not going to remove it, it's

8   part of the Georgia Pattern, I think consistent with Georgia

9   law and adjusted to the facts of the case.

10          MR. EADY:  Thank you, Your Honor, the next one is an

11   objection to Number 6, the financial circumstances and

12   condition and net worth of the Defendant.  We've already been

13   down this path, we moved to exclude the evidence.

14          The Plaintiffs responded.

15          The Court issued its ruling on that and I'm just

16   preserving the record --

17          THE COURT:  Yes.

18          MR. EADY:  -- that we are maintaining that that

19   should be removed and in leu with that our instruction to the

20   net worth can not be considered to inflate an award.

21          THE COURT:  Your objection is preserved as far as

22   I'm concerned.  What's next?

23          MR. EADY:  The last one for me is flipping the page

24   to Page 3, and so beginning with the first full sentence, when

25   I say, I believe this is the Court crafted instruction based

1  upon net worth and profitability.

2          THE COURT:  Yes, that is not part of the Georgia

3  Pattern.

4          MR. EADY:  This particular instruction though --

5          THE COURT:  What I was trying to accomplish with

6  that is quite frankly what I thought Defendant was seeking, at

7  least in part, to have me do with regard to making sure that

8  the jury knew that the punishment here, the award needed to be

9  punishment of these Plaintiffs and not other persons.

10          MR. EADY:  We agree, Your Honor --

11          THE COURT:  Do you want me to take that out?

12          MR. EADY:  No, Your Honor, we don't want you to take

13  that out.  We would like you to somehow include that it's in

14  connection with the financial information that's being

15  presented to the jury because that was my understanding of how

16  --

17          THE COURT:  That's what -- I'll be candid, is a

18  little unclear from some of that law.

19          I don't know why this principle would not apply

20  beyond just financial information.  If the principle is that

21  you can only punish for what was done to these particular

22  Plaintiffs, why would this just be restricted to financial

23  information.

24          MR. EADY:  I think that was the other part of the

25  Federalism argument of conduct outside the state.

```
 1            THE COURT:  Do you want me to narrow this language
 2    so that it applies only to the financial information?
 3            MR. EADY:  Your Honor, I think that makes sense.  We
 4    have to keep in the language that you have in here that I
 5    caution you that Ford Motor Company may only be punished in
 6    this case for the conduct that harmed Debra Mills and Herman
 7    Mills, that has to stay because that's true.  And the last
 8    thing, the next sentence, your award of damages may not punish
 9    Ford Motor Company for the impact of its conduct on any
10    individuals who are not parties in the case, those two pieces
11    have to stay.
12            THE COURT:  To me, this captures the whole concept
13    without making it overly complicated.
14            It says that first of all from the pattern charge,
15    the Pattern Georgia Charge, tell the jury that they can
16    consider whether the conduct involved repeated action or was
17    an isolated event.  And then I explain that in deciding and
18    considering if it involved repeated actions, which would be
19    conduct other than the conduct directly involving the Mills,
20    they can consider that similar misconduct, if it is similar to
21    that which harmed Debra and Herman Mills, but they are
22    cautioned that they may only -- Ford may only be punished in
23    this case for the conduct that in fact harmed Debra and Herman
24    Mills, I mean, that's the best I could do to try to capture
25    that concept in light of the rest of the charge, and I don't
```

1  think just highlighting financial conditions does it, so you

2  preserved your record on that.

3          MR. EADY:  Just one last thing, Your Honor, I

4  understand we covering repeated action in court, it is

5  providing more of a substantive description of what that

6  means.  Rather than emphasize it, we would -- as an

7  alternative at least request that everything be deleted until

8  I caution you, and it could even begin as I believe that both

9  parties have, is that you've heard financial information,

10  coma, I caution you --

11          THE COURT:  So, you don't want me to tell the jury

12  that any of that -- Quite frankly I thought this language was

13  favorable to Ford, but if Ford wants to waive any objection I

14  may be receptive to it.

15          I was trying to make it clear to the jury that if

16  they consider other alleged misconduct that it needs to be

17  similar to the misconduct that they have found here which is

18  the design defect of the roof on this vehicle.  So that was

19  put in there to cabin the jury that they can't just consider

20  general misconduct, that it has to be similar to the

21  misconduct that harmed Debra and Herman Mills; you want me to

22  take that out?

23          MR. EADY:  Yes, Your Honor, up to the part where it

24  says, I caution you.

25          THE COURT:  So, you think that they can find that

1   they engaged in dissimilar conduct to the conduct that harmed

2   the Mills and consider that for purposes of punitive damages?

3          MR. EADY:  I believe the repeated actions or

4   isolated incidents is covered in the last Pattern Instruction

5   --

6          THE COURT:  Okay, I'm not -- Mr. Lowrey, you want to

7   be heard on that?

8          MR. LOWREY:  I think you should leave the charge the

9   way it is.

10          THE COURT:  I'm going to leave it the way it is.

11   Anything else Mr. Eady?

12          MR. EADY:  No, Your Honor, I'll turn it over

13   Mr. Melton.

14          THE COURT:  All right, Mr. Melton?

15          MR. MELTON:  Your Honor, I have one quick item

16   hopefully.  On Charge 2, the last sentence.  I didn't see,

17   Your Honor, that this charge was informed by the Pattern

18   Charge, if I missed it forgive me.  But at the last sentence

19   in Charge 2, beginning with, "to determine whether the

20   contingence fee is a valid indicator".

21          THE COURT:  Yes.

22          MR. MELTON:  It says, "you may consider" I think the

23   case law requires the jury to consider and I think it must be

24   a "must."  And for that proposition I'm relying on Georgia

25   Department of Corrections versus Couch.

Joan Drammeh * Federal Reporter * 706-653-1097

```
1              THE COURT:  Do you intend to put-up evidence to the

2    number of hours -- what do you intend to put-up to show that

3    your contingency fee is reasonable?

4              MR. LOWREY:  We intend among other things to put-up

5    an estimate of the total number of hours.  We will talk some

6    about rates, do you not agree that that's "may consider" is

7    exactly the right phrase.

8              Couch says, for other indicia of value.  I know the

9    Defendants would like it, but they have failed to have the

10   Georgia Courts adopt the idea that it must be an hour of rates

11   analysis, you got this one right.

12             MR. MELTON:  I agree Mr. Lowrey, but perhaps the

13   actual phrase should be in there, it says in addition the

14   party seeking fees must also introduce evidence of hours,

15   rates, or some other indication of value that would be a more

16   complete statement of law.

17             THE COURT:  Okay, they must introduce it and the

18   jury may consider it.  As I understand, they say going to

19   introduce it, that evidence.

20             MR. LOWREY:  Yes, we ask that they do that, Your

21   Honor.

22             THE COURT:  Yes, sir, I'm not going to change

23   may-to-must, I think "may" is an accurate statement of the

24   law.

25             Yes, sir, Mr. Peeler?
```

1          MR. PEELER:  Your Honor, raise with you that
2     Plaintiffs have had this claim in their case from the
3     beginning, they've never produced any documents related to the
4     amount of work that they have done, any of the indicia value
5     of work we haven't seen even the contingency agreement.  They
6     have also not identified on their witness list any witness who
7     will be testifying, so we ask that you would preclude them
8     from putting up any of that evidence on grounds that they
9     haven't provided it into discovery, it is not on the pretrial
10    order, it is not on the exhibit list; it doesn't appear any
11    where, the claimant's been in the case since the beginning.
12         MR. LOWREY:  Were not going to introduce documentary
13    evidence.  If they want to see --
14         THE COURT:  I guess what I would be more concerned
15    about is if they have either discovery requests or mandatory
16    disclosures that would have required the production of
17    evidence to support the claim, and it hadn't been produced,
18    that's a problem.
19         MR. LOWREY:  We don't think so, Your Honor.  Georgia
20    law is perfectly clear, an attorney is competent, when the
21    attorney is trying to the case is competent to stand and
22    advocate for the reasonableness of his or her fees.  It
23    wouldn't be an expert witness.  Our witness will be one of the
24    trial team and can testify to facts like what is the usual --
25         THE COURT:  Well, if you're going to do that they

```
 1    would have had the opportunity to conduct a narrow deposition

 2    on those issues.

 3              MR. LOWREY:  They're welcome to it.

 4              THE COURT:  The question is why -- whether it should

 5    have been disclosed here before we are getting ready to have

 6    the testimony on it.

 7              MR. LOWREY:  Just think about the absence --

 8              THE COURT:  Have you even produced the contingency

 9    fee contract?

10              MR. BUTLER:  They didn't request it.

11              MR. LOWREY:  I don't know if it has been requested

12    --

13              MR. BUTLER:  It's not been.

14              MR. LOWREY:  Hasn't been, is now doing in the

15    courtroom certainly --

16              THE COURT:  It has been requested?

17              MR. PEELER:  It would be required under the initial

18    disclosures Your Honor which requires the party with the claim

19    to provide the information under 26 to support that claim, we

20    don't have anything.  We don't have the name of the witness,

21    we don't have any documents, we don't have anything to even

22    test whether reasonable hourly rate would be what kind of work

23    was done, how many hours were incurred, how that relates to a

24    contingency fee, all of the things that Your Honor would

25    require to be put into the case, we have no notice to all of
```

```
 1    any of it, zero.

 2              MR. BUTLER:  Your Honor, Mr. Peeler just said, the

 3    claimant has been in the case since the beginning, they

 4    haven't requested any of this stuff.  With respect to initial

 5    disclosures, I don't know what they would require to give them

 6    dispute agreements as part of the initial disclosure.  We've

 7    had a claim for attorneys fees since the date the claim was

 8    filed.  They haven't asked for anything.  They haven't

 9    complained about any failure to provide anything about initial

10    disclosure.  Nothing, silence from Ford.

11              THE COURT:  I don't want to reveal your trial

12    strategy but is the plan to ask the jury to give you a

13    percentage of what they awarded just now and then to put up

14    evidence of time in the case to show in hourly rates to show

15    that that contingency fee is within the range of

16    reasonableness.

17              MR. LOWREY:  It's not just put up documents showing

18    that, it is just to offer testimony of --

19              THE COURT:  I understand that.

20              MR. LOWREY:  Right.

21              THE COURT:  You don't have billing records because

22    you don't operate that way.  Somebody is going to give an

23    estimate as to how many hours was spent on the case?

24              MR. LOWREY:  That's right.

25              THE COURT:  That needs to be disclosed to them
```

1    before tomorrow and they need to be able to question who ever

2    is going to state in their place that information.

3            MR. LOWREY:  Okay.

4            MR. PEELER:  That doesn't cure it, respectfully,

5    Your Honor, not only is a tremendous amount of information,

6    it's, we don't have an opportunity now to go out and get

7    another lawyer who could rebut it, there was not one witness

8    ever listed.

9            THE COURT:  This is a little unusual, I guess, but

10   how would they or you know the amount of the claim until the

11   jury comes back with its verdict in Phase 1, nobody knows what

12   they are claiming as far as amount goes until the jury comes

13   back and they apply their contingency fee percentage to what

14   they jury awarded.  So this is really the earliest opportunity

15   that anybody can do any reasonable investigation or discovery

16   on the amount they seek, if in fact attorneys fees are

17   recoverable based on contingency fee percentage which they

18   are.  For example if this jury comes back with $100,000, the

19   amount they would be seeking I guess would be 40-or-50-percent

20   of $100,000.  But now it's a different figure, so it would

21   have done you no good to depose them on whether

22   50-or-40-percent of $100,000 is reasonable, or whether

23   40-or-50-percent of 30-million is reasonable, because we

24   didn't know until an hour ago what it was going to be.

25            I'm going to do this, I'm going to require whoever's

```
 1   going to be stating this evidence in front of the jury
 2   tomorrow, as the lawyer whose going to be providing the
 3   testimony, if you want to depose him under oath you can do
 4   that.  But they need to know before tomorrow what the claim is
 5   and the basis all the basis for it, so if they want to conduct
 6   a cross examination tomorrow they'll be able to do that.  I
 7   just don't -- you all are all capable lawyers I think this is
 8   not something so complicated that you can't find this
 9   information out now.
10            And the more as I've thought through this sitting
11   here on the bench, now is it's just become ripe really,
12   because only now can they say what they're seeking.
13            I'm going let it go on that basis and let the jury
14   decide and then you can make posttrial motions with briefs as
15   to why that should be stricken from whatever finding the jury
16   makes.
17            MR. PEELER:  So in addition to -- without waiving
18   our objection -- in addition to telling us who the witness is
19   can we get what is required under Rule 26, which is all
20   documents or other evidentiary material upon which each
21   computation of damages is based including materials bearing on
22   the nature and extent of the Plaintiff --
23            THE COURT:  They say there are none, as I understand
24   it.
25            MR. PEELER:  I think you said that, I didn't hear
```

1    them say that.

2         THE COURT:  I thought I heard him say that he was

3    just going to -- somebody is going to testify to their

4    estimate as to the number of hours.

5         MR. PEELER:  There's no billing records from anyone,

6    I don't know?

7         MR. BUTLER:  Mr. Peeler knows the answer to his own

8    question.  We don't keep billing records --

9         THE COURT:  When I leave, you're going to talk to

10   them and they are going to tell you what it's all based on and

11   if they are basing it on any documents they are going to

12   produce it this evening and if you want to sit him down and

13   depose him, than I'm going to either let my court reporter,

14   over here, take down that testimony this evening or in the

15   morning before we start, if you want to do it under oath.

16         And then we will handle it that way.  And then I'm

17   going to let it go to the jury and then I'm going to reserve

18   judgment on whether it should be stricken on the basis of late

19   disclosure or failure to disclose.  All right.

20         MR. BUTLER:  Somebody needs to tell us when

21   Mr. Prather is going to be deposed, tonight, or in the

22   morning, either one is fine.

23         THE COURT:  Mr. Prather's the witness?

24         MR. PRATHER:  Yes, Your Honor.

25         THE COURT:  You get together with Mr. Peeler and you

```
 1   all figure it out.
 2            MR. BUTLER:  Captain Drammeh may prefer in the
 3   morning, but --
 4            THE COURT:  Perhaps, would you rather do this in the
 5   morning at 8:00?
 6            COURT REPORTER:  Yes, Your Honor.
 7            THE COURT:  Okay, she's not really excited.  I mean
 8   you all probably got court reporters that would come and do it
 9   in a minute, tonight.
10            MR. PEELER:  I need a little time to get my thoughts
11   together on it.
12            THE COURT:  You want to do it in the morning.
13            MR. PEELER:  Yes.
14            THE COURT:  Do you think you want to depose him or
15   you just want to interview him?
16            MR. PEELER:  Respectfully, Your Honor, in any other
17   case to bring a claim and not identify a witness or provide
18   any documents in support of that until after Phase 1, then it
19   would be highly unlikely that claim would be allowed to move
20   forward but understanding that you have ruled, then we need to
21   huddle up and decide.  We do have to be able to test the work
22   that they did, the effort that they expended, all of those
23   things that are in the lodestar analysis, it is very factual
24   detail and it is required as a part of the claimant to prove
25   their claim.
```

```
 1              THE COURT:  Okay, you think you can depose him in an

 2    hour?

 3              Are you going to have any documents supporting the

 4    testimony.

 5              MR. PEELER:  Any billing records at all from any

 6    firm?

 7              MR. LOWREY:  The basis for our fee request won't be

 8    anything that I have done or anything -- done.

 9              MR. PEELER:  That's the problem all of that, in

10    order to test whether it's reasonable contingency fee the

11    defendant is allowed to look at the work that was done --

12              THE COURT:  Where going to get out of here just a

13    minute.  But let me just ask you Mr. Peeler, when their fee is

14    based on what a jury returns in Phase 1, the only way this can

15    be done is in the gap between Phase 1, and Phase 2, so the

16    question is the length of the gap, do you want me to tell this

17    jury to come back Monday on punitive damages so you can do

18    this discovery on Friday or do you think that you will be able

19    to do it between now at 9:00 a.m.

20              MR. PEELER:  I don't know because I don't even know

21    what exists, Your Honor.

22              THE COURT:  That's going to be the issue on appeal I

23    think is the length of the gap that the Court gave them to

24    discover the evidence.

25              MR. BUTLER:  We told them they exist, Your Honor,
```

1  there are no billing records.

2          MR. PEELER:  I think Mr. Lowrey and perhaps Ms.

3  Moore had billing records.

4          MR. LOWREY:  We're not gonna justify 40 percent

5  contingency based on anything she has done, based on anything

6  that I have done or anyone in my firm has done.

7          THE COURT:  You need to produce any documentary

8  evidence that is relevant to what ever the testimony is going

9  to be on the amount of attorneys fees.

10          MR. LOWREY:  Understood, Your Honor.

11          THE COURT:  And that needs to be produced within the

12  hour.

13          MR. PEELER:  Does that include any billing records

14  of any person on the trial team that exists, because we are

15  entitled to look at that, that goes straight to the lodestar.

16          MR. LOWREY:  That's baffling.  We are willing to

17  forgo anything I've done, anything Ray's done --

18          THE COURT:  They're not seeking fees for any time

19  they've put into the case.  They're not seeking to -- they are

20  not seeking to -- they are gonna put up there contingency fee

21  and they are going to have to show the jury that that's

22  reasonable based in part upon time put in the case.

23          They are taking hours out of the case, as I

24  understand it, to prove that, because they're not going to put

25  in the time of Mr. Lowery, or Ms. Moore, they are just going

```
 1    to put in the I guess the Butler crowd.  So that's to your
 2    benefit, I don't see how you're prejudice by that.
 3              MR. PEELER:  Perhaps.
 4              THE COURT:  Okay, we are not going to get bogged --
 5    I think everybody has got -- I think you will have plenty of
 6    time to find out the basis of their claim to conduct a
 7    thorough and sifting cross-examination, and if after I hear it
 8    tomorrow and determine otherwise, then their attorneys fees
 9    claim may be subject to modification.
10              MR. BUTLER:  8:00 in the morning, Your Honor?
11              THE COURT:  8:00 in the morning, yes, for the
12    deposition and you can just do it in my conference room.  The
13    CSOs need to know people are going to be coming in here before
14    8:00.
15              MR. PEELER:  Your Honor, I'm just going to talk to
16    Mr. Prather and then is there an e-mail we can decide if we
17    don't need the deposition, because I don't want to some --
18              THE COURT:  Yes, get it to Mr. Gunn, and he'll get
19    it to Ms. Drammeh.
20              Anything else anybody else wants to put on the
21    record before tomorrow morning at 9:00.
22              MR. BUTLER:  Thank you, Judge.
23              THE COURT:  See you in the morning.
24
25
```

1                    (Proceedings concluded.)

2                       END OF RECORD

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2

 3                    I, Joan Drammeh, Federal Official Court

 4    Reporter, in and for the United States District Court for the

 5    Middle District of Georgia, do hereby certify that pursuant to

 6    Section 753, Title 28, United States Code, that the foregoing

 7    is a true and correct transcript of the stenographically

 8    reported proceedings held in the above-entitled matter and

 9    that the transcript page format is in conformance with the

10    regulations of the Judicial Conference of the United States.

