**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | | |
|---|---|---|
| JAMES EDWARD ("Dusty") BROGDON, Jr., | * | |
| as Executor of the Estate of Debra Sue Mills, | * | |
| deceased, and JAMES EDWARD BROGDON, Jr., | * | |
| and RONALD BRIAN ("Rusty") BROGDON, | * | |
| Individually and as surviving children of | * | CIVIL ACTION FILE |
| Debra Sue Mills, | * | |
| | * | NO. 4:23-cv-00088-CDL |
| and | * | |
| | * | |
| JAMES EDWARD BROGDON, Jr., | * | |
| as Executor of the Estate of Herman Edwin Mills, | * | |
| deceased, and JASON EDWIN MILLS, | * | |
| Individually and as surviving child | * | |
| of Herman Edwin Mills, | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| | * | |
| v. | * | |
| | * | |
| FORD MOTOR COMPANY, | * | |
| | * | |
| | * | |
| Defendant. | * | |

**PLAINTIFFS' RESPONSE TO DEFENDANT FORD MOTOR COMPANY'S MOTION**
**FOR NEW TRIAL AND REDUCTION OF PUNITIVE DAMAGES**

**INTRODUCTION**

This was anything but a 'plaintiffs' jury.' It should have been a "Ford jury." *Seven of the*

*eleven* jurors who rendered the February 14, 2025 phase two verdict either did own or had owned

Ford trucks or had family members who did own or had owned Ford trucks.[1] It is also true that

---

[1] Juror 47 – Doc. 317 (Vol. 1) at 75/14-25; Juror 26 – *Id.* at 77/15-18; Juror 35 – *Id.* at 77/20-21; Juror 44 – *Id.* at 78/1-7; Juror 52 – Id, at 78/10-12; Juror 46 – *Id.* at 78/8-9; (another juror stated elsewhere that he formerly owned a Ford F150). (Two jurors (52 & 46) personally owned Ford trucks at the time of trial; two jurors (44 & 36) had personally owned Ford trucks in

1

this was not a jury hostile to corporations. Those observations seem particularly telling because Ford castigates this jury as "unreasonable" in all respects. After 285 *admitted* lawsuits and claims, only five of which Ford has taken to trial,[2] Ford should blame its own conduct and its own executives' decisions to keep selling "Super Duty" trucks with abominably weak roofs for over 17 years, totaling some 5.8 million of them, despite actual and abundant knowledge – since 1999 – that citizens were being killed, paralyzed, and otherwise seriously injured by roof crush in those trucks, *and* Ford's 'PR' and litigation decisions to persist in insisting those roofs were "absolutely safe."

This jury's punitive damages verdict was clearly the result of the reprehensibility of Ford's conduct. Yet Ford insists the facts "demonstrate no reprehensibility" at all. Doc. 381 at 20, 25 ("lack of reprehensibility"). One reasonably wonders how Ford denies reprehensibility when it defended based on "causation" and made little effort to defend the defect claim, cannot deny the admissions in its own documents, did not contest the similarity of any of the 50 OSIs the Court allowed Plaintiffs to present, and calculatingly avoided putting any Ford employee on the stand or bringing one to the courtroom to support the arguments its lawyers and testifiers made.

---

the past, and one of them (44) had family members who had also owned Ford trucks in the past; three jurors had family members who personally owned Ford trucks at the time of trial (47 – "father-in-law has a Ford truck"; 26 – "my parents have two F150s"); 35 – "husband owns").

[2] Three of those were long ago, and Ford's references to those three tell almost nothing about the facts, or who the plaintiffs' lawyers were, or whether Ford had concealed from those plaintiffs facts crucial to a determination of Ford's liability (e.g., the existence of the ERSP and documents created by ERSP Team members, and the Autoliv testing of 2008, 2009, and 2015). *See* Doc. 53-1 (Ford MPSJ brief) at 6 & notes 4, 5; Doc. 78 (Plaintiffs' resp. to Ford MPSJ) at 4-5 & note 4. Incredibly, notwithstanding an admitted 285 lawsuits and claims, in its motion for new trial Ford again repeats its boast of about having won those three trials. Doc. 381 at 26.

Misconduct can't get much worse than Ford's, nor can the consequences get much worse: the dangerously weak roofs have been *and still are* killing and injuring innocent citizens *and will continue to do* so into the foreseeable future. Sometimes there is a case which exemplifies ***what punitive damages are for.*** This is that case.

Of course these Plaintiffs – the Mills' family – will accept a reasonable remittitur, for the obvious reason that will help in the United States Court of Appeals for the Eleventh Circuit.

I.     **Ford is not entitled to a new trial based on alleged reference to the *Hill* verdict during jury deliberations.**

A "centuries old' principle ... known as the 'no-impeachment' rule" mandates "that after a jury has reached its verdict it will not later be called into question based on the comments or conclusions [the jurors] expressed during deliberations." *U.S. v. Brown*, 934 F.3d 1278, 1302 (11th Cir. 2019) (Pryor, C.J.) (cleaned up). "[F]ull and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct." *Tanner v. U.S.*, 483 U.S. 107, 120–21 (1987).

A.     **Ford's submissions do not meet any Rule 606(b) exception because the *Hill* verdict was admitted into evidence without competent objection.**

Ford submits hearsay declarations from its counsel and hired investigator purporting to recount statements supposedly made during jury deliberations about the *Hill* verdict and the supposed effect that had on deliberations. Federal Rule of Evidence 606 forbids that "evidence."

> During an inquiry into the validity of a verdict or indictment, ***a juror may not testify*** about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. "***The court may not receive*** a juror's affidavit or evidence of a juror's statement on these matters."

Fed. R. Evid. 606(b)(1) (emphasis added). Ford attempts to invoke the Rule 606 exception

allowing a juror to "testify about whether: (A) *extraneous* prejudicial information was *improperly* brought to the jury's attention." Fed. R. Evid. 606(b)(2)(A) (emphasis added). But the *Hill* verdict was neither "extraneous" nor "improperly brought to the jury's attention" because it was *admitted into evidence* without competent objection by Ford. During Phase 2 of this trial, Dr. Brooks testified about PX 759, which is Ford's Q3 2023 10-Q, and the Court admitted that exhibit into evidence. Doc. 374 (Vol. X) at 43/24–44/15. That exhibit contains Ford's own extensive discussion of the *Hill* case:

> *Hill v. Ford* (as previously reported on page 29 of our 2022 form 10K report) Plaintiffs in this product liability action pending in Georgia state court allege that the roof of a 2002 Ford F250 involved in a rollover accident was defectively designed. During the first trial in 2018, the judge declared a mistrial, ruled that Ford's attorney had violated pre-trial rulings while presenting evidence, and sanctioned Ford by prohibiting Ford from introducing any evidence at the second trial to show that the roof design of the F250 was not defective. During the second trial in August 2022, a jury found that Pep Boys (a party that sold the tires on the vehicle involved in the rollover accident) was responsible for 30% of the damages, and Ford, as a direct result of the sanctions order prohibiting Ford from presenting its defense, was responsible for 70% of the damages, *resulting in a $16.8 million in damages apportioned to Ford. The jury subsequently awarded punitive damages against Ford in the amount of $1.7 billion.* Ford filed post-trial motions seeking a new trial, and on September 14, 2023, the trial court denied Ford's post-trial motions. On October 13, 2023, Ford filed a notice of appeal with the Georgia Court of Appeals. *We believe the law supports our position that Ford is entitled to a new trial* with the right to present its evidence it its defense.

PX 759 at 69 (emphasis added). Ford cannot credibly claim ignorance of the contents of its own heavily vetted securities filings. Nor can Ford's lawyers—PX 759 was on the exhibit list Plaintiffs sent Ford on November 21, 2024. *See* Exhibit 1 hereto (Sarah Andrews email). As of January 2, 2025, PX 759 was also on Plaintiffs' exhibit list attached to the Pretrial Order. Doc. 306-1 at 26. And Ford's counsel cross examined Dr. Brooks about that very exhibit. Doc. 374 (Vol. X) at 54/8–55/8.

