# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# COLUMBUS DIVISION

|  |  |
|---|---|
| JAMES EDWARD BROGDON, JR., et al., <br><br>   Plaintiffs, <br><br> vs. <br><br> FORD MOTOR COMPANY, <br><br>   Defendant. | Case No. 4:23-cv-00088-CDL |

## FORD MOTOR COMPANY'S REPLY IN SUPPORT OF
## MOTION FOR NEW TRIAL AND REDUCTION OF PUNITIVE DAMAGES

Michael W. Eady
*Admitted Pro Hac Vice*
THOMPSON, COE, COUSINS
   & IRONS, LLP
2801 Via Fortuna Drive, Suite 300
Austin, Texas 78746
Telephone: 512-708-8200
meady@thompsoncoe.com

Paul F. Malek
*Admitted Pro Hac Vice*
HUIE, FERNAMBUCQ
   & STEWART LLP
3291 US Highway 280, Suite 200
Birmingham, AL 35243
Telephone: 205-251-1193
pmalek@huielaw.com

Elizabeth B. Wright
*Admitted Pro Hac Vice*
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114
Telephone: 216-566-5500
Elizabeth.wright@thompsonhine.com

Charles E. Peeler
Georgia Bar No. 570399
Harold D. Melton
Georgia Bar No. 501570
TROUTMAN PEPPER LOCKE
600 Peachtree Street, N.E., Suite 3000
Atlanta, GA 30308-2216
Telephone: 404-885-3000
harold.melton@troutman.com
charles.peeler@troutman.com

Michael R. Boorman
Georgia Bar No. 067798
Philip A. Henderson
Georgia Bar No. 604769
WATSON SPENCE LLP
999 Peachtree Street NE, Suite 1130
Atlanta, GA 30309
Telephone: 229-436-1545
mboorman@watsonspence.com
phenderson@watsonspence.com

*Counsel for Ford Motor Company*

## TABLE OF CONTENTS

I. Plaintiffs cannot avoid a new trial. ................................................................................... 1

    A. The jury improperly considered the extraneous and prejudicial *Hill* verdict. ................................................................................................................. 1

        1. The *Hill* verdict is extraneous. ..................................................................... 1

        2. The Court should hold an evidentiary hearing. ............................................ 4

    B. The jury's causation and consciousness findings contravene the great weight of the evidence. ....................................................................................... 6

    C. The Court withheld critical instructions from the jury. ..................................... 8

II. Plaintiffs cannot defend the jury's unconstitutional punitive damages award. ................... 9

    A. The Supreme Court's due process framework applies. ..................................... 9

    B. Ford should not be punished for harm the jury attributed to Mrs. Mills. ............. 10

    C. Ford should not be punished twice for wrongful death. ........................................ 11

    D. Ford should not be punished beyond a 1:1 ratio. .................................................. 13

        1. Plaintiffs recovered "substantial" compensatory damages. ....................... 13

        2. Plaintiffs overstate reprehensibility. ......................................................... 14

        3. Plaintiffs' other arguments do not support a higher ratio. ........................ 15

CONCLUSION ............................................................................................................................ 15

CERTIFICATE OF SERVICE

Ford moved for a new trial because the jury improperly considered the extraneous *Hill* verdict, made causation findings against the great weight of the evidence, and did not receive critical instructions regarding the reasonable disagreement principle of *Ivy v. Ford Motor Co.*, 646 F.3d 769, 776-77 (11th Cir. 2011). Ford also sought a reduction or remittitur of the jury's exponentially unconstitutional punitive damages award of $2.5 billion. Because Plaintiffs fail to refute Ford's contentions, the Court should grant Ford a new trial on both liability and damages or, alternatively, reduce or remit the unconstitutional punitive damages award.

**I.      Plaintiffs cannot avoid a new trial.**

**A.      The jury improperly considered the extraneous and prejudicial *Hill* verdict.**

Plaintiffs, Ford, and this Court all recognized before trial that the (vacated) $1.7 billion verdict in *Hill* had "nothing to do" with the issues for this jury. But after trial, a juror unilaterally contacted Ford's counsel to preview "sworn testimony" that the *Hill* verdict came up during deliberations and "influence[d]" the "verdict" beyond "a shadow of doubt." Dkt. 381-1, at 8. That is classic "extraneous prejudicial information" infecting the proceedings. Fed. R. Evid. 606(b)(2)(A). Plaintiffs' contrary arguments all fail.