11

12

13    Dated this 21st day of MARCH, 2025

14

15

16    _____

17

18    JOAN DRAMMEH, CVR, CCR

19    FEDERAL OFFICIAL COURT REPORTER

20

21    MY COMMISSION EXPIRES:
22    APRIL 1, 2026

23

24

25
```



COURT REPORTER: [1] 154/6
COURT SECURITY OFFICER: [4] 3/3
75/14 123/1 124/6
FOREPERSON: [2] 125/3 125/5
JUROR: [1] 125/7
JURY CHARGE: [1] 88/2
MR. BOORMAN: [4] 3/19 3/25 4/11
4/18
MR. BUTLER: [21] 3/8 5/11 6/13
29/17 75/3 75/17 75/24 120/17 123/6
123/20 124/18 127/10 149/10 149/13
150/2 153/7 153/20 154/2 155/25
157/10 157/22
MR. EADY: [44] 129/3 129/11 129/23
130/13 130/24 131/6 131/11 132/5
132/8 132/15 132/18 132/22 133/23
134/10 135/3 135/7 135/24 136/4
137/5 138/4 138/9 138/12 138/16
138/18 138/24 139/6 139/21 140/8
140/12 140/17 141/12 142/5 142/10
142/18 142/23 143/4 143/10 143/12
143/24 144/3 145/3 145/23 146/3
146/12
MR. LOWREY: [30] 4/20 122/10
128/21 133/10 133/24 134/1 136/12
136/24 137/16 137/24 139/2 141/1
141/8 146/8 147/4 147/20 148/12
148/19 149/3 149/7 149/11 149/14
150/17 150/20 150/24 151/3 155/7
156/4 156/10 156/16
MR. MALEK: [2] 120/12 122/4
MR. MELTON: [20] 118/24 119/1
120/6 120/13 120/19 120/21 120/23
121/2 121/4 122/6 122/12 123/10
128/24 130/1 130/3 137/8 138/20
146/15 146/22 147/12
MR. PEELER: [16] 148/1 149/17
151/4 152/17 152/25 153/5 154/10
154/13 154/16 155/5 155/9 155/20
156/2 156/13 157/3 157/15
MR. PRATHER: [1] 153/24
MS. WRIGHT: [7] 3/10 35/11 123/4
123/9 123/22 124/20 127/11
THE COURT: [133] 3/6 3/9 3/11 3/21
4/7 4/15 5/5 5/13 29/16 35/7 74/25
75/5 75/15 75/19 118/25 119/2 120/11
120/20 120/22 121/1 121/3 121/5
122/2 122/5 122/7 122/11 122/13
123/2 123/5 123/7 123/12 123/21
123/23 124/8 124/19 124/21 124/25
125/4 125/6 125/8 127/12 128/11
128/23 129/2 129/10 129/22 129/25
130/2 130/4 130/16 131/5 131/7
131/13 132/6 132/10 132/12 132/20
133/4 133/19 133/25 134/3 134/19
135/6 135/11 136/2 136/5 136/20
137/4 137/6 137/14 137/17 138/2
138/6 138/11 138/14 138/17 138/19
138/22 139/8 139/24 140/10 140/13
140/19 141/4 141/10 141/24 142/7
142/17 142/21 143/2 143/5 143/11
143/17 144/1 144/12 145/11 145/25
146/6 146/10 146/14 146/21 147/1
147/17 147/22 148/14 148/25 149/4
149/8 149/16 150/11 150/19 150/21
150/25 151/9 152/23 153/2 153/9
153/23 153/25 154/4 154/7 154/12
154/14 155/1 155/12 155/22 156/7
156/11 156/18 157/4 157/11 157/18

**$**

$10 [1] 126/11
$10 million [1] 126/11
$100,000 [3] 151/18 151/20 151/22
$12,352.80 [1] 125/18
$12,599.90 [1] 126/5
$15 [1] 125/25
$15-million-dollars [1] 125/25
$150 [1] 14/7
$2.5 [1] 30/18
$2.5 million [1] 30/18
$20 [2] 33/16 33/18
$20 million [2] 33/16 33/18
$5 [1] 126/6
$5 million [1] 126/6
$500,000 [1] 125/19
$520 [1] 10/5
$520 million [1] 10/5
$6 [1] 73/6
$6-9 [1] 73/6
$9 [1] 31/15
$9 million [1] 31/15

**.**

.06 [2] 61/21 70/5
.06 percent [1] 61/21

**0**

00088 [1] 125/13
08:34:37 [2] 75/12 124/4
08:40:26 [1] 3/1

**1**

1.1 [3] 11/14 11/21 12/10
1.2 [1] 65/3
1.21 [1] 11/14
1.23 [1] 11/21
1.25 [1] 11/14
1.3 [1] 11/15
1.35 [1] 67/17
1.5 [1] 19/8
10 [3] 27/24 28/1 97/8
100 [2] 10/4 116/14
100-percent [2] 116/15 116/16
101 [1] 55/23
105 [2] 1/18 1/20
105TH [1] 1/13
108 [1] 55/23
10:30 [1] 19/6
11 [5] 41/16 41/17 84/17 84/17 97/9
1130 [1] 2/4
1199 [1] 1/16
11th [1] 136/10
12 [5] 1/15 97/10 117/12 117/14 128/3
120 [1] 13/2
127 [1] 1/25
12:43:11 [1] 122/23
12th [1] 13/2
13 [9] 1/5 3/1 13/10 75/12 97/12
122/23 124/3 124/4 124/24
13.02 [1] 19/5
133 [1] 8/14
135 percent [1] 12/1
13:04:19 [1] 124/3
13TH [4] 1/13 1/18 1/20 127/5
15 [5] 65/23 65/25 75/8 75/16 77/17
15 percent [3] 27/24 28/1 126/19
16 [1] 63/20

163 pounds [1] 16/3
17 [3] 8/9 56/25 58/5
175 [1] 11/18
18 [2] 12/18 78/5
181 [2] 9/19 9/21
189 [1] 17/18
18:38:42 [1] 124/24
1949 [2] 33/13 33/14
1979 [1] 79/9
1989 [1] 79/12
1992 [1] 8/11
1996 [1] 10/14
1999 [3] 8/13 17/24 35/1

**2**

2 percent [2] 61/20 63/2
2-A [1] 120/6
2.35 [2] 65/4 65/6
2.4 [3] 65/4 65/4 65/6
2.97 [1] 12/10
2.971 [1] 12/10
20 [4] 12/22 12/22 55/14 75/16
200 [2] 2/8 37/5
200 feet [1] 40/7
2002 [2] 79/15 79/18
2004 [1] 13/21
2005 [1] 8/17
2009 [7] 9/2 24/14 24/19 68/2 68/10
78/15 82/23
2010 [1] 24/4
2015 [22] 8/24 9/4 11/24 11/25 12/2
12/12 23/7 23/11 23/24 67/14 68/2
82/25 83/3 92/14 95/5 95/25 96/2 99/4
102/19 104/20 105/23 106/21
2016 [1] 64/6
2017 [3] 14/7 14/8 23/12
2022 [5] 13/21 29/11 35/15 78/9 78/11
2025 [10] 1/5 3/1 12/17 75/12 122/23
124/3 124/4 124/24 127/5 159/13
216 [5] 64/3 64/14 67/20 78/13 78/19
21st [2] 130/22 159/13
21st of [1] 129/6
2320 [1] 2/10
24 [3] 75/17 75/19 75/25
25 [3] 71/10 74/17 75/15
250 [12] 92/14 93/13 94/3 95/5 95/25
96/2 99/4 102/19 104/20 105/23
106/21 140/1
255 [2] 23/10 78/18
26 [6] 17/12 27/17 31/12 60/9 149/19
152/19
28 [2] 32/15 159/6
280 [1] 2/8
2801 [1] 2/6

**3**

3 degrees [2] 37/22 38/11
3 million [1] 78/8
3 percent [1] 61/20
3-point-something [1] 78/6
3.5 [1] 24/5
3.7 miles [1] 84/20
30 [1] 132/17
30,000 pounds [1] 64/19
30-million [1] 151/23
300 [1] 2/9
3000 [2] 1/23 2/2
30308 [3] 1/24 2/3 2/11
30309 [1] 2/5
30324 [1] 1/15

**3**

319 [5]  129/13 131/2 132/14 136/1
140/11
31901 [2]  1/13 1/18
31902 [2]  1/16 1/20
3291 [1]  2/8
345 [1]  55/23
35 [1]  27/23
35-degree [1]  39/7
350s [2]  9/9 9/11
35243 [1]  2/9
357 [2]  28/17 28/22
3900 [1]  1/25
396 grams [1]  55/21
396-gram [1]  50/9

**4**

4.0 [3]  24/3 67/13 67/13
4.5 [1]  12/9
40 [5]  131/3 131/3 132/17 132/17
132/17
40 percent [1]  156/4
40-or-50-percent [2]  151/19 151/23
40-years [1]  22/4
402-A [1]  134/14
41 [5]  34/5 131/3 131/9 138/5 140/18
41-through-45 [1]  129/14
42 [2]  131/3 140/18
43 [2]  131/4 140/18
44 [6]  131/6 132/19 132/20 132/20
136/1 136/7
44114 [1]  2/1
45 [2]  129/14 140/18
450s [2]  9/9 9/12
47.12A [1]  17/6
48 [2]  8/5 130/21
4:23-CV-00088 [1]  125/13
4:23-CV-00088-CDL [1]  1/4

**5**

5 inches [1]  48/20
5'1 [2]  16/3 50/9
5-foot-one [2]  42/22 44/9
5.2 million [3]  8/8 12/19 78/6
5.585 [1]  83/3
5.85 [3]  12/13 23/7 23/23
50 [9]  8/10 10/4 17/19 28/2 34/5 37/12
67/5 82/19 83/25
50 miles [1]  56/22 68/13
50 percent [2]  7/14 7/16
50-or-40-percent [1]  151/22
58 [1]  85/3
58 degrees [2]  38/5 85/7
58-degree [1]  19/10

**6**

6,000 pounds [1]  64/6
60 [1]  63/21
60 degrees [1]  37/23
600 [3]  1/23 2/2 2/10
62 [1]  130/22
63 degrees [1]  38/6
64 [4]  41/16 56/23 84/17 86/2
66.74 [1]  141/18
66.771 [5]  129/19 130/13 132/23
135/21 136/3
66.772 [2]  130/14 138/16

**7**

70 percent [1]  12/3 67/15

**74** [3]  26/3 35/23 86/2
738th [1]  116/6
78746 [1]  2/6

**8**

80 feet [2]  37/9 40/8
81 [1]  23/13
84 [1]  17/3
85 [1]  28/3
85 percent [1]  126/18
867A [1]  25/5
8:00 [4]  154/5 157/10 157/11 157/14

**9**

90 percent [1]  28/3
90th [1]  50/10
911 [4]  16/8 30/14 42/1 82/7
97 percent [1]  61/17
98 percent [1]  62/21
999 [1]  2/4
9:00 [2]  127/24 157/21
9:00 a.m [2]  128/9 155/19

**A**

a.m [3]  127/25 128/9 155/19
abdomen [1]  46/3
ability [3]  91/4 96/24 97/2
able [20]  5/20 5/21 6/7 42/7 54/16 56/4
64/6 66/12 68/21 79/24 86/18 117/23
118/1 118/5 127/18 139/14 151/1
152/6 154/21 155/18
about [188]
above [7]  15/25 16/23 39/22 80/18
80/19 80/22 159/8
above-entitled [1]  159/8
absence [1]  106/1 139/10 149/7
absolutely [7]  15/5 47/15 48/8 59/11
59/18 59/20 60/22
accept [6]  25/16 46/15 90/12 92/4
102/5 102/23
access [2]  13/6 13/10
accident [14]  36/25 38/17 40/12 40/22
55/25 56/6 56/8 61/21 66/2 70/4 70/5
73/1 73/1 74/6
accidents [4]  57/8 73/9 138/25 139/1
accomplish [1]  143/5
accumulated [1]  4/24
accurate [5]  47/25 49/11 49/24 90/13
147/23
accurately [2]  48/5 91/4
accusation [1]  26/8
accusing [1]  26/20
acid [1]  24/13
acronym [2]  22/10 22/11
across [6]  15/15 16/17 17/25 20/15
42/10 104/10
act [4]  89/8 98/18 99/11 112/14
acted [6]  69/14 69/22 73/15 96/13
110/10 139/9
acting [1]  110/13
action [4]  144/16 145/4
actions [5]  71/18 108/24 109/3 144/18
146/3
acts [2]  89/10 106/6
actual [9]  23/4 25/21 45/14 54/3 90/5
98/2 103/2 133/15 147/13
actually [16]  36/5 37/17 40/14 41/21
41/22 42/2 49/6 60/13 62/1 62/2 63/15
63/20 65/2 68/17 68/24 118/19
add [4]  49/21 116/14 116/16 141/2

added [1]  134/20
adding [1]  63/9
addition [5]  65/13 106/12 147/13
152/17 152/18
additional [3]  108/18 124/15 129/16
address [4]  128/18 130/8 131/20
135/13
addressed [1]  60/16
adjusted [4]  136/23 136/24 140/4
142/9
adjustments [1]  131/20
admit [6]  16/25 27/21 28/5 52/20 81/15
82/15
admits [3]  52/18 66/1 77/24
admitted [18]  6/4 11/2 22/21 24/11
25/4 38/10 53/23 54/20 56/11 59/23
64/12 84/4 84/7 89/14 89/16 117/21
118/13 118/19
adopt [2]  67/21 147/10
advance [1]  68/19
advantage [2]  7/9 112/2
adverse [1]  98/11
advice [1]  103/23
advise [1]  131/24
advocate [1]  148/22
aerial [1]  20/14
aesthetic [1]  97/6
affect [1]  89/5
affidavit [2]  43/1 43/3
affidavits [1]  51/12
affirmative [6]  105/1 105/4 105/11
105/19 115/17 121/14
afraid [1]  26/16
after [31]  5/23 10/10 10/13 10/24 17/25
17/25 17/25 30/10 34/13 35/20 39/22
40/22 41/12 42/1 56/12 60/15 71/11
72/4 74/10 102/19 107/16 109/24
111/15 112/23 117/14 127/24 128/7
129/5 130/13 154/18 157/7
afternoon [1]  128/15
afterwards [1]  54/15
again [21]  6/14 7/11 16/8 20/13 22/8
25/13 51/18 52/4 54/14 55/18 57/18
57/19 59/4 59/7 59/22 61/15 66/4
76/13 78/17 87/23 109/25
against [22]  26/8 36/23 62/15 62/19
66/23 67/5 88/24 95/3 96/12 100/23
104/23 104/25 113/18 114/6 114/17
115/7 117/1 125/17 125/23 126/4
126/10 126/22
age [6]  56/24 104/2 104/10 104/11
104/12 104/15
agency [2]  79/6 83/10
ages [2]  33/12 86/1
aggravating [1]  108/17
ago [4]  49/1 49/23 72/13 151/24
agonal [1]  54/13
agree [12]  30/11 35/14 89/1 111/10
112/23 117/15 137/24 140/15 140/23
143/10 147/6 147/12
agreed [2]  102/4 117/12
agreement [3]  14/2 111/17 148/5
agreements [1]  150/6
agrees [4]  61/17 62/25 72/13 72/22
ahead [1]  12/6
aid [1]  112/5
ain't [5]  8/1 28/6 28/13 33/1 87/6
air [4]  20/12 73/3 85/15 85/18
airbags [4]  72/25 79/14 79/18 139/16
airborne [2]  37/9 40/8 74/5

airplane [1] 69/9
airway [1] 52/2
AIS2 [1] 27/25
AIS3 [1] 27/25
al [3] 1/4 2/8 125/12
all [163]
alleged [6] 93/11 96/7 96/9 110/11 139/25 145/16
allegedly [3] 102/21 139/7 139/22
alliance [1] 72/12
ALLISON [2] 1/13 1/14
allocate [1] 116/8
allocation [4] 76/5 115/15 126/13 126/17
allow [2] 51/24 137/1
allowed [5] 5/16 92/2 134/12 154/19 155/11
almost [9] 12/10 12/22 16/12 40/22 77/24 78/14 78/20 111/3 140/20
alone [3] 34/4 110/14 141/21
along [3] 117/16 120/15 121/2
already [9] 10/15 10/25 29/16 50/20 65/5 70/4 94/6 100/11 142/12
also [38] 20/10 21/5 24/2 32/22 45/2 46/9 50/6 50/12 54/10 56/6 56/8 57/24 58/15 58/24 71/1 71/8 86/21 89/18 91/10 93/15 98/14 102/16 103/18 103/25 104/3 104/6 104/21 105/14 110/4 110/6 112/24 117/15 117/17 117/20 118/3 135/25 147/14 148/6
alter [1] 39/21
altered [1] 16/11
alternative [12] 97/10 97/19 97/24 98/1 98/3 98/6 98/8 98/12 105/8 128/25 129/14 145/7
although [5] 34/22 50/13 95/18 98/22 127/25
always [5] 18/9 26/20 32/8 32/19 57/18
am [17] 8/2 18/8 34/16 61/15 64/12 70/13 74/19 74/22 88/12 112/17 112/18 117/15 120/4 133/7 137/21 139/3 140/23
amazing [1] 13/16
amenable [1] 141/7
America [2] 18/1 82/21
American [1] 78/2
among [3] 11/23 128/2 147/4
amount [37] 5/7 29/22 30/1 30/18 31/7 31/14 33/4 33/7 33/16 33/18 34/20 54/13 65/21 87/1 94/18 102/4 102/5 103/12 107/9 107/12 109/23 109/25 110/14 110/24 111/1 114/10 117/3 127/22 127/22 137/19 148/4 151/5 151/10 151/12 151/16 151/19 156/9
amounted [1] 82/12
amounts [2] 87/2 109/7
analogy [1] 58/19
analysis [10] 10/8 10/10 10/10 10/14 45/15 51/16 54/10 72/5 147/11 154/23
analyze [2] 84/5 84/9
analyzed [1] 53/23
angle [1] 39/7
angry [1] 27/4
animals [1] 44/12
animation [1] 40/5
animations [1] 54/4
annuity [3] 33/11 33/13 104/8
another [15] 4/4 4/18 17/16 21/19 21/22 44/22 49/5 78/13 86/18 99/19

101/3 104/6 11/16 127/18 151/7
answer [35] 11/8/9 18/10 25/3 39/8 53/6 54/9 57/9 73/19 73/23 73/23 74/7 79/19 83/14 91/7 106/19 109/20 109/22 110/21 110/22 115/19 115/24 115/25 116/5 117/2 117/6 117/10 119/8 119/8 119/10 126/17 126/23 127/3 135/13 139/13 153/7
answered [2] 115/23 122/18
answering [2] 40/15 121/11
answers [1] 83/17
Anthony [2] 44/14 82/8
any [119] 4/2 4/15 5/2 6/3 22/17 23/2 26/6 28/7 31/12 33/4 33/7 36/24 37/14 41/5 47/10 48/10 49/8 50/24 52/11 57/5 57/6 57/22 60/4 62/10 64/10 67/1 68/11 77/8 77/11 79/4 79/5 83/23 88/24 89/3 89/5 89/19 89/19 90/16 90/19 92/5 94/20 95/1 95/12 97/4 97/24 98/11 102/16 103/3 104/2 104/12 104/21 105/13 106/22 107/8 107/17 107/22 108/8 108/9 108/15 111/1 111/5 112/6 112/10 113/19 115/14 115/20 115/22 115/23 116/2 116/3 116/4 116/18 117/2 117/6 119/3 122/7 123/21 124/17 126/14 126/15 126/16 127/7 127/9 128/4 128/5 128/6 133/13 133/16 134/24 137/6 137/9 137/25 138/7 140/2 141/11 142/3 144/9 145/12 145/13 148/3 148/4 148/6 148/8 148/10 149/21 150/1 150/4 150/9 151/15 153/11 154/16 154/18 155/3 155/5 155/5 156/7 156/13 156/14 156/18
anybody [17] 11/5 13/20 18/2 66/2 77/11 151/15 157/20
anybody's [1] 77/10
anymore [2] 60/19 76/21
anyone [7] 54/7 64/14 88/25 111/13 128/1 153/5 156/6
anything [31] 6/1 8/4 14/20 14/25 18/13 22/17 43/21 50/22 60/13 68/18 70/23 73/15 77/22 89/16 89/18 89/21 120/25 128/22 141/2 146/11 149/20 149/21 150/8 150/9 155/8 155/8 156/5 156/5 156/17 156/17 157/20
anyway [1] 79/9
anywhere [1] 43/22
apologies [1] 120/6
apparently [5] 55/25 83/8 120/4 121/6 130/20
appeal [3] 130/18 135/16 155/22
appear [3] 91/6 117/24 148/10
appearance [2] 97/6 98/9
APPEARANCES [1] 1/11
appears [3] 125/10 127/6 128/5
applicable [1] 136/5
applied [4] 66/8 130/7 134/5 141/25
applies [2] 95/9 144/2
apply [5] 5/24 64/3 88/8 143/19 151/13
appreciate [7] 35/12 58/25 58/25 74/14 75/6 88/5 88/17
approach [1] 118/24
appropriate [1] 71/17
Approved [1] 23/18
April [1] 10/13
are [168]
area [5] 39/10 39/20 48/14 58/16 59/2
areas [1] 47/19

aren't [4] 40/16 55/15 66/12 118/13
argues [1] 25/23
arguing [1] 83/8
argument [26] 5/19 5/20 6/7 6/11 6/12 14/20 20/22 21/9 24/6 24/9 28/14 28/25 34/2 35/10 41/15 75/9 75/22 75/23 77/17 78/3 82/2 82/12 127/18 139/15 139/16 143/25
arguments [1] 5/17
arm [3] 26/9 26/18 46/5
around [5] 9/13 76/2 76/15 82/21 129/6
arrived [1] 40/22
arrives [1] 41/25
arriving [2] 89/22 103/15
arrows [1] 47/15
art [2] 11/23 12/4
arteries [2] 51/5 55/15
article [3] 23/17 23/25 64/2
as [167]
aside [2] 74/19 74/20
ask [34] 10/24 21/11 29/18 29/20 29/21 30/17 31/13 32/5 33/8 33/15 33/18 34/16 34/18 36/18 44/8 73/22 74/19 74/22 76/5 79/10 79/11 79/17 86/24 87/12 87/21 90/20 91/10 91/12 119/9 119/18 147/20 148/7 150/12 155/13
asked [13] 14/19 14/25 42/9 42/12 48/1 52/10 52/23 57/8 68/22 68/25 78/25 79/1 150/8
asking [4] 11/2 24/25 64/22 86/22
asks [3] 6/25 39/16 78/4
asphyxia [9] 50/24 51/15 51/15 51/19 51/21 54/11 84/4 84/6 84/10
assemble [1] 119/13
assert [1] 96/6
asserted [3] 101/17 103/4 108/13
asserting [6] 100/16 100/20 107/20 107/21 107/25 113/5
asserts [2] 90/5 115/17
asses [1] 16/14
assign [2] 107/8 107/14
assume [7] 18/13 18/14 18/14 18/14 18/15 89/18 135/5
assuming [1] 122/13
assumption [1] 18/11
astonished [1] 140/2
at [133] 5/16 8/6 8/6 11/16 13/7 14/11 14/17 14/23 15/18 17/4 17/7 19/5 20/22 21/2 21/3 21/6 21/7 21/15 23/2 25/17 26/9 27/8 27/16 27/16 27/23 28/6 28/22 33/12 38/20 38/24 39/7 39/8 39/11 39/25 40/5 42/22 43/23 44/23 45/7 46/14 47/19 48/24 48/25 49/7 50/16 51/6 51/17 51/19 51/21 51/25 52/4 52/15 52/15 53/5 54/6 54/12 54/15 55/6 55/21 55/21 56/22 57/9 58/1 59/11 60/1 60/17 62/12 62/20 64/3 64/5 64/11 64/13 65/8 65/11 65/20 65/23 66/20 68/13 69/19 71/2 71/5 71/24 74/20 75/15 75/16 76/1 76/23 77/22 78/10 78/19 81/9 81/16 82/5 85/6 89/22 91/12 93/13 95/13 97/24 98/4 102/24 103/15 103/20 109/20 110/20 112/17 116/9 119/2 122/16 127/7 127/24 128/8 128/9 129/10 131/9 131/20 132/14 132/14 132/16 132/20 133/7 136/16 140/19 141/5 143/6 145/7 146/18

## A

at... [6]  154/5 155/5 155/11 155/19 156/15 157/21
atherosclerotic [2]  50/2 50/4
ATLANTA [7]  1/15 1/24 2/2 2/5 2/10 12/25 14/6
attach [4]  4/4 4/13 4/16 4/18
attack [10]  14/21 15/6 20/21 20/23 21/9 21/22 22/4 22/9 22/19 22/23
attacked [4]  79/25 79/25 80/1 81/14
attacking [1]  27/5
attained [1]  103/20
attempt [1]  135/13
attempted [1]  9/17
attended [1]  42/3
attention [7]  6/9 24/16 35/3 85/1 88/5 88/16 119/13
attorney [4]  110/6 110/9 148/20 148/21
attorney's [5]  86/23 87/1 111/1 126/24 127/2
attorneys [11]  34/24 86/22 86/24 87/6 110/22 117/9 127/22 150/7 151/16 156/9 157/8
attractiveness [1]  97/6
August [5]  29/11 35/15 61/1 78/9 78/11
Augustin [1]  86/3
AUSTIN [1]  2/6
authority [2]  4/9 4/15
authorize [2]  23/25 109/7
authorized [5]  7/21 8/2 8/10 108/20 108/22
auto [1]  62/9
Autoliv [3]  67/25 68/9 68/10
automakers [3]  72/15 79/4 79/7
automobile [1]  72/12
automotive [3]  38/2 62/10 62/12
autopsies [11]  13/14 13/17 13/18 13/22 13/23 14/4 14/11 14/14 14/17 14/21 50/14
autopsy [12]  48/7 48/21 49/4 49/23 49/24 50/3 50/11 50/21 50/23 55/1 81/16 85/21
availability [1]  97/24
available [4]  88/13 96/25 97/10 112/4
average [2]  33/11 33/20
avoid [1]  96/24
avoidability [1]  96/20
avoidance [1]  73/2
awaiting [1]  122/21
award [28]  3/24 4/9 4/24 70/8 101/6 101/10 101/13 102/15 105/14 107/11 108/15 108/18 109/6 110/1 110/3 111/2 113/18 114/6 114/21 115/7 125/17 125/23 126/4 126/9 134/23 142/20 143/8 144/8
awarded [20]  4/1 70/16 101/4 108/20 109/21 110/22 115/14 115/22 116/3 116/12 116/19 116/21 116/22 116/23 117/1 117/5 126/16 126/22 150/13 151/14
awarding [1]  106/23
awards [2]  142/2 142/3
away [5]  32/21 35/21 42/15 54/11 62/22

## B

B-Pillar [2]  65/10 84/1
B-pillars [1]  64/25
B.S [1]  22/11
baby [1]  84/8

Baccouche [6]  23/15 23/25 63/25 64/2 64/11 64/15
back [48]  5/13 5/22 6/24 7/3 16/9 19/11 21/23 27/9 27/15 28/12 28/12 28/23 33/8 34/14 34/16 34/23 35/5 46/25 47/4 47/14 47/17 48/15 48/25 48/25 55/18 66/22 75/8 81/1 81/11 82/7 84/19 84/20 85/5 85/16 85/17 86/12 86/25 88/11 88/12 119/8 119/15 127/15 128/9 130/24 151/11 151/13 151/18 155/17
backed [1]  45/23
background [1]  36/23
backing [2]  57/2 57/2
backseat [2]  81/9 81/10
bad [22]  15/8 16/21 17/4 17/10 35/1 43/16 43/18 74/18 74/18 81/5 82/8 86/13 86/22 86/23 87/2 110/10 110/11 110/11 110/14 110/14 110/16 134/1
badgered [1]  36/15
badly [3]  16/11 16/12 76/22
baffling [1]  156/16
bags [1]  73/3
BAILEY [1]  1/13
Bainbridge [2]  84/19 84/20
bait [1]  22/24
balance [1]  96/11
balanced [1]  135/13
ball [2]  58/8 59/17
ball-size [1]  59/17
Balzer [1]  8/15
Bang [2]  68/15 68/16
barely [1]  67/18
Barthelemy [1]  10/16
baseball [2]  49/3 49/6
based [23]  18/6 39/7 50/22 88/22 101/11 101/14 107/16 108/3 108/4 108/10 114/9 132/25 133/1 135/9 140/20 142/25 151/17 152/21 153/10 155/14 156/5 156/5 156/22
basic [1]  34/25
Basically [1]  139/8
basing [1]  153/11
basis [11]  36/19 71/11 71/22 73/14 139/5 152/5 152/5 152/13 153/18 155/7 157/6
bass [4]  21/11 21/12 21/17 21/18
be [207]
beach [5]  6/23 6/24 7/1 7/5 33/3
bearing [2]  67/10 152/21
bears [3]  25/20 102/25 105/12
because [78]  5/9 9/20 11/11 11/17 13/7 17/14 18/21 22/14 24/24 25/21 25/23 26/19 32/24 40/2 41/16 42/4 43/10 45/1 45/23 46/8 46/14 46/21 48/11 51/7 53/7 54/23 56/1 56/23 57/2 57/16 58/24 60/5 61/8 61/12 61/13 65/2 66/20 67/12 68/11 71/14 71/23 73/20 74/21 76/7 76/21 81/5 81/12 81/19 81/25 83/5 84/11 85/7 86/7 91/20 92/15 95/12 95/17 103/1 111/20 111/21 118/21 119/7 119/18 127/15 131/7 132/3 132/13 135/4 137/1 143/15 144/7 150/21 151/23 152/12 155/20 156/14 156/24 157/17
become [3]  63/5 111/19 152/11
been [64]  6/3 7/20 8/4 12/25 14/7 15/5 19/14 25/6 32/15 34/6 35/23 36/15 38/7 40/18 41/16 41/16 43/7 46/9 46/12 52/3 52/15 52/22 63/11 63/22

[64/5 66/25 67/4 67/14 72/2 74/15 74/25 75/6 75/20 78/23 82/7 87/18 88/3 88/3 88/4 88/14 88/15 89/16 94/20 102/5 103/13 103/13 104/7 107/12 112/1 112/12 117/20 117/21 122/8 131/3 141/25 142/12 148/11 148/17 149/5 149/11 149/13 149/14 149/16 150/3
before [34]  1/9 3/11 6/1 6/21 6/21 7/12 8/18 21/12 25/22 55/25 56/6 56/8 56/9 60/23 69/3 74/18 75/25 76/12 76/16 80/25 89/6 89/13 101/23 103/2 113/21 119/15 119/20 128/12 149/5 151/1 152/4 153/15 157/13 157/21
beforehand [1]  55/23
beg [2]  21/24 80/15
begin [4]  5/25 88/20 122/15 145/8
beginning [8]  64/3 69/20 141/15 142/24 146/19 148/3 148/11 150/3
behalf [3]  3/18 5/20 7/22 29/20 35/10 93/8 93/17 93/20 101/17 108/13 113/8 113/9 113/12 114/16 126/1
being [17]  4/25 13/15 22/10 24/20 25/2 26/12 28/21 54/16 56/12 59/5 67/15 67/17 70/17 92/7 133/15 141/20 143/14
beings [1]  18/7
beliefs [1]  111/20
believable [1]  56/25
believe [41]  4/13 6/17 7/17 11/6 11/8 21/9 38/16 38/16 39/16 40/1 41/19 42/17 44/15 45/22 56/19 57/1 63/8 71/7 72/8 72/15 72/19 73/2 74/2 74/10 80/9 90/13 90/15 90/19 101/4 101/7 109/13 111/6 120/13 129/3 131/3 133/5 136/14 136/25 142/25 145/8 146/3
believes [3]  7/23 25/6 63/20
below [1]  54/20
belt [21]  26/11 26/12 26/18 27/9 28/9 28/9 46/5 46/6 46/8 46/10 46/15 46/16 47/2 47/3 48/9 48/17 58/6 58/14 58/23 59/15 61/10
belted [2]  59/14 62/21
bench [2]  120/5 152/11
benefit [2]  26/1 157/2
benefits [1]  96/12
bent [13]  15/12 16/1 16/2 16/4 16/11 27/16 27/17 28/21 30/3 30/15 51/14 81/2 81/5
berated [6]  43/5 43/12 46/13 80/2 80/2 80/3
beside [1]  113/24
best [6]  23/6 25/24 71/5 87/20 136/19 144/24
bestselling [1]  9/15
bet [1]  25/12
better [3]  7/14 13/20 34/7
between [15]  9/14 15/11 15/21 15/23 23/9 30/12 30/14 39/5 44/23 72/14 80/25 93/10 116/8 155/15 155/19
beyond [4]  41/21 109/18 135/8 143/20
bias [1]  92/9
big [7]  38/6 39/10 39/13 42/6 49/6 68/15 68/16
bigger [1]  58/7
biggest [1]  22/5
billing [7]  150/21 153/5 153/8 155/5 156/1 156/3 156/13
bills [2]  29/23 29/24

**B**

Biloxi [1]  33/3
binding [1]  89/17
biomechanic [3]  53/16 53/17 53/20
biomechanical [1]  53/11
biomechanics [3]  45/3 45/5 53/9
biomedical [1]  53/20
BIRMINGHAM [1]  2/8
birthday [1]  32/20
bit [8]  11/2 16/2 35/6 50/19 71/9
121/19 130/19 130/25
biting [1]  21/19
bits [1]  59/8
black [4]  84/22 84/23 85/14 85/16
blame [3]  61/4 61/5 76/6
blank [3]  113/21 114/7 115/8
blanks [3]  113/19 114/24 114/25
blocked [2]  52/3 55/15
blood [1]  47/19
blow [1]  76/23
BMW [2]  62/19 133/23
BMWs [1]  134/1
bobbed [1]  83/18
bodies [5]  13/16 54/6 54/8 81/21 81/22
body [2]  13/7 49/22
bogged [1]  157/4
BOORMAN [2]  2/4 3/12
both [20]  18/19 27/14 27/25 36/1 37/3
45/3 45/5 45/14 45/20 45/24 54/6
55/23 62/13 69/19 70/9 70/16 73/22
82/4 101/4 145/8
bother [1]  49/21
bothers [1]  60/20
bottom [3]  11/22 49/10 116/15
bought [1]  9/4
bounced [1]  20/12
bounces [1]  40/8
box [6]  1/16 21/14 84/22 84/23 85/14
85/16
boys [1]  70/22
brainstorming [1]  68/16
brake [3]  37/6 39/3 74/4
braked [2]  19/24 37/7 38/14
brakes [1]  37/7
break [9]  19/2 72/3 75/2 75/3 75/6 75/7
75/10 75/25 119/23
breaking [1]  19/2
breath [1]  21/13
breathing [3]  30/4 30/16 54/12
breaths [1]  54/13
BRENNAN [1]  1/13
Brian [12]  11/24 17/20 20/14 24/22
27/9 34/3 73/5 79/25 92/21 93/24
114/5 125/22
brief [4]  4/7 34/14 86/25 141/3
briefing [1]  129/5
briefly [1]  70/14
briefs [1]  152/14
bring [12]  5/6 24/15 75/20 79/22 92/16
93/1 93/4 93/22 93/24 119/13 124/25
154/17
bringing [2]  92/13 121/13
brings [4]  44/20 93/8 93/17 93/25
BROGDON [18]  1/4 92/18 92/20 92/21
93/7 93/11 93/15 93/23 93/24 113/17
114/4 114/5 114/20 125/12 125/16
125/21 125/22 126/3
broken [4]  4/12 16/15 47/5 61/7
brought [9]  36/1 41/24 45/3 62/8 71/14
92/17 92/19 93/20 113/12

bruise [2]  59/16 59/20
bruising [5]  46/3 48/9 48/10 48/12 49/3
Bruno [1]  10/16
Bryant [1]  84/22
Buchner [16]  20/14 37/3 37/24 37/25
38/12 38/19 39/6 39/15 40/1 40/3
52/13 53/21 53/22 60/11 69/5 84/23
building [4]  10/17 12/5 12/8 12/12
bunny [1]  20/13
bunny-hopped [1]  20/13
burden [18]  5/18 7/11 7/12 28/2 41/10
41/13 41/13 94/15 94/16 100/22
105/12 109/10 115/18 120/16 121/7
121/9 121/12 121/13
Bureau [1]  13/20
burial [2]  102/1 102/3
buried [1]  12/5
Burnett [6]  66/4 66/5 66/16 78/24 78/24
78/25
business [5]  8/25 72/10 83/20 133/20
133/25
busy [1]  32/19
but [154]  3/14 4/8 5/3 5/15 6/6 7/15
8/24 10/4 10/10 12/6 14/3 16/2 18/1
18/13 19/5 19/17 20/1 22/7 24/10
25/13 31/1 31/22 32/2 34/2 34/8 35/15
35/19 35/22 36/10 37/23 40/19 42/3
42/6 43/5 43/11 43/12 43/15 44/13
45/10 46/9 46/11 47/7 47/21 48/19
49/14 49/19 49/20 51/11 51/15 52/12
52/13 52/15 53/5 53/5 53/20 53/24
54/19 55/4 55/4 55/18 55/19 56/4 57/5
57/7 57/24 59/6 59/10 60/1 60/10 61/9
61/13 63/17 65/7 65/25 66/2 67/4
67/22 69/21 70/24 71/1 71/5 71/12
71/21 71/25 74/8 74/15 76/19 76/24
78/1 80/21 81/7 91/16 92/4 100/11
100/15 102/11 103/22 104/17 105/4
108/2 108/21 109/17 111/14 111/20
112/4 112/21 114/18 116/10 116/15
116/22 117/15 118/1 118/21 119/5
119/9 119/17 120/4 120/15 121/9
121/15 122/17 127/6 127/24 128/11
128/18 131/17 132/1 132/17 132/22
133/24 134/14 135/8 135/16 135/21
136/17 136/18 137/10 137/12 140/2
140/22 141/7 142/3 144/21 145/13
146/18 147/9 147/12 150/12 151/9
151/20 152/4 154/3 154/20 155/13
BUTLER [16]  1/20 3/7 6/10 43/15
61/13 63/16 63/25 70/13 71/9 73/17
74/16 74/25 75/21 136/9 140/1 157/1
Butler's [1]  139/14
BUTLERPRATHER.COM [4]  1/14 1/15
1/19 1/21
buy [1]  21/15

**C**

C-pillar [1]  65/10
cabin [1]  145/19
CAE [1]  10/8
calculation [2]  11/12 11/13
calculator [1]  33/20
calendar [1]  134/6
California [2]  22/16 34/4
call [15]  7/14 14/13 14/13 15/3 20/25
22/11 34/13 42/1 60/21 76/9 83/23
85/24 85/25 118/12 141/7
called [17]  16/7 18/10 18/20 22/4 33/10
33/13 68/15 71/18 71/80/5 80/6 88/21

94/15 94/22 105/11 106/16 108/19
138/18
calling [3]  9/19 60/15 65/1
calls [3]  30/14 66/25 80/8
cam [1]  19/15
Camacho [31]  22/16 44/21 44/24 45/1
45/5 46/14 46/16 46/23 47/23 48/4
48/14 48/20 48/24 49/7 51/10 52/3