Ford's sole trial objection to PX 759 was to reassert its argument that financial

information, including evidence about other products, is irrelevant and cannot be constitutionally considered in awarding punitive damages. Doc. 374 (Vol. X) at 43/24–44/15. Ford did *not* object that this Ford document included Ford's own statement about the *Hill* verdicts. Nor did Ford request that its account of the *Hill* verdicts be redacted before PX 759 went to the jury, as Ford had requested for various other exhibits during trial. A general objection disputing the relevance and constitutionality of financial information in determining punitive damages is not sufficient to advise the Court of a specific objection to a particular portion of the exhibit on a different ground. *U.S. v. Dennis*, 786 F.2d 1029, 1042 (11th Cir. 1986).[3] Just as Ford could not obtain a new trial on the *waived* ground that PX 759 was improperly admitted, it cannot obtain the same result by complaining that the jury knew information contained in that admitted exhibit.[4]

Because it was in evidence, information about the *Hill* verdicts was not "extraneous" or "improperly brought to the jury's attention." Fed. R. Evid. 606(b)(2)(A).[5] "[E]xtraneous" information means evidence that is "outside the record," *Peveto v. Sears, Roebuck & Co.*, 807 F.2d 486, 489 (5th Cir. 1987), "originating *outside* of normal courtroom proceedings." *U.S. v.*

---

[3] Ford knew that it had to object if it wanted to exclude a reference to the *Hill* case because the Court deferred ruling on Ford's motion in limine to preclude any mention of the case. (Doc. 234 ¶ 5 at 13–14). *See* Doc. 296 at 106/10–21.

[4] Ford did not move for new trial on the ground that PX 759 was improperly admitted at trial (or even mention that exhibit). Ford thus forfeited any such argument, which would be meritless anyway based on its failure to object. *Brown v. R.J. Reynolds Tobacco Co.*, 38 F.4th 1313, 1322 n.11 (11th Cir. 2022). Further, Ford may not make that argument on reply because a party waives an argument for a new trial "by asserting it for the first time in [the party's] reply brief." *Lariscy v. Coleman Co.*, 2010 WL 11598166, at *1 n.1 (N.D. Ga. May 13, 2010). It is notable that Ford asked that completion of Volume X of the trial transcript be expedited—it was filed on Pacer on March 4, 2025—ten days before Ford's motion for new trial was due. Ford knew PX 759 had been admitted into evidence, and Ford knew what it contained—before Ford made its "extraneous information" accusation.

[5] *See also Martinez v. Food City, Inc.*, 658 F.2d 369, 373 (5th Cir. 1981) (binding) (information is "extraneous" if it is "extra-record evidence"); *Robinson v. Polk*, 438 F.3d 350, 363 (4th Cir. 2006) (same).

*Kim*, 2007 WL 9735569, at *4 (D. Guam Feb. 14, 2007), *aff'd*, 292 Fed. App'x 662 (9th Cir. 2008) (emphasis added). Thus, evidence that "was actually admitted into evidence for the jury's consideration … cannot be characterized as 'extraneous information,' and falling within the exception outlined in Rule 606(b)." *Id.* That exception plays no role where "[t]he jury was not exposed to any information beyond that received in evidence at trial." *Id.* That's true *even if* "[t]he evidence may have possibly been misused by the jury," of which there is *no* evidence here. *Id.*

Perhaps Ford will, in reply, ask the Court to speculate that jurors became aware of the *Hill* verdicts not from PX 759, but only from some other source. But Rule 606(b) exists to prohibit inquiry—let alone speculation—into what parts of the evidentiary record jurors did or did not review or what they thought of them. Simply put, no one could ask—and no juror could testify—whether one or more jurors read Ford's statement about the *Hill* verdicts in PX 759. Moreover, binding Circuit authority holds that a party cannot show prejudice where the jury receives extrinsic evidence that is "simply cumulative, adding nothing to the evidence properly introduced at trial." *Llewellyn v. Stynchcombe,* 609 F.2d 194, 196 (5th Cir. 1980).[6] Because the information about the *Hill* verdicts was in evidence, it wouldn't matter even if a juror had already known about them.

Moreover, *if* one or more jurors did know about the *Hill* verdict independently of the

---

[6] *See also U.S. v. Siegelman*, 640 F.3d 1159, 1184 (11th Cir. 2011) (no right to new trial where extraneous information "would not have provided that juror with factual information to which the juror did not already properly have access"); *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1472 (11th Cir. 1992) (access to newspaper "was not prejudicial" where "the facts reported in the article would have been merely cumulative of facts already in evidence."). Notably, Ford counsel Mr. Melton cited both *Siegelman* and *BankAtlantic* to the Georgia Supreme Court for this same proposition. *See* App. Brief in *Poppell v. Cardinal Health, Inc.*, 2024 WL 1935628, at *36 n.32 (Ga. SCT April 22, 2024) (signed by Mr. Melton).

evidence, *Ford would have only itself to blame*. As Ford well knows, the *Hill* verdicts were highly publicized, including in the Columbus area, where nearly all the jurors reside.[7] Despite that, Ford *asked no voir dire questions* to find out if jurors had heard of the *Hill* case *or* of other prior cases against Ford. Doc. 371 (Vol. 1) at 93/16–115/5.[8] Nor did Ford ask to include any such questions in the supplemental juror questionnaire. (Curiously, Ford also didn't ask that the jury be polled after either verdict.)

Binding law does not allow Ford to obtain a new trial based on hypothetical external juror knowledge that it made no effort to detect during the process designed to root out any outside information a party may find concerning. As the former Fifth Circuit held:

> Here, there is no evidence that any external influence was brought to bear on members of the jury. The prejudice complained of is alleged to be the product of personal experiences unrelated to this litigation. The proper time to discover such prejudices is when the jury is being selected and preemptory challenges are

---

[7] "Ford to appeal $1.7 billion verdict in Georgia truck crash," Columbus Ledger Enquirer, (Aug, 22, 2022), https://www.ledger-enquirer.com/Ford%20to%20appeal%20$1.7%20billion%20verdict%20in%20Georgia%20truck%20crash; Chuck Williams, "Columbus attorney lead counsel in $1.7 billion product liability verdict against Ford Motor Company," WRBL News (Aug. 25, 2022), https://www.wrbl.com/news/local-news/columbus-attorney-lead-counsel-in-1-7-billion-product-liability-verdict-against-ford-motor-company/; Alia Pharr, "Georgia jury imposes $1.7 billion verdict against Ford over 2014 rollover crash," Atlanta Journal Constitution (Aug. 22, 2022), https://www.ajc.com/news/jury-imposes-17-billion-verdict-largest-in-state-history-against-ford/E3C6WROKCFEOFCECTIO3VY7BDA/; CBS News, "Georgia jury awards $1.7 billion in Ford F-250 truck crash" (8/22/2022), https://www.cbsnews.com/news/ford-f250-truck-crash-1-7-billion-jury-award-melvin-hill-voncile-hill/; Chris Isidore, "Ford hit with $1.7 billion verdict for F-series pickup roof collapse that killed couple," CNN News (Aug. 22, 2022), https://www.cnn.com/2022/08/22/business/ford-1-7-billion-dollar-verdict/index.html; Chantal Da Silva, "Ford to appeal $1.7B verdict in 2014 truck crash that killed GA couple," NBC News (Aug. 22, 2022), https://www.nbcnews.com/news/us-news/ford-appeal-verdict-georgia-truck-crash-killed-couple-rcna44153?cid=sm_npd_nn_tw_ma; Jeff Martin, "Ford to appeal $1.7 billion verdict in Georgia truck crash," ABC News (Aug. 21, 2022), https://abcnews4.com/news/nation-world/ford-to-appeal-17-billion-verdict-in-georgia-truck-crash-ford-motors?photo=1.