**1.      The *Hill* verdict is extraneous.**

By any account, the $1.7 billion verdict entered against Ford in *Hill* is "extraneous" to the jury issues in this case. The verdict followed *ultra vires* sanctions without any liability finding by a factfinder. And the Georgia Court of Appeals vacated the verdict in its entirety. Ford therefore moved to exclude all references to "the Hills or the verdict, actual or punitive." Dkt. 234, at 13-14. Plaintiffs responded by promising that they would not "reference the amounts of the *Hill* verdicts, not even in Phase 2." Dkt. 280, at 12-13 & n.15. This Court then ruled that *Hill* "has got nothing to do with this case" beyond the "very limited" circumstance where "testimony in [*Hill* is] admitted in this case and there's some incidental reference to it." Dkt. 296, at 106:10-21.

Plaintiffs nevertheless contend the jury permissibly relied upon the *Hill* verdict because Plaintiffs violated their pre-trial assurances by putting the verdict into evidence at the end of a 77-page exhibit admitted for a different purpose. Dkt. 392, at 3-8; PX 759. But Plaintiffs cannot excuse the jury's misconduct with their own; *Hill* remains extraneous for multiple reasons.

*First*, Plaintiffs' extraneity arguments hinge entirely on the admission of PX 759 into evidence during Phase II. Dkt. 374 (Vol. 10 Tr.), at 43:24-44:15. The jury did not see that exhibit during Phase I. So the *Hill* verdict was extraneous to Phase I—even assuming (contrary to law) the verdict was not extraneous to Phase II. Plaintiffs do not argue otherwise. Any prejudice resulting from the jury's reliance on *Hill* during Phase I thus compels a new trial.

*Second*, it is exceedingly unlikely that the jury's Phase II *Hill* discussions stemmed from any exhibit Plaintiffs introduced. PX 759 spans 77 pages, and the lone reference to *Hill* appears on PDF page 71. Neither party discussed this portion of the exhibit in open court. *See* Dkt. 374 (Vol. 10 Tr.), at 20:25-22:23, 39:15-41:13, 43:24-44:17, 54:6-55:8.[1] Nor is there any indication that the jury singled out PX 759, randomly flipped to page 71, and happened upon *Hill* in the 78 minutes they deliberated during Phase II. *Id.* at 111:25-112:1, 114:6-115:7. All indications instead point to the conclusion that certain jurors impermissibly brought the *Hill* verdict into the jury room from extraneous sources. While Plaintiffs say this Court is powerless to confirm that obvious reality, Dkt. 392, at 6, their cases establish that courts may appropriately consider both "the nature of the extrinsic evidence" and "the manner in which it reached the jury." *United States v. Siegelman*, 640 F.3d 1159, 1182 (11th Cir. 2011).

---

[1] Dr. Brooks testified that he relied on PX 759 to "prepare a chart" showing "Ford Financials through September 30, 2023." *Id.* at 39:15-40:12. That chart only cites the first 5 pages of PX 759—a full 66 pages before *Hill* appears on page 71. PX 743, at 10-11.

*Third*, the *Hill* verdict was "not legitimately before the court." *Extrinsic Evidence*, Black's Law Dictionary (12th ed. 2024). Plaintiffs cannot credibly contend otherwise where (1) the verdict is indisputably irrelevant; (2) Plaintiffs promised not to introduce it, Dkt. 280, at 12-13 & n.15; (3) Plaintiffs acknowledged that introducing it would create "potential problematic appellate issues," *id.* at 12; and (4) the Court's in limine ruling did not leave room for it, Dkt. 296, at 106:10-21. Courts evaluating allegations of extraneous prejudicial information under Rule 606 should carefully consider "the nature of the allegation" in each case without applying "rigid distinction[s] based only on whe[re] the [disclosure] took place." *Tanner v. United States*, 483 U.S. 107, 117-18 (1987). Here, the *Hill* verdict remained "extraneous" because everyone agreed the verdict should not "be heard or considered by the jury," *United States v. Hall*, 85 F.3d 367, 370 (8th Cir. 1996), notwithstanding Plaintiffs' improper disclosure.

*Fourth*, Plaintiffs' other authorities are distinguishable. Dkt. 392, at 5-6 & n.5. None addresses the unique circumstances presented here—where a party reneges on prior promises and presents evidence that everyone agrees is not admissible for any purpose.[2] Those circumstances also distinguish cases noting that any extraneous information "add[ed] nothing to the evidence properly introduced at trial." *Id.* at 6 & n.6. Plaintiffs correctly recognized in pre-trial briefing that introducing the *Hill* verdict would *not* be proper and cannot backtrack now.

---

[2] *See Peveto v. Sears, Roebuck & Co.*, 807 F.2d 486, 488-89 (5th Cir. 1987) (holding "trial court's explanation of the effect of contributory negligence on an award" was not an "outside influence"); *Martinez v. Food City, Inc.*, 658 F.2d 369, 371-74 (5th Cir. 1981) (addressing juror statement that the defendant "should be taught a lesson" and possibility that juror lied during voir dire); *Robinson v. Polk*, 438 F.3d 350, 363-64 (4th Cir. 2006) (holding biblical passages read during death-penalty deliberations were not "external" because "the reading of Bible passages invites the listener to examine his or her own conscience from within"); *United States v. Duh Wan Kim*, No. 06-00036, 2007 WL 9735569, at *4-5 (D. Guam Feb. 14, 2007) (addressing photographs "properly admitted into evidence but allegedly used for an improper purpose").