52/4 52/17 53/8 53/24 57/14 57/24
58/9 59/3 59/4 59/7 60/16 61/7 69/6
84/3 84/4
Camacho's [1]  52/6
came [15]  7/18 10/13 12/20 12/21 22/6
22/22 27/11 41/21 42/1 57/4 58/23
61/9 68/18 69/3 79/21
Campbell [2]  137/13
can [77]  3/17 3/19 4/13 4/18 4/21
13/23 16/9 16/15 16/20 17/1 19/15
21/15 23/2 26/10 30/21 33/20 34/7
35/8 38/24 40/13 41/14 42/4 42/18
42/18 43/25 47/6 57/5 61/12 62/20
62/25 63/2 64/18 68/15 69/20 70/2
70/8 71/17 76/16 76/24 78/19 80/20
85/2 87/20 103/18 104/17 105/5
117/16 117/18 118/20 123/2 123/11
123/15 124/10 134/16 135/8 136/17
136/19 138/1 139/6 139/7 141/2
142/20 143/21 144/15 144/20 145/25
148/24 151/15 152/3 152/12 152/14
152/19 155/1 155/14 155/17 157/12
157/16
can't [20]  4/24 7/5 19/19 19/22 20/24
21/10 54/23 55/19 64/24 67/9 69/4
76/22 79/1 119/6 119/17 123/24
131/21 136/22 145/19 152/8
candid [1]  143/17
canning [1]  32/20
cannot [11]  3/13 3/16 4/10 4/16 26/19
70/24 76/18 92/16 103/22 119/8
134/15
canopy [6]  63/14 67/8 68/7 72/25 79/14
79/18
cap [2]  49/3 49/6
capable [1]  152/7
capacities [1]  93/22
Captain [1]  154/2
caption [1]  113/2
capture [2]  136/14 144/24
captured [2]  134/19 136/19
captures [1]  144/12
car [4]  13/1 39/17 43/9 53/12
cardia [1]  20/24
cardiac [15]  15/6 20/24 35/19 44/16
46/1 51/2 51/4 51/8 53/13 55/2 56/14
56/15 60/25 61/2 74/2
cardiologist [6]  22/3 22/5 55/3 55/4
55/14 56/1
cardiology [1]  22/5
cards [1]  40/4
care [12]  46/16 71/19 73/9 74/11 95/20
99/12 106/2 106/4 106/7 108/25 109/4
139/10
career [1]  62/11
careful [5]  6/8 106/2 106/8 106/10
106/12
cares [1]  77/13
caring [1]  32/20
Carolina [1]  13/24
carried [1]  100/22
cars [1]  134/2

**C**

Caruso [1]  9/23
case [110]  4/13 4/20 5/1 5/17 5/24 6/1
6/1 7/8 7/15 7/16 7/17 8/5 13/16 22/13
22/15 24/18 24/22 24/24 25/25 29/14
35/16 35/17 36/24 36/24 41/24 49/19
61/11 65/9 66/23 70/4 70/10 70/18
74/7 74/16 74/19 74/21 75/10 79/24
84/2 84/4 84/7 84/11 87/19 88/8 88/19
88/22 89/14 89/20 91/1 92/12 92/13
92/18 92/20 93/7 101/7 102/17 104/18
109/19 109/19 110/12 111/7 111/9
111/11 111/14 111/16 111/17 111/21
111/23 112/1 113/3 113/3 113/6 119/6
122/17 125/12 125/13 127/25 128/1
128/2 128/3 128/8 129/15 133/11
133/20 133/25 134/22 134/25 135/2
135/9 136/23 137/12 138/23 138/25
140/5 142/9 144/6 144/10 144/23
146/23 148/2 148/11 148/21 149/25
150/3 150/14 150/23 154/17 156/19
156/22 156/23
case-in-chief [1]  41/24
cases [7]  4/22 34/5 57/5 78/11 135/12
135/14 136/6
catastrophic [1]  53/12
catch [1]  21/18
catchall [3]  137/12 137/20 137/22
caught [3]  15/22 30/17 80/24
causal [3]  23/23 72/13 72/20
causation [6]  60/17 61/13 67/10 69/20
cause [49]  22/18 24/24 25/1 29/6
30/23 30/24 30/25 31/1 31/2 31/4
47/17 55/1 67/11 70/11 73/21 85/9
86/9 86/10 86/11 86/12 86/14 86/15
86/16 86/18 86/20 87/19 95/16 99/7
99/8 99/10 99/11 99/14 99/15 99/16
99/18 99/18 99/19 100/8 100/9 105/17
106/25 107/3 107/5 109/12 115/22
116/3 116/7 116/11 126/15
caused [44]  25/7 25/22 27/13 30/22
31/16 35/14 38/17 40/14 44/20 46/1
61/14 69/18 76/8 79/3 86/14 86/17
86/17 93/9 93/12 93/19 94/2 94/9 95/7
96/3 96/7 96/9 99/7 99/23 100/2 100/6
100/7 100/18 101/12 101/16 102/21
103/3 104/22 105/24 106/22 107/12
107/15 121/16 131/22 139/22
causing [5]  21/2 21/4 76/10 76/13
105/9
caution [6]  92/9 105/2 144/5 145/8
145/10 145/24
cautioned [2]  139/19 144/22
cautioning [1]  134/20
Cayden [1]  84/7
CCR [2]  2/14 159/18
CDL [1]  1/4
center [4]  1/25 42/14 53/13 85/17
centered [1]  85/16
certain [5]  33/12 106/13 133/20 134/5
142/2
certainly [2]  131/17 149/15
CERTIFICATE [1]  158/3
certify [1]  159/5
cervical [1]  60/7
chain [1]  90/7
chair [5]  8/2 71/3 79/23 81/19 82/1
challenge [2]  63/1 135/11
chance [3]  44/22 70/5 70/7
change [7]  27/22 46/19 46/21 65/6

11/18 128/22 147/22
changed [2]  67/20 71/4
changes [1]  50/4
characteristic [1]  84/10
characteristics [1]  84/5
charge [53]  10/16 21/1 25/14 30/20
31/18 34/24 35/2 76/11 76/14 84/16
84/16 86/10 86/22 86/23 122/7 128/17
129/7 129/9 129/10 131/18 131/24
132/2 132/3 132/8 132/21 133/1 133/8
133/9 133/24 134/20 135/2 135/13
135/15 135/21 135/22 136/3 137/17
138/7 140/4 140/6 140/19 140/21
140/24 141/14 142/3 144/14 144/15
144/25 146/8 146/16 146/17 146/18
146/19
charged [3]  25/18 133/18 136/21
charges [24]  128/21 129/12 129/22
130/7 130/11 130/12 130/17 130/21
131/8 131/9 131/10 131/14 131/15
131/19 132/7 132/12 132/12 135/18
137/7 137/10 137/11 138/15 140/9
140/16
charging [1]  133/8
CHARLES [1]  1/23
CHARLES.PEELER [1]  1/24
chart [3]  10/2 22/8 35/7
check [10]  29/20 29/21 48/2 48/3 86/24
113/24 114/13 115/2 115/8 115/12
checked [2]  59/6 113/21
chest [4]  52/2 55/13 56/9 56/10
Chevrolet [1]  12/1
Chick [1]  121/20
chief [3]  13/19 41/24 49/14
child [3]  84/8 115/6 126/9
children [6]  70/22 92/20 92/21 93/3
114/6 125/23
chin [1]  52/2
choice [1]  97/22
choices [2]  98/25 114/3
choose [3]  39/3 39/3 112/13
choosing [4]  69/14 69/22 95/21 96/14
chose [2]  14/4 68/25
Chris [2]  61/24 62/1
Chrysler [2]  62/17 67/15
circuit [1]  136/10
circumstances [10]  90/8 106/3 106/6
106/8 106/11 106/12 108/18 137/10
137/25 142/11
circumstantial [3]  90/3 90/7 90/10
citation [3]  132/13 132/20 132/22
cite [1]  136/7
citizens [1]  78/2
civic [2]  88/6 88/17
claim [83]  3/14 3/16 3/17 3/24 4/2 4/3
4/4 4/5 4/10 4/19 11/4 21/5 24/20 25/9
29/21 30/20 30/21 31/6 31/21 47/13
71/8 71/14 73/23 93/24 94/1 94/2
94/11 94/19 94/25 95/2 95/3 95/4
99/25 100/16 100/20 105/14 107/20
107/22 108/1 108/1 108/4 109/13
110/8 113/12 113/12 113/14 113/23
113/24 114/1 114/2 114/8 114/11
114/13 114/15 114/19 114/23 115/1
115/4 115/9 115/11 116/22 120/22
121/13 125/14 125/20 126/2 126/7
130/11 134/4 138/17 148/2 148/17
149/18 149/19 150/7 151/10
152/4 154/17 154/19 154/25 157/6
157/9

claimant [2]  150/3 154/24
claimants [1]  148/11
claimants [1]  117/7
claimed [2]  11/15 38/11
claiming [3]  22/22 83/20 151/12
claims [62]  5/18 7/23 11/5 21/3 21/5
29/13 29/20 38/12 48/21 62/14 67/12
92/16 92/17 92/19 93/1 93/4 93/8
93/17 93/20 93/22 94/4 94/8 94/14
95/22 96/6 96/8 99/21 100/4 100/4
100/7 100/13 100/14 100/15 100/15
100/23 101/11 101/14 101/17 103/4
103/6 104/23 105/4 108/12 108/12
108/13 108/15 108/16 110/3 113/5
113/7 113/9 114/16 115/14 116/19
116/20 116/23 116/24 117/6 120/7
121/17 125/14 126/1
clarify [1]  3/11
classic [2]  46/4 48/12
clavicle [2]  57/15 59/25
CLAY [1]  1/9
clear [19]  4/15 15/5 20/3 35/7 37/1
71/15 108/23 109/2 109/9 109/11
109/14 116/25 120/7 121/10 126/21
135/20 135/23 145/15 148/20
clearly [3]  39/9 91/7 120/9
CLEVELAND [1]  2/1
click [1]  117/24
climbed [1]  42/10
climbing [3]  43/14 51/20 81/9
clock [1]  75/19
close [5]  40/17 40/19 87/17 122/17
141/7
closely [1]  79/7
closest [1]  71/1
closing [14]  5/9 5/17 5/20 5/22 6/11
6/12 35/8 35/9 47/22 75/22 75/23
77/17 127/18 139/15
closings [1]  5/23
code [3]  27/8 27/9 159/6
codes [1]  10/9
Colby [6]  16/22 27/10 41/23 65/14 81/8
81/11
collapse [1]  17/19
collapsed [5]  16/5 17/8 17/10 17/18
17/20
colleagues [1]  141/3
COLUMBUS [7]  1/2 1/6 1/13 1/16 1/18
1/20 13/2
column [4]  51/25 54/24 104/10 104/11
coma [3]  65/23 65/25 145/10
combines [1]  99/19
come [33]  5/22 9/21 18/10 20/22 21/24
22/3 22/20 27/20 33/20 34/5 34/14
40/19 41/14 41/24 52/6 52/7 56/15
64/8 74/16 75/8 77/15 81/23 86/25
112/19 116/20 116/24 120/25 127/15
133/19 137/10 139/14 154/8 155/17
comes [10]  9/22 11/21 47/2 55/18
61/23 69/11 121/23 151/11 151/12
151/18
comfortable [2]  136/10 136/13
comforted [1]  6/19
coming [5]  88/3 88/3 88/15 133/23
157/13
comment [2]  129/1 137/11
comments [1]  128/25
commissioned [1]  59/6
common [4]  90/1 90/20 96/22 133/15
common-law [1]  133/15

commonsense [3]  24/8 38/21 39/2
communicate [2]  119/2 119/11
companies [2]  73/9 83/12
company [59]  1/6 7/23 8/3 9/1 9/14
 10/24 14/8 25/16 77/2 77/21 89/12
 102/23 104/19 104/21 104/24 104/25
 105/1 105/3 105/4 105/6 105/8 105/12
 105/15 105/20 106/13 106/20 107/19
 107/24 108/2 108/5 108/24 109/3
 113/18 113/25 114/7 114/14 114/21
 114/23 115/3 115/7 115/12 116/9
 117/2 117/9 125/13 125/17 125/24
 126/4 126/10 126/18 126/22 127/2
 129/11 129/15 130/10 134/21 134/24
 144/5 144/9
Company's [2]  23/19 135/25
comparative [3]  105/1 105/11 108/8
compare [2]  58/12 123/11
compared [2]  58/1 98/2
comparison [1]  23/9
compensate [1]  71/21
compensation [2]  101/2 108/21
compensatory [12]  4/25 5/3 77/4
 100/25 101/1 101/10 101/13 101/19
 105/14 108/16 109/17 110/3
competent [2]  148/20 148/21
complained [2]  99/11 150/9
complaints [1]  25/12
complete [4]  74/23 131/1 139/10
 147/16
completely [5]  37/5 40/17 40/24 42/9
 139/22
compliance [4]  97/12 98/15 98/20
 98/22
complicated [2]  144/13 152/8
complication [1]  136/15
comply [1]  99/1
component [2]  62/10 66/8
components [1]  66/17
compression [3]  47/4 47/9 57/16
compressions [1]  47/1
compromise [1]  75/16
compromised [3]  21/24 57/17 61/3
computation [1]  152/21
computer [5]  10/8 10/10 10/10 10/14
 112/18
concept [5]  31/23 135/22 136/20
 144/12 144/25
concepts [2]  65/13 129/8
concern [7]  8/20 10/13 17/15 87/8 87/9
 128/18 130/9
concerned [4]  90/2 104/16 142/22
 148/14
concerning [3]  90/17 92/8 111/4
concerns [1]  140/22
concluded [2]  74/3 158/1
concluding [1]  75/9
conclusion [1]  56/15
conclusions [1]  90/1
concocted [1]  63/17
concocting [1]  63/12
condition [10]  25/17 25/21 30/7 60/25
 84/9 87/4 102/24 103/2 110/18 142/12
conditions [7]  44/12 50/24 51/1 55/20
 61/2 106/5 145/1
conduct [33]  23/21 25/18 25/22 102/25
 103/3 130/14 133/13 134/22 134/24
 136/15 136/18 136/18 137/2 138/18
 138/23 139/2 139/4 139/6 139/7

139/19 139/22 143/25 144/6 144/9
 144/16 144/19 144/19 145/25 146/7
 146/1 149/1 152/5 157/6
conference [2]  157/12 159/10
conformance [1]  159/9
confused [2]  27/11 86/12
confusing [2]  133/11 133/14
connect [1]  4/10
connected [2]  3/13 110/11
connection [4]  72/13 129/4 129/11
 143/14
conscience [1]  102/9
conscientiously [2]  88/6 88/18
conscious [29]  3/23 27/2 41/5 41/7
 41/11 41/14 41/16 41/16 41/18 52/12
 52/15 65/22 71/19 84/14 84/17 85/18
 85/22 87/2 93/2 96/7 99/22 102/16
 108/14 109/1 109/5 110/15 125/19
 126/6 141/17
consciously [5]  87/3 101/23 102/14
 102/18 110/17
consciousness [5]  52/10 52/18 84/21
 139/11 141/23
consequences [3]  109/1 109/5 139/11
consider [41]  32/5 36/21 50/17 51/7
 70/2 71/24 89/13 90/11 92/8 94/4
 94/21 94/25 97/19 97/23 98/14 98/23
 100/12 100/14 100/24 101/18 103/16
 103/19 103/25 104/4 106/22 110/17
 113/9 118/20 130/18 133/12 137/19
 137/22 144/16 144/20 145/16 145/19
 146/2 146/22 146/23 147/6 147/18
consideration [1]  140/21
considered [8]  51/7 54/25 56/7 134/15
 134/16 138/25 140/13 142/20
considering [14]  50/24 50/25 51/2 69/4
 89/25 96/15 96/20 98/4 98/24 100/6
 104/13 111/15 137/18 144/18
consist [1]  106/9
consistent [3]  26/10 43/24 142/8
console [11]  15/21 15/21 16/1 16/23
 16/25 17/1 17/11 42/14 80/19 80/22
 81/4
conspiracy [4]  72/16 73/13 74/11 77/13
conspired [2]  72/8 72/20
constellation [2]  46/12 56/17
Constitutional [4]  131/16 131/21
 140/22 141/21
Constitutionally [1]  141/22
consult [2]  51/10 119/20
consulted [2]  51/10 52/1
consumer [1]  97/16
contact [1]  60/9
contain [1]  99/2
contained [1]  129/13
containment [1]  9/23
contemplates [1]  110/14
contend [3]  92/13 135/18 138/8
contends [5]  21/2 93/12 93/19 105/8
 106/13
contention [2]  3/12 3/14
context [3]  61/16 133/11 133/22
contingence [1]  146/20
contingency [10]  147/3 148/5 149/8
 149/24 150/15 151/13 151/17 155/10
 156/5 156/20
continuous [1]  99/9
contract [1]  149/9
contrary [5]  23/21 24/7 29/2 33/21
 81/24

contribute [2]  31/2 138/24
contributed [17]  25/18 29/19 30/23
 30/24 31/3 35/14 35/25 57/20 60/23
 76/9 76/13 100/9 102/25 115/21 116/2
 126/15 138/23
contributorily [1]  116/6
contributory [4]  76/4 115/15 121/15
 126/12
control [3]  63/12 63/14 73/4
convenience [2]  97/9 112/16
conversion [1]  48/20
convince [1]  50/8
convinced [1]  111/19
convincing [8]  71/16 108/23 109/2
 109/9 109/11 109/14 116/25 126/21
cooking [1]  32/20
cool [1]  21/14
COPD [3]  29/8 29/10 61/4
copies [5]  112/21 112/21 112/24
 117/17 118/3
copy [8]  104/8 112/25 117/15 117/18
 128/15 130/2 130/3 132/24
corporation [6]  8/6 26/24 89/4 89/5
 89/7 89/9
correct [3]  4/19 138/13 159/7
Corrections [1]  146/25
cost [2]  9/23 97/4
cost-containment [1]  9/23
Couch [2]  146/25 147/8
could [40]  9/5 10/18 12/16 13/19 16/4
 18/18 22/3 37/20 42/21 45/17 47/17
 49/9 50/18 51/19 52/2 52/22 52/24
 53/3 54/5 54/11 56/15 58/17 58/21
 59/24 59/25 59/25 60/1 64/8 73/4 73/5
 77/25 81/12 82/7 83/6 83/17 97/20
 103/13 144/24 145/8 151/7
could've [4]  9/3 12/15 23/7 46/1
couldn't [9]  16/17 16/20 17/10 21/6
 27/17 57/7 60/3 61/8 79/20
counsel [9]  44/24 47/25 51/12 57/8
 60/14 103/24 120/4 127/7 140/23
County [3]  32/18 32/19 78/11
couple [8]  21/14 41/2 48/7 128/18
 128/24 129/23 131/20 141/14
course [3]  11/9 89/8 99/16
court [51]  1/1 3/4 4/14 18/5 41/10 88/4
 88/16 89/7 92/10 108/9 112/15 117/14
 119/12 124/7 125/8 128/17 129/4
 129/21 130/7 130/12 131/2 131/7
 131/8 131/10 131/15 132/2 132/12
 132/19 132/21 132/22 132/25 135/18
 135/21 136/3 136/7 137/17 138/7
 138/9 138/14 138/21 140/6 140/7
 142/15 142/25 145/4 153/13 154/8
 155/23 159/3 159/4 159/19
Court's [6]  75/9 129/12 129/17 129/18
 136/9 141/13
courthouse [1]  122/16
courtroom [7]  5/12 66/6 77/1 88/23
 119/20 121/25 149/15
courts [2]  124/15 147/10
cover [2]  129/7 129/8
covered [3]  136/5 136/6 146/4
covering [1]  145/4
covers [1]  134/18
cracks [1]  58/20
crafted [1]  142/25
crafting [1]  140/19
crash [13]  23/9 23/16 41/12 43/7 61/16
 63/22 64/13 68/8 68/22 68/24 69/1

**C**

crash... [2]  78/15 78/16
crashes [6]  53/13 61/17 62/23 66/25
67/1 67/3
crawl [1]  42/7
crawled [1]  42/21
crawls [1]  43/9
created [2]  45/19 83/11
credentials [3]  45/1 49/15 52/6
credibility [7]  11/5 14/15 36/2 37/15
44/23 61/23 69/5
credible [1]  49/17
credit [1]  69/4
criminal [1]  109/19
criticize [1]  60/14
criticized [2]  22/14 80/11
criticizes [2]  67/4 69/12
criticizing [1]  62/11
cross [8]  36/14 38/9 42/8 42/25 43/5
132/18 152/6 157/7
cross-examination [2]  38/9 157/7
cross-examined [1]  36/14
cross-reference [1]  132/18
crowd [1]  157/1
crucial [4]  22/2 23/17 24/1 83/6
crush [19]  15/8 16/21 18/23 23/22
23/24 24/6 27/13 28/16 28/20 30/25
76/7 76/8 76/9 81/6 81/13 83/8 85/19
93/11 139/25
crushed [17]  15/19 15/20 16/21 17/4
18/25 23/10 24/17 30/16 43/16 43/18
47/14 78/14 78/15 78/18 80/18 80/23
81/6
crushing [1]  44/1
crystal [1]  15/5
CSOs [1]  157/13
CT [2]  59/19 59/21
CTs [1]  45/9
culvert [4]  19/20 19/22 37/8 40/7
culverts [1]  19/19
curative [1]  122/2
cure [1]  151/4
curious [1]  139/3
curve [2]  63/8 85/1
customs [1]  98/16
cut [2]  27/10 32/19
cut-up [1]  32/19
cuts [3]  60/11 60/12 60/12
cutting [5]  56/10 63/11 82/22 82/23
83/2
cutting-edge [1]  82/22
CV [2]  1/4 125/13
CVR [2]  2/14 159/18
cycle [1]  9/1

**D**

damage [4]  5/3 101/19 113/20 142/2
damages [122]  3/13 3/17 3/17 3/24 4/2
4/9 4/16 4/23 4/24 4/25 31/17 31/18
32/12 33/24 33/25 34/10 34/12 34/12
34/19 34/20 70/9 70/13 70/16 71/6
71/9 71/11 71/21 71/24 76/22 77/3
77/4 77/6 78/22 83/18 93/5 93/12
100/25 101/1 101/3 101/4 101/10
101/14 101/22 102/1 102/6 102/8
102/11 102/15 102/17 103/6 104/25
105/14 106/22 107/9 107/11 107/12
107/22 108/2 108/3 108/7 108/16
108/19 108/19 108/20 108/22 109/6
109/8 109/17 109/21 109/23 109/25
110/3 110/20 110/25 111/5 113/18
114/24 115/7 115/10 115/14 115/22
116/3 116/7 116/11 116/17 116/19
116/20 116/21 116/23 117/1 117/5
121/17 125/17 125/23 126/4 126/9
126/15 126/20 126/21 127/22 129/22
130/7 131/19 132/2 132/12 133/13
134/13 134/23 135/9 137/1 137/2
141/16 141/22 144/8 146/2 152/21
155/17

**DAN** [1]  1/15
danger [9]  70/3 96/18 96/19 96/20
96/22 96/23 96/24 97/2 97/16
dangerous [2]  87/4 110/18
**DANIEL** [1]  1/15
darn [1]  27/18
dash [1]  19/15
dash-cam [1]  19/15
dashboard [1]  28/10
data [6]  39/7 39/12 39/15 63/4 63/4
63/9
date [2]  117/11 150/7
dated [2]  127/5 159/13
David [1]  32/14
day [8]  37/1 39/23 61/1 67/23 73/8
88/2 88/3 159/13
day's [1]  88/14
days [4]  31/15 41/17 60/15 84/18
dead [3]  18/19 30/9 55/6
deal [2]  38/6 51/1
dealing [1]  32/17
dealt [1]  89/6
death [69]  3/14 4/2 4/3 22/18 30/5
30/20 30/21 30/23 30/25 31/1 31/2
31/4 31/6 31/7 31/17 31/18 31/19
31/20 31/21 33/22 35/15 44/20 46/1
55/1 57/20 60/24 72/14 72/19 73/21
73/23 76/13 77/5 86/19 86/20 93/4
93/9 93/11 93/25 94/1 94/9 95/7 96/3
99/17 100/3 100/5 100/7 100/7 100/8
100/9 100/14 100/19 101/14 101/16
101/23 102/12 104/22 105/17 105/18
105/25 107/5 107/6 107/15 107/21
108/1 114/3 115/4 116/22 125/20
126/7
deaths [13]  35/25 40/14 61/14 69/18
71/14 76/10 87/13 93/23 94/2 96/8
99/6 103/5 107/1
Debra [63]  18/24 29/6 29/20 32/19
33/4 33/16 77/20 87/16 92/15 92/21
92/23 93/8 93/21 93/23 93/25 94/10
95/7 96/3 96/5 99/6 100/13 101/9
101/18 103/5 104/22 105/9 105/16
105/22 105/24 106/13 106/20 106/24
107/1 107/4 107/9 107/18 107/20
107/21 107/23 113/8 113/11 113/17
114/2 114/6 114/12 114/17 115/21
116/2 116/8 116/13 125/14 125/14
125/16 125/20 125/23 125/25 126/14
126/19 134/22 144/6 144/21 144/23
145/21
debris [1]  44/13
debt [1]  4/24
decades [1]  62/5
Decatur [2]  32/19 78/2
deceased [11]  92/15 92/24 92/25 93/3
93/3 101/9 103/8 103/9 103/11 103/12
103/13
decedent [28]  50/17 93/6 99/17 99/23
100/2 100/5 100/19 100/11 101/13
101/14 101/16 101/23 102/2 102/4
102/6 102/11 102/14 102/15 103/7
103/7 103/8 103/16 103/17 103/20
103/20 103/21 103/24 103/25

**decedents** [7]  25/17 25/22 92/24 101/9
102/18 102/24 103/2
deception [1]  91/21
decide [25]  11/6 33/19 34/20 36/2
36/24 40/13 46/6 69/13 69/21 69/22
90/13 90/19 91/20 92/6 96/13 97/13
102/11 106/18 110/1 111/14 114/18
119/6 152/14 154/21 157/16
decided [8]  27/12 50/20 50/22 51/14
79/17 110/17 129/9 140/14
deciding [7]  87/3 88/8 88/19 94/20
98/23 104/3 144/17
decision [11]  60/21 70/24 87/3 88/22
89/5 89/22 90/15 91/22 110/15 114/25
136/9
decisions [1]  77/2
decomposed [1]  81/21
deduction [2]  103/10 107/16
deductions [2]  90/1 108/7
defect [45]  23/2 23/6 24/2 24/20 67/24
69/17 69/18 69/21 93/12 94/7 94/8
94/9 94/11 95/6 95/13 95/22 96/1 96/2
96/8 96/9 96/11 99/2 99/5 99/7 99/23
100/1 100/1 100/3 100/6 100/12
100/18 101/12 101/15 104/22 105/13
107/13 110/12 121/6 124/11 124/14
134/4 139/17 139/25 140/1 145/18
defective [20]  62/15 67/12 67/15 67/16
67/18 71/12 72/9 72/16 72/21 73/4
73/21 93/19 94/3 95/17 97/18 97/18
98/14 98/22 102/21 133/17
defectively [3]  92/14 95/6 104/20
defects [2]  95/10 134/8
defend [3]  7/18 12/19 63/17
defendant [22]  1/6 1/22 5/21 8/5 35/10
87/2 95/3 100/23 108/22 110/10
110/16 110/17 122/11 123/16 128/23
130/10 131/22 131/25 139/3 142/12
143/6 155/11
Defendant's [1]  5/19
Defendant/Plaintiff [1]  123/16
Defendants [2]  124/19 147/9
defended [1]  84/8
defending [1]  136/9
defense [12]  20/7 26/5 26/5 105/1
105/5 105/5 105/6 105/11 105/19
115/17 121/14 123/21
defies [2]  38/20 39/2
defined [1]  109/12
definitely [2]  38/3 118/11
definition [2]  107/2 124/10
definitive [1]  124/10
deformation [5]  42/20 60/6 65/18 65/21
68/9
deformed [1]  42/12
degree [9]  19/10 39/7 53/19 68/8 85/4
106/2 106/4 106/7 109/14
degrees [6]  37/22 37/23 38/5 38/6
38/11 85/7
delete [1]  138/2
deleted [1]  145/7
deliberate [4]  13/5 109/25 110/25
127/21
deliberately [4]  38/13 38/14 38/16
41/20

**D**

deliberating [1] 117/19
deliberations [17] 5/10 5/25 88/10 88/11 88/13 88/21 111/11 112/4 112/15 118/1 118/21 118/23 119/3 121/21 121/23 122/15 123/3
deliver [2] 111/11 122/14
delivered [1] 122/8
Delta [1] 27/22
demonstrate [1] 139/11
demonstrated [2] 45/19 139/10
denied [3] 24/25 25/1 129/15
denies [2] 104/19 104/21
deny [2] 77/25 136/13
department [2] 23/19 146/25
departure [1] 14/3
depend [1] 91/22
deployed [2] 67/8 72/25
deployment [1] 68/6
depose [6] 69/1 151/21 152/3 153/13 154/14 155/1
deposed [1] 153/21
deposition [6] 52/11 56/2 68/20 149/1 157/12 157/17
descent [2] 112/17 112/18
describe [1] 54/7
described [7] 42/5 46/4 58/7 58/15 62/6 113/4 124/15
description [1] 145/5
deserve [1] 43/11
design [69] 18/24 65/3 66/7 66/9 66/13 66/13 69/8 69/17 69/21 69/23 73/16 93/12 93/19 94/3 94/7 94/8 94/9 94/11 95/6 95/10 95/18 95/19 95/21 95/22 96/1 96/2 96/10 96/12 96/13 96/14 96/18 97/14 97/15 97/17 97/22 97/24 98/1 98/2 98/3 98/7 98/8 98/12 98/17 98/24 99/2 99/5 99/7 99/23 100/1 100/3 100/6 100/12 100/18 101/12 101/15 102/21 104/21 105/13 107/13 110/12 121/16 134/4 134/8 139/9 139/12 139/17 139/25 140/1 145/18
designed [14] 10/7 37/17 38/4 49/11 62/2 62/10 68/5 68/6 69/10 92/14 95/6 97/25 98/5 104/21
designing [1] 66/14
designs [2] 97/10 97/19
desire [1] 104/9
desk [1] 128/14
despite [1] 8/8
destined [1] 29/11
detail [4] 37/18 91/24 100/12 154/24
detailed [1] 45/16
details [3] 10/13 17/15 46/24
deter [4] 33/25 33/25 71/21 108/22
determination [3] 37/16 107/2 114/22
determine [12] 96/10 99/5 99/22 104/1 104/6 104/9 105/15 106/25 108/17 110/4 146/19 157/8
determined [1] 141/17
determining [5] 97/18 97/21 98/13 104/17 109/17
deterring [1] 71/22
Detroit [1] 12/24
devalue [1] 29/6
devastating [1] 80/20
developed [2] 62/3 73/1
developing [2] 63/11 66/14
development [1] 64/21
diabetes [1] 55/11

diagnose [1] 55/20
diagnostic [1] 36/3
diagnosis [1] 50/13
diamonds [1] 86/6
did [109] 5/15 6/17 8/21 8/22 10/1 10/7 10/8 10/21 10/22 10/25 11/4 11/8 13/4 14/10 14/19 14/25 15/14 16/4 16/7 16/19 17/19 20/3 20/15 22/15 22/16 22/20 23/23 23/25 24/15 27/10 27/15 29/7 31/1 31/13 36/5 36/5 36/10 36/11 36/13 36/18 38/15 38/16 38/19 40/13 43/11 45/10 46/6 48/1 48/14 48/20 49/19 50/15 51/7 51/15 52/16 52/20 53/6 53/25 54/6 54/7 54/17 55/7 57/5 57/24 58/14 59/4 59/4 59/21 60/2 60/10 61/24 61/25 64/1 66/18 67/7 68/18 73/20 76/3 79/11 80/11 80/17 81/15 82/9 82/9 82/15 83/3 83/4 84/4 84/9 84/23 85/10 85/11 87/7 87/25 90/21 90/23 90/25 91/2 91/3 91/6 91/8 91/13 91/13 119/4 135/20 138/9 138/24 140/6 154/22
didn't [69] 5/14 9/6 9/7 10/20 10/21 14/13 14/13 15/3 16/16 16/24 18/24 19/2 19/6 20/1 22/14 24/24 26/15 28/9 28/10 31/12 33/1 36/19 38/1 41/24 42/22 45/11 45/12 45/18 46/15 47/9 48/3 49/21 50/2 50/13 50/16 50/17 51/9 51/21 55/7 57/3 60/13 61/22 64/3 67/2 67/11 67/21 70/10 72/4 74/4 78/1 78/25 79/11 80/14 80/21 84/11 85/9 85/24 85/25 86/21 120/24 128/22 138/11 138/12 138/15 141/1 146/16 149/10 151/24 152/25
die [3] 7/2 29/11 32/23
died [1] 56/17
dies [1] 95/12
differ [2] 12/15 80/15 91/8
difference [3] 83/23 87/22 90/9
different [12] 6/4 39/9 45/4 46/11 46/11 47/3 62/14 81/7 91/14 109/9 134/11 151/20
differently [2] 68/4 111/21
difficult [1] 40/18
difficulty [2] 30/4 30/16
dignity [1] 32/23
diligent [1] 45/7
dire [1] 21/11
direct [9] 12/24 47/24 64/11 83/17 90/2 90/4 90/10 104/2 112/15
directed [1] 136/16
directly [8] 30/22 38/22 38/23 38/25 39/4 91/7 100/8 144/19
disagree [1] 135/4
disagreed [1] 11/25
disagrees [1] 55/3
disbelieve [1] 90/16
disclose [1] 153/19
disclosed [2] 145/5 150/25
disclosure [3] 150/6 150/10 153/19
disclosures [3] 148/16 149/18 150/5
discomfort [1] 101/24
discourage [1] 119/5
discover [1] 155/24
discovery [4] 148/9 148/15 151/15 155/18
discuss [5] 75/10 111/16 128/1 128/2 128/3
discussing [1] 111/17
discussion [1] 117/17

discussions [1] 88/21
disease [4] 50/8 51/3 51/4
dismissed [1] 128/10
disparage [1] 44/24
disprove [2] 90/8 105/3
dispute [7] 14/16 30/6 37/13 39/5 78/7 84/23 150/6
disputed [1] 56/8
disregard [4] 89/2 89/21 128/7 139/11
dissimilar [1] 130/14 138/18 138/22 139/1 139/14 139/18 146/1
dissipates [1] 59/2
distinction [2] 9/10 9/13
distraction [1] 47/6
distress [2] 101/25 102/8
DISTRICT [7] 1/1 1/1 1/10 3/4 3/4 159/4 159/5
disturbance [1] 39/11
disturbances [1] 39/9
disturbed [1] 39/25
disturbing [1] 50/21
diversion [1] 21/21
diversions [1] 21/20
division [2] 1/2 24/4
do [132] 4/1 4/8 9/6 9/7 10/7 10/12 11/11 12/17 12/25 13/4 13/18 13/22 14/22 18/9 18/12 19/3 20/1 21/7 22/1 24/18 26/7 26/18 27/1 29/2 29/18 31/5 32/10 33/2 33/18 34/11 34/12 35/14 36/13 38/16 38/19 39/25 43/14 44/5 45/10 45/18 48/5 48/16 49/19 49/22 52/9 52/20 55/8 56/18 59/4 60/13 63/1 63/2 65/8 67/6 68/19 72/11 73/13 73/10 75/1 75/1 75/9 76/7 76/20 76/21 77/11 78/8 79/7 81/17 82/17 83/4 84/11 86/2 87/3 87/20 87/21 87/22 87/24 89/1 90/12 91/13 106/10 106/11 106/12 110/15 111/17 111/20 115/20 116/5 116/24 117/7 117/16 118/5 118/7 119/9 121/22 126/13 126/20 126/24 127/15 128/4 129/10 130/2 133/5 135/18 136/10 138/6 139/16 143/7 143/11 144/1 144/24 147/1 147/2 147/6 147/20 148/25 151/15 151/25 152/3 152/6 153/15 154/4 154/8 154/12 154/14 154/21 155/16 155/17 155/19 155/17 155/19 157/12 159/5
docket [2] 63/18 64/16
doctor [2] 47/22 58/24
doctors [2] 45/3 45/4
document [3] 9/19 131/2 140/11
documentary [2] 148/12 156/7
documents [12] 9/20 34/17 36/18 55/24 68/23 148/3 149/21 150/17 152/20 153/11 154/18 155/3
Dodge [4] 12/2 12/8 12/10 62/17
does [29] 9/21 19/17 21/8 38/19 43/8 43/8 55/19 59/10 63/5 66/1 66/21 68/24 84/24 84/25 87/10 90/17 91/16 92/4 95/16 98/21 105/3 106/7 110/13 133/19 137/10 140/3 141/14 145/1 156/13
doesn't [38] 18/9 18/19 19/11 19/12 19/17 19/19 22/11 22/19 23/22 23/24 24/7 26/1 30/25 31/1 41/17 43/11 46/16 46/18 51/9 51/24 53/7 55/16 56/24 57/1 58/24 63/13 65/6 67/13 68/8 68/9 72/18 77/11 83/9 83/23 136/23 137/2 148/10 151/4
doing [10] 6/25 8/4 11/24 12/12 32/11

**D**

doing... [5]  73/11 88/6 88/17 106/9
149/14
dollars [6]  14/7 29/5 70/17 73/3 73/6
125/25
Don [1]  37/16
don't [105]  4/11 4/15 4/20 5/1 11/8
13/18 13/20 16/1 18/9 18/15 19/2
19/14 20/1 22/7 22/17 25/13 27/10
27/20 28/12 30/7 30/8 34/8 34/8 38/16