[8] Neither the Hill case nor any other case against Ford was mentioned by anyone during voir dire. Doc. 371 (Vol. I).

available to the attorney.

*Martinez v. Food City, Inc.*, 658 F.2d 369, 374 (5th Cir. 1981); *see also U.S. v. Duzac*, 622 F.2d

911, 913 (5th Cir. 1980) (same holding).

### B. Ford's declarations exceed the scope of the only exception it invokes.

Ford knowingly obtained and *publicly filed* declarations purporting to recount things

jurors allegedly said about the *Hill* verdict during deliberations *as well as* the supposed effect on

deliberations.[9] "The language of Rule 606(b) allows a juror to testify as to *whether* any

extraneous prejudicial information was improperly brought to bear upon a juror. However, the

language of the rule is equally clear that a juror *may not testify as to the effect* the outside

information had upon the juror." *U.S. v. Harris*, 2019 WL 10856862, at *1 (S.D. Ala. Nov. 7,

2019), *aff'd*, 835 Fed. App'x 990 (11th Cir. 2020) (emphasis added); *see Martinez*, 658 F.2d at

373 (explaining this distinction). Thus, for this additional reason, the Court should disregard

Ford's hearsay statements speculating about supposed "influence" on the verdict.

### C. Ford's declarations are not evidence but are instead inadmissible hearsay that is also speculation

Ford submits declarations from its counsel and its hired investigator about what certain

jurors allegedly said or wrote out of court. Those out-of-court statements, plainly offered for the

truth of what they assert about the jury deliberations, are inadmissible hearsay under Federal

Rules of Evidence 801(c) and 802. The Court should deny Ford's motion as baseless, simply for

that reason: "where the defendants failed to file even an affidavit by … the person whose post-

trial statement clearly came the closest to requiring a new trial, we hold that the trial court did

---

[9] Doc. 381-1 (Peeler Decl.) ¶¶ 8 C & 9 ("beyond a shadow of a doubt there was influence [of the *Hill* verdict] based on what I heard and witnessed in that juror room"). Ford quotes this language three times in its brief. Doc. 381 at 1, 6.

not abuse its discretion in denying the motion without an evidentiary hearing." *U.S. v. Slocum*, 708 F.2d 587, 600 (11th Cir. 1983); *see also U.S. v. Townsend*, 502 Fed. App'x 870, 874 (11th Cir. 2012), *potentially abrogated on other grounds*, and *U.S. v. Thompson*, 335 F. App'x 876, 882 (11th Cir. 2009), both denying new trials based on the same reasoning.

Moreover, the secondhand nature of these purported juror statements deeply undermines their credibility. "Unlike cases where a party provides the affidavit of the juror directly, [the declarations] here are from [individuals] hired by the defense for the purpose of reaching a result favorable to the defendant." *U.S. v. Davis*, 60 F.3d 1479, 1484 (10th Cir. 1995). That's compounded because the declarations reference "recorded conversations" that Ford has not shared with the Court or Plaintiffs. Doc. 381-1 ¶ 7. This Court may properly refuse to credit these declarations "because of these concerns" over partiality. *Davis*, 60 F.3d at 1484.

Ford's declarations also recount sheer speculation: one of Ford's declarations states that Juror 36 purportedly told Ford's counsel that "Juror 36 *thinks* that the foreperson and Juror Number 52 knew of the verdict against Ford in the *Hill v. Ford* case" during Phase 1 deliberations. Doc. 381 at 5 (emphasis added). An out-of-court statement about what one juror "thinks" another knew is both hearsay *and* impermissible speculation. Yet, a party trying to overturn a verdict must "do more than speculate; he must show clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred." *Brown*, 934 F.3d 1303.

"In this case, the conclusory statements submitted by defendants' counsel in support of this motion, all of which are based on hearsay allegations, can hardly meet such a stringent requirement." *United States v. Abcasis*, 811 F. Supp. 828, 835–36 (E.D.N.Y. 1992) (applying the same requirement as the Eleventh Circuit in *Brown*). The *Abcasis* court specifically noted that

some courts have "den[ied] a defendant's claims of juror misconduct on the sole ground that the only proffer in support thereof is the hearsay allegations contained in the affidavit of defense counsel and/or a private investigator employed by him[,]" and elected to follow that example. *Id.* at 836; *see also Taus v. Senkowski*, 293 F.Supp.2d 238, 250 (E.D.N.Y. 2003). Ford's motion rests on the same "proof" and should meet the same fate.

### D.    Ford violated Local Rule 48.3.

"Attorneys, parties, or anyone acting on their behalf shall not contact any juror without express permission of the Court and under such conditions the Court may prescribe." LR 48.3. At the end of trial, the Court said it "typically tell[s]" jurors "they are free to talk to the lawyers and the family if they want to." Doc. 374 (Vol. X) at 116/24–117/5. But that's the end of the Record. The Court did not inform the parties it had so told the jurors, nor did Ford ever inquire whether the Court had granted "permission" in that fashion. The Court certainly did not authorize any party's representatives to *initiate* such contact. The Court most certainly did not authorize Ford to dispatch a private investigator to interrogate jurors in hopes of obtaining information to impeach the verdict—which is what Ford clearly has done, although Ford has concealed nearly everything about its actions in that regard.

As the Seventh Circuit observed, "[t]he ground rules for inquiries of this sort— particularly as to things like time and place—are best left to a judge, not a hired 'investigator' employed by a losing litigant." *Cuevas v. U.S.*, 317 F.3d 751, 753 (7th Cir. 2003) (excluding affidavit).[10] Courts in this circuit likewise exclude "evidence" gained through violation of local

---

[10] Surely under the Local Rule, which mandates that outreach to jurors be "under such conditions the Court may prescribe," if and when any juror reached out to Ford counsel it was incumbent upon counsel to then seek "express permission" to do whatever it is Ford has done in its investigation of the jury. If permission was then granted, the potential for abuse could have been avoided, and the Court's "conditions" would have presumably foreclosed the kind of

rules limiting juror contact. *See, e.g.*, *U.S. v. Cavallo*, 790 F.3d 1202, 1226–27 (11th Cir. 2015); *U.S. v. Perez*, 2022 WL 17338862, at *9–10 (M.D. Fla. Nov. 30, 2022). This Court should do the same.

> **E.    Ford elected not to submit evidence to support its accusation.**

Ford has submitted nothing that would warrant consideration of a "full evidentiary hearing." Hearsay that is also speculation cannot justify making that request, much less granting it. Ford was obligated when it filed its motion for a new trial and made its accusation against the jurors to support that accusation with admissible evidence. Ford had plenty of time to try to come up with actual evidence. Ford admits its representatives started talking to jurors two days after the February 14 verdict. Doc. 381-1 ¶ 5. Ford had 28 days to file its motion for new trial. Ford clearly did more than talk to just two jurors—numbers 36 and 6. *See* Doc. 381-2 ¶ 5 (the cryptic comment "among other things" stated by Mr. Hyde). If Ford spoke to two jurors, surely it spoke or attempted to speak to others. Clearly Ford could not get an affidavit—that is to say, actual "evidence" —from any jurors.

Ford's inability to get any actual evidence to support its accusations surely explains why Ford chose not to reveal to the Court all that Ford has been doing in its "scrutiny" of jurors and their deliberations. Ford has told the Court nothing about what it has been doing other than that Ford's lawyers talked twice to Juror number 36 and Ford's investigator had a conversation with Juror number 6. Ford did not disclose the "recordings" of the Peeler/Wright conversations with

---

secrecy with which Ford has shrouded its efforts. Instead, that there has been a "barrage of post-verdict scrutiny" (*Tanner v. U.S.*) seems certain—despite Ford's calculated failure to reveal to this Court all it has done to investigate and interrogate the jurors.