*Fifth*, Plaintiffs' waiver arguments fail. Ford categorically objected to all *Hill* references, Dkt. 234, at 13-14, and this Court limited those references to "incidental" mentions unrelated to the *Hill* verdict, Dkt. 296, at 106:17-21. When Plaintiffs proffered "excerpts" of Ford's securities reports to show Ford's "financial condition," Dkt. 374 (Vol. 10 Tr.), at 43:10-44:3, Ford reasonably assumed Plaintiffs' "excerpts" excluded improper references to the *Hill* verdict that would violate their prior assurances and the Court's ruling. *See also supra* at 2 n.1.[3] In any event, Ford's contemporaneous objection that the information contained in Plaintiffs' exhibits "doesn't relate to the product at issue in the case," Dkt. 374 (Vol. 10 Tr.), at 44:10-12, directly tracks the Court's prior comments that *Hill* "has got nothing to do with this case," Dkt. 296, at 106:18-19.

Plaintiffs later suggest Ford should have discussed *Hill* during voir dire, but they do not cite any case requiring parties to explore extrinsic information with prospective jurors (thereby drawing their attention to inadmissible evidence). Plaintiffs' cases instead hold that parties should use voir dire to screen for *intrinsic* "personal experiences." Dkt. 392, at 7-8. Plaintiffs' cases also recognize that newspaper articles—like the *Hill* articles Plaintiffs acknowledge the jurors might have read—constitute a classic example of extraneous information that can warrant a new trial. *See Tanner*, 483 U.S. at 118; *Peveto*, 807 F.2d at 489.

## 2. The Court should hold an evidentiary hearing.

Recent Eleventh Circuit decisions cited by both parties recognize that, where a new trial movant "makes an adequate showing of extrinsic influence," the district court has a "duty to investigate." *U.S. v. Brown*, 934 F.2d 1278, 1303 (11th Cir. 2019); *accord U.S. v. Ifediba*, 46 F.4th 1225, 1239 (11th Cir. 2022) ("When a party makes a colorable showing of extrinsic

---

[3] Plaintiffs find it "notable that Ford asked that completion of Volume X of the trial transcript be expedited." Dkt. 392, at 5 n.4. But correspondence with the court reporter shows that *Plaintiffs* placed this request. *See* Email from Joan Drammeh (Feb. 28, 2025), attached as **Exhibit A**.

- 4 -

influence, the court must investigate to determine whether the influence was prejudicial."). Ford's evidence—including the complete text exchange with the juror who reached out to Ford's counsel right after the verdict regarding the jury's discussion of the *Hill* verdict—"adequate[ly]" and "colorabl[y]" shows that "some impropriety has occurred" regarding a "serious" issue of "potential jury contamination." *Ifediba*, 46 F.3d at 1238-39; *Brown*, 934 F.3d at 1303.

Plaintiffs dispute that Ford presented "clear, strong, substantial and incontrovertible" evidence that the jury discussed the *Hill* verdict. Dkt. 392, at 15. But Ford submitted text messages directly from the juror stating, *inter alia*, that "beyond a shadow of a doubt there was an influence" on the verdict from "the previous verdicts (ie: Hill case) and monetary amounts awarded." Dkt. 381-1, at 8. This "specific, nonspeculative" proof of an impropriety—which Ford can reduce to admissible evidence by examining Juror 36 under oath[4]—equals or surpasses the evidence triggering further judicial investigation in prior binding decisions.[5]

Plaintiffs argue that Ford cannot show prejudice while simultaneously claiming that jurors cannot testify whether the *Hill* verdict "affected [their] ability to be impartial." Dkt. 392, at

---

[4] *See, e.g.*, *Smith v. LePage*, 834 F.3d 1285, 1296 n.6 (11th Cir. 2016) (noting exception to bar on consideration of hearsay evidence "'if the statement could be reduced to admissible evidence,' for example by 'having the hearsay declarant testify directly to the matter at trial'" (quoting *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012)); *Firster v. Athens Heart Ctr., P.C.*, 305 F. Supp. 3d 1368, 1370 (M.D. Ga. 2017) (Land, J.) (same). As the text messages attached to Mr. Peeler's declaration show, Juror 36 only ceased moving forward with an affidavit after conferring with counsel. Dkt. 381-1, at 10.