42/16 43/10 43/22 47/4 48/6 48/18
52/11 52/12 56/3 57/3 57/4 59/1 59/19
60/18 61/4 61/5 63/3 64/1 68/10 71/6
73/9 73/10 73/13 74/2 74/10 76/20
77/8 77/10 77/11 81/17 81/18 82/12
82/14 83/15 83/21 84/25 85/1 86/13
104/16 115/24 117/2 119/4 119/6
119/22 119/24 119/25 122/16 122/18
123/10 123/18 128/6 132/10 134/11
137/1 137/14 137/22 138/10 140/4
143/12 143/19 144/25 145/11 148/19
149/11 149/20 149/20 149/21 149/21
150/5 150/11 150/21 150/22 151/6
152/7 153/6 153/8 155/20 155/20
157/2 157/17 157/17
Donaldsonville [1]  84/18
done [33]  6/17 6/18 7/15 9/5 11/12
12/15 12/16 19/6 21/17 34/25 38/7
38/8 70/21 74/11 79/6 87/20 101/2
110/24 136/11 141/8 143/21 148/4
149/23 151/21 155/8 155/8 155/11
155/15 156/5 156/6 156/6 156/17
156/17
double [6]  15/13 16/1 28/21 30/3 30/15
81/2
doubt [6]  10/22 23/2 23/8 87/6 109/18
139/24
down [48]  4/12 5/6 6/23 6/25 7/6 10/3
13/1 15/19 15/20 16/5 16/13 17/17
18/25 22/11 30/3 30/15 31/10 32/24
34/18 37/10 39/7 43/16 44/1 47/14
49/12 49/20 54/23 58/11 58/18 64/20
64/20 65/1 65/4 72/5 75/6 80/16
80/19 81/6 85/7 119/7 119/11 119/23
124/22 130/19 131/5 142/13 153/12
153/14
down questions [1]  119/7
downhill [1]  85/8
downloaded [1]  117/21
Downs [16]  13/24 14/2 14/4 14/14
14/20 14/23 14/25 15/3 15/4 60/15
60/19 76/9 81/15 81/23 82/4 85/24
Dr [56]  11/1 12/7 14/13 14/19 14/23
14/23 16/25 22/4 22/20 23/15 23/25
24/11 27/25 28/5 29/1 30/6 41/1 44/21
44/21 47/24 48/14 48/17 48/20 49/21
49/24 52/4 52/10 52/17 52/17 52/19
55/18 56/7 56/25 57/24 58/9 59/3 59/3
59/4 59/7 59/10 59/15 59/21 60/12
60/16 60/19 61/7 63/25 64/11 64/12
65/5 69/7 72/6 80/11 81/25 82/4 84/4
Dr. [75]  10/12 13/24 13/25 14/2 14/4
14/14 14/14 14/20 14/22 14/25 14/25
15/3 15/4 15/9 15/15 16/24 22/12
22/16 27/21 29/7 30/9 30/11 44/22
44/24 45/1 45/5 46/14 46/16 46/23
47/23 48/4 48/15 48/24 49/4 49/7
49/13 51/6 51/10 52/3 52/6 53/8 53/8
53/10 53/24 53/24 53/25 54/2 54/22
55/1 55/4 56/3 57/14 59/6 60/16 61/6

62/4 62/14 62/18 64/17 66/22 69/6
69/6 69/7 69/23 76/9 80/1 80/11 81/14
81/15 81/23 82/3 82/6 85/20 85/24
86/21
Dr. Camacho [17]  22/16 44/24 45/1
45/5 46/14 46/16 46/23 48/4 48/24
49/7 51/10 52/3 53/8 53/24 57/14
60/16 69/6
Dr. Camacho's [1]  52/6
Dr. Downs [12]  13/24 14/2 14/4 14/14
14/20 14/25 15/3 15/4 76/9 81/15
81/23 85/24
Dr. Eisenstat [17]  13/25 14/14 14/22
14/25 44/22 47/23 49/13 51/6 53/8
53/24 53/25 59/6 69/7 80/1 81/14 82/3
85/20
Dr. Eisenstat's [2]  48/15 49/4
Dr. Ellis [5]  22/12 29/7 55/4 56/3 80/11
Dr. Michelle [1]  62/14
Dr. Sochor [13]  15/9 15/15 16/24 27/21
30/9 30/11 53/10 54/2 54/22 55/1 61/6
82/6 86/21
Dr. Vogler [7]  10/12 62/14 62/18 64/17
66/22 69/6 85/20
drag [1]  37/20
DRAMMEH [6]  2/14 2/15 154/2 157/19
159/3 159/18
draw [2]  15/18 45/12
drawn [3]  65/15 65/15 65/16
drew [3]  15/15 15/25 17/7
drive [6]  9/8 9/9 9/15 9/16 13/2 26/2
driver [10]  16/19 43/23 44/18 80/24
81/12 106/3 106/6 106/10 106/12
106/15
driver's [7]  42/8 42/8 42/10 43/15 65/11
65/22 78/18
drivers [2]  106/5 106/8
driveway [1]  89/1
driving [3]  93/13 106/14 106/16
drove [3]  41/20 56/19 74/4
due [2]  77/14 137/13
Duke [1]  45/1
dummy's [1]  78/18
duplicate [1]  4/3
durability [1]  97/9
during [19]  5/10 7/20 14/21 41/5 64/21
75/10 88/10 88/13 89/21 91/15 112/4
117/16 118/1 118/7 118/23 119/3
119/18 123/3 134/5
duties [2]  9/3 89/11
duty [12]  8/12 8/24 12/2 23/8 26/2 43/8
67/22 87/21 88/6 88/17 95/20 106/17
dynamics [3]  37/17 38/3 67/3

**E**

e-mail [1]  157/16
each [19]  6/14 36/10 45/19 52/23 53/4
54/6 66/10 86/5 94/4 94/25 100/15
102/4 109/13 111/14 112/11 113/1
117/18 121/17 152/20
EADY [8]  2/6 3/20 128/25 129/2
130/16 137/4 141/10 146/11
earlier [1]  6/1
earliest [1]  151/14
early [2]  14/8 22/13
earned [1]  103/13
easily [2]  122/17 122/20
easy [3]  26/21 31/23 74/15
ECF [4]  129/13 132/14 136/1 140/11
economic [1]  98/6

economist [1]  34/15
economy [2]  34/11 35/1
edema [5]  47/16 47/19 49/5 59/8 59/13
edge [4]  63/11 82/22 82/23 83/2
education [2]  36/3 44/25
EDWARD [12]  1/23 92/18 92/20 93/7
93/23 113/16 114/4 114/20 125/12
125/15 125/21 126/3
Edwin [4]  92/22 93/25 115/5 126/8
effect [1]  98/8
effectiveness [1]  96/22
effects [1]  98/11
effort [2]  39/1 154/22
eight [5]  32/11 60/15 66/19 67/5 71/3
eighth [1]  58/22
Eikey [26]  8/1 8/25 9/11 24/24 24/25
34/16 61/24 62/2 62/20 63/1 63/3 64/1
68/16 68/17 68/18 68/24 69/6 70/1
72/6 78/9 78/24 79/11 79/15 82/15
83/14 83/17
Eisenstat [32]  13/25 14/14 14/19 14/22
14/23 14/25 30/6 44/22 47/23 47/24
48/17 49/13 49/22 49/25 51/6 52/10
52/19 53/8 53/24 53/25 56/25 59/6
59/10 59/16 59/21 60/12 69/7 80/1
81/14 81/25 82/3 85/20
Eisenstat's [3]  29/1 48/15 49/4
either [9]  4/20 21/8 51/11 90/10 106/9
143/18 153/13 153/13 153/22
EKG [1]  55/14
electrical [1]  51/5
electricity [1]  80/12
Electronic [1]  63/14
element [1]  109/13
elements [6]  94/11 95/23 101/19
113/13 114/9 115/11
eliminate [1]  97/2
ELIZABETH [1]  1/25
ELIZABETH.WRIGHT [1]  2/1
Ellis [7]  22/4 22/12 29/7 55/4 55/18
56/3 80/11
Elmo [1]  11/20
else [14]  12/17 44/15 45/12 46/22
50/22 55/9 73/16 80/17 86/15 130/6
131/22 146/11 157/20 157/20
elsewhere [2]  47/20 82/21
emergency [1]  53/10
emotional [2]  101/24 102/8
emphasize [2]  112/10 145/6
emphysema [1]  55/12
employed [2]  12/23 106/4
employees [4]  8/1 89/9 89/10 89/11
enclosed [1]  13/8
encounter [1]  37/20
encourage [1]  37/20
end [9]  6/14 49/15 58/20 64/11 74/13
85/11 103/20 127/23 158/2
ended [1]  20/8
ending [1]  86/17
ends [1]  83/22
endured [1]  77/19
engaged [2]  110/16 146/1
engages [1]  87/2
engineer [9]  7/19 12/20 23/16 37/16
37/25 53/21 62/2 66/5 68/18
engineering [10]  34/4 45/23 53/15
53/16 53/16 53/19 53/20 62/5 65/13
73/8
engineers [14]  8/19 9/24 10/7 10/22
61/25 62/1 66/6 66/8 66/11 66/16
66/21 68/22 69/1 72/8

E

enjoy [1] 121/20
enjoying [3] 32/8 86/5 86/5
enjoyment [1] 103/23
enlarged [5] 50/8 55/21 55/22 55/24
 56/13
enlighted [1] 141/17
enlightened [2] 102/9 141/22
enough [5] 44/17 49/6 50/11 94/18
 121/8
ensure [3] 70/16 95/19 101/3
enter [6] 107/17 108/8 113/19 113/22
 114/10 114/24
ENTERS [1] 5/12
entire [7] 39/17 59/2 71/18 73/7 108/25
 109/4 112/24
entirely [3] 33/19 136/16 140/20
entirety [1] 128/8
entitled [1] 29/23 87/6 101/5 102/17
 104/3 107/22 110/5 112/10 117/8
 127/1 156/15 159/8
equal [3] 89/6 107/18 107/24
equals [1] 89/7
equipment [2] 27/8 98/20
ER [2] 53/14 56/12
err [1] 141/6
errors [1] 40/2
ERSP [4] 8/14 8/19 12/21 68/14
essential [3] 94/14 95/1 109/13
establish [4] 95/1 95/23 105/19 105/20
established [1] 141/24
estate [30] 3/15 3/18 3/23 4/10 29/21
 92/25 93/1 93/8 93/9 93/15 93/16
 93/18 100/14 107/20 108/1 108/12
 108/13 113/11 113/12 113/13 113/17
 114/19 114/20 116/19 116/20 116/23
 125/14 125/16 126/2 126/3
estate's [1] 100/4
estates [4] 92/18 93/21 96/5 101/17
estates' [1] 99/21
estimate [3] 147/5 150/23 153/4
et [2] 1/4 125/12
evade [1] 39/1
evaluate [2] 134/3 134/7
evaluating [5] 25/15 62/6 73/9 102/22
 110/15
EVAN [1] 1/15
even [25] 9/17 16/16 23/14 36/16
 47/19 48/6 48/21 51/15 54/21 59/16
 63/5 67/24 76/19 84/5 87/4 88/25
 104/23 109/6 110/18 134/12 145/8
 148/5 149/8 149/21 155/20
evening [2] 153/12 153/14
event [24] 15/6 20/24 20/24 35/18
 35/19 39/7 39/12 39/15 41/9 44/16
 46/2 51/8 56/16 61/2 74/3 86/11 86/16
 99/9 99/10 99/13 99/13 99/15 142/4
 144/17
events [1] 99/16
ever [19] 11/12 21/1 31/19 32/16 41/4
 53/6 54/7 57/11 57/22 62/10 65/15
 70/7 70/23 79/3 79/6 88/15 151/1
 151/8 156/8
every [21] 11/2 11/12 11/12 17/19
 17/21 17/23 21/15 31/15 45/21 61/21
 66/7 66/8 66/8 66/9 66/23 66/23 67/14
 72/8 82/16 94/14 134/11
everybody [7] 3/6 5/14 18/8 82/20
 119/19 128/11 157/5
everyone [4] 61/16 62/25 66/1 72/21

everything [7] 30/3 44/15 61/12 73/14
 119/22 128/12 143/7
evidence [142] 6/2 6/2 6/4 6/6 7/13
 11/17 11/17 13/17 18/6 18/15 18/16
 22/17 23/6 25/5 26/24 28/7 29/2 33/10
 36/6 36/9 36/22 39/8 39/20 42/16
 43/20 44/4 44/5 46/22 47/16 48/8
 48/10 49/8 52/2 52/12 52/18 52/19
 55/22 57/24 59/3 60/22 69/24 71/12
 71/16 73/20 79/5 79/8 79/10 79/21
 79/23 81/24 82/1 85/22 85/23 85/24
 87/1 88/5 88/17 88/23 89/14 89/14
 89/16 89/24 89/25 90/2 90/3 90/3 90/4
 90/7 90/10 90/12 90/12 91/1 91/11
 91/12 92/8 94/15 94/17 94/18 94/21
 94/23 95/2 95/24 96/15 97/19 99/4
 100/1 100/18 100/24 101/5 101/21
 102/13 103/9 104/2 104/4 104/8
 104/14 104/24 105/2 105/7 105/16
 105/20 108/23 109/2 109/9 109/10
 109/12 109/12 109/15 109/16 109/23
 109/24 110/10 110/23 111/15 111/24
 112/7 112/8 114/9 115/20 116/2
 116/25 117/8 119/7 126/14 126/21
 127/1 127/16 127/17 135/5 136/24
 138/22 142/13 147/1 147/14 147/19
 148/8 148/13 148/17 150/14 152/1
 155/24 156/8
evidentiary [1] 152/20
exact [2] 16/12 112/21
exactly [6] 43/24 54/5 59/1 73/11
 123/14 147/7
exaggerated [2] 32/1 48/23
examination [4] 38/9 64/11 152/6 157/7
examined [2] 36/10 36/14
examiner [3] 13/19 49/14 53/12
example [7] 47/8 49/2 90/4 103/23
 123/7 123/15 151/18
except [3] 26/12 49/8 89/20
excited [1] 154/7
exclude [1] 142/13
executive [5] 8/7 9/18 9/21 9/22 10/23
executives [6] 7/19 9/22 10/21 66/12
 66/12 77/1
executor [7] 93/8 93/15 93/16 113/17
 114/20 125/16 126/3
exemplar [2] 122/21 51/23
exercise [1] 95/20
exercising [1] 110/13
exhibit [21] 8/14 9/21 11/18 15/14 17/3
 17/6 17/18 19/5 20/7 23/10 23/13 25/5
 28/17 28/22 55/23 78/13 78/17 117/23
 117/24 118/17 148/10
Exhibit 13.02 [1] 19/5
Exhibit 175 [1] 11/18
Exhibit 181 [1] 9/21
Exhibit 345 [1] 55/23
exhibits [15] 6/3 89/15 94/23 117/20
 118/4 118/19 118/9 118/12 118/18
 118/19 118/20 118/22 121/22 121/23
 122/13
exist [2] 108/18 155/25
existed [1] 95/13
exists [2] 155/21 156/14
exits [1] 121/25
expectancy [10] 33/12 33/14 103/25
 104/1 104/7 104/9 104/11 104/12
 104/16 104/18
expectation [1] 96/23
expected [1] 83/16

expended [1] 154/22
expense [2] 4/6 5/7 190
expenses [24] 3/16 4/10 4/17 5/3 93/1
 93/2 93/9 93/18 96/6 100/4 102/2
 102/3 103/10 108/14 110/5 110/8
 110/21 111/1 117/4 117/9 125/18
 126/5 126/24 127/1
expensive [1] 97/3
experience [4] 36/4 62/1 62/12 92/2
experienced [1] 102/14
expert [9] 7/24 14/8 37/16 38/3 43/6
 64/12 65/16 82/15 148/23
experts [7] 13/11 22/21 36/16 36/17
 40/3 57/21 80/9
explain [16] 8/7 8/22 8/23 9/6 9/17 9/18
 50/18 55/11 64/1 65/13 66/13 88/25
 94/10 100/11 111/12 144/17
explained [21] 37/18 40/11 45/24 46/1
 46/24 47/1 54/2 54/22 58/9 59/8 62/20
 63/1 63/3 64/21 65/1 65/12 65/17 66/6
 66/9 101/8 109/11
explains [2] 41/1 46/8
explanation [8] 26/11 39/18 40/9 40/10
 41/14 44/18 61/3 130/15
Explorer [2] 79/15 79/19
Exponent [2] 14/6 14/9
exposed [1] 97/15
expression [1] 99/15
extensive [2] 60/6 72/5
extent [4] 25/15 101/19 102/22 152/22
extra [2] 130/2 130/3
extraterritorial [1] 135/2
extraterritoriality [2] 133/3 133/7
extricate [1] 41/22
eyes [1] 16/11
eyewitness [1] 90/6
eyewitnesses [2] 40/15 40/16

F

F-250 [11] 92/14 93/13 94/3 95/5 95/25
 96/2 99/4 102/19 104/20 105/23
 106/21
F150 [11] 8/24 9/2 23/7 23/24 24/15
 24/16 24/21 66/15 82/24 82/25 83/3
F150s [1] 9/8
F250 [8] 12/5 16/19 66/18 67/14 72/4
 78/13 134/4 134/5
F250s [2] 9/9 9/11
facility [1] 13/8
fact [30] 7/17 19/1 19/2 26/1 26/17
 29/10 38/19 48/6 49/15 50/2 54/12
 58/12 59/1 59/22 61/6 66/5 67/22
 84/22 84/24 89/4 90/6 90/8 91/12
 91/23 94/20 95/15 111/4 136/25
 144/23 151/16
factor [1] 98/23
factors [8] 51/2 56/7 60/25 70/2 70/3
 96/16 137/19 137/21
facts [11] 18/7 18/16 22/2 89/22 90/7
 111/23 135/1 136/23 140/4 142/9
 148/24
factual [2] 89/19 154/23
fail [1] 109/2
failed [9] 17/14 17/20 17/21 36/21 50/7
 120/8 120/14 120/17 147/9
failing [2] 17/24 106/11
fails [2] 84/2 95/1
failure [6] 17/21 83/24 83/25 106/1
 109/9 153/19
faint [1] 41/1

F

fair [6]  70/16 70/18 101/4 102/9 141/17 141/21
fairness [3]  71/7 78/5 78/5
faith [11]  35/1 73/14 86/22 86/23 87/2 110/11 110/11 110/11 110/14 110/14 110/16
fall [1]  40/4
false [1]  63/18
falsely [1]  91/11
families [5]  29/12 32/6 35/18 70/21 86/5
family [13]  31/22 32/20 33/2 40/16 40/18 40/20 70/19 74/15 77/5 77/9 80/2 82/17 87/9
famously [1]  76/15
far [10]  16/2 16/18 16/19 16/21 127/17 128/16 135/15 138/3 142/21 151/12
Farm [1]  137/13
farms [1]  9/12
fast [2]  75/20 131/12
father [1]  94/1
fault [25]  21/2 21/3 21/6 21/7 25/23 26/22 76/5 105/2 105/12 107/7 107/9 107/14 107/18 107/19 107/23 107/24 108/5 108/8 108/10 115/16 116/8 116/9 116/11 116/13 126/13
favor [27]  3/15 29/22 73/22 94/7 99/24 100/3 100/15 100/15 108/11 108/15 110/2 113/16 113/25 114/4 114/14 114/19 115/2 115/5 115/12 115/13 116/18 116/23 121/12 125/15 125/21 126/2 126/8
favorable [1]  145/13
favorites [1]  6/20
feasibility [3]  97/4 98/3 98/6
feasible [1]  98/25
feather [3]  7/16 10/4 28/3
features [1]  67/7
FEBRUARY [9]  1/5 3/1 12/17 75/12 122/23 124/3 124/4 124/24 127/5
fed [1]  51/12
federal [8]  79/6 83/9 98/15 98/17 98/18 98/20 159/3 159/19
Federalism [2]  133/1 143/25
fee [11]  146/20 147/3 149/9 149/24 150/15 151/13 151/17 155/7 155/10 155/13 156/20
feel [3]  35/18 86/13 136/10
feels [1]  40/25
fees [21]  34/24 86/22 86/23 86/24 87/1 87/6 110/6 110/9 110/22 111/2 117/9 126/24 127/2 127/22 147/14 148/22 150/7 151/16 156/9 156/18 157/8
feet [4]  37/5 37/9 40/7 40/8
female [1]  33/12
few [3]  49/21 59/9 90/20
fewer [1]  86/7
fiddle [1]  86/3
field [2]  19/22 92/2
Fifty [1]  37/12
Fifty miles [1]  37/12
fighting [1]  40/1
figure [6]  55/19 56/4 57/1 104/16 151/20 154/1
Fila [1]  121/20
file [1]  130/22
filed [4]  130/21 131/1 132/14 150/8
fill [2]  30/1 112/23
filled [1]  27/7

final [6]  34/2 50/13 75/21 75/23 108/9 128/10
finally [4]  18/13 38/9 68/14 72/23
financial [7]  142/11 143/14 143/20 143/22 144/2 145/1 145/9
find [79]  26/22 29/21 30/21 30/22 31/5 50/2 50/20 55/9 70/9 73/22 94/7 94/8 95/2 99/3 99/24 99/25 100/2 100/5 100/7 100/15 100/17 100/21 101/11 101/15 101/19 102/13 102/15 102/20 104/11 105/13 106/20 106/24 107/4 107/12 107/14 107/18 107/23 108/11 108/14 109/21 110/2 113/15 113/16 113/16 113/20 113/22 113/23 113/25 114/4 114/8 114/11 114/12 114/14 114/19 114/24 115/1 115/2 115/5 115/8 115/10 115/12 115/20 116/5 116/9 116/10 116/25 117/7 121/12 125/15 125/21 126/2 126/7 126/13 126/20 126/25 132/25 145/25 152/8 157/6
finding [4]  50/22 57/11 108/4 152/15
findings [4]  46/18 108/10
finds [4]  25/17 40/23 66/24 102/24
fine [4]  32/18 77/9 123/4 153/22
finest [1]  32/16
finish [1]  74/9
finished [5]  5/23 88/20 111/3 118/25 128/7
firefighter [1]  41/25 43/6
firm [5]  22/5 34/4 34/4 155/6 156/6
firmly [1]  109/13
first [31]  8/11 8/12 10/20 16/7 23/3 29/19 37/13 37/15 54/18 63/13 72/24 73/19 73/19 74/24 79/14 82/7 113/11 114/19 115/19 122/2 128/25 129/12 130/1 131/13 132/1 135/17 137/18 141/15 142/1 142/24 144/14
fishing [3]  21/11 21/12 21/17
fit [2]  43/11 51/9
five [8]  8/23 9/3 10/18 12/13 30/9 60/18 66/16 82/15 82/25
five-and-a-half-times [1]  82/25
flat [7]  17/1 17/1 17/5 23/10 60/7 78/14 78/15
flight [1]  80/7
flights [1]  12/24
flip [2]  10/2 22/8
flipped [1]  68/13
flipping [1]  142/23
flooded [1]  8/13
flopped [1]  58/11
fluid [1]  47/16
fly [1]  13/1
focus [3]  4/21 5/4 26/23
focused [3]  139/17 139/22 139/24
focuses [1]  77/6
folded [5]  51/14 51/24 54/23 82/7 82/8
folks [2]  19/21 86/4
follow [6]  85/8 88/25 89/1 104/13 117/16 134/14
followed [2]  39/14 57/13
following [7]  95/23 96/15 97/23 101/18 102/20 123/14 137/19
follows [9]  113/18 114/7 114/22 115/7 125/17 125/24 126/4 126/10 126/17
foot [2]  42/22 44/9
forceful [1]  52/2
forces [1]  58/25
FORD [223]

Ford's [28]  3/12 3/14 8/19 9/15 13/18 15/16 16/22 16/23 20/23 21/8 23/6 23/15 23/20 25/5 25/22 29/2 36/12 41/12 63/19 64/15 71/17 74/18 74/22 77/21 78/1 79/25 84/10 121/14
foregoing [1]  159/6
foreperson [6]  112/14 112/14 112/23 117/11 125/1 127/4
foreseen [1]  99/12
forget [4]  17/17 76/3 78/7 91/18
forgive [1]  146/18
forgo [1]  156/17
forgot [1]  28/18
form [32]  27/8 29/14 29/19 30/19 34/11 73/17 73/18 74/9 74/23 76/4 88/9 94/5 100/10 106/19 107/7 107/17 108/7 109/21 110/6 112/20 113/2 117/11 120/12 121/7 121/10 127/8 127/9 127/12 128/14 128/22 135/7 138/12
format [1]  159/9
former [6]  7/25 13/19 49/14 61/25 62/2 66/5
FORTUNA [1]  2/6
Forty [1]  67/5
Forty-eight [1]  67/5
forward [3]  54/18 58/10 154/20
found [28]  3/15 12/17 44/13 45/11 45/13 45/25 47/22 49/17 49/21 49/25 50/1 55/5 55/10 59/8 60/7 72/20 90/14 95/17 107/10 115/13 116/1 116/18 116/22 117/5 132/6 139/8 139/12 145/17
founder [1]  54/15
four [8]  13/12 15/25 16/23 17/2 20/11 28/19 73/19 74/24
four-to-six-inches [3]  15/25 16/23 17/2
four-ton [1]  20/11
fracture [3]  46/25 52/21 53/7
fractured [1]  28/23
fractures [19]  28/19 46/24 47/9 52/20 57/15 57/16 58/16 59/24 60/6
fragile [1]  25/10
frankly [4]  47/21 61/12 143/6 145/12
Friday [1]  155/18
friend [4]  13/8 40/18 40/19 71/2
friends [2]  40/16 70/20
front [5]  37/21 38/11 47/1 47/9 152/1
frontal [9]  52/22 52/24 53/1 56/21 56/25 57/10 58/11 68/12 70/6
frontals [1]  61/22
full [21]  6/17 32/3 33/7 33/16 33/17 87/10 87/14 87/16 93/5 103/6 103/7 103/9 103/11 103/15 114/11 115/10 125/25 126/11 137/18 141/15 142/24
funded [1]  83/11
funeral [18]  3/16 4/6 4/10 4/17 5/3 5/6 29/22 29/24 93/1 93/9 93/18 96/6 100/4 102/1 102/3 108/14 125/18 126/5
further [1]  42/15

G

GA [9]  1/13 1/15 1/16 1/18 1/20 1/24 2/2 2/5 2/10
gallbladder [4]  50/1 81/15 81/16 82/2
GAMD.USCOURTS.GOV [1]  2/15
game [1]  141/5
games [1]  83/21
gap [5]  44/23 61/23 155/15 155/16 155/23

Document 384    Filed 03/21/25    Page 172 of 190

**G**

gauge [3]  17/17 65/2 65/4
gauged [1]  65/6
gauging [4]  64/20 64/20 64/20 65/2
gave [7]  19/6 61/2 75/15 76/2 91/15
122/5 155/23
GBI [3]  13/21 13/25 49/14
gear [2]  42/7 43/8
general [5]  62/17 67/17 89/9 120/23
145/20
generally [1]  106/5
gentlemen [25]  5/13 6/13 8/17 11/1
13/3 34/22 35/4 75/5 75/7 75/25 88/2
88/14 91/25 92/12 95/4 98/13 99/3
99/21 100/21 104/19 108/11 111/3
119/3 121/5 127/14
GEORGIA [56]  1/1 1/6 3/4 3/22 4/4 4/9
4/22 13/2 13/7 13/19 19/3 22/6 33/22
37/4 78/2 95/9 106/14 128/17 129/16
129/21 130/6 130/12 131/8 131/10
131/15 131/17 131/19 132/1 132/21
132/23 133/7 133/8 134/17 134/18
134/18 134/20 135/4 135/8 135/18
137/6 137/12 137/20 138/7 138/14
140/6 140/20 141/19 142/3 142/8
142/8 143/2 144/15 146/24 147/10
148/19 159/5
Georgia's [2]  31/18 31/20
get [62]  3/12 16/4 16/24 17/10 17/12
19/6 19/10 21/23 21/24 22/3 27/17
28/12 31/7 31/11 31/12 32/7 33/8
34/23 34/23 38/1 42/13 42/19 44/7
53/9 54/16 56/24 58/18 59/1 60/2 63/2
72/3 73/24 74/1 74/10 76/16 79/4
79/20 79/23 80/21 81/12 86/12 86/12
111/21 112/13 116/10 119/14 119/19
121/20 123/11 123/12 127/24 128/12
130/17 138/1 151/6 152/19 153/25
154/10 155/12 157/4 157/18 157/18
gets [5]  5/18 7/2 76/15 87/8 87/9
getting [8]  8/9 12/6 30/13 32/25 41/22
70/7 83/14 149/5
Giles [1]  13/8
give [35]  5/17 5/19 5/20 5/22 6/7 6/8
6/10 33/5 35/8 35/9 48/7 75/19 83/17
90/10 111/20 112/6 118/2 119/12
125/8 127/18 127/19 129/4 130/5
130/17 135/4 135/22 135/25 136/12
138/9 138/15 140/3 140/7 150/5
150/12 150/22
given [13]  51/12 56/1 56/12 70/18
73/18 92/10 101/1 111/4 129/14 131/3
131/14 137/7 138/8
gives [1]  87/12
glad [3]  6/16 87/24 119/10
glasgow [2]  65/23 65/25
glass [1]  86/7
GM [2]  12/1 12/8
go [36]  5/25 21/12 21/19 27/12 33/1
44/10 47/7 48/8 55/8 56/11 64/16 75/1
80/21 85/8 88/11 88/20 94/6 107/8
112/25 114/2 114/16 115/4 115/14
116/4 117/23 118/4 120/4 121/19
121/24 128/8 128/17 132/19 140/10
151/6 152/13 153/17
goal [2]  6/18 21/20
goes [10]  40/6 40/7 40/23 127/17
130/21 130/22 135/8 135/16 151/12
156/15
going [119]  5/7 18/13 19/10 21/15

22/25 25/9 25/12 25/14 27/14 29/13
29/14 29/18 30/17 30/20 31/18 33/15
34/16 34/24 39/1 39/2 42/6 47/7 48/11
49/16 49/19 50/23 55/9 55/10 55/13
58/18 60/19 60/21 61/15 63/9 65/3
65/19 66/12 66/22 67/8 69/15 69/16
69/21 70/12 70/13 70/15 71/15 71/16
73/18 73/18 74/16 74/19 74/22 76/1
76/2 76/11 76/24 78/21 79/7 85/7
86/10 114/2 117/13 117/15 117/25
118/1 118/3 118/10 118/13 123/10
127/14 127/16 133/10 133/14 134/3
134/7 135/4 135/4 135/9 135/15 136/9
137/21 137/24 138/22 139/14 139/17
140/3 142/7 146/10 147/18 147/22
148/12 148/25 150/22 151/2 151/24
151/25 151/25 152/1 152/2 152/13
153/3 153/3 153/9 153/10 153/11
153/13 153/17 153/17 153/21 155/3
155/12 155/22 156/8 156/21 156/24
156/25 157/4 157/13 157/15
golden [1]  86/4
Goleta [1]  34/4
golf [1]  58/7
gone [3]  41/3 45/17 62/10
gonna [2]  156/4 156/20
good [15]  3/6 6/13 6/18 13/8 24/24
41/8 45/7 46/20 70/25 73/14 77/11
87/25 91/2 141/8 151/21
got [50]  7/24 10/17 12/5 13/8 13/22
16/25 19/12 19/18 20/19 21/12 21/13
21/14 21/14 21/20 22/21 23/15 24/2
24/3 24/25 26/5 27/11 34/11 34/18
36/7 44/14 46/9 46/13 49/23 55/8
59/10 76/21 76/25 77/2 80/24 114/3
114/18 115/19 119/5 119/5 121/6
122/13 125/1 128/14 130/4 130/20
130/21 140/14 147/11 154/8 157/5
gotta [1]  12/25
gotten [3]  35/24 46/11 58/21
government [4]  72/2 79/6 83/10 97/13
grace [1]  76/25
gradually [2]  37/2 40/6
gram [1]  50/9
grammar [1]  79/12
grams [1]  55/21
grand [3]  73/13 74/11 77/12
grandchildren [2]  32/11 86/6
grasp [1]  31/23
grass [4]  16/14 19/14 20/3 20/20
grateful [1]  74/13
gravity [2]  19/12 85/9
grayed [1]  54/5
great [3]  37/18 83/3 87/18
greater [6]  65/21 97/16 107/19 107/24
109/15 112/11
green [4]  19/18 19/23 20/3 47/15
grief [1]  77/9
Griffin [1]  32/18
grille [1]  39/20
gross [1]  109/7
ground [15]  16/13 20/11 20/12 23/3
27/21 27/23 28/4 28/7 28/8 28/11
37/12 56/22 56/24 61/18 102/20
grounds [1]  148/8
group [1]  73/8
growing [1]  20/20
Grubbs [1]  32/14
guess [6]  117/22 136/8 148/14 151/9
151/19 157/1

guidance [2]  141/20 141/21
guide [3]  104/12 104/16 104/20
gun [1]  80/9
Gunn [3]  117/25 121/21 157/18
guy [6]  6/23 7/4 10/16 15/16 26/16
32/14
Gwinnett [1]  78/11

**H**

habits [1]  104/5
had [112]  8/6 9/3 10/23 12/7 12/16
13/6 13/9 13/17 14/2 15/10 15/12
18/13 20/2 22/15 22/23 25/6 26/6
26/10 27/1 27/21 28/5 28/7 28/14
28/18 29/4 30/2 31/9 31/23 32/16 34/4
35/19 35/23 36/3 36/12 36/18 37/6
38/7 38/7 41/8 41/16 42/12 42/19 43/2
47/23 48/12 48/12 48/13 50/17 50/18
50/20 51/2 51/10 51/14 51/17 51/19
51/19 51/21 51/25 54/13 56/9 56/10
56/11 56/15 57/18 57/22 57/24 58/10
58/13 59/6 60/5 60/6 60/16 61/22 64/8
65/5 65/23 65/25 66/1 68/12 68/23
68/23 69/24 71/4 71/13 74/2 75/16
75/17 76/7 81/6 83/14 86/7 87/15
90/4 95/25 99/5 103/11 103/13
103/21 114/9 116/18 129/21 139/16
148/2 149/1 150/7 156/3
hadn't [3]  64/5 71/3 148/17
hair [6]  15/11 15/11 15/19 15/22 30/17
80/24
half [13]  11/23 12/14 16/12 30/13
48/18 48/19 48/21 78/14 78/16 82/8
82/25 84/8 124/12
halfway [1]  76/15
hand [8]  31/11 31/11 44/21 44/22
61/24 62/8 78/18 78/20
handed [2]  43/2 138/20
handle [1]  153/16
hands [6]  14/22 45/20 80/16 82/4
87/19 87/20
happen [4]  64/3 72/4 74/6 78/1
happened [16]  17/14 19/8 39/23 40/9
40/10 40/12 44/22 44/8 50/19 50/21
57/3 67/2 70/11 74/8 74/21 120/21
happening [4]  54/8 55/17 70/6 78/21
happens [4]  21/23 43/8 45/2 46/4
hard [6]  36/20 40/1 81/22 83/14 86/13
118/3
harder [1]  26/23
harm [8]  87/5 96/11 97/14 110/19
131/22 131/23 138/23 138/24
harmed [7]  134/22 139/7 144/6 144/21
144/23 145/21 146/1
HAROLD [3]  2/2 14/5 14/9
HAROLD.MELTON [1]  2/3
Harrison [8]  16/7 30/13 40/21 41/6
41/21 44/14 80/7 82/8
has [106]  4/3 4/5 5/17 7/20 9/10 9/16
10/18 11/13 19/12 20/22 21/17 26/5
32/15 34/4 34/5 34/25 36/9 37/17 38/3
38/15 38/18 39/18 41/4 45/1 45/5 45/5
45/23 49/6 49/16 49/22 52/17 53/5
53/19 53/21 53/23 54/18 55/14 55/21
59/16 60/2 60/8 60/9 60/24 62/2 62/4
62/5 62/9 62/9 62/10 62/11 63/6 63/22
65/8 66/7 66/20 66/23 67/23 67/24
69/10 69/17 69/21 71/10 72/1 72/23
73/7 73/11 74/11 77/11 77/21 78/23 79/3

has... [36]   79/5 83/22 85/23 87/18 88/2
88/4 88/16 88/23 90/5 92/1 94/20
95/20 100/17 104/7 112/22 114/8
114/23 115/1 115/9 115/11 116/1
121/9 121/14 130/25 131/3 131/23
136/11 141/25 144/7 145/20 149/11
149/16 150/3 156/5 156/6 157/5
hasn't [2]   74/15 149/14
hauling [1]   9/13
have [302]
haven't [6]   141/7 148/5 149/3 150/4
150/8 150/8
having [11]   29/8 35/18 41/8 44/15
48/16 51/8 51/8 55/24 61/4 70/25
102/5
he [283]
he'll [2]   140/3 157/18
he's [28]   13/8 14/16 22/18 38/2 40/19
40/21 41/25 43/5 43/6 45/1 45/7 49/23
53/10 53/11 53/20 55/2 55/3 55/4
57/16 59/10 62/15 67/4 71/16 80/15
80/17 81/9 118/1 118/2
head [18]   17/8 17/10 28/12 28/24
38/23 45/24 49/14 50/18 54/20 55/7
57/19 57/21 57/22 59/23 60/7 60/8
60/8 66/1
headed [4]   20/5 38/22 38/22 38/25
header [9]   15/22 17/14 17/16 17/17
17/18 17/20 17/24 17/24 84/1
headers [1]   64/25
headlines [1]   70/17
headrest [12]   15/12 15/23 43/17 43/17
43/22 43/23 43/25 44/6 54/18 54/21
80/25 81/1
health [7]   25/24 35/23 54/25 55/11
56/14 71/5 104/4
healthy [1]   26/4
hear [12]   36/10 36/14 61/25 61/25 67/9
70/8 71/10 76/14 79/24 135/5 152/25
157/7
heard [53]   6/21 6/21 14/6 16/8 20/17
26/25 27/21 31/20 32/12 36/8 37/3
37/5 41/15 42/1 42/2 43/1 44/11 48/6
49/15 49/17 49/23 51/4 52/3 52/20
53/10 54/12 57/20 60/14 60/15 61/6
62/3 62/13 63/16 66/4 67/22 68/1 68/3
68/14 70/4 70/19 70/25 71/1 71/9 72/6
73/14 74/18 76/18 79/5 111/24 118/7
145/9 146/7 153/2
hearing [2]   25/10 55/22
heart [25]   14/21 14/22 14/23 15/1 15/6
20/21 20/23 21/9 21/21 22/4 22/9
22/19 22/23 50/7 50/8 50/9 54/25
55/16 55/21 55/22 55/24 56/13 82/2
82/4 82/5
heavily [2]   72/23 79/13
heavy [5]   9/16 12/1 12/2 16/3 19/12
held [3]   82/4 136/22 159/8
help [4]   43/6 76/24 76/25 119/17
helped [1]   42/3
helpful [1]   92/1
Helping [1]   32/17
hematoma [6]   47/16 48/13 48/18 57/25
58/8 59/18
hemorrhages [1]   57/17
HENDERSON [1]   2/10
her [104]   11/2 14/22 15/11 15/11 15/19
15/22 16/5 16/10 16/10 16/14 16/14
16/16 16/16 17/8 18/22 22/9 26/9