Juror 36 and "voicemail" referenced in the Peeler Declaration.[11] Ford disclosed nothing about its attempts to contact other jurors, whether other jurors would talk to Ford, and if so what other jurors have had to say about Ford's accusation, or anything else. Ford disclosed nothing about how it was that Mr. Hyde came to speak to Juror number 6, and nothing about what was actually said to and by that juror, and Ford disclosed no recordings of that conversation – or of conversations Mr. Hyde has had with other jurors.[12]

### F.    Ford has failed to demonstrate prejudice.

Ford's challenge (based on supposedly extrinsic information that was in fact admitted) requires that Ford "first establish prejudice by preponderance of credible *evidence*." *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1472 (11th Cir. 1992) (emphasis added). Ford admits it bears this burden (Doc. 381 at 4), but Ford cannot fulfill it.[13]

Most obviously, there can be no prejudice where, as here, the supposedly extraneous information merely duplicates what was admitted into evidence. Second, Rule 606(b)(1) squarely excludes the portions of Ford's declarations purporting to recount what it was jurors supposedly said about the *Hill* verdict or its purported influence on deliberations. Even if these declarations

---

[11] *U.S. v. Abcasis*, 811 F. Supp. 828, 835–36 (E.D.N.Y. 1992) ("Defendants' assertion in their reply papers that they have a tape-recording of the conversation with Juror No. 2 does not impress the Court and would not enable defendants to meet the requisite showing: first, the recording was not submitted in conjunction with this motion; and second, and more importantly, such a recording does not have the force of sworn testimony or a sworn statement.").

[12] It certainly seems unlikely that Ford's lawyers would record their conversations with one juror but the investigator they hired would not record his conversations with Juror number 6 – and other jurors.

[13] At one point in its brief, Ford's parenthetical descriptions of criminal cases suggest that prejudice is "presume[ed]." Doc. 381 at 7. *Yet as Mr. Melton stated to the Georgia Supreme Court less than a year ago*, courts do "not presume prejudice in a civil case" where a jury allegedly considered extraneous information. *See* App. Brief in *Poppell v. Cardinal Health, Inc.*, 2024 WL 1935628, at *36 n.32 (Ga. SCT April 22, 2024) (citing *BankAtlantic*).

could be considered merely for the assertion that jurors knew about the *Hill* verdict, there is no objective reason to assume that this would prejudice Ford, *rather than Plaintiffs.* One could also presume that a prior large punitive award would be a reason for the jury to award *less,* given that (as far as the jury could know) Ford had already suffered substantial punishment. That would reasonably seem the most likely "influence" of the jurors knowing about the *Hill* verdict, since it is irrefutable that this particular jury would be expected to be favorably disposed toward Ford. *See infra,* p1 & n1.

One could also presume that the information had no effect. For example, the *inadmissible* assertion that some juror purportedly said "'*this* could be a record breaker'" suggests that the jury had *already* settled on its award before this alleged discussion—otherwise, to what does "'this'" refer? Doc. 381-1 at 3.

Those assumptions are just as valid as Ford's negative assumption about supposed "prejudice," and mean that Ford has not "establish[ed] prejudice by preponderance of *credible evidence.*" *BankAtlantic*, 955 F.2d at 1472. Cases like those Ford cites, all of which involve extraneous *unadmitted* information that would inherently tend to drive the verdict against the losing party, do not support a claim of prejudice here.[14]

Critically, if the Court held the hearing Ford requests, under Rule 606 no one could ask the jurors, and no juror could testify, whether any information about the *Hill* verdict had one effect or the other or no effect at all. Asking a juror whether he or she believes extraneous information or an improper influence affected his or her ability to be impartial in reaching a

---

[14] If the Court remits the punitive damages award, that is yet another reason that Ford cannot establish any likelihood of prejudice. Ford can offer no substantial basis to believe that, but for alleged knowledge of the *Hill* verdict, the jury would have awarded punitive damages *below* whatever the Court determines to be the constitutional maximum. The Court should not vacate a jury verdict based on such unmoored guesswork.

verdict goes directly to "the effect of anything upon that ... juror's mind or emotions," or "mental processes." *United States v. Honken*, 541 F.3d 1146, 1169 (8th Cir. 2008); *see also U.S. v. Ayarza-Garcia*, 819 F.2d 1043, 1051 (11th Cir. 1987)

Ford's argument for prejudice during Phase 1 is, if possible, even weaker. As noted above, Mr. Peeler's declaration provides hearsay speculation about what one juror supposedly "thinks" two other jurors supposedly "knew" during the Phase 1 deliberations. Ford's investigator Mr. Hyde declared that "*[a]mong other things*, I spoke with Juror Number 6, *who confirmed* that the jury discussed the *Hill v. Ford* verdict in the deliberations concerning compensatory damages in this case," Doc. 381-2 ¶ 5 (emphasis added), giving no indication what was purportedly discussed—the amount, the mere fact of the verdict, what? The Court is left to guess—and Ford has not provided to the Court Mr. Hyde's recordings of his conversation with that juror (*or with any other jurors*). Notably Ford has not claimed that Juror #6 sought out Mr. Hyde—or anyone else with Ford. Regardless, statements about what a juror allegedly "confirmed" are pure hearsay, unsupported by any declaration from the juror. This Court should deny Ford's motion on these grounds alone. *Supra* § I(C).

The word "confirmed" is itself a suspect choice of words. It seems clear that Ford's investigator contacted Juror 6, primed her with the statement that the jury discussed the *Hill* verdict during Phase 1 and then purportedly got Juror 6 to "confirm" that statement by the investigator.[15] What was supposedly "confirmed"? *Ford does not even claim* that Juror 36 said that in Phase 1 deliberations the jury *did in fact discuss* the *Hill* verdict—merely that Juror 36 "thinks" two jurors "*knew*" of the *Hill* verdict "during deliberations of Phase 1." Doc. 381-1

---

[15] Unlike a police interrogation, Georgia Rule of Professional Conduct 4.1 prohibits a lawyer (or anyone acting on behalf of a lawyer) from "mak[ing] a false statement of material fact or law to a third person."

¶ 8(A) (emphasis added). If any juror had actually volunteered that the *Hill* verdict was discussed in Phase 1, surely Ford would have gotten a juror affidavit so stating or at least made that claim in the declarations Ford did file. Full disclosure of what was said by Mr. Hyde in an attempt to supposedly get that juror to "confirm" something would have surely been telling.

None of what Ford has submitted is "clear, strong, substantial and incontrovertible" evidence that "a specific, nonspeculative impropriety" occurred during Phase 1. *Brown*, 934 F.3d at 1303. Indeed, courts have found no justification for further investigation even where there was *an affidavit by the juror*, where that "was undoubtedly done [for the juror's signature] by a private investigator hired" by the losing party. *King v. U.S.*, 576 F.2d 432, 437–38 (2d Cir. 1978). Here, the cryptic hearsay in the Hyde declaration does not even purport to relate the words of a juror.

Further, even if one or more jurors knew about the *Hill* verdict during Phase 1, Ford's failure to even attempt to ascertain that background knowledge during *voir dire* forecloses any supposed entitlement to new trial under binding circuit precedent. *See Martinez*, 658 F.2d at 374; *Duzac*, 622 F.2d at 913. On top of that, there's no objective reason to assume that speculation by one juror that he "thinks" two jurors "knew" of the *Hill* verdict would affect the jury's resolution of the specific issues posed in Phase 1. Ford can *never* offer anything to the contrary except rank speculation because Rule 606(b)(1) would bar any inquiry into the supposed effect of the *Hill* verdict on Phase 1 (or Phase 2).