[5] *See, e.g.*, *Ifediba*, 46 F.4th at 1234 (investigation triggered by anonymous email to clerk's office regarding alleged juror external research on case that "contained information that could only have come from someone with access to trial evidence"); *U.S. v. Rowe*, 906 F.2d 654, 655 (11th Cir. 1990) (investigation triggered by anonymous call to court's chambers from a person claiming to be a juror); *U.S. v. Brantley*, 733 F.2d 1429, 1438-39 (11th Cir. 1984) (investigation triggered by affidavit of juror's boyfriend regarding statements of juror); *U.S. v. Forrest*, 620 F.2d 446, 456 (5th Cir. 1980) (investigation triggered by anonymous call to government agent regarding external communication with juror); *U.S. v. Herring*, 568 F.2d 1099, 1102, 1105 (5th Cir. 1978) (holding newspaper article in Macon Telegraph sufficient to trigger investigation as to jurors' exposure to article and "its effects on their ability to render an impartial verdict").

13-14. When a criminal defendant has shown exposure to extraneous information, "prejudice to the defendant is presumed and the burden shifts to the government to show that the jurors' consideration of extrinsic evidence was harmless to the defendant." *Siegelman*, 640 F.3d at 1182. But in civil cases, courts presented with evidence of jury exposure to extrinsic evidence have convened an "evidentiary hearing" that "included an in camera interview of the jurors." *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1470-72 (11th Cir. 1992); *see also Vezina v. Theriot Marine Serv., Inc.*, 610 F.2d 251, 252 (5th Cir. 1980). The court must then determine if the extrinsic evidence "poses *a reasonable possibility of prejudice* to the defendant," including evaluating "jurors' testimony" as to whether the information had an "effect on their impartiality." *BankAtlantic*, 955 F.2d at 1471-73.[6]

Finally, Plaintiffs claim Ford violated Local Rule 48.3. Dkt. 392, at 10. Contrary to Plaintiffs' characterization, the Court not only referred to its "typical[]" practice of telling the jurors they could speak to the lawyers, but specifically answered "I will" when Plaintiffs asked the Court to so inform the jurors in this case. Dkt. 374 (Vol. 10 Tr.), at 116:24-117:2. Juror 36 then unilaterally and affirmatively reached out to Ford's counsel—mere hours after the jury had returned its punitive damages verdict—regarding the jury's improper consideration of the *Hill* verdict. Dkt. 381-1, at 2. In this undisputed factual context, Ford did not violate Rule 48.3.

### B. The jury's causation and consciousness findings contravene the great weight of the evidence.

As detailed in Ford's JMOL briefing, Plaintiffs cannot defend their counterfactual narrative that Mr. and Mrs. Mills died from roof-induced positional asphyxiation and that Mrs.

---

[6] Plaintiffs argue—citing criminal cases involving a presumption of prejudice—that courts should only examine jurors as to their exposure to extrinsic evidence and not its effect on the verdict. But Plaintiffs simultaneously dispute whether the jurors learned about the *Hill* verdict from an external source or from PX 759 (i.e., an issue of "exposure" to the extrinsic evidence).

Mills suffered conscious pain. Plaintiffs offered no testimony from a radiologist or practicing physician. Dr. Camacho provided unrebutted expert testimony that (1) radiological scans capture bruising better than an autopsy (meaning any bruising on the body would show on the scans); (2) Mr. and Mrs. Mills' scans showed no bruising indicative of life-threatening pressure applied by the roof; (3) Mr. and Mrs. Mills' scans showed no chin-to-chest bruising indicative of positional asphyxiation; and (4) Plaintiffs' made-for-litigation bruising illustrations incorrectly identified the location of some bruising and heavily exaggerated the extent of other bruising. Dr. Sochor, a practicing emergency room physician who regularly attends to patients experiencing cardiac events, then provided expert testimony that Mrs. Mills suffered an electrical cardiac event. And Dr. Tandy provided expert testimony that the black-box data did not reflect conscious steering inputs. Other evidence established that Mr. and Mrs. Mills had more than sufficient room to breathe in the overturned truck and that Mrs. Mills had multiple cardiac risk factors.[7]

Plaintiffs did not counter this evidence. Their pathologist deferred to Dr. Camacho in radiology; included organs in his autopsy report that had been removed; ignored Mrs. Mills' medical history; and conceded he had no evidence Mrs. Mills was conscious following the accident. Mrs. Mills' retired cardiologist had not examined Mrs. Mills in more than two years before the accident; was unaware of her recent hospitalization for chest pains; did not consider electrical heart failures; was not admitted as an expert; and did not testify to a reasonable degree of medical certainty as to any issue. And Plaintiffs' occupant kinematics expert did not offer any testimony regarding occupant kinematics. To the extent these evidentiary disparities do not

---

[7] In addition to having an enlarged heart (consistent with multiple other risk factors shown by Ford's evidence), Mrs. Mills had been hospitalized for reported chest pains shortly before her death and inexplicably let the truck drift off the road without ever applying the brakes.

justify judgment as a matter of law, they surely establish that the "great weight of the evidence" favors Ford. *Richardson v. Mason*, 956 F. Supp. 2d 1372, 1380 (M.D. Ga. 2013).