26/11 26/25 27/1 27/6 28/23 30/16
30/16 31/3 35/8 36/13 38/14 41/2 41/8
43/16 43/17 44/10 44/16 44/17 44/18
44/20 46/3 46/6 46/8 46/10 46/16
46/24 47/2 47/3 47/14 47/17 48/16
48/17 48/25 48/25 50/7 50/8 50/9
50/12 50/16 50/19 50/24 52/2 54/24
54/25 54/25 55/11 55/15 55/16 55/20
56/4 56/5 56/7 56/12 56/16 56/17
56/24 57/4 70/2 73/21 74/5 74/5 74/25
80/24 81/5 82/1 82/1 82/2 82/5 84/20
85/3 85/21 85/21 85/25 93/9 93/11
105/16 105/17 105/22 106/21 106/25
107/5 107/5 107/7 114/3 116/6 116/11
148/22
Herbst [22]   8/10 11/25 14/6 17/20
24/22 34/3 60/13 61/16 61/19 62/8
62/9 62/13 66/22 67/12 67/21 67/25
69/6 70/4 73/5 78/7 78/12 80/1
here [92]   7/8 7/20 7/20 8/3 8/21 8/23
9/6 12/16 12/19 13/1 13/15 17/14 19/3
19/20 19/21 21/17 22/2 22/8 23/20
29/17 32/17 34/5 34/14 35/13 35/19
35/25 37/3 38/22 38/23 39/10 39/11
39/13 39/17 39/17 39/19 39/25 40/9
40/19 43/21 44/1 44/3 44/5 45/11
45/17 47/2 48/9 48/14 52/6 52/7 54/14
54/21 58/1 61/13 61/22 62/17 63/21
66/6 68/24 71/11 72/1 72/4 74/17
74/25 75/6 76/13 77/22 79/10 79/20
81/23 83/7 88/4 88/15 95/9 110/16
119/19 120/13 122/16 128/9 130/4
130/18 132/13 132/24 134/4 141/2
143/8 144/4 145/17 149/5 152/11
153/14 155/12 157/13
here's [10]   19/21 20/7 25/14 27/19
29/10 29/19 42/17 82/22 84/21 86/9
hereby [1]   159/5
Herman [57]   27/1 29/6 29/7 29/9 31/8
32/14 32/15 33/4 33/17 77/20 87/15
92/15 92/22 92/23 93/16 93/16 93/17
93/21 93/23 94/1 94/10 95/7 96/4 96/6
99/6 100/13 101/9 101/18 103/5
104/23 105/10 105/18 105/25 107/1
107/6 107/25 108/1 108/4 113/9
114/16 114/18 114/21 115/4 115/6
115/10 120/22 126/1 126/1 126/3
126/7 126/9 126/11 134/22 144/6
144/21 144/23 145/21
heroes [1]   86/3
herself [4]   44/19 87/17 103/17 105/25
hesitate [1]   111/18
Hey [1]   12/24
hide [1]   47/10
high [2]   12/9 109/14
higher [2]   71/16 109/10
highlighting [1]   145/1
highlights [1]   48/7
highly [1]   154/19
Highway [1]   83/11
hill [3]   78/11 78/12 85/7
Hill's [1]   78/20
him [46]   14/19 15/3 15/18 18/22 26/16
27/17 29/8 31/12 34/16 34/16 40/4
40/18 42/5 42/6 42/18 42/24 43/2 43/2
44/25 48/1 49/17 49/20 51/11 52/20
52/23 53/10 55/5 57/8 60/21 61/4 61/5
61/9 61/9 62/13 71/3 78/25 81/5 81/19
84/11 152/3 153/2 153/12 153/13
154/14 154/15 155/1

himself [4]   42/5 81/4 87/15 103/17
hint [1]   59/16
hired [3]   7/24 7/25 80/9
hired-gun-experts [1]   80/9
his [63]   14/3 14/22 22/15 22/18 31/10
31/11 38/5 40/2 42/1 42/7 43/3 43/8
43/10 44/25 45/7 45/15 45/15 45/20
45/20 48/7 48/21 49/15 49/22 50/3
50/11 50/13 50/21 51/15 52/6 52/11
53/13 53/22 54/10 54/19 56/20 57/9
57/17 57/20 58/5 58/6 58/13 58/14
59/15 59/16 59/18 60/8 60/8 60/11
61/3 62/11 67/13 67/13 67/18 71/2
71/3 71/4 81/7 82/4 94/1 115/25
139/15 148/22 153/7
history [3]   51/8 56/13 79/2
hit [11]   20/11 20/20 23/3 27/23 28/6
28/8 28/9 28/10 28/10 28/11 38/5
hits [4]   27/20 39/25 40/7 40/8
hitting [1]   19/15
hold [3]   25/15 102/22 130/5
holding [4]   14/22 31/10 31/11 80/16
hole [1]   39/10
home [3]   56/10 56/12 71/2
Honda [1]   62/18
honest [4]   4/11 30/8 110/12 111/20
Honor [73]   3/10 3/25 4/11 4/19 5/4
35/5 35/11 75/4 75/17 75/24 88/1
118/24 122/4 122/6 122/10 122/12
123/22 124/18 124/20 125/3 125/5
125/7 127/10 127/11 128/24 129/3
129/24 130/13 130/24 132/15 132/18
133/11 133/18 134/10 135/3 135/24
136/4 136/12 137/5 137/8 137/25
138/4 138/20 140/8 140/12 140/17
141/9 141/12 142/5 142/10 143/10
143/12 144/3 145/3 145/23 146/12
146/15 146/17 147/21 148/1 148/19
149/18 149/24 150/2 151/5 153/24
154/6 154/16 155/21 155/25 156/10
157/10 157/15
HONORABLE [2]   1/9 124/6
hook [3]   21/21 21/22 22/25
hoop [1]   58/17
hope [6]   5/14 6/15 7/9 21/20 22/10
87/23
hopefully [3]   112/19 121/19 146/16
hopped [1]   20/13
horizontal [4]   43/17 43/18 43/21 64/18
hospital [3]   31/15 56/11 61/7
hospitalized [1]   56/10
hour [10]   27/23 37/12 37/13 56/22
68/13 77/17 147/10 151/24 155/2
156/12
hourly [2]   149/22 150/14
hours [9]   75/1 75/7 147/2 147/5 147/14
149/23 150/23 153/4 156/23
house [2]   40/4 84/21
how [56]   10/1 11/11 13/12 15/8 15/9
16/1 16/4 16/6 16/18 16/19 17/4 17/18
18/12 21/11 23/17 24/15 25/11 27/16
27/16 30/7 31/6 34/6 36/15 36/16
36/17 37/18 37/20 39/6 40/12 47/1
57/3 58/9 58/16 58/17 59/15 60/2 64/7
65/12 67/2 67/25 80/21 90/14 102/10
102/10 112/17 117/25 121/22 131/24
134/3 134/7 143/15 149/23 149/23
150/23 151/10 157/2
however [5]   95/14 99/1 107/23 133/12
138/10

huddle [2] 141/2 154/21
HUIELAW.COM [1] 2/9
human [4] 18/7 32/3 32/4 33/21
hundred [1] 74/8
hundred percent [1] 74/8
hundreds [1] 142/1
hurt [3] 72/9 72/21 76/22
husband [2] 44/19 74/5
husband's [1] 47/3
HWY [1] 2/8
hybrid [2] 64/5 64/14
hypertension [2] 55/12 61/4
Hyundai [1] 62/18

I
I'll [12] 22/9 26/3 29/15 29/17 31/7
34/22 35/5 100/11 119/7 119/10
143/17 146/12
I'm [48] 3/21 7/2 12/6 19/10 21/7 21/15
25/13 42/6 47/25 52/4 67/25 76/2
76/22 76/23 77/16 117/13 118/25
122/13 131/9 131/13 132/13 132/14
132/16 132/20 135/15 136/13 137/24
137/24 138/2 138/6 139/18 140/3
141/7 142/2 142/7 142/15 142/22
146/6 146/10 146/24 147/22 151/25
151/25 152/13 153/13 153/16 153/17
157/15
I've [22] 8/4 8/4 8/5 12/25 21/13 21/14
21/14 31/19 34/18 63/16 78/25 119/5
128/14 130/4 130/21 134/19 136/5
137/7 137/16 140/13 152/10 156/17
idea [4] 22/22 33/21 34/25 147/10
ideas [1] 6/19
identified [1] 148/6
identify [2] 66/17 154/17
if [176]
ignore [1] 68/11
ignored [4] 36/6 39/15 50/7 50/12
ignores [1] 39/16
IIHS [4] 11/18 11/22 24/10 24/10
illustration [3] 27/20 48/13 48/22
illustrations [5] 29/1 47/23 48/4 49/11
59/5
illustrative [7] 118/8 118/9 118/12
118/14 118/17 118/19 118/20
illustrator [1] 48/1
image [5] 45/22 46/2 52/8 59/21 78/21
images [9] 45/14 46/7 46/17 46/19
49/8 52/4 57/15 57/18 59/19
imagine [3] 58/6 68/15 80/20
imaging [1] 45/6
immediately [1] 40/22
impact [12] 28/7 39/13 39/13 39/14
47/5 52/22 53/22 54/6 102/19 134/16
134/24 144/9
impacts [5] 37/12 53/23 54/9 57/10
68/13
impairing [1] 97/3
impartial [2] 102/9 141/17
impeccable [1] 45/1
implication [1] 4/7
implications [1] 131/16
imply [1] 120/25
importance [3] 32/5 32/6 32/6
important [15] 6/6 7/17 8/15 9/8 13/17
14/18 15/9 17/13 34/1 42/4 50/11 77/7
90/14 91/11 91/23
importantly [2] 68/7 69/5

impose [1] 135/8
imposition [1] 135/9
impossible [1] 27/15
impress [1] 90/21
impression [1] 112/11
improperly [1] 26/25
improve [2] 63/9 63/15
improvements [1] 128/19
in [527]
inaccurately [1] 91/19
inadvertent [2] 120/8 120/9
inadvertently's [1] 120/24
inboard [2] 15/22 80/23
incapable [1] 95/19
inch [2] 48/18 58/22
inches [8] 15/25 16/23 17/2 48/19
48/20 48/21 80/18 80/19
incident [1] 67/8
incidents [5] 67/1 67/5 67/9 82/20
146/4
include [9] 130/6 131/18 132/11 135/20
140/14 140/16 140/24 143/13 156/13
135/19
included [5] 50/15 129/17 129/21 132/2
135/19
includes [4] 64/25 89/15 103/22 133/15
including [15] 54/7 62/22 67/7 96/15
101/23 106/14 110/5 110/9 110/22
111/1 117/9 126/24 127/2 141/6
152/21
income [1] 92/11
incorrectly [1] 49/16
increased [1] 97/4
increasing [1] 72/17
incredible [1] 56/13
incredibly [1] 35/18
incurred [1] 149/23
independent [3] 60/10 83/11 112/7
INDEX [1] 2/17
indicate [2] 107/7 117/12
indication [3] 111/6 133/16 147/15
indicative [1] 65/18
indicator [1] 146/20
indicia [2] 147/8 148/4
indifference [3] 71/20 109/1 109/5
indisputably [1] 47/18
individual [1] 93/22
individually [4] 114/5 115/6 125/22
126/8
individuals [3] 26/22 134/24 144/10
industrial [1] 53/19
industry [3] 63/20 97/12 98/16
industry-wide [1] 98/16
inflate [1] 142/20
influenced [2] 88/24 112/8
information [15] 119/22 119/25 120/1
120/1 129/5 135/10 143/14 143/20
143/23 144/2 145/9 149/19 151/2
151/5 152/9
informed [1] 146/17
inherent [1] 96/11
initial [4] 149/17 150/4 150/6 150/9
initially [2] 10/17 111/19
injured [9] 8/9 24/21 28/4 32/25 34/6
35/22 63/2 95/12 136/18
injuries [85] 25/8 25/15 25/18 25/20
26/10 27/14 27/24 28/6 28/13 28/15
28/18 28/23 28/24 28/25 35/22 40/14
45/11 45/12 45/13 45/19 45/25 45/25
46/9 46/11 46/23 47/11 47/12 48/5
48/11 51/11 55/5 56/13 56/21 57/3

57/6 57/9 57/11 57/19 57/22 58/18
59/22 59/23 59/24 60/24 61/9 62/23
66/1 66/3 67/11 69/18 70/1 71/14
73/21 76/8 81/7 86/17 86/20 87/13
94/9 95/7 96/3 99/6 101/11 101/13
101/22 102/7 102/12 102/14 102/16
102/18 102/20 102/22 102/25 103/1
104/22 105/10 105/17 105/18 105/25
107/1 107/5 107/6 107/15 121/16
135/9
injuring [1] 34/3
injury [34] 24/24 25/2 25/7 25/22 29/1
30/22 47/10 47/21 53/5 55/7 56/24
57/23 58/22 60/7 60/17 62/25 63/6
63/7 64/13 65/19 70/7 72/14 72/18
72/22 95/16 95/19 97/21 99/17 99/20
100/7 100/8 100/18 101/2 103/3
innocent [2] 49/16 91/21
innovation [1] 72/24
input [3] 38/10 119/7 119/14
insert [1] 104/15
inside [2] 15/10 28/7
inspected [3] 13/11 13/12 24/23
inspections [1] 13/10
installed [2] 73/1 79/14
instead [6] 37/7 39/17 51/11 63/8
63/25 118/5
Institute [1] 83/10
instruct [6] 5/23 70/15 71/15 88/7 88/18
95/8
instructed [4] 102/7 107/3 114/10
115/16
instruction [13] 122/2 129/4 133/1
134/18 135/25 136/7 136/13 137/9
141/18 142/19 142/25 143/4 146/4
instructions [29] 69/15 75/9 89/2 89/3
89/20 92/23 111/4 117/18 117/19
121/8 124/15 124/16 127/20 128/13
128/16 128/20 129/13 129/14 129/15
129/17 129/19 130/5 130/25 132/23
133/2 135/17 140/18 141/13 141/19
insurance [3] 83/10 83/12 97/5
insurer [1] 95/15
intact [2] 40/25 65/12
intangible [3] 103/16 103/19 103/21
intend [5] 120/25 135/22 147/1 147/2
147/4
intended [1] 124/14
intention [2] 130/6 131/18
intentional [2] 37/14 91/21
intentionally [17] 38/7 38/8 38/13 38/14
38/15 38/17 38/18 39/3 41/19 44/18
52/14 52/16 56/18 70/12 74/3 74/4
74/5
interest [2] 90/25 111/23
interested [3] 3/21 50/20 83/2
interesting [1] 23/20
interestingly [1] 47/21
interpretation [1] 89/23
interpreted [1] 111/5
interview [1] 154/15
into [20] 6/24 7/6 16/15 25/4 27/12
37/8 43/14 47/2 56/22 56/24 58/11
79/21 81/9 104/8 104/15 140/1 140/21
148/9 149/25 156/19
introduce [6] 109/23 110/23 147/14
147/17 147/19 148/12
introduced [2] 104/7 109/24
inverted [1] 64/18
invested [3] 72/23 73/3 79/13

**I**

investigation [3] 67/24 128/5 151/15
investigations [2] 13/20 57/8
involuntary [1] 79/3
involve [2] 61/17 67/6
involved [7] 43/7 68/2 68/3 89/4 89/8
 144/16 144/18
involving [1] 57/9 144/19
ironed [1] 128/12
irrelevant [3] 18/21 119/25 137/1
is [512]
ISH [1] 24/3
isn't [3] 46/2 48/24 51/4
isolated [2] 144/17 146/4
issue [13] 24/2 34/23 71/7 82/11 83/24
 89/19 100/24 111/4 133/12 135/14
 135/15 136/10 155/22
issued [2] 73/12 142/15
issues [7] 54/25 56/14 56/14 60/17
 69/8 131/21 149/2
Isuzu [1] 62/18
it [372]
it's [96] 4/4 11/6 11/6 11/17 11/21
 11/22 13/9 13/16 17/1 17/4 18/21
 18/23 19/7 20/15 21/9 22/20 23/4 23/8
 23/21 24/1 24/7 25/23 26/12 26/21
 26/23 27/4 27/15 29/16 33/12 33/13
 33/14 37/15 39/1 39/19 39/25 41/1
 41/10 41/13 43/21 44/14 46/22 48/22
 48/23 49/9 49/24 49/24 51/5 51/5 51/9
 54/19 54/21 55/21 61/5 63/19 63/23
 65/11 67/16 67/18 68/15 68/15 68/16
 71/15 71/17 73/7 73/21 74/21 74/22
 78/14 80/21 82/3 84/22 85/13 87/20
 88/7 119/24 120/9 121/10 124/12
 124/13 133/2 134/15 135/9 135/23
 136/21 136/24 140/4 141/24 142/7
 143/13 149/13 150/17 151/6 151/20
 152/11 153/10 155/10
item [3] 3/11 137/8 146/15
items [3] 102/8 103/19 113/20
its [18] 24/17 25/18 37/11 73/8 76/16
 89/8 89/10 95/17 102/25 105/1 128/8
 129/12 131/3 134/17 134/24 142/15
 144/9 151/11
itself [1] 100/8
ivory [1] 44/25
IX [1] 1/9

**J**

Jacob [1] 27/7
jail [2] 49/17 49/18
JAMES [12] 1/20 92/18 92/20 93/7
 93/23 113/16 114/4 114/20 125/12
 125/15 125/21 126/2
Jamie [1] 60/15
January [1] 129/6 130/22
Jason [7] 8/15 20/18 26/25 92/22
 93/25 115/5 126/8
Jeep [1] 62/17
JIM [1] 1/21
JOAN [4] 2/14 2/15 159/3 159/18
job [10] 36/2 45/7 49/22 70/21 87/10
 88/7 88/18 111/7 111/8 119/5
jobs [2] 70/22 134/1
Johnson's [1] 84/18
JR [8] 1/20 92/19 92/20 93/7 93/23
 113/17 114/4 114/20
judge [26] 1/10 7/11 8/10 21/1 22/10
 25/4 25/9 25/14 30/20 31/17 33/24

34/24 35/1 36/9 49/17 67/9 69/15 70/8
 70/15 71/16 71/11 84/1 86/10 86/25
 121/4 157/22
Judge's [1] 21/1
judges [3] 86/13 111/22 111/23
judgment [4] 4/8 108/9 110/13 153/18
Judicial [1] 159/10
jumping [1] 69/9
Junior [4] 125/12 125/16 125/22 126/3
junk [1] 77/25
juror [2] 21/22 112/11
jurors [3] 110/22 111/16 112/9
jury [76] 1/9 3/15 5/6 5/7 5/12 5/25
 13/3 21/23 29/21 88/10 88/20 103/16
 109/12 112/13 113/16 113/22 113/25
 114/4 114/14 114/19 115/2 115/5
 115/12 117/23 118/13 119/14 120/10
 121/25 122/24 123/15 124/5 124/23
 124/25 125/15 125/21 126/2 126/7
 128/4 128/10 129/17 129/18 130/5
 132/23 133/1 133/14 133/18 133/24
 134/3 134/18 134/21 135/4 139/4
 140/9 140/18 141/18 141/19 143/8
 143/15 144/15 145/11 145/15 145/19
 146/23 147/18 150/12 151/11 151/12
 151/14 151/18 152/1 152/13 152/15
 153/17 155/14 155/17 156/21
just [105] 3/11 4/12 7/11 11/9 15/6
 16/12 21/10 26/21 35/6 36/6 37/22
 40/5 41/17 42/17 45/11 45/18 45/22
 46/17 47/8 47/22 48/5 49/10 49/21
 49/23 51/4 51/5 52/4 59/1 59/17 60/6
 60/14 61/6 61/22 63/3 63/10 63/19
 63/21 63/24 64/2 64/13 64/16 64/22
 69/11 70/13 74/9 76/2 76/6 76/18
 77/12 77/15 77/15 77/16 77/16 78/20
 82/16 84/13 87/23 94/10 101/7 108/6
 111/20 117/3 118/19 118/22 119/18
 120/9 120/9 120/23 121/9 122/5
 122/20 129/8 130/8 130/17 130/19
 131/2 135/20 135/23 136/12 137/1
 137/20 139/21 139/22 140/17 141/1
 142/15 143/20 143/22 145/1 145/3
 145/19 149/7 150/2 150/13 150/17
 150/18 152/7 152/11 153/3 154/15
 155/12 155/13 156/25 157/12 157/15
justice [4] 6/17 6/18 87/11 89/7
justify [1] 156/4

**K**

Kao [1] 24/18
keep [13] 13/5 13/6 25/9 29/3 40/19
 55/22 59/5 71/6 78/21 91/16 123/24
 144/4 153/8
keeping [1] 87/18
keeps [1] 13/9
kept [4] 8/7 18/1 19/1 46/17
KEY [1] 1/25
Keyserling [3] 14/5 14/9 14/13
Keyword [1] 25/19
Kia [1] 62/18
kid [4] 6/24 6/25 7/1 7/5
kill [1] 78/1
killed [11] 8/9 8/18 18/19 18/22 18/22
 20/19 32/25 34/6 76/22 82/16 103/14
killing [2] 34/3 83/18
kind [9] 16/3 32/13 32/16 42/6 55/5
 70/5 119/9 128/4 149/22
kinds [1] 26/2
kneeling [1] 16/13

knew [15] 10/15 17/22 17/23 18/1 22/6
 32/24 34/25 66/13 68/2 84/12 86/1
 87/4 98/25 110/18 143/8
knocked [1] 16/2
know [85] 5/1 11/10 11/11 13/20 16/1
 16/16 16/24 18/9 18/18 19/2 19/3
 19/14 19/19 20/1 20/6 25/13 30/7
 30/8 30/12 30/13 30/14 31/25 33/6
 40/2 43/25 45/9 45/9 48/19 49/24
 52/12 54/18 55/20 56/3 56/4 56/6 56/8
 57/3 57/4 59/19 60/25 64/14 67/8 70/6
 71/4 74/15 78/8 79/11 79/19 81/17
 81/18 81/20 83/5 83/13 83/15 83/21
 84/25 85/1 85/18 87/25 118/11 119/24
 120/1 120/2 121/8 123/2 127/7 127/14
 128/6 128/11 131/13 132/1 134/11
 141/14 143/19 147/8 149/11 150/5
 151/10 151/24 152/4 153/6 155/20
 155/20 157/13
knowing [1] 8/8
knowingly [1] 73/4
knowledge [4] 90/5 92/1 96/21 96/22
known [3] 51/18 51/20 99/1
knows [7] 18/4 18/17 34/7 72/3 73/11
 151/11 153/7

**L**

laceration [3] 47/18 52/21 57/16
lacerations [1] 53/1
lack [1] 112/7
ladies [25] 5/13 6/13 8/17 11/1 13/3
 34/22 35/3 75/5 75/7 75/24 88/2 88/14
 91/25 92/12 95/4 98/13 99/3 99/21
 100/21 104/19 108/11 111/3 119/3
 121/5 127/14
LAND [11] 1/9 7/11 8/10 21/1 22/10
 25/4 62/18 71/14 84/13 86/10 86/23
lane [1] 106/15
Laned [1] 106/14
language [5] 114/13 135/12 144/1
 144/4 145/12
lap [2] 27/9 28/8
lapse [1] 91/21
LARAE [1] 1/16
large [5] 48/12 48/14 57/25 59/17
 136/16
last [14] 19/6 33/23 35/13 35/13 35/16
 88/4 88/15 99/18 142/23 144/7 145/3
 146/4 146/16 146/18
late [2] 128/15 153/18
later [3] 39/22 39/24 44/14
launched [1] 37/8
law [44] 3/22 4/4 4/8 4/13 4/22 5/24
 18/5 26/1 31/3 32/3 43/2 70/15 72/2
 72/3 88/7 88/19 88/25 89/1 89/3 89/6
 89/10 89/20 90/9 92/17 92/25 95/8
 95/9 99/8 101/3 106/14 106/17 124/14
 131/16 133/15 133/18 134/11 137/12
 141/25 142/9 143/18 146/23 147/16
 147/24 148/20
lawful [7] 133/13 133/14 133/17 134/8
 134/15 136/21 137/3
laws [2] 106/14 106/16
lawsuit [1] 25/6
lawsuits [3] 8/16 8/20 63/17
lawyer [14] 5/18 5/19 5/21 13/18 16/23
 18/20 65/16 77/15 77/16 77/16 78/4
 79/25 151/7 152/2
lawyer's [1] 15/24
lawyers [33] 5/16 6/2 6/5 6/7 7/14 7/24

lawyers... [27]  7/24 15/16 20/23 22/21
23/21 29/3 36/8 36/9 36/11 36/13
36/15 63/17 63/19 74/18 74/22 80/1
84/11 86/13 87/9 88/5 88/16 89/16
112/20 119/13 119/20 127/18 152/7
lawyers' [1]  77/21
laying [2]  78/18 78/20
lead [2]  20/7 85/11
leading [1]  36/12
leaning [1]  81/4
leans [1]  7/6
learned [2]  59/7 59/19 64/10
least [7]  50/19 52/15 53/5 60/1 131/20
143/7 145/7
leave [4]  37/2 146/8 146/10 153/9
LECs [1]  22/22
led [2]  11/13 139/25
left [16]  41/14 15/2 19/19 19/10 19/17
38/5 41/11 41/18 48/9 56/16 71/10
75/25 85/4 85/6 85/9 86/7
legal [5]  23/19 90/9 95/11 101/8 102/8
length [2]  155/16 155/23
lengthy [1]  72/7
LENOX [1]  1/15
less [5]  27/25 39/13 62/23 85/6 109/17
let [23]  3/11 11/20 15/8 17/13 18/3
21/3 26/7 36/13 49/18 87/8 120/4
123/12 127/6 127/7 130/24 132/18
133/4 141/21 152/13 152/13 153/13
153/17 155/13
let's [16]  5/5 13/14 15/14 20/21 27/19
31/8 31/17 35/7 38/19 51/18 65/20
67/19 75/20 78/22 131/5 140/10
leu [1]  142/19
leukemia [4]  29/8 29/9 57/17 61/5
level [3]  53/13 98/1 109/15
Lewis [14]  44/22 53/18 53/19 53/21
53/22 53/25 54/7 56/20 57/1 57/11
58/21 58/24 60/10 69/7
Lewis's [1]  54/17
liability [2]  83/12 134/13
liable [2]  95/11 95/17
lie [1]  76/15
life [39]  31/22 31/24 31/24 32/2 32/3
32/4 32/23 33/11 33/14 33/16 33/17
33/21 35/23 71/2 71/4 87/15 87/16
93/5 103/6 103/8 103/9 103/12 103/15
103/17 103/20 103/22 103/23 103/25
104/1 104/7 104/9 104/11 104/12
104/16 104/17 114/12 115/10 125/25
126/11
life-threatening [1]  35/23
light [5]  9/15 23/3 23/4 23/5 144/25
lighter [2]  8/24 9/2
like [43]  4/12 5/15 7/14 8/4 13/16 13/21
16/4 16/13 20/12 21/17 21/21 26/24
29/15 30/9 40/4 43/10 58/3 58/4 58/13
62/22 65/25 66/15 67/7 68/10 68/12
77/16 78/19 78/20 80/14 80/21 83/22
83/22 85/4 85/4 104/18 106/5 106/10
106/12 128/21 128/21 143/13 147/9
148/24
liked [2]  71/2 79/16
likelihood [2]  70/3 96/19
likely [6]  7/13 28/3 28/5 87/5 94/19
110/19
limit [1]  20/6
limitation [1]  129/9
limited [1]  103/12

limiting [2]  4/25 129/4
line [7]  15/19 15/18 15/25 17/7 44/3
65/15 116/15
lines [2]  120/15 121/2
list [11]  11/19 25/11 49/20 50/25 62/16
62/19 66/18 78/12 137/21 148/6
148/10
listed [1]  151/8
listen [3]  21/1 35/19 84/16
listening [1]  74/14
litany [1]  60/24
litigation [8]  110/5 110/8 110/21 111/1
117/4 117/8 126/24 127/1
little [25]  16/2 23/20 26/23 47/1 47/3
47/9 51/22 59/8 59/9 71/9 75/20 81/7
88/9 100/11 113/21 118/2 118/10
119/19 121/19 130/19 130/25 131/12
143/18 151/9 154/10
live [3]  19/21 32/22 53/12
lived [6]  31/23 87/16 87/17 103/11
103/18 103/21
livelihood [1]  52/7
liver [3]  47/18 52/21 53/1
lives [9]  29/16 29/12 33/8 77/20 86/4
86/8 87/14
living [1]  104/5
LMOORE [1]  1/17
load [7]  47/2 58/6 58/8 58/10 58/19
58/20 59/1
loading [3]  47/2 47/6 61/9
loads [1]  45/18
locked [1]  13/9
lodestar [2]  154/23 156/15
long [15]  13/21 30/7 39/22 50/25 62/19
66/18 88/3 88/3 88/14 102/10 103/17
122/19 127/17 127/19 127/20
look [31]  11/16 11/21 15/18 15/24 17/4
17/7 23/2 27/8 27/16 27/16 28/6 28/22
38/20 38/24 40/5 44/23 50/16 57/25
58/1 59/11 62/20 65/8 65/11 65/20
68/10 74/20 78/19 104/10 127/7
155/11 156/15
looked [16]  14/23 47/19 49/7 51/6
51/17 51/19 51/21 51/25 57/9 58/3
58/4 58/13 59/8 76/1 82/4 140/19
looking [9]  16/14 52/4 64/4 64/13 68/12
131/9 132/14 132/16 133/7
looks [1]  29/15
loss [2]  70/18 103/23
lost [8]  10/9 32/9 32/10 32/22 32/22
33/5 78/25 137/16
lot [13]  7/16 10/6 16/10 24/12 29/8
45/10 45/16 45/17 61/14 68/14 79/23
82/18 82/18
lots [1]  6/22
love [1]  32/7
loved [2]  44/19 70/21
low [2]  12/10 70/7
lower [2]  21/25 46/3
Lowery [5]  10/12 11/2 12/7 140/25
156/15
Lowrey [4]  136/8 146/6 147/12 156/2
lunch [1]  121/20
lungs [2]  84/5 84/10
lure [6]  21/15 21/18 21/19 21/19 21/21
21/23
lying [1]  60/7

M

ma'am [1]  17/6

made [19]  10/18 15/18 23/4 36/21 49/5
49/20 69/20 52/4 82/23 77/2 80/12
82/11 89/11 97/20 102/19 112/3 130/8
131/20 142/4
magically [1]  117/24
mail [1]  157/16
main [2]  17/11 79/21
mainly [1]  128/17
maintain [1]  106/15
maintaining [1]  142/18
make [35]  5/2 20/24 21/10 26/8 29/17
32/7 37/15 41/17 48/2 48/23 53/7 63/3
63/13 66/21 83/23 87/22 90/1 95/16
96/8 107/10 107/11 107/11 107/16
108/6 108/9 112/5 114/22 117/20
120/10 121/9 122/19 137/2 139/15
145/15 152/14
makes [9]  9/8 14/9 24/7 26/9 27/4
56/23 72/11 144/3 152/16
making [12]  15/7 20/6 23/1 25/7 80/13
90/15 97/3 107/1 110/12 139/21 143/7
144/13
maladies [2]  26/6 29/3
male [1]  33/12
MALEK [2]  2/8 62/16
malice [1]  73/15
man [2]  32/18 42/5
management [1]  23/19
mandatory [1]  148/15
manufacture [2]  69/22 84/9
manufactured [1]  97/1
manufacturer [17]  38/2 62/9 66/24 67/4
95/10 95/14 95/14 95/16 95/18 95/20
96/13 97/11 97/15 97/16 97/25 98/11
98/25
manufacturer's [4]  64/15 97/12 97/22
98/15
manufacturers [9]  62/12 62/15 62/16
63/10 63/20 63/21 63/23 70/1 72/12
many [21]  12/25 13/12 18/12 21/12
24/15 25/11 34/6 35/1 36/16 36/18
37/2 55/11 57/9 57/10 62/14 67/25
70/2 70/17 70/17 149/23 150/23
MARCH [1]  159/13
mark [2]  76/15 118/10
market [2]  72/25 98/4
marketing [1]  79/19
marks [3]  37/1 37/5 38/24
married [1]  70/22
marvelous [1]  70/21
massive [1]  27/14
master's [1]  53/20
masters [1]  53/11
match [1]  48/6
material [4]  64/5 64/5 64/9 152/20
materials [2]  37/25 152/21
matter [16]  4/8 18/19 23/22 23/24 24/7
82/12 82/14 82/17 82/17 82/20 83/9
90/18 92/3 104/3 106/17 159/8
mattered [3]  82/2 82/18 82/18
matters [8]  24/11 24/12 24/14 60/5
83/5 83/6 84/1 89/24
may [85]  5/5 5/8 6/21 18/8 24/13 25/20
31/25 39/23 47/24 49/4 52/11 58/24
64/22 75/20 75/21 83/13 86/11 86/15
86/16 86/18 89/8 89/18 89/21 89/25
90/9 90/15 91/22 92/8 92/25 93/3
94/21 94/22 94/24 95/11 95/15 95/17
97/19 98/14 99/1 99/14 99/24 100/7
101/10 101/13 102/14 103/1 103/16

may... [38]  103/18 104/1 104/6 104/13
104/25 106/9 109/6 110/16 112/12
118/24 119/17 119/18 120/24 121/19
121/24 128/8 130/3 130/4 133/12
133/21 133/21 134/21 134/23 137/12
137/19 137/21 144/5 144/8 144/22
144/22 145/14 146/22 147/6 147/18
147/23 147/23 154/2 157/9
maybe [5]  22/24 66/16 77/7 124/12
134/7
MBOORMAN [1]  2/5
McCrae [1]  86/3
me [50]  3/11 5/15 11/20 13/16 15/8
17/13 18/3 18/7 21/8 21/11 22/11 26/7
31/24 32/13 45/22 52/13 57/5 60/20
69/3 87/8 87/18 118/9 118/12 119/2
119/6 119/9 119/20 119/23 119/25
123/12 127/7 129/25 130/10 130/17
130/18 130/24 131/15 132/18 133/4
136/12 142/23 143/7 143/11 144/1
144/12 145/11 145/21 146/18 155/13
155/16
MEADY [1]  2/7
mean [14]  11/22 14/15 23/14 25/12
90/12 91/16 92/4 98/21 99/15 120/2
130/16 136/14 144/24 154/7
meaning [5]  59/9 61/21 65/24 87/12
138/11
meaningless [2]  141/23 141/25
means [24]  7/13 10/6 31/25 37/19 38/1
45/9 65/5 67/13 73/24 74/2 76/21 78/9
80/24 86/14 86/24 94/17 99/8 103/18
106/1 106/17 110/11 115/16 115/25
145/6
meant [3]  21/11 48/23 70/18
measure [4]  48/2 102/9 103/5 141/16
measured [3]  16/18 93/5 103/24
measuring [1]  48/19
mechanical [1]  62/5
mechanism [1]  64/13
medical [22]  13/19 25/12 26/6 27/19
29/3 45/4 49/14 50/5 50/12 50/16
50/24 51/1 51/8 53/12 53/15 53/17
55/8 55/17 56/18 60/17 69/8 71/4
medications [2]  50/25 56/6
medicine [3]  45/23 53/14 58/23
MELTON [5]  2/2 138/3 141/14 146/13
146/14
member [2]  8/15 12/21
members [2]  87/9 112/14
memo [1]  8/14
memories [2]  32/5 32/7
memory [4]  91/2 91/21 112/5 112/11
mental [7]  101/22 101/24 102/6 102/8
102/12 102/16 102/18
mention [6]  28/18 70/14 86/9 86/21
118/7 118/8
mentioned [3]  7/11 9/10 24/19
mentioning [1]  131/2
Mere [1]  109/6
merely [1]  104/13
message [1]  119/11
met [1]  32/16
metal [2]  9/24 63/9
method [1]  104/5
methodically [1]  138/6
Mexico [1]  33/3
MICHAEL [2]  2/4 2/6
Michelle [1]  62/4

Michigan [1]  12/24
microscope [1]  34/24
middle [6]  1/1 3/4 5/15 39/19 58/20
159/5
might [5]  19/14 41/12 92/1 99/13 139/4
mild [1]  59/9
miles [6]  27/23 37/12 37/12 56/22
68/13 84/20
million [15]  8/8 10/5 12/19 14/7 30/18
31/15 33/16 33/18 45/6 78/6 78/8
125/25 126/6 126/11 151/23
millions [2]  73/3 73/3
Mills [204]
Mills' [32]  12/5 17/10 25/11 28/17
29/21 30/1 31/8 33/16 33/17 35/15
40/14 50/5 54/8 55/1 56/21 58/3 58/4
58/12 60/5 60/23 71/1 81/11 92/14
93/21 95/5 95/25 96/2 106/20 108/4
125/20 125/25 126/11
mind [8]  13/5 13/6 21/10 40/19 71/6
91/16 111/19 123/10
minds [2]  9/14 20/25
mine [1]  119/5
minimized [1]  97/21
minimum [1]  98/19
minute [7]  19/11 20/21 31/7 44/14
130/16 154/9 155/13
minutes [16]  17/12 27/17 30/10 30/14
30/15 31/12 41/2 60/9 71/10 74/17
75/8 75/15 75/17 75/25 77/18 85/19
mirror [2]  78/15 114/17
misconduct [8]  71/18 108/24 109/3
144/20 145/16 145/17 145/20 145/21
mislead [1]  49/11
missed [2]  133/5 146/18
missing [2]  65/24 129/18
misstated [2]  91/19 121/18
misstatement [1]  91/23
mistake [4]  49/5 49/6 91/16 110/12
mistakenly [1]  139/5
mistakes [2]  36/21 49/20
moaning [1]  31/10
mocked [1]  24/10
model [4]  8/12 23/11 23/12 45/20
modes [2]  83/24 83/25
modification [2]  130/8 157/9
modifications [1]  25/2
modified [1]  25/7
moment [12]  3/19 25/8 31/16 48/25
49/23 72/13 94/6 94/10 100/10 100/12
107/8 121/21
Monday [3]  88/4 88/15 155/17
money [5]  9/25 33/4 33/7 36/15 103/12
Montgomery [1]  84/7
month [2]  56/9 84/8
months [3]  41/17 71/4 84/17
MOORE [5]  1/16 75/17 87/17 156/3
156/25
more [48]  7/13 7/16 9/8 10/6 10/6 14/9
15/6 18/8 22/25 25/20 28/3 28/5 33/2
34/1 40/6 44/17 45/17 49/21 50/21
55/4 63/9 66/10 66/15 67/16 71/11
71/25 79/23 86/6 86/11 86/15 86/16
86/18 94/19 99/14 100/11 100/22
103/1 108/12 110/3 114/25 124/10
124/22 130/23 135/1 145/5 147/15
148/14 152/10
morning [15]  3/6 6/13 127/15 127/24
128/9 128/13 153/15 153/22 154/3