**G. Ford is not entitled to an evidentiary hearing.**

There is no need for an evidentiary hearing to confirm or refute Ford's claim that one or more jurors knew about the *Hill* verdict because, even if that "fact" were true, it would not justify a new trial for the multiple reasons stated above. And under Rule 606(b)(1), no hearing

could go beyond that one "fact"—by inquiring into what any juror said or thought about that verdict (if anything at all) or how it did or did not supposedly affect deliberations. Thus, an evidentiary hearing would accomplish nothing.[16] Yet it would inevitably damage the crucial interests protected by the no-impeachment rule, which provides "jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict." *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 218 (2017).[17] That violation of the sanctity of deliberations is not, and cannot be, what Rule 606 intends.

As Chief Judge Pryor's 2019 decision in *Brown* makes clear, "'No per se rule requires the trial court to investigate the internal workings of the jury whenever a defendant asserts juror misconduct.'" 934 F.3d at 1303 (quoting *U.S. v. Cuthel*, 903 F.2d 1381, 1282–83 (11th Cir. 1990) Instead, "a district court has a duty to investigate '*only when* the party alleging misconduct makes an *adequate showing of extrinsic influence to overcome the presumption of jury impartiality.*'" *Id.* (emphasis added) (quoting *U.S. v. Barshov*, 733 F.2d 842, 851 (11th Cir. 1984)). As noted above, this requires "*clear, strong, substantial and incontrovertible evidence* that a specific, *nonspeculative* impropriety has occurred." *Brown*, 934 F.3d at 1303 (emphasis added). For all the reasons stated above, Ford's declarations don't come close.

To the extent Ford contends that *U.S. v. Brantley*, 733 F.2d 1429, 1439 (11th Cir. 1984)

---

[16] If in the "full evidentiary hearing" Ford purports to seek (Doc. 381 at 2) the inquiries were to go further than that, fairness would require that all twelve jurors be summoned for questioning, along with those who conducted Ford's investigation—which includes two lawyers and Mr. Hyde, if not others.

[17] *See, e.g., Duzac*, 622 F.2d at 914 ("The only questions that the trial judge might have asked at a hearing would have concerned the jurors' prejudices and, therefore, would have been impermissible. Under these circumstances, the judge did not abuse his discretion in failing to hold a hearing.").

requires a district court to "conduct a full investigation" based simply on "an allegation" that extraneous information reached the jury, that is not Circuit law. *Brantley* (which didn't cite Rule 606) had quoted that language from *U.S. v. McKinney*, 429 F.2d 1019, 1026 (5th Cir. 1970) (which predates the 1974 enactment of Rule 606). 733 F.2d at 1439. But on rehearing, the original *McKinney* opinion, which contained the "full investigation" language on which Ford relies, became the dissenting opinion. *U.S. v. McKinney*, 434 F.2d 831, 833–34 (5th Cir. 1970) (Goldberg, J., dissenting). *McKinney* ultimately held that there was *no duty* for the district court to investigate an allegation that several jurors learned and considered extraneous information that the criminal defendant had escaped from jail before trial and was recaptured. *Id.* at 833.[18]

This case is also factually different than *Brantley*, where the extraneous information was that that the defendant had "been in this kind of trouble before." 733 F.2d at 1439. Here, even aside from PX 759, it was no secret that there had been multiple substantially similar rollover wrecks and lawsuits involving collapsing "Super Duty" roofs, including *Hill*.[19]

## II.    Ford is not entitled to a new trial based on the weight of the evidence.

Ford repeats the arguments from its JMOL brief, urging that even if the evidence

---

[18] Even if *Brantley* appears to support Ford's suggested rule, it is non-binding under the "earlier case rule." *Morrison v. Amway Corp.*, 323 F.3d 920, 929 (11th Cir. 2003). In a case predating *Brantley* by five years, the former Fifth Circuit rejected the "full investigation" language of the vacated *McKinney* opinion, stating that it "has never been adopted by this Circuit." *U.S. v. Martinez*, 604 F.2d 361, 364 (5th Cir. 1979) (citing multiple pre-*Brantley* cases).

[19] For example, the Court admitted fifty OSIs, and Plaintiffs' expert Herbst testified without objection that his firm had been involved in other 41 separate cases "involving this defect, this roof" (Doc. 390 (Vol. III) at 270/13–18, 271/18–22, 271/25–272/3, 307/21–23) over the span of "20 years" (*id*. at 275/20–21) and had testified in 25 such cases. *Id.* at 308/16–19. Ford's own roof engineer Jason Balzer testified about other lawsuits involving the "Super Duty" trucks (Doc. 390 (Vol. III). at 32/12–20, 46/7–11), including from Ford documents PX 133 & 133A (admitted without objection, *Id.* at 13/4–5, 14/15–16). Mr. Herbst likewise testified, without objection, to the reference in PX 133 to other lawsuits. Doc. 388 (Vol. IV) at 47/11–22.

authorized the jury to find that the roof crush caused the Mills' deaths and that Debra Mills consciously suffered, the Court should override those finds as supposedly contrary to the great weight of the evidence. But a district court may grant a new trial "on an evidentiary basis 'only when the jury verdict is against the great—not merely the greater—weight of the evidence.'" *Henderson v. Ford Motor Co.*, 72 F.4th 1237, 1244 (11th Cir. 2023). That's not remotely true here. *See* Plaintiffs' Response to Ford Motor Co.'s Renewed Motion for Judgment as a Matter of Law, Arg. I ("Causation was a jury issue"). Ford's "great weight" argument is just another way of asking this Court to second-guess the jury's assessment of the credibility of witnesses and its resolution of conflicting evidence. Ford is not entitled to a new trial on this basis.

### III.    The Court properly declined Ford's non-pattern punitive damages charges.

"Language used in appellate court decisions may embody sound law, but it is not always proper to include such language in the jury charge." *Ike v. Kroger Co.*, 248 Ga. App. 531, 533 (2001). That warning is well heeded here, where Ford has plucked language from appellate opinions that Georgia has never felt necessary to include in its pattern punitive damages charges.

Ford first maintains that the Court should have charged that, "[i]f reasonable people can disagree with respect to a design choice, a manufacturer's selection of one of those choices is neither willful, wanton, nor the product of an entire want of care that raises the presumption of conscious indifference to consequences." Doc. 357 at 4. But the jury did not need an additional charge to understand that reasonable disagreement is *not* willful or wanton or consciously indifferent conduct. In fact, the Court instructed that even *gross negligence* does not rise to that level. Doc. 384 (Vol. IX) at 109/15-17. By contrast, Ford's charge risked confusing the jury into believing that punitive damages were unavailable so long as Ford presented some evidence supporting its design choice. Thus, "[t]he proposed instructions were unnecessary to correctly

state the law." *Stalley v. Allstate Ins. Co.*, 682 F. App'x 846, 848 (11th Cir. 2017).

Nor did the Court abuse its discretion by refusing additional charges defining terms used in Georgia's punitive damages statute and pattern charge. Not every term in the charge can or needs to be defined. "Willful" and "wanton" have ordinary meanings outside the courtroom. Nor was there any need to charge that "conscious indifference to consequences means an intentional disregard of the rights of another, knowingly or willfully disregarding such rights." Doc. 357 at 5. "[K]nowingly" or "willfully disregarding" the rights of another is just another—and no better—way of saying "conscious indifference to consequences." Ford's clear purpose was to inject the term "intentional" into this prong of the charge, risking juror confusion and disregarding Georgia law that "intentional misconduct is not required" for punitive damages. *Taylor v. Devereux Found., Inc.*, 316 Ga. 44, 55 (2023). The Court did not abuse its discretion in refusing to do that.