### C. The Court withheld critical instructions from the jury.

Plaintiffs do not deny that Ford's requested instructions regarding the standard for punitive liability "correctly stated the law" and "dealt with an issue properly before the jury." *Brink v. Direct Gen. Ins. Co.*, 38 F.4th 917, 923 (11th Cir. 2022). That distinguishes both of Plaintiffs' cited cases.[8] While Plaintiffs note that Ford's (correct) instructions do not appear in Georgia's pattern charges, the Instructions Committee emphasizes that "[e]ach judge must carefully adjust these charges" to reflect "the case on trial." Ga. Suggested Pattern Jury Instructions – Civil Preface (5th ed. 2024). And district courts "ha[ve] a duty to give instructions that are meaningful and translated into terms the jury can understand" in the context "of this particular case." *King v. Allstate Ins. Co.*, 906 F.2d 1537, 1543 (11th Cir. 1990); Dkt. 381, at 19.

This case involves punitive damages for an alleged design defect. But the jury never heard the Eleventh Circuit's controlling observation that punitive damages are off the table in such a case "[i]f reasonable people can disagree with respect to a design choice." Dkt. 357, at 4; *Ivy*, 646 F.3d at 776-77. That tailored standard is far more descriptive and helpful than general instructions referring to undefined concepts like willfulness, wantonness, conscious indifference, and gross negligence. Had the jury been instructed regarding *Ivy*'s reasonable disagreement principle, it is difficult to imagine the jury awarding punitive damages where Ford "expended considerable effort" to resolve "a problem that the scientific and engineering community ha[d]

---

[8] *See Stalley v. Allstate Ins. Co.*, 682 F. App'x 846, 848-49 (11th Cir. 2017) (noting rejected instruction lacked support in "relevant or binding precedent"); *Ike v. Kroger Co.*, 546 S.E.2d 903, 905-06 (Ga. Ct. App. 2001) (holding trial court properly omitted instruction that employee statements were admissible where court already admitted them without limitation).

been studying for some thirty years." 646 F.3d at 777-78 & n.9. The Court's omissions thus "resulted in prejudicial harm" to Ford. *Brink*, 38 F.4th at 923.

## II.     Plaintiffs cannot defend the jury's unconstitutional punitive damages award.

The jury awarded $2.5 billion in punitive damages even though Ford indisputably did everything regulators asked, invested heavily in safety precautions, and relied on decades of scientific studies accepted throughout the industry. Plaintiffs invite the Court to disregard binding Supreme Court precedent, punish Ford for harm attributed to Mrs. Mills, punish Ford twice under a wrongful death statute that forbids double penalties, and predicate its ratio analysis on a decision abrogated 29 years ago. This Court should reduce punitive damages to $4,675,000 (or $4,250,000 if the Court sets aside the pain and suffering award to Mrs. Mills).

### A.     The Supreme Court's due process framework applies.

Plaintiffs first suggest that the Supreme Court's longstanding limitations on punitive damages "did not survive *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)." Dkt. 392, at 19. But *Dobbs* itself states: "Nothing in this opinion should be understood to cast doubt on precedents that do not concern abortion." 597 U.S. at 290.[9]

Plaintiffs next contend that "Georgia's one-award limitation displaces ratio analysis" or "warrants a high ratio." Dkt. 392, at 27-28. But the Supreme Court "mandated" that *all* "courts reviewing punitive damages" ensure "each" award comports with the "three guideposts." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 427 (2003). While Plaintiffs argue punitive damages may be unavailable in future cases under the one-award rule, Dkt. 392, at 27, *State Farm* held that the likelihood of future punishment "bear[s] no relation to [an] award's

---

[9] This Court "must leave to the Supreme Court the prerogative of overruling its own decisions." *Muscogee (Creek) Nation v. Rollin*, 119 F.4th 881, 889 (11th Cir. 2024).

reasonableness or proportionality" and refused to authorize increased liability where a defendant "will be punished in only the rare case." 538 U.S. at 427. The Supreme Court later added that due process "forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties." *Philip Morris USA v. Williams*, 549 U.S. 346, 353-54 (2007). Plaintiffs' demand for extra punishment to account for hypothetical future nonparty litigants who cannot recover punitive damages flatly contradicts that directive.