154/5 154/12 157/10 157/11 157/21

157/23
mortality [6]  53/11 53/13 104/8
mortem [1]  45/8
most [9]  7/17 13/15 32/13 34/1 47/12
47/21 61/6 68/7 77/7
mother [1]  93/25
motion [1]  4/8
motions [1]  152/14
motor [65]  1/6 7/22 8/3 9/1 9/14 10/24
14/8 23/18 25/16 77/2 77/21 98/17
98/18 98/19 98/19 98/20 102/23
104/19 104/21 104/24 104/25 105/1
105/3 105/4 105/6 105/8 105/12
105/15 105/19 106/13 106/20 107/19
107/24 108/2 108/4 108/24 109/3
113/18 113/25 114/6 114/14 114/21
114/23 115/2 115/7 115/12 116/9
117/1 117/9 125/13 125/17 125/24
126/4 126/10 126/18 126/22 127/2
129/11 129/15 130/10 134/21 134/24
135/25 144/5 144/9
Motors [2]  62/17 67/17
mountains [1]  33/3
mouse [2]  117/22 117/24
move [9]  15/10 15/12 15/16 37/22
37/22 44/17 58/10 68/4 154/19
moved [4]  16/15 38/10 65/3 142/13
movement [1]  54/3
moving [2]  16/10 32/13
MR [93]  1/15 1/18 1/23 2/2 2/4 2/6 2/8
8/10 8/19 9/4 11/2 12/5 12/11 12/15
13/8 14/6 16/16 17/7 17/12 20/17
23/11 24/25 25/10 27/14 28/18 29/4
29/10 31/14 34/15 35/14 37/23 40/2
40/14 41/23 41/25 42/4 42/18 42/19
42/24 43/15 45/14 48/12 50/14 53/22
54/3 54/4 54/8 56/20 57/1 57/11 57/13
58/4 58/12 58/21 59/2 59/22 59/24 60/10
60/11 60/13 60/23 61/3 63/1 63/3
63/16 64/1 65/20 66/4 66/4 67/24
68/16 69/6 69/18 69/25 70/19 72/6
74/8 77/19 78/7 78/9 79/14 80/7 80/16
81/3 81/9 82/15 82/18 83/1 93/11
93/15 117/25 136/8 146/14 153/7
Mr. [128]  3/7 3/12 3/20 6/10 8/1 8/25
9/11 9/23 10/12 12/7 17/9 17/10 18/12
20/4 20/10 24/24 27/19 30/19 35/22
37/3 37/3 37/18 37/25 38/12 38/19
39/5 39/6 39/6 39/12 39/15 40/1 40/5
40/11 40/21 41/6 41/21 42/17 42/21
42/23 43/11 43/14 43/24 44/3 44/7
44/22 51/20 52/13 52/15 53/18 53/19
53/21 53/21 53/22 53/25 54/7 54/16
54/17 57/22 57/25 58/5 58/24 59/14
60/5 61/13 61/16 61/19 62/8 62/9
62/13 62/16 62/20 63/25 65/22 66/16
66/22 67/12 68/17 68/18 68/24 69/5
69/5 69/6 69/7 70/4 70/13 71/1 71/9
73/17 74/16 74/25 75/21 78/12 78/20
78/24 79/11 80/14 81/12 83/14 83/17
84/3 87/13 120/7 121/21 128/25 129/2
130/16 136/9 137/4 138/3 139/14
140/1 140/25 141/10 141/14 146/6
146/11 146/13 147/12 147/25 150/2
153/21 153/23 153/25 155/13 156/2
156/25 157/16 157/18
Mr. and [1]  87/13
Mr. Boorman [1]  3/12
Mr. Buchner [11]  37/3 37/25 38/12
38/19 39/6 39/15 40/1 52/13 53/21

**M**

Mr. Buchner... [2] 53/22 69/5
Mr. Burnett [2] 66/16 78/24
Mr. Butler [12] 3/7 6/10 61/13 63/25 70/13 71/9 73/17 74/16 74/25 75/21 136/9 140/1
Mr. Butler's [1] 139/14
Mr. Camacho [1] 84/3
Mr. Caruso [1] 9/23
Mr. Eady [7] 3/20 128/25 129/2 130/16 137/4 141/10 146/11
Mr. Eikey [11] 8/1 8/25 9/11 24/24 62/20 68/17 68/18 68/24 79/11 83/14 83/17
Mr. Gunn [2] 121/21 157/18
Mr. Harrison [3] 40/21 41/6 41/21
Mr. Herbst [10] 61/16 61/19 62/8 62/9 62/13 66/22 67/12 69/6 70/4 78/12
Mr. Hill's [1] 78/20
Mr. Lewis [8] 44/22 53/18 53/19 53/21 53/25 54/7 58/24 69/7
Mr. Lewis's [1] 54/17
Mr. Lowery [4] 10/12 12/7 140/25 156/25
Mr. Lowrey [3] 146/6 147/12 156/2
Mr. Malek [1] 62/16
Mr. Melton [3] 138/3 141/14 146/13
Mr. Mills [9] 27/19 30/19 35/22 57/25 58/5 59/14 65/22 81/12 120/7
Mr. Mills' [3] 17/10 60/5 71/1
Mr. or [1] 57/22
Mr. Peeler [4] 147/25 150/2 153/25 155/13
Mr. Prather [3] 44/3 153/21 157/16
Mr. Prather's [1] 153/23
Mr. Swicord [11] 17/9 18/12 42/17 42/21 42/23 43/11 43/14 43/24 44/7 51/20 54/16
Mr. Swicord's [1] 80/14
Mr. Tandy [9] 20/4 20/10 37/3 37/18 39/5 39/6 39/12 40/11 69/5
Mr. Tandy's [2] 40/5 52/15
MRIs [1] 45/8
Mrs [89] 8/18 9/4 12/5 12/11 12/15 15/10 21/2 21/3 22/6 22/7 23/11 25/10 25/11 26/8 27/5 27/14 28/17 28/22 29/4 29/10 30/1 30/9 35/15 35/19 37/5 37/14 38/7 38/12 38/15 38/17 39/2 40/6 40/14 40/23 41/4 41/7 41/19 41/23 42/15 42/22 44/8 44/16 45/8 45/15 45/24 46/15 46/24 48/5 48/13 48/15 49/3 49/22 50/5 50/15 51/7 52/16 54/3 54/5 54/8 54/10 54/22 55/1 55/6 55/24 56/9 56/18 56/21 57/22 58/3 58/12 60/23 60/24 68/12 69/19 70/11 70/19 74/2 74/3 74/8 76/6 76/7 77/19 79/25 80/16 81/10 81/11 82/6 82/18 83/1
MS [18] 1/13 1/16 1/25 3/9 20/17 35/7 35/9 75/15 78/23 80/14 81/8 82/11 84/17 86/1 87/13 87/17 156/2 157/19
Ms. [8] 75/17 77/12 77/14 78/4 79/13 82/6 84/13 156/25
Ms. Moore [2] 75/17 156/25
Ms. Wright [6] 77/12 77/14 78/4 79/13 82/6 84/13
much [10] 10/1 24/14 27/16 27/16 31/6 33/7 35/12 36/15 42/14 57/13 61/14 71/16 80/21 82/12 82/14 83/19 85/6 88/1 102/10

multiple [4] 10/18 13/10 97/8 98/9
music [1] 88/4
must [55] 5/24 39/6 40/18 41/15 52/14 58/25 88/8 88/19 88/22 88/23 88/25 89/1 89/2 89/5 89/6 89/13 90/12 91/20 92/4 92/5 92/17 92/19 94/4 94/8 94/12 95/23 96/11 96/13 99/5 99/11 99/22 100/4 100/12 100/13 100/16 100/24 105/14 105/20 106/4 106/25 108/23 110/4 110/9 111/9 111/9 111/10 111/14 111/16 125/1 146/23 146/24 147/10 147/14 147/17 147/23
my [42] 6/20 10/2 12/5 21/7 21/12 26/3 31/24 31/24 32/2 34/1 46/18 56/24 75/4 75/19 76/1 80/21 83/17 86/2 88/7 88/18 89/1 89/20 111/7 112/18 119/7 119/13 120/6 122/2 124/14 128/14 130/6 131/18 132/3 135/24 136/22 137/17 141/3 143/15 153/13 154/10 156/6 157/12
myself [2] 6/22 12/6

**N**

name [4] 22/16 56/1 79/2 149/20
narrative [2] 43/11 51/9
narrow [2] 144/1 149/1
natural [2] 99/8 99/16
naturally [1] 91/18
nature [1] 152/22
NCAP [2] 27/21 27/23
NE [5] 1/15 1/23 2/2 2/4 2/10
nearest [1] 99/18
nearing [1] 6/14
nearly [5] 16/1 18/7 45/6 49/6 127/20
necessarily [5] 90/18 95/16 98/21 119/4 131/14
necessary [3] 5/5 103/10 108/9
neck [8] 45/25 50/18 55/7 57/19 57/21 57/23 59/23 66/1
need [26] 48/18 65/7 73/19 77/10 99/17 115/24 116/16 119/22 119/24 119/25 120/2 122/17 129/20 130/19 132/1 136/6 137/22 139/19 141/2 151/1 152/4 154/10 154/20 156/7 157/13 157/14
needed [2] 129/8 143/8
needs [8] 116/14 117/14 122/18 127/16 145/16 150/25 153/20 156/11
negligence [19] 76/4 105/17 105/24 106/1 106/9 106/16 106/17 106/21 106/25 107/5 109/6 109/7 115/15 115/21 116/2 116/6 121/15 126/12 126/14
negligent [6] 105/16 105/22 106/24 107/4 107/15 116/6
negligently [2] 106/6 110/13
neither [6] 37/6 57/22 68/2 68/5 68/7 112/8
net [5] 65/2 135/7 142/12 142/20 143/1
network [1] 129/5
neuroradiologist [1] 45/2
never [31] 5/17 8/4 8/5 11/9 32/7 36/18 37/7 38/2 38/4 38/14 38/15 42/23 45/22 51/6 51/6 53/23 56/1 59/6 62/9 62/10 64/10 67/23 67/24 68/23 72/1 72/1 73/24 79/7 79/8 111/12 148/3
new [5] 64/5 64/9 68/19 95/11 134/2
newspaper [1] 128/6
next [25] 10/23 13/14 15/21 15/21 26/22 25/25 30/19 31/5 33/23 61/23

66/4 107/13 108/16 114/2 115/15
116/4 137/13 137/19 137/20 137/3 137/5
141/11 142/10 142/22 144/8
NHTSA [15] 24/9 63/23 64/16 67/19 67/19 67/20 67/22 67/23 72/3 73/11 73/19 79/2 79/3 79/5 83/9
night [2] 5/15 19/6
nine [2] 31/15 70/19
Nissan [2] 12/8 62/18
no [156] 7/18 7/18 7/19 8/6 8/7 9/18 10/9 10/22 10/25 11/4 11/25 13/18 14/16 15/2 19/1 20/19 23/8 23/22 24/7 24/8 26/5 26/5 26/9 26/9 26/11 26/24 27/13 28/6 28/13 28/15 28/20 28/24 28/24 28/25 29/2 29/23 30/2 30/24 31/3 31/9 33/1 33/23 33/6 33/19 34/2 37/23 39/11 39/18 39/19 41/4 41/6 44/10 44/11 44/11 44/12 44/12 44/13 44/18 45/24 45/25 47/4 47/16 48/3 48/8 48/10 49/4 49/8 50/3 50/18 51/11 51/16 52/1 52/18 53/7 54/9 55/5 55/22 56/13 57/19 58/5 58/13 59/23 60/7 60/7 60/10 60/22 61/2 61/13 62/12 62/25 65/12 66/1 66/2 67/10 68/18 69/20 70/23 71/11 71/22 72/11 72/13 72/20 72/22 73/14 74/11 74/24 76/5 76/6 77/12 77/21 79/8 81/24 82/1 85/22 85/23 87/6 90/9 101/21 115/23 115/25 117/2 117/3 117/10 122/12 122/24 123/5 123/20 123/22 124/15 124/18 124/20 127/10 127/11 127/12 127/23 130/24 132/20 132/22 133/16 136/25 137/2 138/1 139/24 141/20 143/12 146/12 149/25 151/21 153/5 156/1
noblest [1] 31/19
nobody [25] 7/18 7/19 7/19 7/20 7/23 8/3 8/6 8/21 8/22 9/6 9/9 9/16 12/19 13/14 14/12 18/4 18/17 27/1 34/7 55/3 79/10 79/21 80/17 140/24 151/11
Nobody's [1] 79/20
non [1] 140/9
non-pattern [1] 140/9
noncompliant [1] 61/1
nondisclosure [1] 14/2
none [12] 39/11 47/17 47/20 48/13 50/19 52/2 56/7 59/11 77/22 122/10 140/8 152/23
noneconomic [2] 103/19 103/21
nonetheless [1] 55/19
nonsense [4] 20/13 58/23 72/17 73/7
nor [3] 37/7 68/2 99/18
normal [3] 50/10 55/14 55/15
nose [1] 37/10
not [295]
note [3] 50/7 123/12 123/14
noted [3] 96/5 135/16 136/15
notes [11] 10/2 12/6 29/17 75/4 76/1 112/11 112/3 112/3 112/6 112/9 112/10
nothing [19] 8/21 8/22 28/10 35/24 44/1 44/6 44/13 48/16 49/10 50/22 59/18 59/21 65/5 67/1 67/3 71/13 76/7 85/20 150/10
notice [1] 149/25
noticed [4] 83/13 83/15 88/4 88/16
notions [1] 32/1
now [45] 3/4 7/20 10/8 11/4 12/4 15/24 16/18 17/9 17/13 21/5 24/15 24/22 34/22 43/15 44/25 52/10 60/8 61/12

## N

now... [27]  62/13 63/16 65/20 69/15
75/1 86/11 87/17 87/19 87/20 88/7
95/8 115/13 117/13 118/20 119/17
124/1 125/10 130/14 133/7 149/14
150/13 151/6 151/20 152/9 152/11
152/12 155/19
number [18]  5/8 17/3 27/9 28/17 90/16
113/6 118/8 129/12 132/11 135/25
136/16 137/9 137/20 141/15 142/11
147/2 147/5 153/4
Number 1 [1]  141/15
Number 3 [1]  27/9
Number 357 [1]  28/17
Number 6 [1]  142/11
Number 7 [1]  137/9
numbers [3]  11/16 117/23 130/11
nurse [5]  16/7 30/12 80/7 80/7 82/8

## O

o'clock [1]  60/18
oath [2]  152/3 153/15
object [4]  18/14 37/20 123/18 141/20
objection [13]  79/4 123/20 123/21
124/17 124/18 127/7 127/9 127/12
142/4 142/11 142/21 145/13 152/18
objections [4]  36/12 122/7 128/19
141/12
objective [2]  46/18 46/22
objects [2]  123/19 140/24
observe [1]  91/4
obstruction [1]  42/14
obtain [5]  3/13 3/16 3/17 3/23 3/24
obviously [5]  31/13 70/20 92/16 116/9
140/24
occupant [12]  23/18 42/8 54/13 54/14
63/6 63/7 63/15 64/7 64/12 72/5 72/24
74/12
occupants [1]  62/21
occur [1]  61/17
occurred [3]  30/10 99/10 133/14
off [33]  18/3 18/4 18/17 18/18 18/20
18/21 19/9 25/3 29/20 35/20 38/13
40/6 41/20 43/8 44/9 44/11 44/19
46/21 52/14 52/16 56/19 57/2 57/2
70/12 72/6 72/7 74/4 79/4 80/6 80/8
80/10 85/3 134/2
off-duty [1]  43/8
offer [1]  150/18
office [1]  43/2
officer [2]  119/12 125/9
official [4]  112/20 159/1 159/3 159/19
often [1]  17/19
oh [4]  2/1 48/2 49/5 137/25
okay [23]  4/15 5/5 77/9 120/20 121/1
121/5 123/2 123/24 124/21 127/14
128/11 130/4 132/10 132/20 133/5
140/10 142/7 146/6 147/17 151/3
154/7 155/1 157/4
old [8]  6/23 7/4 25/24 26/2 26/3 26/4
56/23 84/8
older [1]  86/3
omission [1]  99/11
omitted [2]  129/24 140/23
on [320]
once [8]  57/18 57/18 59/4 59/7 59/22
66/4 67/22 121/6
one [128]  3/11 3/19 6/20 7/6 7/7 7/7
7/18 10/23 11/15 11/15 15/14 16/3
17/16 17/19 17/21 17/23 20/15 21/18
21/21 21/21 21/21 22/2 22/22 22/25
22/18 24/19 24/19 24/19 24/25 31/1
34/15 34/15 37/23 38/12 39/10 40/5
40/21 41/4 41/6 41/7 41/19 41/20
42/22 44/9 44/21 48/18 48/18 48/19
48/19 50/1 50/1 52/23 53/6 53/13
53/22 56/21 56/25 57/11 58/22 60/1
60/2 60/3 61/24 62/22 70/3 70/9 70/23
76/3 77/18 77/19 78/10 79/1 79/2 79/9
79/15 79/16 79/21 80/15 80/18 82/21
82/24 83/1 86/2 86/11 86/15 86/16
86/17 86/17 86/17 86/18 99/14 100/22
101/2 104/10 108/12 110/2 111/16
112/13 112/21 112/22 113/1 113/15
114/25 117/13 119/22 122/5 123/11
128/18 129/1 130/1 130/9 131/21
132/3 133/5 133/15 133/20 136/15
137/5 138/9 139/6 142/10 142/23
145/3 146/15 147/11 148/23 151/7
153/22
one-and-seven-eighth [1]  58/22
one-by-one-and-a-half-inch [1]  48/18
one-impact [1]  53/22
one-to-one-half-inches [1]  48/19
ones [8]  13/12 59/5 62/22 117/21
118/18 129/23 131/1 138/4
only [75]  3/16 14/16 14/17 18/18 22/13
24/10 24/11 24/19 26/10 28/7 30/10
30/25 31/1 38/9 38/10 38/18 39/22
40/9 40/10 41/13 41/20 42/2 43/14
44/5 45/10 49/23 55/15 56/14 58/21
61/18 61/20 66/18 70/8 71/12 71/17
73/19 87/10 88/22 89/8 89/13 99/18
99/24 101/10 101/13 102/12 102/17
105/5 108/2 108/7 110/21 111/15
111/23 112/5 116/22 118/13 118/18
120/1 121/13 128/2 130/21 131/14
134/16 134/21 135/8 136/18 139/6
139/7 143/21 144/2 144/5 144/22
144/22 151/5 152/12 155/14
onto [1]  37/11
open [5]  13/6 13/10 16/11 19/18 37/1
opened [1]  67/24
opening [11]  5/19 6/10 6/12 10/2 25/19
26/15 28/14 31/2 43/15 61/11 76/12
operate [1]  150/22
operates [1]  117/25
operation [2]  105/22 106/21
opinion [8]  36/23 51/15 84/22 89/19
92/3 92/5 92/6 111/18
opinions [1]  36/4
opportunity [13]  7/8 7/10 32/9 32/10
32/22 34/23 37/15 66/20 91/3 112/2
149/1 151/6 151/14
options [1]  114/1
or [191]
order [10]  3/24 10/21 99/10 100/15
111/11 125/10 127/6 139/13 148/10
155/10
ordered [1]  9/23
ordinarily [3]  106/2 106/4 106/7
ordinary [2]  99/12 99/16
organize [2]  75/4 76/1
organized [1]  75/4
original [5]  65/3 112/22 117/13 118/10
118/11
OSI [1]  78/12
OSIs [6]  8/10 17/19 17/22 34/5 82/19
83/25
other [68]  11/23 21/22 22/2 24/2 26/23
34/15 36/24 44/9 44/11 44/21 46/9
50/12 52/25 56/2 58/15 58/18 61/3
61/8 62/8 63/10 64/15 66/19 66/23
66/24 66/25 67/3 67/5 70/1 70/24 80/3
82/19 86/5 89/6 91/8 91/9 91/12 92/1
92/5 94/11 103/10 104/2 111/10
111/15 112/5 112/9 113/15 117/6
133/16 133/21 135/17 137/6 137/9
137/25 138/25 139/3 140/1 140/2
140/6 141/11 143/9 143/24 144/19
145/16 147/4 147/8 147/15 152/20
154/16
others [4]  62/16 101/21 111/20 134/9
otherwise [1]  157/8
ought [3]  20/6 80/9 136/20
our [21]  3/25 4/1 4/4 7/15 7/16 22/18
23/6 36/10 37/13 41/13 58/16 61/23
62/22 87/19 87/19 131/1 138/10
142/19 148/23 152/18 155/7
out [56]  5/7 10/17 11/16 17/11 17/12
19/6 21/15 21/18 23/4 23/14 27/7
27/17 29/14 31/12 32/22 35/7 36/20
42/3 44/15 46/6 49/18 50/20 54/5 55/9
55/10 55/19 56/4 56/20 57/1 61/7 69/9
70/1 78/18 78/20 86/14 89/2 94/5
104/16 112/23 113/7 114/17 128/12
128/15 133/19 137/15 138/19 139/19
143/11 143/13 145/22 151/6 152/9
154/1 155/12 156/23 157/6
outcome [1]  91/1
outer [1]  17/16
outfit [1]  83/11
outlawed [1]  133/21
outside [1]  143/25
outweighs [1]  97/14
over [65]  6/15 14/7 15/13 16/1 16/2
16/4 16/11 16/15 16/20 17/8 19/20
19/21 19/22 24/17 25/12 25/12 27/16
27/17 28/21 30/3 30/15 34/25 35/21
37/9 37/11 40/8 40/23 42/13 46/10
47/3 48/16 51/24 54/23 57/10 58/6
58/11 58/14 59/2 59/15 64/19 67/18
68/13 70/25 73/7 78/7 78/13 79/3 80/9
81/1 81/2 81/5 81/5 82/7 82/8 82/25
83/23 83/24 94/6 107/8 111/22 112/6
121/8 140/10 146/12 153/14
overly [1]  144/13
overs [1]  68/5
oversight [1]  132/4
overturned [1]  43/9
overwhelming [1]  71/13
ovulate [1]  135/10
own [14]  8/19 15/24 16/22 21/9 23/6
23/15 23/21 26/3 36/16 36/17 89/22
104/15 111/18 153/7

## P

pace [1]  54/14
pack [1]  69/10
page [11]  8/15 74/10 130/22 132/17
132/17 132/17 137/17 141/15 142/23
142/24 159/9
Page 2 [1]  141/15
Page 3 [1]  142/24
page 4 [1]  74/10
page 40 [1]  132/17
page 62 [1]  130/22
pages [3]  55/23 66/11 124/12
PAGESCRANTOM.COM [1]  1/17
paid [1]  16/16 36/16 43/5 67/4

PAGESCRANTOM.COM [1]  1/17

**P**

paid... [2]  77/15 92/7
pain [29]  3/23 4/1 4/5 4/14 29/25 30/2
30/3 30/18 31/8 31/9 31/10 31/13
31/14 55/13 77/14 77/19 93/2 93/10
93/18 96/7 99/22 99/23 100/2 101/24
102/7 108/14 125/19 126/6 142/1
pains [2]  56/9 56/11
paint [1]  134/1
Palmer [4]  27/10 40/17 41/6 82/9
palpitations [1]  55/12
pants [1]  76/16
paper [1]  118/3
papers [1]  57/6
paperwork [1]  125/2
parachute [1]  69/10
parachutes [1]  69/11
paragraph [2]  137/18 141/15
paralyzed [3]  8/9 32/25 34/6
paralyzing [1]  34/3
parent's [1]  94/2
parents [1]  20/19
part [24]  13/15 16/24 17/17 51/6 70/6
90/16 94/14 95/1 115/21 116/2 118/21
126/14 127/25 131/24 134/19 140/11
142/8 143/2 143/7 143/24 145/23
150/6 154/24 156/22
particular [15]  5/2 69/23 70/18 78/2
90/17 90/23 95/18 96/14 97/15 99/24
100/5 100/16 113/20 143/4 143/21
parties [12]  32/21 70/17 92/13 101/4
102/4 109/22 110/23 113/3 134/25
140/15 144/10 145/9
parts [4]  9/24 66/10 81/22 132/11
party [5]  89/4 101/2 127/13 147/14
149/18
passed [2]  35/21 54/11
passenger [3]  16/19 17/5 65/20
past [1]  134/2
pastes [3]  60/11 60/12 60/12
path [2]  38/21 142/13
pathologist [6]  13/24 14/16 26/14 26/15
30/6 81/25
patient [1]  119/18
patients [3]  53/12 53/14 55/2
Patrol [2]  19/4 37/4
pattern [44]  57/14 128/17 129/16
129/18 129/22 130/7 130/11 130/12
130/21 131/9 131/10 131/15 131/17
131/19 132/2 132/12 132/21 132/23
132/25 133/2 133/7 133/9 134/18
134/20 135/2 135/18 137/7 137/10
137/11 137/21 138/7 138/15 140/6
140/9 140/20 141/18 141/19 142/3
142/8 143/3 144/14 144/15 146/4
146/17
PAUL [1]  2/8
pay [2]  101/1 101/3
paying [1]  85/1
PEACHTREE [4]  1/23 2/2 2/4 2/10
PEELER [6]  1/23 147/25 150/2 153/7
153/25 155/13
peer [1]  67/14
penalize [1]  108/21
people [46]  7/9 8/9 9/8 9/9 18/18 25/24
26/2 26/2 26/4 26/4 26/4 26/4 26/6
28/4 31/25 32/7 32/13 32/17 32/17
32/18 32/24 33/12 34/3 34/6 39/23
43/7 45/9 49/16 61/6 63/2 64/8 68/4
69/12 69/13 70/20 70/23 72/3 72/9
72/21 82/16 82/19 89/8 91/18 136/16
139/19 157/13
per [2]  68/13 106/16
percent [30]  7/14 7/16 10/4 10/4 12/1
12/3 27/24 28/1 28/2 28/3 61/17 61/18
61/20 61/20 61/21 62/21 63/2 67/15
70/5 74/8 82/13 82/13 116/15 116/16
126/18 126/19 151/19 151/22 151/23
156/4
percentage [12]  107/7 107/8 107/10
107/14 107/17 108/3 108/5 108/10
116/12 150/13 151/13 151/17
percentages [3]  108/8 116/14 116/15
percentile [1]  50/10
perception [1]  19/7
perfect [2]  18/8 78/14
perfectly [1]  148/20
performance [1]  98/20
perhaps [6]  47/12 49/9 147/12 154/4
156/2 157/3
period [3]  30/12 30/15 69/2
permitted [1]  112/1
person [21]  14/17 26/22 26/23 32/16
38/18 42/2 68/25 90/5 92/1 92/25 93/3
93/4 95/12 99/12 103/11 104/1 104/2
104/4 104/10 104/12 156/14
person's [2]  31/21 104/10
personal [4]  26/3 42/2 90/25 103/10
personally [1]  32/1
persons [4]  89/6 106/3 113/4 143/9
perspective [2]  26/3 103/7
persuade [1]  94/18
persuasion [1]  94/16
pertaining [1]  104/4
pertinent [2]  137/9 137/25
Ph.D [4]  23/15 45/2 45/5 62/4
phase [19]  34/13 34/19 86/25 110/24
110/25 127/15 127/21 127/23 128/13
128/16 129/13 132/16 141/11 141/13
151/11 154/18 155/14 155/15 155/15
PHENDERSON [1]  2/11
PHILIP [1]  2/10
PHILYAW [1]  1/15
photo [2]  42/17 51/20
photograph [5]  20/14 39/22 39/24 44/2
66/24
photographs [4]  19/4 37/4 39/21 81/8
photos [6]  38/20 38/21 44/12 51/17
54/15 54/19
phrase [2]  147/7 147/13
physical [15]  10/25 11/4 11/9 25/21
39/8 42/16 59/3 101/22 101/23 102/6
102/12 102/16 102/18 103/2 118/23
physician [3]  53/11 53/17 56/15
pick [2]  13/1 40/2
picked [1]  121/6
picks [1]  7/6
pickup [1]  32/24
picture [3]  31/11 43/12 45/12
piece [2]  20/15 77/25
pieces [2]  132/8 144/10
pillar [5]  65/10 65/10 65/10 84/1 84/1
pillars [2]  64/25 64/25
pitch [2]  68/5 83/24
pitch-overs [1]  68/5
pitched [2]  35/8 58/11
pitches [2]  37/10 40/8
pitchover [6]  57/7 57/12 61/21 61/22
61/23 68/3
pitchovers [1]  61/20
place [11]  18/5 20/18 26/12 39/18
58/21 59/22 63/13 106/18 115/9
131/18 151/2
places [4]  46/11 58/18 59/9 120/21
placing [1]  120/15
plain [1]  36/7
plaintiff [24]  3/15 5/17 6/11 94/7 99/25
100/16 100/17 100/19 104/7 105/13
108/21 113/13 114/20 115/1 115/5
115/8 115/11 117/5 121/11 123/16
125/15 126/2 126/8 152/22
plaintiff's [21]  8/14 9/20 11/18 17/3
17/6 17/18 23/10 23/13 25/5 28/17
28/22 36/11 94/19 97/21 100/24 105/3
111/5 114/4 116/23 125/21 133/6
plaintiffs [90]  1/4 1/12 5/18 5/21 7/15
29/22 30/21 35/14 36/1 40/1 40/13
43/1 43/10 44/2 44/24 47/22 47/25
51/12 51/13 56/19 57/8 57/21 59/14
60/14 62/8 63/7 68/20 69/16 70/9 71/8
72/7 72/14 72/19 73/2 84/14 87/5
92/12 94/12 94/13 95/3 95/4 95/22
100/3 100/22 101/5 101/6 101/8
101/12 101/15 101/20 102/17 104/23
106/23 107/20 107/21 107/25 108/12
108/17 108/23 109/2 110/2 110/4
110/9 111/6 113/4 113/16 113/23
113/24 114/12 115/13 115/23 116/4
116/18 116/19 116/25 120/17 121/13
121/15 122/9 124/17 126/16 126/20
126/25 127/9 128/19 131/23 142/14
143/9 143/22 148/2
Plaintiffs' [8]  36/14 40/3 41/10 41/24
42/20 78/12 78/17 78/19
plan [2]  9/1 150/12
planning [2]  32/20 130/18
plastic [2]  23/4 23/4
platen [1]  64/18
play [2]  16/8 16/9
played [1]  68/20
plays [1]  83/21
please [6]  17/3 17/6 42/18 47/7 76/6
76/19
plenty [2]  44/7 157/5
plumbing [2]  51/5 80/12
plural [1]  123/13
plus [4]  7/14 7/16 10/4 28/2
PMALEK [1]  2/9
pneumonia [1]  35/24
PO [1]  1/16
pogo [1]  20/12
pogo-stick [1]  20/12
point [11]  5/16 32/2 32/3 36/20 52/15
71/2 71/5 78/6 90/17 103/24 134/10
POINTE [1]  1/15
pointed [1]  56/20
points [2]  17/21 22/8
pole [5]  20/2 20/5 20/8 20/9 85/12
poles [4]  38/23 38/25 39/2 39/4
police [3]  38/20 38/21 44/12
poor [5]  11/23 35/23 54/25 55/11
110/13
portion [1]  92/11
pose [2]  87/5 110/19
posed [1]  96/18
position [3]  3/21 3/25 4/1 4/5 25/1
54/21 64/15 77/21 77/23 78/1 81/7
133/6
positional [9]  50/23 51/14 51/15 51/19
51/21 54/11 84/3 84/6 84/6

**P**

possibility [1] 92/9
post [1] 45/8
post-mortem [1] 45/8
posttrial [1] 152/14
pounds [3] 16/3 64/6 64/19
poured [1] 8/20
PowerPoint [1] 38/5
practices [3] 98/16 133/20 133/25
PRATHER [5] 1/18 17/7 44/3 153/21
157/16
Prather's [1] 153/23
pre [1] 102/12
pre-death [1] 102/12
preacher [1] 32/15
precedence [1] 112/6
precious [3] 32/6 86/8 86/8
precisely [1] 103/22
preclude [1] 148/7
prefer [2] 75/3 154/2
prejudice [3] 70/24 88/24 157/2
preliminarily [1] 129/3
preparatory [1] 130/15
prepared [1] 112/16
preponderance [27] 7/13 94/14 94/17
94/21 95/2 95/23 99/3 99/25 100/17
100/23 101/5 101/20 102/13 104/24
105/2 105/7 105/15 105/20 109/10
109/16 110/10 114/8 115/20 116/1
117/7 126/13 126/25
preposterous [2] 28/16 28/25
presence [1] 77/1
presentation [1] 45/15
presented [4] 63/23 88/23 127/16
143/15
presents [1] 135/12
preserved [4] 140/14 141/10 142/1
145/2
preserving [1] 142/16
press [1] 128/6
pressed [1] 58/18
pressing [1] 44/6
presumption [3] 71/19 109/1 109/5
pretrial [1] 148/9
pretty [2] 16/11 82/8
prevail [6] 6/8 94/12 95/22 105/5 110/8
111/7
prevent [1] 107/25
prevented [1] 97/20
previously [8] 96/5 101/7 107/3 108/6
109/11 113/4 114/9 122/8
price [1] 97/5
primarily [1] 66/3
principle [5] 5/1 135/22 141/25 143/19
143/20
principles [2] 136/6 136/14
print [1] 138/19
pristine [1] 47/16
probability [1] 109/14
probably [14] 6/20 10/6 22/2 71/3
71/10 74/13 74/7 79/12 116/14
119/15 121/5 131/11 142/1 154/8
problem [9] 15/1 17/11 29/10 124/13
133/8 133/16 137/14 148/18 155/9
problems [2] 50/12 56/17
procedures [2] 139/3 139/4
proceed [1] 75/21
proceedings [3] 3/2 158/1 159/8
process [5] 66/14 66/14 72/7 119/18
137/13

processes [5] 28/23 46/25 47/5 47/11
52/22
produce [4] 58/8 84/18 153/12 156/7
produced [7] 11/9 94/24 99/17 148/3
148/17 149/8 156/11
produces [1] 99/9
producing [1] 95/19
product [35] 87/4 95/10 95/13 95/14
95/15 95/15 95/17 95/19 95/21 96/10
96/12 96/12 96/14 96/17 96/21 96/25
97/7 97/9 97/10 97/17 97/17 97/18
97/20 97/22 97/25 98/4 98/12 98/14
98/22 98/24 99/1 110/18 110/19
133/17 134/13
product's [5] 97/3 97/5 97/8 97/14 98/9
production [4] 62/3 62/11 64/10 148/16
profit [1] 10/6
profitability [3] 129/5 135/5 143/1
profits [1] 73/7
project [2] 64/4 64/9
proof [20] 5/18 7/11 7/12 28/2 63/1
65/7 65/17 72/22 90/7 94/15 95/1
98/14 105/12 109/10 109/14 109/15
109/18 121/7 121/9 121/13
proper [1] 101/8
properly [5] 27/7 46/10 59/14 62/21
117/20
property [1] 95/11
proposed [7] 130/5 132/3 132/6 132/8
132/11 137/17 141/13
proposition [2] 4/23 146/24
protect [2] 26/5 64/8
protection [2] 72/24 79/18
proud [2] 6/16 87/24
prove [25] 19/4 40/13 41/11 69/17
69/19 71/15 73/22 84/14 84/24 85/23
86/19 90/8 94/12 94/13 104/23 108/23
109/2 110/9 113/14 120/9 120/14
120/18 121/15 154/24 156/24
proved [15] 10/3 94/20 101/12 101/15
101/20 102/5 105/15 106/20 108/17
110/4 116/25 117/7 120/14 126/21
126/25
proven [10] 100/17 113/23 113/24
114/8 114/13 114/23 115/1 115/9
115/11 116/1
proves [3] 63/18 105/1 105/6
provide [6] 14/8 106/19 124/21 149/19
150/9 154/17
provided [2] 124/16 148/9
provides [1] 98/18
providing [3] 141/20 145/5 152/2
proving [5] 7/16 72/17 100/22 115/18
121/12
proximate [22] 86/9 86/10 86/11 86/12
86/14 86/15 86/16 86/18 86/19 99/7
99/11 99/14 99/15 105/25 106/25
107/2 107/5 115/22 116/3 116/7
116/11 126/15
proximately [18] 69/18 94/9 95/6 96/3
99/7 99/23 100/2 100/5 100/18 101/12
101/15 102/21 104/22 105/24 106/22
107/12 107/15 121/16
prudent [1] 141/6
psychology [1] 26/21
public [2] 1/25 63/18
publication [1] 23/18
publicity [1] 96/21
publish [3] 23/25 125/9 125/11
pull [2] 42/3 112/18

pulling [2] 47/6 118/5
pulse [3] 96/16 102/5 112
punish [8] 33/25 71/22 108/21 131/21
134/23 136/17 143/21 144/8
punished [5] 72/1 72/4 134/21 144/5
144/22
punishing [1] 71/22
punishment [4] 131/23 139/5 143/8
143/9
punitive [57] 3/13 3/17 3/17 3/24 4/9
4/16 4/22 4/24 33/24 33/25 34/10
34/11 34/12 34/19 34/20 71/8 71/11
71/21 71/24 76/19 77/3 77/6 78/22
83/18 108/19 108/20 108/22 109/6
109/8 109/21 109/23 109/25 110/20
110/25 116/17 116/20 116/21 117/1
126/20 126/21 127/22 129/22 130/7
131/19 132/2 132/12 133/13 134/13
134/23 135/8 137/1 137/2 141/16
141/22 142/2 146/2 155/17
punitives [2] 128/16 136/22
purchase [1] 72/10
purchasing [1] 97/5
purpose [1] 34/10
purposes [4] 33/24 98/9 118/14 146/2
pursuant [1] 159/5
pushing [2] 39/20 42/13
put [62] 8/23 11/20 12/6 14/10 15/4
15/16 23/7 23/23 24/14 26/16 26/16
32/3 34/16 37/20 44/3 47/6 48/22
50/11 50/13 50/20 61/15 62/16 64/10
67/20 72/9 72/16 72/21 73/4 73/6
74/19 74/20 79/18 79/22 81/19 81/25
82/23 82/25 83/1 83/6 85/23 86/25
87/22 88/8 115/9 116/12 116/15 117/2
132/23 132/24 145/19 147/1 147/2
147/4 149/25 150/13 150/17 156/19
156/20 156/22 156/24 157/1 157/20
put-up [3] 147/1 147/2 147/4
puts [1] 50/9
putting [2] 9/1 148/8
PVCs [1] 55/12

**Q**

Q-A [1] 120/11
qualified [1] 36/22
quantified [1] 103/22
quarter [3] 39/14 39/16 45/6
question [46] 10/20 10/21 10/23 24/8
25/1 26/9 27/13 29/23 29/25 30/2
30/24 31/3 31/5 31/9 33/6 34/2 40/15
58/5 58/13 64/19 110/21 115/19
115/23 116/5 116/21 116/24 117/4
117/7 119/9 119/9 119/12 119/14
119/16 119/22 122/18 122/24 123/18
124/5 124/8 124/9 131/16 139/13
149/4 151/1 153/8 155/16
questions [12] 11/3 73/19 83/15 83/17
90/20 91/7 91/7 102/10 115/24 119/7