### IV.    The maximum punitive damages award is not remotely limited to $4,675,000.

As an initial matter, plaintiffs submit that substantive due process limitations on punitive damages did not survive *Dobbs v. Jackson Women's Health Org.,* 597 U.S. 215 (2022). Like the abortion right *Dobbs* overturned, punitive damages limitations are not "'deeply rooted in this Nation's history and tradition,'" or "'implicit in the concept of ordered liberty.'" *Id*. at 231; *see Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 26–27 (1991) (Scalia, J., concurring). But even if *State Farm*'s limitations somehow survived *Dobbs*, Ford badly overstates how they would apply here. The maximum award to deter and punish conduct that caused the suffering and death of two good people and continues to endanger many millions more cannot be $4,675,000—a mere

rounding error (two-hundreds of one percent) on Ford's $22 billion cash on hand.[20]

### A. *State Farm* ratio analysis counts the "actual or potential harm suffered by the plaintiff," which includes the Mills' deaths as well as the potential for horrific, permanent injury just short of death.

Ford wrongly insists that the Mills' deaths count as zero for federal ratio analysis, based

on the argument that Georgia's wrongful death statute doesn't provide for punitive damages.

> [O]ur case law does not impose a requirement that the punitive damages bear a relationship to compensatory damages specifically. Instead, we consider "the ratio between the actual or potential harm suffered by the plaintiff and the punitive damages award." The appropriate ratio, therefore, is not based on a comparison of compensatory damages to the punitive damages award, but on *harm* likely to occur or that has actually occurred.

*SE Prop. Holdings, LLC v. Judkins*, 822 F. App'x 929, 936–37 (11th Cir. 2020) (emphasis in

original) (quoting *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 901 F.3d 1282, 1288 (11th Cir.

2018)); *see also TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 460 (1993) (ratio looks to

"the harm that is likely to occur from the defendant's conduct as well as to the harm that actually

occurred") (citation omitted). Based on this reasoning, *Capital Inventory, Inc. v. Green* recently

used a $579,000 breach of contract award, not a $1 tortious interference award, to measure harm

for ratio analysis, although punitive damages are not available for breach of contract. 2024 WL

1383228, at *9 (N.D. Ga. Feb. 29, 2024). Thus, the question is not whether punitive damages are

available for wrongful death under Georgia law; the question is whether death is actual or

potential harm under *State Farm*. By any rationale definition of "harm," the answer is "yes."

*Andrews v. Autoliv Japan, Ltd*., 2022 WL 16753148, *6 (N.D. Ga. Sept. 30, 2022) is

directly on point, holding that Georgia wrongful death damages count as "actual harm" for ratio

---

[20] Doc. 374 (Vol. X) at 36/8–15 (Dr. Brooks: "On average they keep $22 billion dollars of cash available at all times"); 56/7–15 (Dr. Brooks, on cross-examination by Ford).

purposes. Georgia's Attorney General agrees.[21] Otherwise, "a manufacturer who introduced a dangerous product into Georgia would be better served (financially at least) by having the product instantly kill a victim than permanently disable the same victim." *Id.* at 24. Ratio analysis is supposed to *prevent* arbitrariness, not compel it. *State Farm*, 538 U.S. at 416–17.

Ford urges the Court to look to Georgia law to determine the nature of wrongful death damages. But Georgia courts have treated death damages as harm for purposes of ratio analysis. *Georgia Clinic, P.C. v. Stout* affirmed a punitive award "2.5 times the $900,000 awarded in compensatory damages." 323 Ga. App. 487, 494 (2013). That $900,000 included "$500,000 in compensatory damages" for wrongful death. *Id.* at 490. Indeed, Georgia counts even *potential death* as harm for ratio analysis. *Craig v. Holsey*, 264 Ga. App. 344, 349 (2003). Although merely injured, "Holsey could have died." *Id.* Because "the potential harm was much greater than the actual.… we find no disparity between the potential harm" (death) and the "punitive damage award." *Id.*; *see also Hosp. Auth. of Gwinnett Cnty v. Jones,* 261 Ga. 613, 615 (1991) (same). If "potential" death counts as harm, then surely *actual* death does so.

Further, the *potential* harm to both Mr. and Mrs. Mills included horrific but non-fatal injury, such as quadriplegia or the permanent coma that garnered a $36 million *compensatory* award in *Bibbs v. Toyota Motor Corp.*, 304 Ga. 68, 69 (2018). As discussed below, *Bibbs* confirmed that the damages for such a devastating and lifelong personal injury are virtually indistinguishable in measure and potential amount from wrongful death damages. So even if death somehow didn't count as actual harm, the prospect of a horrific, life-long injury counts as *potential* harm that exposes an automaker to unlimited punitive damages. *See* O.C.G.A. § 51-12-

---

[21] *See* Exhibit 2 (Brief of Intervenor State of Georgia, *Andrews v. Autoliv*, Dkt. 49, Eleventh Circuit Appeal No. 22-13713, filed May 18, 2023), at 21–25.

5.1(e)(1). Thus, the Court may consider them a proxy for "potential harm suffered by the plaintiff" for ratio purposes. *See Andrews,* 2022 WL 16753148, at *6–7 (following this reasoning).[22]

Ford relies on early decisions describing damages under Georgia's wrongful death statute as "penal." But context is essential. The statute "is penal, *in that the measure of the recovery is the full value of the life of the deceased, irrespective of its real value to the person in whom the cause of action is vested*." *Engle v. Finch*, 165 Ga. 131, 134 (1927) (emphasis added). In other words, the statute is "penal" *relative to the common law,* under which no one could recover those damages. *Bibbs*, 304 Ga. at 70. As the Georgia Supreme Court explained:

> [A] number of our cases [*Engle v. Finch* and *Savannah Electric Co. v. Bell*] hold that the wrongful death statute is not only compensatory but punitive in nature. But the statute is punitive not because it permits double damages, but because it allows recovery for "the full value of the life of the deceased, irrespective of its real value to the person in whom the cause of action is vested."

*Id.* at 80.  Yet, as *Bibbs* clarified, the *measure of damages* is just as compensatory as the damages for personal injury: "[A]lthough the *cause of action* for wrongful death belongs to the decedent's survivors and benefits them directly, the *measure of damages* in wrongful death actions is much the same as in personal injury actions." *Id.* at 73 (emphasis original). Thus, "the sorts of damages recoverable in wrongful death actions are substantially the same as the kinds of damages that may be recovered in personal injury actions. These damages cover the losses *suffered by the injured person* …." *Id.* at 75–76 (emphasis original, citations omitted).

---

[22] In *Davis v. White*, 2022 WL 3083458, at **2–3 (N.D. Ala. Aug. 3, 2022), Judge Coogler likewise used potential harm (the amounts that the defendant *attempted* to wrongfully collect) for ratio purposes, rather than the compensatory damages awarded. The Eleventh Circuit affirmed his use of potential harm for federal constitutional purposes, reversing only on the separate issue of whether a state law statutory cap applied. 2024 WL 3067179, at *1 (11th Cir. June 20, 2024).

Thus, wrongful death damages *compensate* for the loss of the victim's life; they are *not* "damages … awarded … solely to punish, penalize, or deter a defendant." O.C.G.A. § 51-12-5.1(c). The latter are the sorts of damages purportedly limited by due process, *i.e.*, "damages … aimed at deterrence and retribution: to deter the defendant and others from this type of conduct and to punish the defendant for his particular wrongful conduct." *Williams v. First Advantage LNS Screening Sols. Inc*, 947 F.3d 735, 746 (11th Cir. 2020) (cleaned up). Since *the amount of* wrongful death damages has nothing to do with the nature of the defendant's *conduct*, they do not duplicate any sum awarded for the purpose of punishment or deterrence. A mere difference in who receives the recovery (the victim or the statutory plaintiff) does not change that.[23]

### B. Apportionment of damages does not reduce the "actual or potential harm suffered by the plaintiff" for ratio purposes.

Ford cites cases that counted only the apportioned compensatory damages for ratio purposes. But those cases never explain *why* that would be constitutionally compelled. After all, *potential* harm counts towards the ratio even though not awarded as damages *against anyone*.