Plaintiffs also err in claiming that *State Farm's* ratio analysis "rests heavily," or at all, on concerns about "multiple punitive damages awards for the same conduct." *Compare* Dkt. 392, at 27, *with State Farm*, 538 U.S. at 424-28.[10] Nor may courts treat ratios as an afterthought, because punitive damages "*must* bear a 'reasonable relationship' to compensatory damages." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580 & n.32 (1996) (emphasis added). The jury's $2.5 billion award—and Plaintiffs' $732 million alternative, Dkt. 392, at 30—dwarf the relevant compensatory damages. The largest discrepancy upheld in Plaintiffs' Eleventh Circuit cases, meanwhile, is $14.45 million. *Cote v. Philip Morris USA, Inc.*, 985 F.3d 840, 848-49 (11th Cir. 2021). That case involved a multi-year "deliberat[e]" disinformation campaign designed to get "young people" addicted to smoking—egregious evidence absent here. *Id.* at 844.

**B.      Ford should not be punished for harm the jury attributed to Mrs. Mills.**

Plaintiffs insist the compensatory denominator should include harm the jury attributed to Mrs. Mills, ignoring (1) the Supreme Court's observation that ratio analysis focuses on harm caused by "the defendant," *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 435

---

[10] Plaintiffs quote language from *State Farm*'s discussion of reprehensibility, not ratios. Just before noting "the possibility of multiple punitive damages awards for the same conduct," *State Farm* held that "[d]ue process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis." 538 U.S. at 423; *see also Philip Morris*, 549 U.S. at 353-54.

(2001); (2) unanimous federal appellate authority holding courts should not "calculat[e] the punitive-to-compensatory ratio by using the full compensatory award when a defendant is only liable for a portion of the damages," Dkt. 381, at 23 & n.9 (collecting cases); and (3) this Court's recognition that ratios should be calculated "[a]fter apportionment," *H&L Farms LLC v. Silicon Ranch Corp.*, No. 4:21-cv-134, 2023 WL 6973211, at *11-12 & n.7 (M.D. Ga. Oct. 23, 2023).

The *Andrews* decision and brief that Plaintiffs cite, Dkt. 392, at 24, do not address these authorities.[11] And Plaintiffs' cases show that "potential harm" only applies when claimants escape the "harm that is likely to occur from the defendant's conduct," Dkt. 392, at 20, not when claimants seek to rewrite jury verdicts apportioning fault for death. Only by excluding the 15% of damages attributed to Mrs. Mills can the Court assess "the true relationship between the harm for which [Ford] is responsible" and "the punitive damages assessed against [Ford]."[12]

### C. Ford should not be punished twice for wrongful death.

Plaintiffs do not dispute that awarding punitive damages in wrongful death actions imposes a prohibited "double penalty." *Engle v. Finch*, 139 S.E. 868, 869 (Ga. 1927); *Roseberry v. Brooks*, 461 S.E.2d 262, 268 (Ga. Ct. App. 1995). Nor do they contend this Court erred in explaining that Plaintiffs "cannot obtain punitive damages connected to the wrongful death claim." Dkt. 384 (Vol. 9 Tr.), at 3:12-14. Yet Plaintiffs claim every dollar awarded in wrongful death damages yields *at least twenty-four more* in punitive damages, Dkt. 392, at 30—a "double penalty" exceeding $510 million. This Court should reject that end-run around Georgia law.

---

[11] The "majority" cases cited in *Louisville SW Hotel, LLC v. Lindsey*, 636 S.W.3d 508, 521 n.47 (Ky. 2021), also say nothing about due process ratios.

[12] *Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 961 (9th Cir. 2005).

Plaintiffs' contrary arguments are meritless. The fact that "death is actual or potential harm," *id.* at 20, does not authorize federal courts sitting in diversity to disregard state law limitations on actions to recover for that harm. *Calderon v. Sixt Rent a Car, LLC*, 114 F.4th 1190, 1200 (11th Cir. 2024). Georgia law permits recovery for wrongful death solely by virtue of Georgia's wrongful death statute, and that statute prohibits all punitive damages connected to a wrongful death claim.[13] And while Plaintiffs protest that wrongful death damages are penal only in a limited sense, Dkt. 392, at 22-23, Georgia courts deem them sufficiently penal to foreclose a "double penalty" of punitive damages. *Engle*, 139 S.E. at 869; *Roseberry*, 461 S.E.2d at 268.

These authorities control here. *See Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1321 (11th Cir. 2007) (deferring to Georgia law in determining which damages are "compensatory" for ratio purposes). And they distinguish Plaintiffs' non-binding authorities.[14] Plaintiffs also ignore multiple cases that correctly "construct[ed] the ratio by looking only to the

---

[13] While Plaintiffs decry the legislature's policy choice as "arbitrar[y]," Dkt. 392, at 21, this Court does not "sit as a super-legislature to judge the wisdom or desirability of legislative policy determinations," *Williams v. Morgan*, 478 F.3d 1316, 1324 (11th Cir. 2007).