121/11 122/20
quick [2] 123/11 146/15
quickly [1] 55/6
quit [1] 21/18
quite [7] 5/15 47/21 61/12 65/25 81/5
143/6 145/12
quotations [1] 6/20
quote [6] 16/12 43/16 86/2 134/7 137/2
141/24
quoted [1] 137/20
quotes [1] 64/2

**Q**

quoting [1] 64/14

**R**

Rachel [2] 127/4 127/5
radiological [4] 22/17 45/14 46/2 49/8
radiologist [7] 14/5 14/10 22/15 22/19 46/20 51/10 52/1
radiologists [2] 22/14 52/9
radiology [4] 50/5 50/17 52/1 59/12
rails [2] 65/1 65/10
rain [2] 5/14 19/15
raise [3] 108/25 109/4 148/1
raised [1] 135/14
raises [2] 71/19 105/4
raising [1] 70/22
ramble [1] 76/2
RAMSEY [3] 1/18 1/19 16/25
ran [9] 18/3 18/4 18/17 18/18 18/20 35/20 38/13 44/9 70/12
ranches [1] 9/12
range [2] 12/9 150/15
rate [1] 149/22
rates [4] 147/6 147/10 147/15 150/14
rather [3] 69/10 145/6 154/4
ratio [2] 11/14 12/13
Ray [1] 13/7
Ray's [2] 13/7 156/17
rays [1] 45/9
reach [9] 16/15 16/20 36/4 71/6 76/25 77/2 77/3 90/1 111/17
reachable [2] 122/17 122/20
reached [6] 36/4 42/14 74/13 120/3 125/4 127/25
reacted [1] 69/25
reaction [1] 19/7
read [5] 36/18 45/5 48/15 69/15 133/4
readily [1] 64/12
ready [2] 3/7 149/5
real [3] 52/19 111/22 123/11
realize [1] 43/9
realized [1] 60/16
really [20] 18/19 21/14 38/6 38/10 40/1 52/20 54/7 57/20 74/20 76/22 77/13 77/25 78/3 119/25 120/1 122/18 132/10 151/14 152/11 154/7
rear [1] 57/10
reason [11] 29/5 38/20 44/10 46/7 74/1 74/6 83/13 83/16 89/25 90/23 136/25
reasonable [15] 41/13 56/14 61/3 95/20 98/24 101/7 102/1 109/18 147/3 149/22 151/15 151/22 151/23 155/10 156/22
reasonableness [3] 97/22 148/22 150/16
reasonably [7] 69/14 69/22 69/25 96/14 99/13 106/10 106/11
reasons [5] 7/7 14/3 71/25 79/16 79/21
rebut [1] 151/7
rebuttal [3] 5/22 75/21 75/23
recall [12] 38/1 40/24 47/24 49/4 52/11 54/4 57/14 65/3 72/2 73/12 79/3 118/9
recalled [2] 67/23 78/24
recalls [1] 79/1
received [1] 94/23
recently [1] 55/4
receptive [1] 145/14
recess [4] 75/11 122/21 122/22 124/2
recognized [2] 6/10 35/9
recognizes [1] 87/14

recollection [4] 6/4 6/6 89/23 112/7
reconvene [2] 109/22 110/25
record [11] 16/3 60/22 122/9 135/20 135/23 140/17 141/11 142/16 145/2 157/21 158/2
recorded [1] 39/12
recorder [3] 39/8 39/12 39/15
records [14] 50/5 50/17 55/3 55/8 55/18 56/18 71/5 150/21 153/5 153/8 155/5 156/1 156/3 156/13
recover [7] 29/23 101/6 102/17 107/22 110/5 117/8 127/1
recoverable [2] 102/12 151/17
recovering [1] 108/2
recovery [2] 3/23 134/12
red [1] 78/13
redirect [1] 57/7
reduce [3] 63/5 72/18 107/9
reduced [2] 63/6 104/25
reduction [1] 107/11
reductions [1] 108/9
reexamine [1] 111/18
refer [1] 92/23
reference [1] 132/18
referring [2] 44/25 120/7
refers [1] 137/9
reflect [1] 48/5
refusing [1] 135/25
regard [18] 3/22 3/22 95/9 102/3 102/6 117/4 121/7 121/17 125/13 125/20 126/12 127/21 128/13 133/6 136/6 139/9 139/12 143/7
regarding [1] 124/14
regardless [2] 94/22 94/23
registered [1] 80/7
regularity [1] 92/10
regularly [4] 6/22 53/14 55/2 62/14
regulation [2] 66/19 72/2
regulations [6] 68/19 97/13 98/16 98/23 99/2 159/10
rejected [5] 24/9 24/10 83/9 83/10 83/12
related [2] 139/17 148/3
relates [2] 4/2 149/23
relationship [2] 23/23 72/20
relevant [5] 36/21 96/15 136/16 136/17 156/8
rely [8] 6/5 40/3 46/18 53/21 53/24 63/21 69/13 92/6
relying [1] 146/24
remains [1] 35/16
remember [29] 8/9 8/14 10/13 10/15 11/16 12/6 14/19 15/18 15/19 17/9 18/12 19/7 20/24 24/18 27/11 43/17 48/10 48/11 58/15 64/22 78/9 78/16 79/1 80/2 80/12 82/13 86/21 91/19 111/22
remembered [1] 91/17
remind [1] 5/8
reminds [1] 21/10
remission [1] 29/9
remove [4] 9/24 9/24 17/16 142/7
removed [2] 142/6 142/19
render [3] 36/22 85/20 141/21
rendered [2] 44/16 56/16
rent [1] 13/1
repeated [4] 144/16 144/18 145/4 146/3
replicate [1] 68/7
report [7] 48/7 48/15 49/4 50/3 50/11

56/20 60/11
report [1] 159/8
reporter [4] 153/13 159/1 159/4 159/19
reporters [1] 154/8
reprehensibility [1] 136/17
representative [3] 78/10 92/17 95/12
representatives [1] 101/8
represented [1] 131/7
represents [1] 92/11
reprimanded [1] 140/3
request [7] 129/12 129/16 138/11 138/12 145/7 149/10 155/7
requested [6] 129/13 130/25 140/18 149/11 149/16 150/4
requests [1] 148/15
require [4] 122/16 149/25 150/5 151/25
required [10] 4/22 58/8 66/19 66/20 95/18 101/2 148/16 149/17 152/19 154/24
requirement [1] 134/14
requires [4] 106/15 109/15 146/23 149/18
rereading [1] 141/1
research [5] 63/22 64/4 64/9 72/17 128/5
researched [1] 69/11
researchers [1] 72/20
researching [2] 62/6 73/8
reserve [1] 153/17
residence [1] 134/17
resist [1] 26/19
resources [1] 8/25
respect [5] 24/6 73/16 77/14 141/14 150/4
respectfully [1] 135/3 151/4 154/16
respond [3] 119/10 119/15 119/21
responded [1] 142/14
response [4] 64/19 68/11 119/16 124/14
responsibility [2] 77/22 94/13
responsible [9] 25/16 74/7 89/9 95/11 102/23 105/9 105/10 108/3 136/22
rest [7] 31/24 32/2 55/16 115/24 138/4 140/8 144/25
resting [1] 49/10
restored [1] 134/2
restraint [1] 66/17
restricted [1] 143/22
restriction [1] 129/9
result [2] 84/12 99/13
resulted [1] 49/16
resulting [1] 99/19
retired [1] 86/5
retirement [1] 32/8
return [7] 30/17 31/6 33/15 74/23 87/10 87/12 107/16
returned [1] 117/14
returns [2] 41/2 155/14
reveal [1] 150/11
review [1] 88/11
reviewed [2] 46/7 55/3
reviewing [1] 92/7
revised [1] 134/20
revision [1] 140/21
revisions [1] 128/18
Reynolds [1] 13/7
rhetoric [1] 74/20
rib [6] 46/24 52/20 53/6 59/24 60/6 61/9

**R**

ribcage [1]  58/16
ribs [2]  52/24 61/7
rid [1]  138/1
riding [1]  82/21
right [64]  17/1 17/8 19/13 20/2 20/8
20/8 26/11 26/12 28/19 30/11 33/2
38/2 38/6 38/23 39/10 39/11 39/13
39/19 47/2 48/2 48/9 48/16 48/17 49/9
49/24 52/16 52/17 52/17 54/14 54/24
56/8 57/25 58/1 58/1 58/6 59/13 59/15
59/16 61/12 69/3 69/20 75/19 80/23
84/24 84/25 85/2 85/7 85/10 85/11
87/23 121/3 121/19 125/10 127/12
130/20 133/4 138/3 141/10 146/14
147/7 147/11 150/20 150/24 153/19
ripe [1]  152/11
rise [4]  3/3 75/14 123/1 124/6
risk [13]  25/20 27/24 51/2 56/7 57/21
60/24 63/6 63/6 72/18 96/11 97/14
97/16 103/1
road [37]  18/3 18/4 18/17 18/18 18/20
18/21 19/9 19/13 19/22 20/18 25/3
35/20 37/1 37/2 38/13 39/3 40/6 41/11
41/18 41/20 44/9 44/11 44/12 44/19
52/14 52/16 56/16 56/19 70/13 72/9
72/16 72/21 73/5 74/4 79/5 85/3 85/5
roads [1]  78/8
Roadway [1]  106/14
roll [2]  63/12 63/13
rolled [2]  24/17 83/23
rollover [12]  23/9 57/7 57/12 62/23
63/3 63/22 68/22 68/24 69/1 79/18
82/16 83/21
rollovers [8]  61/19 61/20 64/8 68/3
68/4 78/14 82/12 82/13
rolls [1]  78/16
Ronald [4]  92/20 93/24 114/5 125/22
roof [144]  7/19 8/8 8/13 8/23 9/3 9/24
9/25 10/7 10/8 10/11 10/14 10/17
10/22 10/25 11/1 11/12 11/13 11/18
11/22 12/20 15/8 15/12 15/19 15/20
15/23 16/5 16/21 17/4 17/10 18/23
18/25 23/5 23/7 23/12 23/17 23/22
23/23 23/24 24/6 24/8 24/11 24/13
24/15 24/16 24/17 24/20 24/21 24/24
27/13 28/15 28/20 30/16 30/25 35/17
35/24 37/11 40/13 42/10 42/21 43/16
43/22 47/13 49/10 51/9 53/6 53/7
57/12 59/22 59/25 60/2 60/8 60/10
60/23 61/10 61/11 61/14 61/15 62/1
62/3 63/4 64/9 64/14 64/15 64/22
64/23 64/24 65/1 65/7 65/8 65/10
65/18 66/21 66/24 67/11 68/5 69/14
69/17 69/23 70/10 71/12 71/13 72/1
72/9 72/14 72/18 73/6 73/12 73/20
76/7 76/8 76/9 78/6 78/13 78/15 78/19
80/18 80/23 81/1 81/6 81/6 81/13
82/11 82/23 82/24 83/3 83/5 83/8 84/2
84/2 85/19 92/13 93/11 93/13 93/19
94/3 95/5 95/25 99/4 102/21 104/20
139/9 139/18 139/25 145/18
roofs [15]  7/18 9/2 12/19 18/24 32/25
34/2 34/7 34/25 62/14 62/22 63/5
68/25 72/16 72/21 77/25
room [20]  5/25 15/10 15/12 15/16
21/23 42/19 42/22 44/7 44/10 44/17
53/11 80/21 81/10 88/10 88/20 112/13
117/23 118/13 128/4 157/12
round [1]  16/3

Rover [1]  62/18
rubber [1]  22/24
rubber-worm [1]  22/24
Rule [1]  152/19
ruled [2]  44/15 154/20
ruler [1]  80/21
rules [2]  67/20 88/19
ruling [1]  142/15
run [2]  21/15 123/10
running [4]  18/21 23/3 23/4 23/5
runoff [1]  39/3
runs [2]  40/9 40/23
Rusty [1]  20/17

**S**

sad [2]  35/18 70/19
safer [3]  23/8 24/8 97/20
safety [30]  9/8 9/14 23/16 27/2 27/8
63/10 63/14 63/15 64/7 64/13 66/17
67/7 67/7 68/6 69/1 72/5 72/23 72/25
73/7 73/9 74/12 77/13 79/13 83/2
83/11 98/1 98/15 98/17 98/18 98/21
said [76]  6/22 9/23 14/14 14/19 15/10
15/17 16/10 17/9 18/12 20/23 22/9
24/10 24/23 25/6 27/6 27/10 27/25
28/14 30/9 31/12 32/15 35/13 38/15
41/7 42/11 42/13 43/16 45/22 46/22
47/24 48/2 48/17 49/4 49/5 51/13 52/4
52/11 52/13 53/4 53/5 55/8 56/20 60/1
60/18 61/11 64/24 65/5 67/10 68/16
75/25 76/11 76/12 76/17 78/12 78/23
79/11 79/13 80/3 80/14 82/6 82/6
84/13 84/23 89/13 89/16 89/19 89/21
91/13 94/25 120/8 123/7 123/8 123/12
140/20 150/2 152/25
sails [1]  37/9
salience [1]  136/14
same [18]  8/1 12/14 23/11 27/22 57/13
60/19 66/23 68/8 73/23 73/24 74/17
83/25 106/3 106/8 110/24 133/3
135/22 137/8
Sanchez [3]  27/7 41/6 82/10
Sanchez's [1]  19/16
sand [1]  20/15
sandwiches [1]  121/20
sat [1]  54/2
satisfactory [1]  122/3
save [4]  7/5 7/8 9/25 10/1
saved [4]  7/7 10/5 10/6 73/5
saw [21]  9/19 15/20 17/14 20/14 22/7
23/8 23/13 42/5 43/5 44/12 47/22 48/5
48/22 48/25 59/17 64/18 65/15 68/9
68/10 78/13 81/16
say [45]  6/2 6/5 6/14 6/22 10/8 13/19
14/7 14/20 14/25 16/7 16/24 18/13
23/22 23/24 29/7 31/25 34/11 34/12
34/18 34/22 36/9 43/12 52/7 56/23
57/5 65/7 68/17 74/24 76/13 76/19
76/19 77/7 78/21 78/22 87/8 90/11
90/14 91/13 119/13 142/25 147/18
152/12 152/23 153/1 153/2
saying [7]  42/12 48/14 24/1 46/17
120/14 120/17 131/14
says [27]  4/9 4/13 4/16 7/1 7/4 7/7 7/23
11/6 16/3 27/23 31/20 41/7 50/3 53/25
55/18 66/23 73/5 80/9 118/15 118/16
137/18 141/16 144/14 145/24 146/22
147/8 147/13
scale [4]  11/22 65/23 65/24 65/25
scalp [1]  49/4

scan [1]  46/21
scans [3]  45/16 49/22 50/5
scene [9]  39/8 40/22 41/25 51/18
54/13 54/15 55/6 65/23 80/5
school [3]  53/15 53/16 79/12
science [1]  65/13
scientific [1]  91/25
scope [1]  89/11
score [1]  119/23
screen [4]  112/19 117/22 117/25 118/5
screens [1]  29/16
se [1]  106/16
seat [5]  43/23 44/6 80/24 81/11 84/9
seatbelt [16]  26/7 26/8 26/25 27/7
27/10 28/6 28/13 28/13 28/20 28/24
28/24 46/4 47/18 58/22 59/1 59/2
seatbelts [1]  28/8
seated [1]  3/6
second [19]  8/15 10/20 13/15 21/13
37/10 39/5 39/14 39/14 39/16 49/2
77/7 127/15 127/21 128/13 128/16
129/1 133/10 136/12 141/3
seconds [1]  19/8 19/9
secret [1]  111/12
section [17]  39/9 73/25 74/1 107/13
113/8 114/16 115/15 115/25 116/4
116/7 116/10 116/17 116/17 120/6
137/8 137/11 159/6
Section 3 [2]  73/25 74/1
sections [1]  73/20 74/24
security [2]  119/12 125/8
see [48]  5/13 16/17 16/20 17/1 19/15
19/18 19/20 22/25 23/19 28/18 38/22
38/24 42/18 43/21 43/22 43/25 44/5
46/2 47/4 47/5 47/14 48/9 48/11 49/3
50/14 50/14 51/22 52/7 54/5 54/14
55/17 55/23 58/17 70/2 78/19 100/10
112/17 112/21 113/4 123/18 128/9
128/22 129/20 132/20 146/16 148/13
157/2 157/23
seeing [6]  19/23 25/14 37/10 39/24
55/25 132/13
seek [3]  111/24 119/7 151/16
seeking [8]  131/25 143/6 147/14
151/19 152/12 156/18 156/19 156/20
seeks [2]  70/16 101/3
seem [3]  91/2 136/23 141/5
seems [1]  77/24
seen [25]  4/12 5/1 8/4 8/5 9/20 25/11
27/1 36/19 37/2 51/11 51/22 52/1
56/12 68/23 70/17 71/3 72/17 85/21
94/6 100/11 110/7 111/25 117/21
141/7 148/5
sees [3]  6/23 46/17 46/21
selected [1]  98/24
selective [1]  68/20
sell [5]  18/24 87/4 110/17 133/17 134/8
selling [2]  8/7 18/2
send [16]  13/23 14/4 112/24 117/13
117/15 117/17 118/3 119/6 119/8
119/15 119/23 122/18 122/19 123/18
123/19 123/24
sense [9]  5/2 24/7 26/9 41/17 53/8
72/11 90/1 90/20 144/3
sent [6]  13/24 14/5 56/12 74/5 124/21
128/15
sentence [6]  133/10 142/5 142/24
144/8 146/16 146/18
separate [4]  20/11 93/20 113/8 117/17
separated [1]  113/7

separately [7]  94/4 94/5 95/1 100/13
 100/14 113/10 114/18
sequence [1]  99/9
serenity [1]  32/23
serious [14]  27/24 45/24 57/19 57/21
 57/22 59/23 62/23 65/19 66/1 70/7
 72/14 72/18 87/5 110/19
seriously [1]  28/4
served [3]  6/16 87/24 87/25
service [2]  6/15 84/19
session [2]  3/5 124/7
set [7]  46/6 94/5 114/17 129/17 129/18
 131/1 138/10
seven [1]  58/22
several [1]  41/15
severe [2]  25/21 103/1
severity [1]  96/18
shade [1]  26/19
shared [1]  69/3
she [132]  15/12 15/12 15/20 16/1 16/2
 16/4 18/3 18/4 18/17 18/18 18/20 19/2
 19/9 19/9 19/17 19/19 19/24 19/25
 20/1 20/2 20/2 20/3 20/3 20/4 21/5
 21/6 21/6 22/23 26/10 26/24 27/6
 27/16 30/2 30/3 30/4 30/7 30/15 35/8
 35/20 35/21 37/6 37/8 38/16 38/18
 38/23 40/7 40/7 41/7 41/11 41/11
 41/14 41/15 41/16 41/17 41/18 44/9
 44/13 44/18 44/19 45/24 46/2 46/9
 46/9 46/10 47/20 50/25 51/2 51/14
 51/18 51/21 52/12 52/13 52/14 54/12
 54/13 54/23 55/6 55/14 55/18 55/20
 56/5 56/9 56/10 56/11 56/12 56/15
 56/16 58/14 60/25 62/5 62/5 64/17
 64/21 64/24 65/1 65/7 65/9 65/12
 65/12 65/17 70/12 75/18 80/2 80/5
 80/8 80/11 81/14 82/22 84/14 84/25
 85/1 85/2 85/5 85/18 85/22 85/23
 85/24 86/2 87/17 90/5 93/10 93/13
 103/18 105/9 105/10 106/6 107/14
 116/5 116/9 116/10 118/12 156/5
she's [17]  16/2 16/3 16/10 16/11 16/11
 19/3 19/18 19/23 41/7 44/9 47/3 55/13
 77/14 77/15 81/1 85/7 154/7
Sheriff [2]  32/18 32/18
shift [1]  41/12
shoed [1]  63/4
Shop [1]  13/7
short [5]  34/13 34/19 75/2 75/3 75/7
shortly [3]  42/1 56/6 56/17
should [63]  6/5 6/8 6/8 16/18 18/25
 19/5 19/24 19/25 25/16 27/4 31/6
 41/19 46/8 72/1 73/24 89/18 89/20
 90/2 90/11 90/13 91/10 92/9 94/25
 95/2 97/17 97/23 98/25 101/6 101/18
 102/5 102/23 107/2 108/6 108/7
 109/21 109/24 110/22 111/5 111/6
 111/7 112/4 112/6 112/8 116/14 117/1
 117/23 117/24 119/11 119/23 126/22
 128/1 128/3 128/7 131/14 136/8
 138/20 141/16 142/19 146/8 147/13
 149/4 152/15 153/18
shoulder [26]  16/20 26/11 26/12 26/18
 27/9 28/9 46/5 46/6 46/10 48/9 48/11
 48/16 48/17 48/17 57/25 58/2 58/3
 58/4 58/6 58/6 58/14 59/13 59/15
 59/15 59/17 59/18
shoulders [1]  58/13
shouldn't [6]  56/23 71/23 121/22

127/17 128/2 128/4
show [23]  30/10 31/10 31/11 31/14
 29/15 33/23 38/21 39/21 43/20 53/6
 54/8 57/3 57/5 59/10 59/21 67/9 71/17
 78/17 117/25 147/2 150/14 150/14
 156/21
showed [23]  17/20 36/5 37/21 38/4
 39/6 39/12 45/13 47/8 47/8 47/11 49/2
 54/4 54/16 58/19 59/3 64/17 67/6
 71/18 73/17 81/8 84/5 108/24 109/3
showing [3]  76/3 121/22 150/17
shown [4]  59/5 103/8 104/2 104/12
shows [7]  39/23 59/18 63/4 63/9 65/17
 73/20 85/14
sick [1]  26/4
side [23]  7/15 9/10 15/22 17/5 19/13
 40/25 42/10 43/15 43/23 57/10 60/5
 65/11 65/20 65/22 68/12 79/14 79/18
 80/23 81/11 81/12 132/24 132/24
 141/6
sideline [1]  23/20
sifting [1]  157/7
sign [5]  14/3 43/2 46/4 72/7 117/11
sign-off [1]  72/7
signature [1]  117/12
signed [2]  72/6 127/4
significance [1]  91/22
significant [1]  92/11
significantly [3]  30/23 65/21 100/9
silence [1]  150/10
similar [11]  46/12 82/19 93/17 99/13
 106/3 106/5 106/8 144/20 144/20
 145/17 145/20
simple [2]  29/5 91/16
simply [11]  27/5 36/22 46/7 51/17
 94/17 109/20 110/12 111/21 113/3
 117/10 119/8
since [7]  35/1 75/6 88/4 88/15 148/11
 150/3 150/7
single [10]  12/20 12/21 17/19 17/21
 41/5 45/21 56/24 65/24 72/8 89/2
sink [1]  21/3
sir [5]  3/8 5/11 135/6 147/22 147/25
sit [4]  34/18 35/18 71/3 153/12
sitting [4]  8/2 42/15 51/23 152/10
six [3]  15/25 16/23 17/2
Sixteen [1]  63/23
size [4]  38/1 49/7 58/1 59/17
skill [2]  106/2 106/4
skin [1]  59/20
slammed [3]  37/8 39/7 56/22
slams [1]  37/9
sleep [1]  21/7
slender [1]  42/5
slices [1]  14/23
slid [1]  20/15
slides [2]  39/17 82/5
slight [1]  130/8
slightly [3]  37/21 46/11 85/3
slope [2]  37/21 40/7
slopes [1]  19/13
slow [2]  130/19 131/5
slowdown [1]  130/24
small [2]  47/19 49/9
smoke [1]  76/23
so [96]  4/14 5/8 5/18 6/8 7/2 10/9 13/9
 13/22 13/23 16/21 17/10 19/23 21/19
 26/21 30/14 30/17 35/3 39/25 41/12
 43/16 43/18 43/25 44/20 48/21 53/8
 54/5 55/6 75/6 75/3 58/17 58/20 61/11

61/14 67/24 70/13 73/4 73/13 75/16
 76/2 79/20 86/11 82/9 82/9 83/19 88/6
 88/10 88/17 91/19 92/6 93/7 102/5
 105/13 111/16 112/22 112/24 113/9
 113/25 116/24 117/15 117/18 118/4
 118/11 118/14 118/15 119/6 120/1
 122/20 123/17 123/18 128/8 131/12
 135/2 135/9 135/20 135/23 138/3
 139/3 139/13 139/18 140/14 142/24
 144/2 145/1 145/11 145/18 145/25
 148/7 148/19 151/14 151/20 152/5
 152/8 152/17 155/15 155/17 157/1
Sochor [26]  15/9 15/15 15/25 16/24
 16/25 22/21 27/21 27/25 28/5 30/9
 30/11 41/1 44/21 52/17 53/10 54/2
 54/22 55/1 56/7 58/9 60/16 61/6 69/7
 80/11 82/6 86/21
society [1]  103/23
sold [7]  12/11 12/18 12/18 78/5 78/6
 95/10 95/14
solely [2]  4/16 108/21
solid [1]  20/15
some [63]  4/25 6/18 6/21 7/8 11/8
 17/17 20/6 21/22 26/23 30/12 30/14
 31/25 34/17 39/21 42/12 45/9 51/12
 52/15 53/5 55/25 57/17 60/6 63/12
 66/17 71/25 73/13 74/1 74/6 80/3
 81/22 84/19 86/16 86/25 87/25 91/12
 91/18 92/17 92/19 99/13 112/2 119/9
 124/22 127/16 127/19 129/8 130/22
 134/8 134/12 134/13 134/14 135/7
 135/12 135/12 136/21 136/25 140/1
 140/21 140/22 141/12 143/18 147/5
 147/15 157/17
somebody [19]  13/1 18/8 22/25 24/16
 24/20 27/24 76/21 77/14 79/22 85/17
 118/4 118/14 118/15 118/16 123/19
 130/5 150/22 153/3 153/20
somebody's [1]  24/17
somehow [3]  50/10 50/10 143/13
someone [13]  45/12 46/4 46/21 52/5
 53/14 68/24 69/10 69/11 80/6 80/8
 80/10 90/21 131/22
something [38]  6/24 9/7 12/17 13/21
 16/12 18/10 21/7 26/20 26/21 26/23
 27/5 33/10 46/2 46/22 48/23 52/8 55/9
 58/7 63/17 78/6 85/2 86/14 86/14 87/3
 91/13 91/14 91/20 106/9 106/11
 110/15 119/4 120/15 121/2 139/16
 140/15 140/23 141/6 152/8
sometimes [3]  88/21 92/23 94/15
somewhat [2]  46/12 57/17
son [3]  6/25 7/4 92/22
son's [1]  32/9
sons [5]  20/17 32/8 93/21 96/8 103/4
soon [2]  35/20 122/14
sorting [1]  86/13
sounds [1]  30/11
source [1]  10/9
South [2]  13/24 22/6
space [3]  42/8 54/14 106/19
speak [3]  7/21 8/2 112/15
special [1]  92/2
specialist [1]  23/16
specialized [1]  92/1
specialties [1]  45/4
specific [2]  105/5 139/12
specifically [2]  42/9 50/3
specifications [3]  66/7 66/10 66/13
speculate [1]  85/2

**S**

speculation [4]  18/5 18/7 18/11 44/15
spend [1]  9/19
spends [1]  73/8
spent [4]  62/5 62/11 74/14 150/23
spine [1]  28/19
spinner [1]  22/24
spinner-bait [1]  22/24
spinous [5]  28/23 46/25 47/5 47/11 52/21
splenic [1]  57/16
spoke [1]  131/11
spoken [1]  120/24
spot [2]  26/11 49/9
spots [1]  40/10
spreading [1]  97/4
SQR [1]  1/25
ST [7]  1/13 1/18 1/20 1/23 2/2 2/4 2/10
stability [3]  63/12 63/14 73/4
staff [1]  14/6
stage [3]  109/20 110/20 141/5
stand [17]  4/23 7/22 12/21 12/22 13/3 14/10 15/5 15/17 26/16 26/17 34/16 43/4 43/12 46/14 46/20 89/6 148/21
standard [14]  24/3 24/3 24/4 64/3 67/13 67/13 67/21 71/16 98/19 98/21 109/11 109/16 109/17 109/18
standards [8]  24/3 97/13 98/16 98/17 98/18 98/23 99/1 134/11
standing [2]  47/25 110/14
Stanford [2]  44/25 62/4
starfish [1]  7/1
start [10]  27/19 37/3 40/15 40/21 49/13 118/2 121/22 128/12 131/18 153/15
started [9]  3/12 7/12 9/1 21/13 27/11 49/19 120/13 120/15 127/24
starting [1]  17/23 24/14 54/12
starts [5]  29/19 36/25 113/2 132/16 132/17
state [18]  11/23 12/4 19/3 27/6 27/7 37/4 80/8 92/3 98/15 131/16 133/17 133/21 134/12 136/21 136/22 137/13 143/25 151/2
stated [2]  108/6 122/8
statement [10]  10/3 25/19 26/15 28/14 31/3 76/12 120/8 120/23 147/16 147/23
statements [1]  89/10
states [15]  1/1 1/10 3/3 18/1 82/20 123/14 133/21 134/8 134/12 134/13 134/14 136/25 159/4 159/6 159/10
stating [1]  152/1
station [1]  84/19
statute [5]  31/19 31/20 32/2 33/22 33/22
statutory [1]  134/14
stay [4]  71/2 122/16 144/7 144/11
STE [6]  1/23 2/2 2/4 2/6 2/8 2/10
steer [9]  19/9 19/10 19/17 37/6 39/4 52/16 85/4 85/9 85/10
steered [3]  20/2 37/7 52/14
steering [14]  28/10 37/14 37/19 37/22 38/5 38/10 51/23 51/24 54/23 54/24 85/6 85/8 85/15 85/17
stenographically [1]  159/7
sternum [5]  46/25 52/21 53/3 57/15 59/25
stick [2]  20/12 58/19
still [11]  12/23 20/19 20/19 67/16 67/18 78/8 81/6 83/8 99/2 123/23 128/1

stipulation [3]  5/6 5/9 102/4
stop [11]  34/1 49/15 67/16 69/20 76/20 76/23 76/24 76/24 76/25 78/22 87/22
stopped [1]  43/6
stored [1]  13/6
stories [1]  6/19
storm [1]  5/16
story [1]  79/20
straight [5]  20/5 37/4 39/1 122/14 156/15
strategy [1]  150/12
Strauss [2]  127/4 127/5
street [5]  13/2 46/21 80/6 80/8 80/10
strength [13]  11/13 11/13 11/19 11/22 12/13 23/17 24/11 24/14 64/16 65/6 72/14 72/18 83/5
strength-to-weight-ratio [1]  12/13
stress [1]  55/15
stricken [2]  152/15 153/18
strike [1]  28/4
strikes [1]  20/11
strong [4]  24/16 24/21 63/3 65/8
stronger [20]  8/23 9/2 9/3 10/19 10/19 12/1 12/3 12/14 23/5 23/7 23/13 24/8 24/14 63/4 63/5 66/21 67/17 73/6 82/24 83/1
structure [2]  68/5 132/17
structures [1]  62/7
studies [1]  45/6
stuff [12]  9/19 12/24 15/6 15/7 16/10 20/7 23/1 25/7 26/7 80/13 130/23 150/4
stunning [1]  13/15
subcomponent [1]  66/9
subject [3]  72/2 104/3 157/9
submit [1]  39/22
submitted [1]  140/11
substantive [1]  145/5
successes [1]  32/9
such [14]  60/5 87/3 90/6 92/10 93/1 98/22 99/1 99/10 99/12 101/6 102/14 102/15 104/12 106/18
sudden [4]  20/24 22/18 46/1 61/2
suffered [5]  93/10 101/23 102/11 102/19 105/11
suffering [28]  3/23 4/1 4/5 4/14 5/3 29/25 30/2 30/3 30/18 31/8 31/9 31/13 31/14 77/4 77/19 93/2 93/10 93/18 96/7 99/22 99/24 100/2 101/24 102/7 108/14 125/19 126/6 142/1
suffers [1]  96/10
sufficient [1]  99/19
suffocated [1]  30/4
suggest [4]  56/18 70/23 73/15 90/19
suggested [9]  128/19 129/16 129/18 130/11 132/23 132/25 134/17 141/18 141/19
suggests [1]  137/11
summarize [1]  22/9
summary [2]  9/21 9/22
sum [1]  101/6
sun [1]  7/2
Super [7]  8/12 8/24 9/3 12/2 23/8 26/2 67/22
superficial [3]  59/8 59/9 59/20
Superior [17]  128/17 129/21 130/6 130/12 131/8 131/10 131/15 132/1 132/12 132/21 135/18 135/21 136/2 137/8 138/14 140/6

support [9]  22/19 45/21 57/18 59/21 64/6 130/7 148/7 149/19 154/18
supported [1]  7/19
supporting [1]  155/3
supports [1]  22/17
supposed [3]  10/14 18/6 30/1
supposedly [1]  29/4
sure [12]  19/14 48/2 63/13 67/25 117/20 120/10 121/9 129/21 137/24 139/18 139/21 143/7
Surely [1]  11/8
surf [3]  6/24 7/3 7/6
surprised [1]  55/5
surrogate [2]  54/17 54/17
surrogate's [1]  54/20
surrounding [2]  96/21 106/6
surroundings [1]  104/5
survival [1]  23/18
survived [1]  5/14
surviving [11]  92/19 92/21 92/22 93/3 93/21 96/8 103/4 114/5 115/6 125/23 126/9
suspension [2]  37/17 38/4
sustained [2]  48/6 142/2
sweeter [1]  86/3
swelling [1]  47/17
Swicord [21]  16/22 17/9 18/12 27/10 41/23 41/25 42/4 42/17 42/18 42/19 42/21 42/23 43/11 43/14 43/24 44/7 51/20 54/16 65/14 81/9 81/11
Swicord's [2]  42/24 80/14
switched [1]  48/10
sworn [1]  6/2
SWR [5]  11/14 23/7 23/23 24/3 83/3
SWRs [1]  12/9
sympathy [9]  70/24 74/16 74/20 74/21 77/8 77/8 77/10 77/11 88/24
system [5]  38/4 61/4 64/22 64/24 66/9
systems [1]  37/18

**T**

table [6]  33/11 33/13 104/8 104/9 104/12 104/15
tachycardia [1]  55/12
tackle [1]  21/14
tailored [2]  135/1 135/21
take [21]  7/9 12/20 12/21 13/2 16/16 33/5 34/17 49/12 69/4 75/1 75/3 75/7 78/17 82/23 112/1 119/19 127/17 143/11 143/12 145/22 153/14
taken [3]  39/21 56/2 112/2
takes [3]  25/16 66/15 102/23
taking [3]  137/14 140/21 156/23
talk [32]  3/19 13/14 15/8 18/3 18/20 20/21 25/8 26/7 26/18 29/13 31/8 31/17 34/1 34/20 36/19 48/1 55/24 57/6 61/15 64/23 67/15 67/17 67/19 67/19 71/25 72/6 77/15 84/3 86/1 147/5 153/9 157/15
talked [24]  8/25 9/11 11/23 13/25 15/9 22/12 26/14 29/8 29/8 40/12 41/21 55/2 58/16 63/12 69/19 69/24 70/10 70/13 72/12 80/15 80/17 80/18 82/22 113/11
talking [8]  8/16 19/1 23/17 28/2 29/3 32/14 36/12 36/13 41/7 61/13 65/23 69/8 80/6 81/21 82/3 139/2
talks [2]  63/25 67/25
Tallahassee [1]  31/15
Tandy [12]  20/4 20/10 37/3 37/16

Tandy... [8] 37/18 39/5 39/6 39/12 40/11 69/5 84/23 85/14
Tandy's [2] 40/5 52/15
tape [3] 16/8 48/19 82/7
target [1] 68/21
taught [1] 68/19
teaches [2] 53/14 53/15
teaching [1] 32/17
team [9] 8/15 8/19 12/21 21/8 68/15 68/16 68/17 148/24 156/14
technical [2] 23/16 91/25
technologies [2] 63/11 82/22
technology [5] 82/23 83/3 96/25 98/4 112/17
telephone [5] 20/2 20/5 20/8 20/9 85/12
tell [42] 4/21 7/22 13/3 17/13 19/3 20/4 20/10 21/1 23/22 25/9 26/3 33/24 34/8 34/8 41/10 42/4 44/2 45/11 45/18 48/14 55/16 59/14 60/3 60/19 64/1 66/18 67/2 70/12 71/17 74/17 84/13 84/14 88/12 90/24 123/24 129/25 130/10 144/15 145/11 153/10 153/20 155/16
telling [7] 13/18 43/4 46/17 47/12 90/22 91/17 152/18
tells [7] 21/8 33/11 46/8 52/13 55/15 58/21 61/19
ten [2] 10/19 85/19
tend [2] 90/8 91/18
terms [2] 86/24 136/17
terrain [1] 37/20
terrible [2] 72/10 139/15
territory [1] 130/14
test [18] 11/12 11/15 24/13 27/21 27/23 55/15 63/22 64/6 68/5 68/6 68/10 68/22 78/15 78/16 84/21 149/22 154/21 155/10
tested [4] 23/12 67/22 69/11 73/12
testified [19] 10/18 13/12 14/16 14/17 36/17 36/17 41/4 47/24 48/4 49/16 62/15 62/19 78/7 79/15 81/11 82/9 85/20 91/5 91/11
testifiers [3] 7/25 20/23 23/21
testify [10] 22/3 22/6 22/16 26/25 28/15 32/12 67/5 80/6 148/24 153/3
testifying [4] 90/17 92/8 118/14 148/7
testimony [30] 6/3 10/16 42/24 43/10 46/15 46/18 57/13 68/20 80/15 80/20 81/3 81/24 89/15 90/4 90/15 91/8 91/9 91/14 92/5 92/9 92/10 94/21 112/12 118/21 149/6 150/18 152/3 153/14 155/4 156/8
testing [6] 10/25 11/4 11/9 62/6 66/15 68/25
tests [5] 23/9 67/25 68/2 68/7 68/9
than [47] 6/5 7/13 7/16 9/9 10/6 12/2 14/9 18/8 23/5 28/3 28/5 34/7 39/13 44/17 47/3 50/21 55/4 58/7 58/19 62/23 65/21 66/10 66/15 68/4 79/23 82/24 83/1 86/6 86/11 86/15 86/16 86/18 94/19 97/16 99/14 107/19 107/24 109/10 109/15 109/17 112/11 135/2 136/22 140/23 144/19 145/6 153/13
thank [13] 35/3 35/5 35/11 35/12 49/12 74/24 75/24 87/25 88/1 121/4 122/6 142/10 157/22
Thankfully [1] 46/19

thanks [1] 6/15
that [97]