It makes no sense to exclude any portion of the actual harm found by the jury for ratio purposes. The "actual or potential harm suffered by the plaintiff" (*McGinnis*, 901 F.3d at 1288) does not change depending on how many persons are at fault. The Mills suffered no less and are no less dead because of Debra Mills' alleged contribution. Nor is Ford's conduct one whit less reprehensible because of her alleged contribution. That is "the *most important* indicium of the reasonableness of a punitive damages award." *BMW of N.Am., Inc. v. Gore,* 517 U.S. 559, 575

---

[23] By statute, the expenses of continued living are not deducted from future earnings. To the extent that could be described as "punitive," it is irrelevant in a case like this, where the plaintiffs sought only non-economic damages. Moreover, this statutory treatment of avoided expenses in no way authorizes a jury to award additional damages to punish or deter the defendant's conduct, which are the type of damages that implicate *State Farm* limitations.

(1996) (emphasis added). Under Ford's proposed rule, constitutional limits on damages would vary materially based on mere negligence of another party even though the two paramount considerations—the "actual or potential harm suffered by the plaintiff" and "the degree of reprehensibility of the defendant's conduct" remain the same. That is irrational.

Ford cites this Court's remittitur order in *H&L Farms LLC v. Silicon Ranch Corp.*, 2023 WL 6973211 (M.D. Ga. Oct. 23, 2023). While the Court calculated that particular remittitur by trebling the damages apportioned to each defendant, the Court did not—and was not required to—decide whether that was constitutionally required. *Id.* at *12 & n.7. By contrast, another district court in this circuit *was* required to resolve that issue, and it calculated the punitive ratio using the full compensatory award, "not just the amount apportioned to Autoliv, because in this calculation, the Court can consider actual or potential harm to [the decedent]." *Andrews*, 2022 WL 16753148, at *7. That is also the position of the State of Georgia (Exhibit 2 at 25–27) and of "the majority of states," which "do not consider comparative fault in their analysis of punitive damages." *Louisville SW Hotel, LLC v. Lindsey*, 636 S.W.3d 508, 521 (Ky. 2021).

### C.  If ratios apply at all, due process permits a high ratio here.

For good reason, "[t]he Court is skeptical of relying too heavily upon the proportion of compensatory damages to punitive damages. The Court understands that this is simply one guidepost to consider." *H&L Farms*, 2023 WL 6973211, at *11. To the extent that *State Farm* imposes any ratio limit here, Ford is nowhere near the ballpark.

### (1) Ford's conduct is particularly reprehensible.

Reprehensibility of the defendant's conduct is "the most important indicium of the reasonableness." *BMW,* 517 U.S. at 575. Ford knowingly exposed the Mills and countless others to avoidable risks of death and crippling injury, all for the sake of profit. *See* Plaintiffs' Response

to Ford Motor Co.'s Renewed Motion for Judgment as a Matter of Law, Arg. IV ("Whether to award punitive damages was an issue for the jury."). *State Farm* treats that conduct as particularly reprehensible because "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;" and "the conduct involved repeated actions"—selling millions of trucks for multiple years, all while protesting the roofs were "absolutely safe."[24] 538 U.S. at 419. Ford *still* insists that, "even with the benefit of hindsight," it would do nothing different.[25]

Courts have affirmed ratios of 100:1 where the conduct, like Ford's, "was extraordinarily reprehensible" because it put "a significant number of victims at profound risk for an extended period of time."[26] Likewise, *Gen. Motors Corp. v. Moseley*, 213 Ga. App. 875, 884-85 (1994) recognized the propriety of a 24:1 ratio against a carmaker who, "motivated by economic benefit," endangered many Georgians. Particularly when considered in the context of Georgia's one-award limitation for products liability cases, as discussed below, that ratio is reasonable here.[27]

### **(2) Ford was on notice that its conduct was subject to a high ratio.**

*State Farm*'s limitations seek to ensure "fair notice not only of the conduct that will subject [a defendant] to punishment, but also of the severity of the penalty." 538 U.S. at 417.

---

[24] Doc. 390 (Vol. III) at 149/23–150/12.

[25] *Id.*

[26] *Williams v. Philip Morris Inc.*, 127 P.3d 1165, 1181 (Or. 2006), *rev'd and remanded*, 549 U.S. 346 (2007), *award reinstated*, 176 P.3d 1255 (2008).

[27] To be sure, *Mosely* predates *BMW* and *State Farm*. But it gives notice of the ratios reasonable under Georgia law. And *BMW* and *State Farm* both involved statutes, unlike Georgia's, that allowed collection of multiple punitive damages awards for the same conduct. As addressed below, that either eliminates ratio analysis or materially increases the allowable ratio.

That purpose is satisfied here. Automakers know that Georgia's legislature has singled out the knowing sale of dangerous products for *unlimited* punitive damages. O.C.G.A. § 51-12-5.1(e)(1). And automakers were on notice, well before Ford sold a single "Super Duty" truck, that Georgia might impose at least a 24:1 ratio of punitive to compensatory damages if they endanger many Georgia citizens by selling a defective vehicle. *Moseley*, 213 Ga. App. at 884–85.

### (3) Ford's wealth requires a large award in order to punish and deter.

"Because deterrence is an important aspect of any punitive damages award, the jury may consider the impact of their award on a defendant's financial condition. The Court must evaluate the award in this context—how it compares to [Ford's] financial condition. An award like the one made here may be unsupportable if assessed against a small mom-and-pop operation but be defensible as to a defendant with a net worth that is as eye-popping as a nine-figure jury award." *H&L Farms*, 2023 WL 6973211, at *11; *see also* Dkt. 350 (Order, Feb. 28, 2025). Ford keeps some $22 billion cash on hand,[28] generates revenues of $144 billion each year,[29] and obtained *profits* of $695 million selling "Super Duty" trucks in Georgia alone.[30] (*See also* PX 755A, 756A, 757A, and 758A;[31] PX 1A[32]). Moreover, the jury's punitive damages award of $2.5 billion represented 10% of what the evidence proved Ford made selling trucks with similarly weak roofs.[33] A ratio of 1:1, 1:4, or 9:1—particularly if applied to only the apportioned pain-and-

---

[28] Doc. 374 (Vol. X) at 36/8–15 (Dr. Brooks: "On average they keep $22 billion dollars of cash available at all times"); 56/7–15 (Dr. Brooks, on cross-examination by Ford).

[29] *Id.* at 33/5–12.

[30] *Id.* at 61/21–23.

[31] Admitted into evidence. *Id.* at 43/24–44/15.

[32] Admitted into evidence. *Id.* at 61/24–62/5.

[33] Doc. 374 (Vol. X) at 61/1–15, 83/10–15, quoting from PX 1A ($25.3 billion profit).

suffering damages—is not remotely adequate to punish or deter Ford from doing anything.

### (4) Georgia's one-award limitation displaces ratio analysis or, at a minimum, warrants a high ratio.

*State Farm*'s ratio analysis rests heavily on limiting the impact "of multiple punitive damages awards for the same conduct; for *in the usual case* nonparties are not bound by the judgment some other plaintiff obtains." 538 U.S. at 423 (emphasis added). But this isn't "the usual case." *Id.* Once a punitive damages judgment is actually collected, other Georgians killed or injured by the same defect cannot recover punitive damages awards of their own, no matter how many times that happens. "Proper due process analysis of a punitive award … requires first that we identify the state's interest in deterring the relevant conduct and the strength of that interest." *Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1218 (11th Cir. 2010). In *all* of the Supreme Court's punitive damages cases, that state interest could be fulfilled through *multiple* punitive damages awards. But in Georgia, the first collected punitive damages judgment must be sufficient *in and of and by itself* to punish and deter all of the reprehensible conduct. Ratio limitations intended to mitigate the impact of multiple awards for the same conduct should not apply where, as here, the state has protected against that risk through a different, statutory, method adopted by the legislature.