[14] *See Cap. Inventory, Inc. v. Green*, No. 1:20-CV-3224, 2024 WL 1383228, at *8-9 (N.D. Ga. Feb. 29, 2024) (using contract damages as proxy for tortious interference damages where "breach of contract and tortious interference claims were based on the same facts"); *Andrews v. Autoliv Japan, Ltd.*, No. 1:14-cv-3432, 2022 WL 16753148, at *6 (N.D. Ga. Sept. 30, 2022) (failing to address Georgia Supreme Court's "double penalty" principle); *Ga. Clinic, P.C. v. Stout*, 747 S.E.2d 83, 90-91 (Ga. Ct. App. 2013) (calculating ratio without analyzing nature of wrongful death claims). To the extent that passing ratio calculations in cases like *Stout* are informative, the *Moseley* decision repeatedly cited by Plaintiffs excluded $4,241,611.84 in wrongful death damages when commenting that "the proportion of punitive damages to compensatory damages" was "101,000,000 to 1." *Gen. Motors Corp. v. Moseley*, 447 S.E.2d 302, 305, 312 (Ga. Ct. App. 1994). While *Moseley* then declined to apply ratio analysis after concluding that "the concept of proportionality" does not limit "the amount of punitive damages," *id.* at 312, that conclusion has been abrogated by the Supreme Court's intervening decisions in *Gore* and *State Farm*.

count on which punitive damages were awarded."[15] These cases confirm that the compensatory comparator in this case is no more than the $4,675,000 award for pain and suffering.

### D. Ford should not be punished beyond a 1:1 ratio.

Plaintiffs suggest the Court utilize a 24:1 ratio based on *General Motors Corp. v. Moseley*, 447 S.E.2d 302. But *Moseley* predated the Supreme Court decisions that have controlled ratio analysis for the last 29 years. Dkt. 392, at 25 n.27; *supra* at 12 n.14. And the record does not provide any basis to depart from the 1:1 benchmark that courts across the country have established in cases involving similarly substantial compensatory damages awards.

#### 1. Plaintiffs recovered "substantial" compensatory damages.

The Eleventh Circuit and other circuits take seriously the Supreme Court's observation that punitive damages "equal to compensatory damages" can reach the constitutional limit when "compensatory damages are substantial."[16] "Many cases" treat compensatory damages exceeding $1,000,000 as substantial.[17] Ford's multi-million comparator thus supports a 1:1 ratio.

Plaintiffs cite no authority holding $4,675,000 is insubstantial. Dkt. 392, at 28. Plaintiffs also dismiss the Supreme Court's language as "dicta," but *State Farm* returned to the "substantial compensatory damages awarded" in concluding that *Gore*'s guideposts "likely would justify a punitive damages award at or near the amount of compensatory damages." 538 U.S. at 429; *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 501 (2008) (reiterating this ruling).[18]

---

[15] *E.g.*, *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 82 n.9 (1st Cir. 2001); *Dubey v. Pub. Storage, Inc.*, 918 N.E.2d 265, 282 (Ill. Ct. App. 2009); Dkt. 381, at 25.

[16] *State Farm*, 538 U.S. at 425; *Williams v. First Advantage LNS Screening Sols. Inc.*, 947 F.3d 735, 749, 754-55 (11th Cir. 2020); Dkt. 381, at 21-22 & n.8.

[17] 538 U.S. at 426; *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1069 (10th Cir. 2016).

[18] Even if that repeated language is dicta, Supreme Court dicta "is not something to be lightly cast aside." *Zack v. Tucker*, 704 F.3d 917, 923 (11th Cir. 2013).

The "facts and circumstances" of each case, Dkt. 392 at 28, do not change *State Farm*'s 1:1 "benchmark" that courts should use as a starting point, Dkt. 381, at 21-22. And the "facts and circumstances" here confirm a higher ratio would not be appropriate.

### 2.     Plaintiffs overstate reprehensibility.

The Supreme Court's reprehensibility factors favor Ford. No evidence shows Ford "target[ed]" consumers with "financial vulnerability" or acted with "intentional malice, trickery, or deceit." *State Farm*, 538 U.S. at 419. While Plaintiffs argue Ford's conduct "involved repeated actions," Dkt. 392, at 25, repeated conduct reflects heightened reprehensibility only where the defendant "kn[ew] or suspect[ed]" the conduct was prohibited. *Gore*, 517 U.S. at 576-77. It is undisputed that Ford's Super Duty design "had [not] been adjudged unlawful on even one occasion." *Id.* at 579. In fact, NHTSA carefully studied the issue and opted not to impose a strength-to-weight requirement for heavy vehicles until model year 2017. 74 Fed. Reg. 22348-01, 22360-61, 22366-67; Dkt. 381, at 27-28. NHTSA also determined that the most effective ways to prevent severe rollover injuries are to "reduce the occurrence of rollovers" and "mitigate ejection." 74 Fed. Reg. 22348-01, 22349. Ford's research and commitment to safety led it down those paths before NHTSA—as demonstrated by pioneering efforts in rollover stability control, electronic stability control, and safety canopies. Dkt. 380, at 11-12. This conduct does not involve the "intentional, malevolent behavior" or "flagrant disregard" of rights that the Eleventh Circuit requires for a finding of heightened reprehensibility. *Williams*, 947 F.3d at 755-56.