that's [129] 4/25 6/18 7/7 7/19 8/17 8/17 10/5 11/1 12/13 13/9 13/22 14/4 15/4 15/4 16/5 16/12 17/11 18/10 18/15 19/2 19/10 20/13 21/25 21/25 22/11 22/24 24/18 25/24 26/5 26/17 26/21 27/5 28/5 28/9 28/19 28/20 30/4 30/5 30/8 30/10 31/3 31/25 32/16 32/21 33/6 33/7 33/18 33/19 34/17 36/23 40/8 41/8 43/20 46/20 48/19 48/20 48/24 49/5 49/14 49/25 50/10 50/10 50/21 52/3 52/8 52/8 53/8 53/16 58/23 58/23 60/20 63/18 67/18 68/25 72/16 73/6 74/19 76/8 76/16 77/5 77/5 77/22 78/2 78/12 78/21 79/6 79/9 79/21 80/21 80/24 81/20 82/2 83/6 83/18 84/1 85/4 85/4 85/5 85/16 87/11 111/7 111/7 114/10 123/17 124/1 124/12 131/11 131/23 131/24 133/15 133/17 133/19 133/22 134/10 134/17 138/12 139/12 143/14 143/17 144/7 144/24 147/6 148/18 150/24 155/9 155/22 156/16 156/21 157/1
their [96] 5/18 6/7 8/19 9/8 16/20 19/21 20/19 20/24 21/10 21/19 22/3 22/9 24/6 25/18 25/23 25/24 26/14 26/14 28/14 28/25 29/11 29/12 29/16 30/6 31/22 32/8 32/9 32/22 33/8 35/25 36/11 36/13 36/16 36/17 46/5 46/5 47/13 51/25 54/6 56/2 61/14 67/11 70/11 70/21 71/4 71/13 77/1 77/9 77/22 78/3 78/4 80/9 80/17 81/25 82/2 82/15 83/6 86/1 86/4 86/5 86/6 86/8 87/13 87/14 89/11 92/18 92/19 93/22 93/25 94/2 94/14 95/22 96/6 96/8 100/22 100/23 102/25 104/23 108/12 108/15 110/3 110/5 110/5 110/8 117/6 121/12 122/15 148/2 148/6 151/2 151/13 153/3 154/25 155/13 157/6 157/8
them [87] 5/7 5/8 5/10 6/8 7/3 7/5 7/5 7/25 9/20 12/19 12/22 12/22 12/23 12/25 17/21 17/23 18/25 21/14 25/14 25/17 25/22 26/5 28/1 29/11 29/12 29/17 29/18 32/21 33/2 36/18 39/1 42/3 42/3 47/7 47/13 48/1 48/8 49/18 49/21 50/13 51/12 51/24 57/18 60/2 64/22 66/25 68/1 68/22 70/20 70/25 75/20 76/1 77/3 77/3 77/5 78/6 78/8 79/22 80/8 86/7 91/19 94/23 94/24 101/20 102/24 103/3 112/5 113/9 119/20 122/19 123/19 123/19 123/24 123/24 123/25 130/18 140/8 140/14 140/19 148/7 150/5 150/25 151/21 153/1 153/10 155/23 155/25
themselves [2] 31/22 92/16
then [102] 5/19 5/21 5/23 5/24 6/5 16/23 21/18 21/23 23/10 23/15 23/23 23/24 25/4 34/19 34/21 35/8 37/1 37/13 37/23 39/5 43/2 46/23 47/11 47/21 49/2 49/20 51/14 52/13 52/14 52/17 53/5 53/9 53/17 54/16 59/4 59/13 61/19 61/23 66/16 67/4 67/24 68/14 68/22 74/9 75/8 78/4 80/5 85/3 85/9 85/13 97/15 99/5 100/24 106/24 107/6 107/13 107/15 107/19 108/16 109/5 110/3 110/25 113/3 113/5 113/6 113/8 113/15 113/18 113/22 114/7 114/21 115/4 115/14 115/24

116/7 116/12 116/20 116/24 117/3 117/6 117/8 117/10 119/10 119/12 119/15 127/17 127/20 129/1 130/8 131/20 137/19 144/17 150/13 152/14 153/16 153/16 153/17 154/18 154/20 157/8 157/16
theory [4] 22/4 22/10 22/19 53/22
there [156] 4/25 9/7 10/3 11/14 11/14 12/22 13/9 13/17 16/17 17/1 17/8 17/16 18/8 18/17 19/1 19/13 19/18 19/19 19/22 20/6 20/19 23/2 24/17 24/25 28/6 28/13 28/13 28/15 28/19 28/20 28/20 28/23 28/24 28/24 28/25 29/2 29/23 30/1 30/12 30/13 30/13 33/4 33/7 33/9 33/19 34/1 34/12 34/14 37/14 38/24 39/8 42/12 42/13 42/23 44/7 44/10 44/11 44/14 44/17 47/12 47/15 48/8 48/24 48/24 49/9 49/25 50/1 51/20 52/8 54/2 54/16 58/1 59/11 60/10 60/22 61/2 61/12 63/8 65/12 65/16 65/19 66/5 69/20 70/1 70/1 72/22 73/12 73/14 76/5 77/12 77/18 79/8 81/10 81/21 81/24 84/3 84/25 85/1 85/20 86/9 86/10 86/12 86/15 86/16 86/18 86/19 88/12 90/8 91/10 91/12 94/8 99/14 100/1 104/6 104/7 112/24 113/1 114/3 114/7 115/19 117/3 117/22 118/8 118/15 118/17 118/18 118/22 120/7 121/14 122/7 122/14 123/24 127/23 128/3 129/23 130/14 132/3 133/20 134/4 137/1 137/6 137/23 137/25 138/7 138/22 139/13 139/19 139/19 145/19 147/13 151/7 152/23 156/1 156/20 157/16
there and [1] 85/1
there's [70] 7/4 8/7 8/21 8/22 9/18 10/9 10/22 12/24 13/18 14/2 14/15 19/22 20/19 23/8 23/22 24/20 26/9 26/24 27/13 29/22 30/2 30/24 31/9 34/2 38/25 39/11 39/19 42/16 44/17 47/4 48/23 49/8 55/22 58/5 58/13 59/17 59/20 63/8 69/20 70/5 70/6 71/11 71/22 72/13 79/10 82/1 83/13 83/16 85/3 85/10 85/13 85/22 86/1 86/7 113/8 114/7 115/8 127/16 129/16 132/5 132/22 133/16 133/16 136/25 137/22 138/9 140/15 141/2 141/6 153/5
thereafter [1] 56/17
thereby [1] 114/13
therefore [1] 134/23
therefrom [1] 99/14
these [66] 7/1 7/18 8/9 9/3 10/2 12/18 18/2 18/24 19/5 21/20 22/21 22/22 24/21 25/23 26/2 26/6 27/25 28/4 29/3 34/2 34/7 34/25 35/1 38/23 40/9 47/8 47/25 48/2 49/10 54/9 55/11 55/13 55/20 56/5 57/3 59/9 61/8 63/21 66/19 67/6 67/21 72/15 72/19 73/24 77/2 77/24 78/1 78/5 78/10 82/21 86/4 92/23 93/12 93/20 94/4 117/18 130/17 131/8 131/23 132/18 134/11 139/15 139/18 141/1 143/9 143/21
they [260]
they'll [1] 152/6
they're [9] 45/4 70/23 82/3 85/24 149/3 152/12 156/18 156/19 156/24
they've [7] 10/9 21/20 32/9 36/4 70/21 148/3 156/19

thing [21]  8/1 14/15 19/8 23/3 29/19 30/11 30/19 33/23 45/21 49/2 60/20 66/23 76/3 77/7 80/12 83/9 86/17 86/17 134/16 144/8 145/3
things [20]  11/24 18/15 31/19 32/10 36/7 50/15 55/13 56/5 60/1 61/8 63/15 69/17 74/10 74/17 87/7 91/4 91/18 147/4 149/24 154/23
think [72]  4/12 4/14 6/8 9/22 11/15 12/9 15/9 19/25 27/4 28/18 29/5 36/8 41/1 41/15 42/5 42/24 47/15 48/23 52/5 58/7 62/16 63/7 69/7 71/1 71/10 73/13 75/5 79/9 103/18 111/21 114/23 120/8 120/23 121/8 123/9 123/12 131/11 133/22 134/10 135/1 136/5 136/19 137/7 137/21 137/22 139/4 139/4 139/5 140/4 140/16 141/1 142/2 142/8 143/24 144/3 145/1 145/25 146/8 146/22 146/23 147/23 148/19 149/7 152/7 152/25 154/14 155/1 155/18 155/23 156/2 157/5 157/5
thinks [2]  57/4 57/4
third [1]  127/23
this [349]
THOMPSONCOE.COM [1]  2/7
THOMPSONHINE.COM [1]  2/1
thoracic [1]  28/19
thorough [3]  45/7 45/16 157/7
thoroughly [2]  88/6 88/18
those [115]  4/21 9/15 9/16 10/13 11/16 17/15 22/18 25/20 27/20 28/12 32/10 32/11 33/1 35/22 36/2 36/12 37/1 38/25 39/1 39/4 45/13 45/19 46/19 46/25 47/14 47/20 48/4 50/15 51/1 54/7 54/13 55/24 57/14 59/5 60/1 61/1 61/9 62/15 63/2 63/12 63/14 66/7 66/10 67/1 67/3 67/5 67/9 67/25 68/7 68/9 69/13 76/25 79/1 81/8 82/19 82/19 83/21 83/25 87/7 88/11 91/7 92/13 103/1 103/6 108/3 108/15 108/16 109/23 112/3 113/4 113/19 113/20 113/25 114/24 114/25 115/14 116/13 116/15 116/24 117/19 118/4 118/4 118/12 118/13 118/15 118/22 118/23 120/15 121/2 121/11 121/16 121/17 121/20 122/14 122/19 123/9 129/8 129/15 129/20 131/1 131/2 131/3 132/6 132/24 135/14 137/11 140/10 140/10 140/11 140/13 140/15 140/17 144/10 149/2 154/22
though [11]  31/22 36/16 41/2 54/21 70/3 87/4 87/15 87/17 110/18 131/15 143/4
thought [9]  20/3 129/8 129/20 131/24 135/14 143/6 145/12 152/10 153/2
thoughts [1]  154/10
thousand [5]  43/13 66/11 66/15 72/8 82/16
thousands [1]  7/4
threading [1]  41/1
threatening [1]  35/23
three [9]  12/10 23/12 32/8 39/24 70/22 76/4 82/24 84/8 87/6
Three's [1]  28/20
three-and-a-half-month [1]  84/8
threw [1]  81/5
through [39]  10/12 12/7 14/7 15/22 24/4 24/19 39/20 39/25 40/23 42/7 42/21 43/9 45/8 45/16 45/17 46/23

47/7 48/8 52/23 54/6 54/10 55/8 57/14 59/23 60/11 65/8 77/10 78/4 84/13 84/20 87/24 89/8 97/5 112/25 118/4 120/12 121/10 129/14 152/10
throw [1]  21/18
throwing [3]  6/24 7/2 26/19
throws [1]  7/6
Thursday [6]  3/1 75/12 122/23 124/3 124/4 124/24
tick [1]  65/24
tied [2]  79/7 121/6
time [51]  8/6 9/19 13/22 19/7 20/18 21/13 21/16 22/7 25/17 30/12 35/5 35/12 37/6 37/6 37/10 40/6 41/5 45/18 55/18 60/19 68/6 69/1 78/17 79/2 79/9 83/14 86/7 86/13 87/18 88/3 88/14 91/13 93/10 93/11 93/13 95/13 97/25 98/4 102/24 112/3 112/3 119/3 119/19 128/2 128/8 150/14 154/10 156/18 156/22 156/25 157/6
timekeeper [1]  75/18
timely [1]  130/25
times [23]  6/19 6/22 8/23 9/3 10/18 10/18 10/19 12/10 12/14 12/25 18/12 20/23 23/12 25/11 36/16 36/18 37/2 41/15 67/17 68/1 70/25 82/24 82/25
tire [3]  37/1 37/4 38/24
tired [4]  25/13 37/10 76/22 128/11
tires [4]  38/1 61/18 85/8 85/8
Title [1]  159/6
today [4]  12/16 24/19 35/13 35/16
together [7]  32/8 32/23 71/1 113/1 123/4 153/25 154/11
told [34]  5/7 6/1 7/12 8/1 11/25 13/22 16/22 24/23 31/2 34/5 35/15 36/9 38/18 42/7 42/17 43/3 43/20 43/24 45/21 46/9 47/10 47/17 48/24 49/8 62/19 66/22 67/1 67/3 68/17 69/16 78/9 81/23 113/13 155/25
tolerate [1]  27/2
tomorrow [6]  151/1 152/2 152/4 152/6 157/8 157/21
ton [1]  20/11
tongue [1]  121/6
tongue-tied [1]  121/6
tonight [2]  153/21 154/9
too [7]  10/15 33/7 97/3 104/16 124/13 141/14 141/20
took [11]  17/12 25/1 29/11 29/12 31/12 32/21 45/17 47/23 59/5 85/3 106/18
top [6]  30/16 43/23 54/19 54/20 60/8 64/23
topic [1]  133/2
torso [4]  57/6 57/9 57/11 66/3
tortious [1]  133/15
total [2]  116/13 147/5
totally [3]  16/5 17/8 33/21
touch [2]  16/20 85/14
touching [2]  37/7 37/23
tout [1]  64/2
touted [1]  49/13
toward [2]  81/4 85/5
towards [3]  38/24 39/1 39/4
tower [1]  44/25
toy [1]  123/3
Toyota [2]  12/8 62/17
track [1]  78/25
tracks [2]  20/7 85/10
Traffic [2]  98/17 106/15
training [2]  36/3 92/2

transcript [3]  1/9 159/7 159/9
trapped [4]  15/11 15/11 15/19 17/9
trauma [1]  53/13
traumatic [8]  45/25 47/20 50/18 50/23 51/11 55/5 55/7 56/13
Treatable [1]  62/24
treated [1]  22/7
treats [3]  53/12 53/13 55/2
tremendous [1]  151/5
trial [12]  1/9 7/12 7/21 8/6 78/10 79/24 89/21 91/15 118/8 148/24 150/11 156/14
tried [9]  16/24 20/4 20/10 36/20 44/24 50/8 57/1 129/7 129/8
tries [1]  19/9
trips [1]  33/2
Trooper [7]  19/15 27/7 40/17 41/6 41/6 82/9 82/9
troopers [2]  27/6 80/8
trouble [1]  6/19
TROUTMAN.COM [2]  1/24 2/3
truck [65]  8/8 8/12 9/2 9/4 12/13 13/6 13/11 13/13 13/16 16/17 19/13 20/8 20/11 20/15 20/20 23/12 24/23 25/2 25/2 25/6 27/18 27/20 27/22 32/24 35/20 37/8 37/19 38/11 38/13 39/6 42/22 43/9 54/4 54/15 64/4 64/17 64/21 67/7 68/8 78/23 80/16 80/25 81/9 82/11 83/1 83/7 83/22 83/22 85/11 85/15 85/18 92/14 93/13 94/3 95/5 95/25 96/3 99/5 102/19 104/20 105/23 106/21 123/3 123/6 140/2
trucks [17]  9/15 9/16 12/1 12/2 12/8 12/18 18/2 26/2 33/1 72/10 78/5 82/21 123/7 123/11 123/15 123/17 139/18
true [15]  11/6 11/8 27/5 42/21 43/18 49/25 63/18 76/17 87/10 90/13 94/19 94/19 133/19 144/7 159/7
truth [9]  16/2 24/22 33/6 43/4 76/16 90/22 90/24 91/17 111/24
try [19]  18/10 22/25 41/12 41/22 51/1 76/1 76/19 76/20 76/24 78/22 87/21 87/22 88/22 111/16 112/18 128/18 130/8 131/20 144/24
trying [11]  50/20 63/12 76/6 76/23 104/15 130/17 138/6 138/19 143/5 145/15 148/21
Tuesday [1]  35/13
turn [4]  84/25 84/25 85/6 146/12
turned [8]  43/17 43/18 58/17 78/13 81/1 85/2 85/16 85/17
tutorial [1]  118/2
Twain [1]  76/15
twelve [2]  111/10 112/24
Twenty [1]  82/15
Twenty-five [1]  82/15
twice [3]  16/8 67/23 121/6
two [53]  7/25 18/18 20/10 22/8 23/9 27/6 28/23 30/13 30/14 32/7 34/13 34/14 34/19 38/23 39/9 39/25 40/9 43/6 45/3 45/4 48/21 50/14 53/23 56/9 61/22 62/20 66/19 67/16 67/18 68/12 69/17 70/9 70/10 73/19 74/14 75/1 75/6 78/1 78/14 78/16 80/7 86/25 114/3 114/16 114/24 116/13 116/15 120/21 124/12 129/12 131/21 132/5 144/10
two-and-a-half-pages [1]  124/12
two-and-a-half-rollovers [1]  78/14
TX [1]  2/6

**T**

type [1] 5/2
typed [3] 43/1 88/8 88/9
typed-up [1] 88/9
types [1] 113/5

**U**

ultimate [2] 84/21 85/13
ultimately [1] 10/17
unanimous [3] 111/9 111/10 125/6
unanimously [1] 112/23
unclear [2] 42/23 143/18
unconscious [14] 14/21 20/22 21/5 21/6 21/10 21/22 22/10 44/13 44/16 56/16 85/5 85/21 85/23 85/25
uncontested [1] 10/15
undamaged [1] 23/13
under [26] 4/4 4/22 14/23 17/11 26/9 26/18 46/5 67/16 76/4 78/18 89/9 92/16 92/25 99/8 106/3 106/5 106/8 106/10 106/12 133/2 133/18 149/17 149/19 152/3 152/19 153/15
understand [12] 3/13 40/17 91/6 131/17 132/10 135/11 140/22 145/4 147/18 150/19 152/23 156/24
understanding [3] 135/24 143/15 154/20
understands [1] 120/10
Understood [1] 156/10
undisputed [23] 10/5 11/1 11/3 11/24 14/3 14/15 15/11 19/7 19/11 22/20 26/13 27/3 29/1 30/4 30/5 31/10 76/8 81/3 82/3 84/24 85/14 85/21
undisturbed [2] 39/9 39/19
unduly [1] 112/8
unfortunately [2] 55/17 60/9
unimportant [1] 91/23
unintentional [1] 121/18
UNITED [8] 1/1 1/10 3/3 18/1 82/20 159/4 159/6 159/10
unlawful [2] 134/9 134/15
unless [1] 140/15
unlikely [1] 154/19
unobstructed [2] 37/5 42/9
unpack [1] 76/18
until [11] 37/9 42/14 64/11 85/18 121/23 128/7 145/7 151/10 151/12 151/24 154/18
unusual [1] 151/9
up [94] 5/14 7/1 7/2 7/6 9/20 11/5 13/1 13/9 15/7 18/10 20/7 20/8 20/12 20/22 20/24 21/10 21/24 22/8 22/22 23/1 24/25 25/7 28/25 32/19 33/3 33/19 33/20 34/23 35/6 37/21 40/2 43/1 45/11 45/16 47/6 52/13 54/2 58/10 62/17 64/9 64/20 65/2 65/6 74/9 74/16 76/2 76/12 80/12 80/13 83/22 85/11 85/15 85/23 86/25 87/21 88/8 88/9 104/10 111/20 112/18 112/19 112/24 116/14 116/16 117/13 117/17 117/22 118/3 118/5 118/15 118/17 118/18 118/22 120/14 121/6 121/21 121/23 122/14 123/19 123/19 123/24 128/3 130/21 130/22 132/23 145/23 147/1 147/2 147/4 148/8 150/13 150/17 154/21 156/20
updated [1] 33/13
upon [9] 69/13 92/6 108/10 132/25 134/16 135/9 143/1 152/20 156/22
upper [2] 46/3 47/14

upside [6] 30/3 30/15 31/10 32/24 54/23 80/8
us [15] 2/8 8/10 19/3 41/13 44/20 46/19 49/2 54/16 57/3 60/3 60/14 123/4 129/4 152/18 153/20
use [13] 33/20 67/9 88/19 89/25 99/15 104/17 106/1 106/4 106/7 107/2 112/5 123/15 135/10
used [15] 9/12 9/12 13/25 19/20 21/12 25/3 37/25 47/15 64/5 65/12 106/2 106/7 123/9 123/15 123/17
usefulness [2] 96/17 97/3
user's [2] 96/21 96/24
users [2] 87/5 110/19
uses [1] 97/8
using [3] 97/17 98/12 99/12
usual [1] 148/24
uterus [4] 49/25 81/14 81/16 82/1
utility [4] 96/12 97/8 97/14 98/9

**V**

vague [1] 141/20
valid [1] 146/20
valuable [1] 86/6
value [30] 31/21 31/21 32/1 32/3 32/4 33/8 33/16 33/17 33/20 77/18 77/20 87/14 87/15 87/16 93/5 103/6 103/7 103/9 103/11 103/15 103/16 103/19 103/22 114/11 115/10 125/25 126/11 147/8 147/15 148/4
various [1] 20/22
veers [1] 140/1
vegetables [1] 56/10
vehicle [52] 9/15 13/10 13/10 15/10 28/8 36/24 36/25 37/17 37/21 38/3 38/14 38/22 40/25 41/22 42/2 42/20 43/15 44/10 51/17 51/23 54/3 56/22 58/10 60/5 62/7 62/11 62/22 62/25 63/13 64/10 65/8 65/9 65/11 66/7 67/2 67/12 67/14 67/23 68/12 71/23 72/5 72/22 73/5 79/4 98/17 98/18 98/19 98/19 98/21 134/5 140/2 145/18
vehicles [11] 37/18 44/11 61/18 62/3 62/21 66/15 66/25 67/6 67/21 134/5 134/8
velocity [1] 27/22
verbatim [2] 132/9 135/21
verbose [1] 124/13
verdict [56] 18/6 21/24 21/24 21/25 29/14 29/19 30/18 30/19 31/6 31/13 33/15 33/17 34/13 73/17 73/18 74/9 74/23 74/23 76/4 87/10 87/12 87/14 94/5 100/10 106/19 107/7 107/16 107/17 108/7 109/20 110/6 111/9 111/11 111/13 112/16 112/20 112/24 113/2 113/6 117/11 118/10 120/3 120/12 121/7 121/10 122/21 124/23 125/4 125/9 125/11 127/6 127/25 128/14 128/21 141/22 151/11
verify [1] 10/9
version [2] 42/20 136/2
versus [7] 5/3 69/6 69/7 80/12 133/23 137/13 146/25
vertical [4] 43/22 43/25 44/6 80/25
very [20] 29/5 34/13 34/14 34/19 35/12 35/20 36/20 40/17 49/9 57/25 59/9 59/17 70/7 70/19 78/20 86/25 88/1 111/22 122/19 154/23
VIA [1] 2/6
victims [2] 26/19 26/20 26/20

view [3] 92/9 103/24 136/23
violated [2] 72/1 106/13
violation [2] 106/16 106/18
violent [1] 43/7
Virginia [1] 53/15
visualize [1] 81/22
Vogler [14] 10/12 11/2 12/7 24/11 62/4 62/14 62/18 64/17 65/5 66/22 69/6 69/25 72/6 78/24
voir [1] 21/11
VOLUME [1] 1/9
volunteer [1] 43/6
Volvo [2] 24/3 24/4

**W**

wait [4] 119/1 122/19 124/22 130/16
waiting [1] 123/23
waits [1] 60/9
waive [1] 145/13
waiving [1] 152/17
wake [1] 5/14
walk [2] 61/7 62/22
walked [5] 10/12 10/17 12/7 65/9 66/2
walking [1] 6/23 120/12
walks [1] 6/25
Walmart [1] 21/15
want [63] 5/8 6/14 13/5 13/23 16/9 25/8 29/17 33/23 34/8 40/5 40/15 40/21 41/8 46/20 60/18 61/15 64/23 66/2 68/11 71/19 71/25 75/1 75/1 76/20 77/7 77/8 77/11 84/11 88/11 108/25 109/4 111/21 112/25 117/16 117/19 118/7 119/10 119/14 120/9 121/9 122/19 123/2 123/17 128/12 130/18 131/13 143/11 143/12 144/1 145/11 145/21 146/6 148/13 150/11 152/3 152/5 153/12 153/15 154/12 154/14 154/15 155/16 157/17
wanted [1] 45/21
wanton [1] 73/15
wantonly [1] 139/9
wantonness [3] 71/18 108/25 109/4
wants [6] 64/14 67/19 118/4 120/5 145/13 157/20
warning [1] 18/2
warnings [1] 96/22
warrant [1] 108/18
was [262]
washed [1] 7/1
wasn't [15] 18/13 24/23 41/18 50/1 50/1 50/19 56/3 56/12 60/21 64/7 64/10 65/15 65/24 81/4 85/1
waste [1] 60/18
watch [2] 19/15 32/9
WATSONPENCE.COM [1] 2/5
WATSONSPENCE.COM [1] 2/11
way [31] 10/9 28/5 33/1 35/8 39/17 42/10 47/8 51/25 54/24 58/17 61/2 66/3 81/6 84/18 84/19 84/20 88/24 89/5 104/6 105/5 111/5 111/22 113/7 114/17 119/10 135/14 146/9 146/10 150/22 153/16 155/14
we [249]
we'll [7] 4/20 75/16 75/19 107/8 112/24 122/21 124/22
we're [18] 7/7 29/13 29/18 32/17 47/7 70/12 80/6 81/21 86/22 111/3 112/17 114/2 123/10 127/14 128/7 138/19 139/21 156/4

we've [21]  23/15 24/2 24/3 37/2 62/13
63/11 67/10 68/1 68/3 68/14 70/10
70/17 70/19 74/13 74/18 74/25 75/6
87/20 122/13 142/12 150/6
weak [2]  10/15 10/25
weaken [1]  10/22
weakened [5]  10/11 10/14 10/24 11/1
17/24
wearing [6]  26/8 26/11 26/24 27/6
46/10 58/5
weaved [1]  83/19
week [3]  6/16 35/13 35/16
weeks [3]  39/21 70/10 74/14
weight [5]  11/13 11/19 12/13 90/9
112/11
welcome [2]  5/13 149/3
well [19]  7/1 7/4 7/7 9/22 11/11 19/25
31/25 50/16 52/14 118/15 118/16
128/14 133/19 136/1 136/8 139/6
141/24 141/24 148/25
well-established [1]  141/24
went [14]  45/8 45/16 46/23 52/22 54/6
54/10 57/14 59/23 60/11 61/8 65/7
66/16 121/8 121/10
were [72]  7/25 8/9 8/18 12/1 12/3 12/8
12/12 22/13 25/3 25/10 25/22 25/24 26/16
27/25 28/4 28/15 29/10 32/11 32/25
34/3 35/22 43/20 44/11 45/3 45/13
45/14 47/11 47/13 47/20 48/2 50/4
54/9 56/1 56/21 59/7 63/7 66/3 66/5
67/3 68/5 68/6 68/21 68/22 70/20 71/6
72/24 74/1 74/6 79/24 81/10 83/25
86/4 93/12 93/19 94/2 96/7 99/6
102/20 103/2 111/19 118/13 118/18
118/19 123/9 123/17 131/8 133/20
134/2 138/25 139/1 140/11 148/12
149/23
weren't [4]  36/22 43/3 47/12 71/5
wet [1]  19/14
what [202]
what's [15]  8/16 8/19 23/6 24/22 44/5
46/19 55/16 55/19 87/23 87/23 128/19
129/18 133/8 137/4 142/22
whatever [4]  25/17 60/8 102/24 152/15
wheel [10]  28/10 37/22 38/3 52/13
51/24 54/24 85/6 85/15 85/17 118/10
wheels [4]  37/20 37/22 38/11 85/8
when [76]  6/15 7/2 10/21 11/2 12/4
16/7 16/13 16/14 21/23 24/25 25/5
27/20 27/22 28/6 28/8 28/11 33/8
36/10 36/14 37/19 38/24 41/2 41/11
41/18 44/13 47/1 47/2 48/1 48/22
49/18 50/14 54/9 56/5 56/16 58/11
58/15 58/20 61/1 64/17 66/20 67/15
67/16 67/20 69/4 69/8 76/3 76/12
76/21 78/15 79/2 84/8 87/1 87/23
88/20 89/7 90/11 91/25 92/7 96/25
99/15 101/2 102/22 104/1 108/20
112/13 120/2 121/10 122/19 128/3
133/13 137/18 142/24 148/20 153/9
153/20 155/13
where [66]  5/16 8/5 11/21 15/3 15/15
16/15 17/8 20/18 20/20 22/20 24/16
24/20 25/6 26/14 26/15 27/11 30/6
36/20 36/21 36/22 37/13 39/19 42/15
44/2 45/13 45/13 46/6 46/8 46/15
46/16 47/10 49/13 49/15 49/25 50/1
54/19 57/4 57/6 58/19 58/23 59/1
59/10 61/16 65/20 77/13 84/2 85/10

85/11 92/10 114/10 116/8 116/12
116/16 132/6 132/11 153/3 153/7
133/20 134/19 137/9 137/16 137/18
141/16 145/23 148/11 155/12
whether [55]  3/22 11/6 11/21 24/13
37/14 52/12 55/14 65/7 65/18 69/14
62/21 69/22 83/23 84/5 84/9 90/2
90/13 90/19 91/10 91/12 91/20 91/22
92/6 94/20 96/10 96/13 97/18 98/13
98/24 99/5 99/22 102/10 105/15
106/18 106/19 106/25 108/17 109/21
110/4 110/16 110/17 112/21 114/22
118/11 121/11 133/14 134/15 144/16
146/19 149/4 149/22 151/21 151/22
153/18 155/10
which [76]  8/6 12/10 23/5 25/15 25/15
27/21 35/25 36/3 36/4 36/6 36/6 36/23
38/1 42/14 50/5 53/6 53/6 56/7 60/2
60/3 61/23 64/3 67/8 69/13 71/6 71/19
72/25 73/11 73/24 74/9 79/2 80/25
81/4 87/2 92/18 93/18 94/5 94/6 95/9
98/25 99/8 99/9 102/22 104/6 105/12
106/15 106/17 108/13 109/11 109/16
109/18 109/19 112/21 113/3 115/15
120/2 123/6 127/19 127/20 128/6
128/16 130/10 131/17 132/1 132/16
132/24 133/3 136/15 137/20 144/18
144/21 145/17 149/18 151/17 152/19
152/20
whichever [1]  123/17
while [11]  36/12 37/7 43/7 55/21 85/15
85/17 104/13 106/15 111/17 117/19
118/14
who [75]  7/21 9/8 9/9 9/15 9/16 9/21
10/16 13/12 13/22 13/24 14/4 14/5
14/10 14/16 14/17 14/17 17/22 23/16
32/14 37/16 38/12 38/18 39/25 40/3
40/16 40/21 41/21 41/21 41/25 42/2
42/3 43/6 43/7 44/3 44/19 45/2 45/10
46/4 49/7 50/18 53/14 55/1 56/23 62/1
62/2 62/4 63/2 68/24 69/10 69/11
69/12 70/22 72/3 72/9 72/20 73/9 74/7
76/25 77/2 87/8 87/9 90/5 90/21 92/1
94/22 94/24 95/12 101/9 121/9 134/24
144/10 148/6 151/1 151/7 152/18
who's [1]  14/6
whoever [2]  13/23 124/21
whoever's [1]  151/25
whole [13]  7/15 19/8 25/24 32/3 33/21
39/10 49/3 64/22 64/24 89/2 90/16
104/14 144/12
wholly [1]  50/7
whom [1]  100/19
whose [2]  56/1 152/2
why [73]  5/1 6/7 8/7 8/15 8/22 8/23 9/6
9/7 9/10 9/18 10/20 10/21 10/24 13/3
13/3 13/4 13/9 14/18 15/3 15/4 15/4
17/12 17/13 17/13 18/3 18/4 18/17
18/18 18/20 19/2 19/12 20/1 21/25
23/23 23/24 26/7 26/18 29/2 38/23
39/18 42/3 44/18 50/13 50/16 51/7
51/22 52/5 52/7 54/10 55/6 56/3 59/19
60/4 60/4 68/15 71/25 78/21 79/17
81/4 81/18 81/20 83/4 83/18 83/21
84/25 85/2 86/6 118/17 131/11 143/19
143/22 149/4 152/15
wide [1]  98/16
wife's [2]  31/10 31/11
will [130]  5/4 5/9 5/19 5/21 5/23 5/25
6/16 6/16 6/17 7/2 11/16 16/9 21/1

27/8 29/6 32/7 33/10 33/24 34/1 34/12
34/14 34/14 34/17 34/19 34/20 34/23
35/1 37/22 40/24 41/10 44/2 48/7
49/12 50/6 50/14 51/22 59/20 65/2
70/2 70/8 70/23 71/7 71/10 75/7 75/8
76/13 76/14 76/19 84/13 84/14 85/8
85/8 85/9 86/23 86/25 87/17 87/25
88/9 88/12 88/12 88/20 92/23 94/6
94/10 95/8 100/10 104/11 106/19
107/9 107/10 107/13 107/16 108/9
109/7 109/12 109/20 109/22 109/24
110/6 110/21 110/23 110/25 111/12
111/12 112/3 112/15 112/18 112/19
112/23 112/25 117/11 117/12 117/17
117/20 118/9 118/11 118/18 118/22
119/1 119/12 119/13 119/15 121/21
122/14 122/14 123/18 123/19 124/16
125/9 125/10 127/6 127/18 127/19
127/19 127/20 127/21 127/23 127/23
127/24 128/7 128/9 132/19 132/22
132/25 147/5 148/7 148/23 153/16
155/18 157/5
willful [3]  71/18 108/24 109/3
willing [3]  33/5 140/24 156/16
win [1]  69/16
window [2]  16/14 42/8
windows [1]  40/24
windshield [6]  16/15 19/16 23/14 40/24
wise [1]  140/16
wish [2]  119/2 119/9
within [5]  41/2 80/19 89/11 150/15
156/11
without [13]  4/24 50/24 50/25 51/1 78/7
83/18 97/2 99/9 103/10 104/2 135/12
144/13 152/17
withstand [1]  64/19
witness [54]  7/21 11/25 12/20 12/22
14/10 15/17 15/24 16/22 41/5 41/20
43/4 44/3 45/10 46/15 46/18 79/16
79/17 79/23 80/3 80/3 80/4 80/17
81/19 90/14 90/16 90/19 90/21 90/23
90/25 91/2 91/3 91/4 91/6 91/8 91/11
91/13 91/15 91/17 91/17 91/19 92/4
92/5 92/7 92/10 92/11 148/6 148/6
148/23 148/23 149/20 151/7 152/18
153/23 154/17
witnesses [27]  6/3 11/5 11/15 14/9
28/15 32/12 34/15 36/1 36/2 36/3 36/5
36/6 36/6 36/10 36/11 36/13 36/14
36/15 36/20 44/23 51/13 62/20 79/1
80/5 89/15 90/17 94/22
woman [2]  50/9 56/23
won't [9]  9/19 16/8 48/8 76/18 78/17
80/21 84/16 118/15 155/7
wonder [2]  60/4 60/4
wonderful [2]  70/20 70/23
word [7]  34/1 47/15 57/11 77/18 77/19
80/2 83/21
words [8]  22/18 43/3 43/3 43/13 51/13
94/11 111/10 112/6
work [17]  9/13 19/11 19/12 19/17 36/5
36/5 45/10 51/22 53/24 54/17 60/10
85/10 148/4 148/5 149/22 154/21
155/11
worked [4]  38/2 57/5 62/9 68/17
working [3]  21/13 41/22 77/10
works [1]  37/19
world [3]  16/4 67/18 76/16
worm [1]  22/24
worth [6]  43/12 135/7 142/12

# W

worth... [2]  142/20 143/1
would [121]  4/3 5/2 11/10 11/11 15/5
22/18 33/5 33/21 35/24 38/23 42/23
43/20 44/18 45/18 46/10 46/12 46/20
51/10 51/18 51/20 52/1 52/5 52/7 55/6
56/1 56/19 57/19 59/19 61/7 63/7 63/8
64/6 67/14 67/16 69/9 69/13 72/7
72/10 72/15 72/19 73/2 74/6 75/5
76/25 79/16 79/19 81/23 81/23 84/12
86/2 97/19 98/8 99/10 99/12 102/17
103/13 103/20 103/25 106/10 106/12
107/6 107/22 107/25 108/2 108/16
108/25 109/4 110/24 113/13 113/15
113/15 113/19 113/24 114/10 114/13
114/22 114/24 114/25 115/2 115/11
116/8 116/20 116/24 117/2 117/6
118/12 120/2 129/15 131/17 133/3
135/3 138/16 139/10 140/2 140/16
141/5 141/19 142/5 143/13 143/19
143/22 144/18 145/6 147/9 147/15
148/7 148/14 148/16 149/1 149/17
149/22 149/24 150/5 151/10 151/19
151/19 151/20 154/4 154/8 154/19
154/19
wouldn't [11]  12/16 27/1 41/8 76/9
81/19 81/25 83/7 85/6 85/14 116/10
148/23
wound [1]  120/14
wreck [16]  8/11 17/25 17/25 17/25
17/25 21/3 21/4 24/20 27/22 30/12
31/16 78/12 81/5 93/14 102/20 105/9
wrecks [2]  24/15 82/17
WRIGHT [15]  1/25 3/9 35/9 75/15
77/12 77/14 78/4 78/23 79/13 80/14
81/8 82/6 82/11 84/13 86/1
Wright's [1]  35/8
wrist [1]  16/16
write [3]  76/5 76/6 119/11
written [5]  51/13 57/6 66/7 66/11
119/16
wrong [14]  26/1 36/7 38/1 40/3 53/22
53/25 54/1 54/21 55/19 56/4 59/7 87/3
110/15 111/19
wrongful [30]  3/14 4/2 4/3 30/20 30/21
31/5 31/7 31/17 31/18 31/19 31/20
31/21 33/22 73/23 77/5 93/4 93/22
93/24 94/1 100/3 100/6 100/14 103/5
107/21 108/1 114/3 115/4 116/21
125/20 126/7
wrote [3]  10/3 22/8 23/16

# X

x-rays [1]  45/9

# Y

yeah [1]  19/25
year [7]  8/11 8/12 12/14 23/11 23/11
23/12 82/16
years [18]  8/5 8/17 12/18 22/4 32/15
35/1 39/24 41/16 55/14 57/10 63/22
66/16 70/25 78/5 84/17 86/4 134/6
142/1
yelled [1]  46/14
yellow [3]  17/7 44/3 65/15
yes [61]  3/8 3/10 3/25 5/11 22/15 34/11
34/12 34/18 49/5 52/25 53/2 53/4
59/25 60/1 61/24 61/25 74/7 76/19
78/22 86/24 109/22 110/23 116/5
117/2 117/3 117/10 120/13 120/19
120/21 122/4 122/6 123/5 125/3 125/5
125/7 126/17 126/23 127/8 129/3
132/15 135/6 135/11 136/5 136/13
138/4 139/13 140/12 141/4 142/5
142/17 143/2 145/23 146/21 147/20
147/22 147/25 153/24 154/6 154/13
157/11 157/18
yesterday [8]  15/14 22/8 25/4 29/9
53/10 54/2 60/18 60/21
yet [7]  46/12 48/13 49/7 50/4 59/17
60/6 68/23
you [807]
you'll [13]  7/9 50/3 54/4 55/17 55/23
70/2 74/10 87/24 112/13 112/21 113/3
118/5 121/20
you're [18]  25/12 27/14 28/2 29/14
30/1 37/9 42/23 69/4 73/17 74/13
76/23 87/24 94/6 120/17 135/24
148/25 153/9 157/2
you've [32]  7/23 9/20 16/8 34/11 49/17
57/5 57/6 72/17 73/14 76/18 76/25
77/2 88/3 88/3 88/15 100/11 110/7
114/3 114/18 115/19 116/3 116/12
117/4 117/21 118/7 119/5 125/1
136/15 136/19 140/14 141/8 145/9
young [1]  26/4
your [165]
yourself [6]  33/8 42/19 90/20 91/10
92/6 111/14
yourselves [1]  128/2

# Z

zero [2]  85/16 150/1
zoom [2]  42/18 51/18