At the very least, any constitutional limits on the single permissible award cannot rationally be the same as if other victims could subsequently obtain their own additional awards to punish and deter. *State Farm* refused "to impose a bright-line ratio" even for awards rendered under state laws that did allow *multiple* awards for the same conduct. 538 U.S. at 424–25. So it would be particularly senseless to apply arbitrary limitations like 1:1, 4:1, or 9:1 where the award is the first, last, and only award collectible for the same conduct. Here, one punitive award limited by a single-digit ratio is hopelessly insufficient to deter or punish Ford for conduct that

saved it some $520 million from Ford's weakening of the roof and generated $25.3 billion in profit from sales of the trucks for 17 years. Instead, "the protection afforded by the statutory 'one award' provision" counsels for a substantially higher ratio than where a defendant faces additional awards each time its conduct causes harm.

### (5)  Ford's low-ratio arguments are unsupported by law.

Ford insists that due process will tolerate no more than a 1:1 ratio here because the compensatory damages are "substantial."[34] Of course, Ford also wants to artificially limit the supposedly substantial damages to 85% of the pain and suffering award. Again, context matters. The resulting $4,675,000 is not substantial *relative to the types of injury* (death, brain damage, paralysis) that are foreseeable (and actual) results of *this* sort of reprehensible conduct.

Regardless, the Eleventh Circuit describes the 1:1 "limit" that Ford extracts from *State Farm* as "dicta," contradicted by "the very next sentence [which] says the precise award in each case 'must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.'" *Cote v. Philip Morris USA, Inc.*, 985 F.3d 840, 849 (11th Cir. 2021) (upholding $20.7 million in punitive damages on $6.25 million in compensatory damages). In *McGinnis*, the Eleventh Circuit likewise rejected any supposed 1:1 limitation, noting that "we have upheld ratios substantially greater than 1:1 in cases with large compensatory damages awards." 901 F.3d at 1290. *McGinnis* gave the example of *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1306 (11th Cir. 2007), which "upheld a punitive damages award of $17.5 million despite a sizeable $3.2 million compensatory damages award (a ratio of nearly 5.5:1) where the

---

[34] The compensatory damages awarded are not "substantial" relative to other verdicts for pain and suffering or for wrongful death, but Ford's argument is too off-base to warrant a canvas of other such verdicts.

defendant's conduct was 'exceedingly reprehensible.'"[35] 901 F.3d at 1290.

Ford cites *Williams*, which reduced the punitives to a 4:1 ratio. But the harm there was financial and emotional, not fatal or catastrophic injury, and the defendant's conduct posed *no* "risk to the health or safety of others." 947 F.3d at 751–52. Reprehensibility was also relatively low because the defendant "promptly corrected its error once advised that it had made a mistake." *Id.* at 754. Ford has done precisely the opposite. Finally, the Court emphasized that "the elasticity of the guidelines means that each court's decision will be *very* fact-specific." *Id.* at 762 (emphasis added). On these facts, applying Ford's 1:1 or 1:4 or 1:9 standard here would elevate numerical ratios over "the most important indicium" of reasonableness—reprehensibility. *BMW*, 517 U.S. at 575. Ford knowingly exposed millions—*and is still exposing millions*—to avoidable risks of death and injury. No single-digit ratio—particularly one calculated from a base that ignores the deaths of Mr. and Mrs. Mills —is adequate to punish and deter such conduct by a company of Ford's great resources.

### (6) Comparable civil penalties do not constrain this award.

This factor is "accorded less weight" than other *State Farm* guideposts. *Cote*, 985 F.3d at 850. The rationale for this guidepost is to ensure notice of the potential award. *Johansen*, 170 F. 3d at 1337. But in gauging its exposure, Ford cannot pretend to have looked to the $5,000 penalty that it absurdly suggests is comparable. Ford knew that Georgia's legislature had *singled out* products liability cases for unlimited punitive damages *and* that Georgia courts had approved nine-figure punitive damages awards for the sale of dangerously defective vehicles as well as for

---

[35] *Action Marine* cited *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1338 (11th Cir. 1999), which upheld a 100:1 ratio. Noting this line of cases, *Andrews* declined to impose a 1:1 ratio on compensatories of $36 million. 2022 WL 16753148, at *7.

egregious conduct that had merely a financial impact.[36]

### (7) The maximum punitive award is far higher than Ford contends.

In applying *State Farm*, this Court may not reduce the award below "the *upper* limit of the due process guarantee." *Williams*, 947 F.3d at 767 (emphasis added). Plaintiffs respectfully submit that if there is any constitutional limit on the jury's award, that limit cannot be *any lower than* $732 million. That (rounding down) is 24 times the full compensatory damages of $30,524,952.70, which is the proper measure of the actual or potential harm the Mills suffered. And 24:1 is less than three times what Ford (wrongly) claims to be *State Farm*'s outside ratio of 9:1 in cases where a defendant faces *multiple* awards for the same misconduct. Finally, $732 million is less than 5/10ths of one percent of Ford's annual revenues and about 3% of its ready cash on hand. Due process requires no further reduction.[37]

If possible, Ford's half-hearted request for "traditional" remittitur is even more baseless than its request for "constitutional" remittitur. First, Ford engaged in exactly the conduct that Georgia's legislature singled out for unlimited punitive damages "[b]ecause of the potential ability to damage numerous citizens[.]" *Mack Trucks, Inc. v. Conkle*, 263 Ga. 539, 542–43 (1993). Second, Georgia courts account for a defendant's financial condition in "determine[ing] the amount necessary to effectively punish and deter[.]" *Christian v. Ford Motor Co.*, 2024 WL 1496236, at *1 (M.D. Ga. Mar. 4, 2024). Given Ford's great wealth and Georgia's strong interest

---

[36] *Time Warner Ent. Co. v. Six Flags Over Georgia, LLC*, 254 Ga. App. 598 (2002) affirmed $257 million in punitive damages for *economic* harm ($455 million in 2025 dollars).

[37] Contrary to Ford's passing suggestion, the "excessive fines" clause does not apply here at all. The State's right to 75% of a plaintiff's collected punitive award does not, as Ford posits, give the State power to levy fines or "'extract payments" as a form of "punishment.'" Doc. 381 at 28. Instead, the State merely receives a portion of what plaintiffs won. From Ford's perspective, that's no different than the State taxing the plaintiffs' award.

in deterring Ford's conduct here, Plaintiffs' suggested award is not excessive under state law.

## CONCLUSION

Plaintiffs respectfully submit that Ford's motion for new trial should be denied.


This 4th day of April, 2025.

Respectfully submitted,

/s/ James E. Butler, Jr.
JAMES E. BUTLER, JR.
Georgia Bar No. 099625
jim@butlerprather.com
RAMSEY B. PRATHER
Georgia Bar No. 658395
ramsey@butlerprather.com
DANIEL E. PHILYAW
Georgia Bar No. 877765
dan@butlerprather.com
ALLISON B. BAILEY
Georgia Bar No. 478434
allison@butlerprather.com
BUTLER PRATHER LLP
105 13th Street
Post Office Box 2766
Columbus, GA 31902
(706) 322-1990

LARAE DIXON MOORE
Georgia Bar No. 223379
lmoore@pagescrantom.com
PAGE SCRANTOM SPROUSE
TUCKER & FORD
1111 Bay Avenue 3rd Floor
P.O. Box 1199
Columbus Georgia 31902
(706) 324-0251

MICHAEL D. TERRY
Georgia Bar No. 702582
terry@bmelaw.com
FRANK LOWREY VI
Georgia Bar No. 410310

lowrey@bmelaw.com
BONDURANT MIXSON & ELMORE
1201 W. Peachtree Street NW
Suite 3900
Atlanta, Georgia 30309

***Attorneys for Plaintiffs***