While Plaintiffs (erroneously) contend that Ford's regulatory compliance, additional safety investments, science-based decision-making, and industry backing do not foreclose punitive damages as a matter of law, Dkt. 393, at 17-18, Plaintiffs cannot refute that those factors strongly support a low ratio. *See also* Ford's JMOL Reply. None of Plaintiffs' punitive damages cases involves anything close to the combination of mitigating circumstances here. And while

- 14 -

the largest discrepancy between compensatory and punitive damages that Plaintiffs can identify in the Eleventh Circuit is less than $15 million, *supra* at 10, Plaintiffs here propose that punitive damages exceed the compensatory comparator by more than $727 million.

### 3. Plaintiffs' other arguments do not support a higher ratio.

Plaintiffs repeatedly assert that the absence of a statutory cap on punitive damages in products liability cases gave Ford "notice" that it could be subjected to "unlimited" liability. Dkt. 392, at 25-26, 29. But there similarly was no statutory cap in any of the Supreme Court's punitive damages cases, yet the Court "mandated" its three guideposts precisely because the prospect of unlimited damages does *not* provide "fair notice" of "the severity of the penalty that a State may impose." *State Farm*, 538 U.S. at 417-18. Plaintiffs also cite Ford's finances, but *State Farm* holds that "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award," has "little to do" with ratio analysis, and "cannot make up for the failure of other factors, such as 'reprehensibility,' to constrain significantly an award that purports to punish a defendant's conduct." *Id.* at 427-28. "Exacting" application of the Supreme Court's guideposts compels a reduction of punitive damages equal to the $4,675,000 the jury awarded in substantial compensatory damages. *Id.* at 418.

## CONCLUSION

The Court should grant Ford a new trial on both liability and damages; reduce punitive damages to the constitutional maximum if it does not grant a new trial; and remit punitive damages to $4,675,000 if it determines the constitutional maximum exceeds that amount.

Respectfully submitted this 18th day of April, 2025.

| | |
|---|---|
| Michael W. Eady | */s/ Harold D. Melton* |
| *Admitted Pro Hac Vice* | Charles E. Peeler |
| THOMPSON, COE, COUSINS | Georgia Bar No. 570399 |
|   & IRONS, LLP | Harold D. Melton |
| | Georgia Bar No. 501570 |

2801 Via Fortuna Drive, Suite 300
Austin, Texas 78746
Telephone: 512-708-8200
meady@thompsoncoe.com

Paul F. Malek
*Admitted Pro Hac Vice*
HUIE, FERNAMBUCQ
   & STEWART LLP
3291 US Highway 280
Suite 200
Birmingham, AL 35243
Telephone: 205-251-1193
pmalek@huielaw.com

Elizabeth B. Wright
*Admitted Pro Hac Vice*
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114
Telephone: 216-566-5500
Elizabeth.wright@thompsonhine.com

TROUTMAN PEPPER LOCKE
600 Peachtree Street, N.E.
Suite 3000
Atlanta, GA 30308-2216
Telephone: 404-885-3000
harold.melton@troutman.com
charles.peeler@troutman.com

Michael R. Boorman
Georgia Bar No. 067798
Philip A. Henderson
Georgia Bar No. 604769
WATSON SPENCE LLP
999 Peachtree Street NE
Suite 1130
Atlanta, GA 30309
Telephone: 229-436-1545
mboorman@watsonspence.com
phenderson@watsonspence.com

*Attorneys for Defendant Ford Motor Company*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

James E. Butler, Jr.
Ramsey B. Prather
Daniel E. Philyaw
Allison Bailey
BUTLER PRATHER LLP
105 13th Street
Post Office Box 2766
Columbus, GA 31902
jim@butlerprather.com
ramsey@butlerprather.com
dan@butlerprather.com
allison@butlerprather.com

Larae Dixon Moore
PAGE SCRANTOM SPROUSE TUCKER & FORD
1111 Bay Avenue 3rd Floor
P.O. Box 1199
Columbus, GA 31902
lmoore@pagescrantom.com

Frank M. Lowrey IV
Michael B. Terry
BONDURANT MIXON & ELMORE LLP
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA 30309
lowrey@bmelaw.com
terry@bmelaw.com

This 18th day of April, 2025.

/s/ Harold D. Melton
Harold D. Melton
Georgia Bar No. 501570